UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITY INSURANCE COMPANY OF HARTFORD,<br><br>Plaintiff,<br><br>-against-<br><br>TRUSTMARK INSURANCE COMPANY,<br><br>Defendant. | Civil No. 3:01 CV 2198 (PCD) |
| TRUSTMARK INSURANCE COMPANY,<br><br>Third Party Plaintiff,<br><br>-against-<br><br>TIG INSURANCE COMPANY,<br><br>Third Party Defendant. | JUNE 7, 2004 |

**MEMORANDUM OF LAW IN SUPPORT OF THIRD PARTY
DEFENDANT TIG INSURANCE COMPANY'S MOTION TO STAY
THIS ACTION PENDING THE DECISION OF THE SUPREME
COURT ON TIG'S PETITION FOR A WRIT OF *CERTIORARI*_**

Third Party Defendant TIG Insurance Company ("TIG"), through its counsel, respectfully submits this memorandum of law in support of its motion for an order staying this action pending the Supreme Court's decision on TIG's petition for a writ of *certiorari* seeking review of the Second Circuit's March 2, 2004 decision affirming the District Court's August 5, 2003 decision (the "Ruling") staying the arbitration between TIG and Security Insurance Company of Hartford ("Security").

**STATEMENT OF FACTS**

A.  **The Relevant Agreements And TIG's And Security's Agreement To Arbitrate**

More than five years ago, TIG and Security entered into the Workers Compensation Underlying First, Second and Third Excess of Loss Reinsurance Agreement (the "Reinsurance Agreement"), effective January 1, 1999, pursuant to which Security reinsured a portion of TIG's liability in certain layers for workers' compensation claims. Security was bound to the Reinsurance Agreement by its managing general agent WEB Management LLC ("WEB").

The Reinsurance Agreement contains an arbitration clause which requires that all disputes be submitted to arbitration before a panel of industry professionals. The panel is required to "make its decision with regard to the custom and usage of the insurance and reinsurance business" (the "Arbitration Clause"). *See* Declaration of Brian J. O'Sullivan, dated June 7, 2004 ("O'Sullivan Decl."), Ex. A, Art. XVII at 20-21. The Reinsurance Agreement also contains a general governing law clause which provides that the "Agreement shall be governed by and construed according to the laws of the state of California." *Id.*, Ex. A, Art. XVIII.

Also effective January 1, 1999, Security and Trustmark, which had also appointed WEB as its managing general agent, entered into a retrocession contract (the "Retrocession Agreement"), pursuant to which Trustmark agreed to reinsure 100% of the risk assumed by Security (subject to certain immaterial exceptions) under the Reinsurance Agreement between TIG and Security.

B.  **The Connecticut Litigation**

By letter dated November 2, 2001, Trustmark informed Security that it believed Security was entitled to rescind its Reinsurance Agreement with TIG because TIG had allegedly defrauded WEB (which, as noted above, acted on behalf of Security in connection with the

Reinsurance Agreement, and both Trustmark and Security in connection with the Retrocession Agreement). *Id.*, Ex. B.

Security responded by asking Trustmark to provide evidence supporting its assertions. *Id.*, Ex. C. Rather than doing so, Trustmark, by letter dated November 26, 2001, purported to rescind the Retrocession Agreement based on the same alleged fraudulent conduct that Trustmark asserted formed the basis of Security's right to rescind the Reinsurance Agreement. *Id.*, Ex. D.

Security immediately commenced the Connecticut Litigation action against Trustmark in the District Court for the District of Connecticut, seeking, *inter alia*, a declaration that Trustmark was not entitled to rescind the retrocession agreement and a judgment in its favor directing Trustmark to pay to Security amounts that Trustmark owed under that agreement.

On May 3, 2002, Trustmark filed a third-party complaint against TIG in the Connecticut Litigation, alleging that TIG made material misrepresentations and omissions in connection with the placement of the Reinsurance Agreement.

C.   **The Arbitration Between TIG And Security**

On April 29, 2002, Security advised TIG that it was suspending any further claim payments to TIG under the Reinsurance Agreement "pending the conclusion of Security's investigation of potential grounds for rescission of [the Reinsurance Agreement]." *Id.*, Ex. E at 2.

TIG objected to Security's unilateral suspensions of payment under the Reinsurance Agreement, and demanded arbitration against Security on June 27, 2002 (the "Arbitration"). *Id.*, Ex. F.[1]  At a November 2002 organizational meeting, the Arbitration panel

---

[1]   In conjunction with its arbitration demand, TIG moved to stay this litigation on the ground that the Arbitration was likely to resolve some, or all, of the issues in this action. Security opposed TIG's motion

NYLIB2 230901.3                                    -3-

scheduled a two-week evidentiary hearing commencing on August 11, 2003, and, over the months following the organizational meeting, the parties worked diligently getting the case ready for the hearing. *Id.*, Ex. I at 50.

On May 5, 2003, Security made a motion asking the Panel to stay the arbitration pending the trial in the Connecticut Litigation. On May 26, 2003, the Panel denied Security's motion to stay the Arbitration. *Id.*, Ex. J.

**D.   TIG's Appeal Of The District Court's Order Staying The Arbitration**

On June 4, 2003, Security made, in effect, the same motion in the District Court, seeking, again, a stay of the Arbitration pending the outcome of the Connecticut Litigation. The principal basis of Security's motion was that TIG and Security, by including in the Reinsurance Agreement a general choice of law provision calling for the agreement to "be governed by and construed according to the laws of the state of California," agreed to opt out of the application of the FAA and incorporate California procedural arbitration rules, specifically California Code of Civil Procedure § 1281.2(c). Section 1281.2(c) permits a court to stay arbitration pending the outcome of a related litigation that involves "a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact." Cal. Civ. Proc. Code § 1281.2(c) (West 1982).

On August 5, 2003, the Court granted Security's motion, ruling ("Ruling") that (a) it was authorized under California Civil Procedure § 1281.2(c) to stay the Arbitration and (b) a stay of the Arbitration was appropriate because "if [Trustmark] establishes fraud on the part

---

to stay on the ground that a stay of the litigation pending arbitration would be "unjust" since "[i]t would expose Security to the risk of inconsistent results in the arbitration and this litigation." *Id.*, Ex. G at 2. On August 16, 2002, the Court denied TIG's motion to stay, holding that "[o]n occasion it is necessary to require simultaneous arbitration and litigation" and that "[t]his requirement, in and of itself, will thus not suffice to justify a stay." *Id.*, Ex. H at 5.

of TIG at trial, and TIG prevails in the arbitration, [Security] may find itself in the unenviable position of covering TIG but losing reinsurance for such losses." *Security Ins. Co. of Hartford v. Trustmark Ins. Co.*, 283 F. Supp. 2d 602, 611 (D. Conn. 2003), *aff'd sub nom. Security Ins. Co. of Hartford v. TIG Ins. Co.*, 360 F.3d 332 (2d Cir. 2004).

On August 8, 2003, the Honorable Richard C. Wesley, Circuit Judge, issued an Order staying this action pending the Second Circuit's decision on TIG's appeal on the Ruling. *Id.*, Ex. K.

On March 2, 2004, the Second Circuit issued a decision affirming the Ruling, stating that "[it] believe[d] the district court was correct in determining that the California Supreme Court would rule that the choice-of-law provision did incorporate the state's procedural rules for arbitration." *Security Ins. Co. of Hartford v. TIG Ins. Co.*, 360 F.3d 322, 328-29 (2d Cir. 2004). In reaching this decision, the Second Circuit drew a distinction between "substantive" and "procedural" state arbitration rules, holding that, although general choice of law provisions were insufficient to incorporate state substantive rules inconsistent with the FAA, they were sufficient to incorporate state procedural arbitration rules.

On March 16, 2004, TIG filed a petition for rehearing and rehearing *en banc*. On May 20, 2004, the Second Circuit denied the petition and vacated the stay of this action. *Id.*, Ex. L.

## ARGUMENT

The Court has the authority to stay the Connecticut Litigation pending the Supreme Court's decision on TIG's petition for a writ of *certiorari*. *See WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997); *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991). "[T]he power to stay proceedings is incidental to the power inherent in every court to

control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936); *see Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441-42 (2d Cir. 1964); *Cosmotek Mumessillik ve Ticaret Ltd. Sirkketi v. Cosmotek USA, Inc.*, 942 F. Supp. 757, 760 (D. Conn. 1996). TIG respectfully submits that the Court should stay the litigation pending the Supreme Court's decision on TIG's petition for a writ of *certiorari* because: (a) there are compelling reasons why the Supreme Court should hear this case, including the fact that the Second Circuit's decision is in conflict with decisions of several other courts of appeal; (b) TIG would suffer irreparable harm if the District Court does not stay this litigation pending the Supreme Court's decision on TIG's petition for a writ of *certiorari*; and (c) the balancing of the equities and judicial economy weigh heavily in favor of granting the stay.

A. **There Are Compelling Reasons For Concluding That The Supreme Court Likely Will Grant TIG's Petition And Hear The Issues Arising From The Court's Decision Staying The Arbitration**

There are several compelling reasons for concluding that the Supreme Court likely will grant TIG's petition for a writ of *certiorari*.

First, the decision of the Second Circuit (and District Court) is in direct conflict with decisions of several other courts of appeal that have held that "a generic choice-of-law clause, standing alone, is insufficient to support a finding that contracting parties intended to opt out of the" FAA in favor of state-law arbitration rules. *See, e.g.*, *Roadway Pkg. Sys., Inc. v. Kayser*, 257 F.3d 287, 289, 296 (3d Cir.) (noting supportive decisions from, *inter alia*, First, Fourth, Sixth, Eighth and Ninth Circuits), *cert. denied*, 534 U.S. 1020 (2001); *Action Indus., Inc. v. United States Fidelity & Guar. Co.*, 358 F.3d 337, 342-43 (5th Cir. 2004); *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1213 (9th Cir. 1998) (holding that a general California choice of law provision is insufficient to incorporate Section 1281.2(c) of the California Civil Code of

Procedure). Indeed, the distinction that the Second Circuit (and District Court) drew between "procedural" and "substantive" arbitration rules was expressly rejected by the Third Circuit in *Roadway*. 257 F.3d at 298-99. A conflict among the circuits court of appeals is, of course, one of the enumerated bases on which the Supreme Court will grant a petition for *certiorari*. *See* Sup. Ct. R. 10(a).

Second, the interplay between the FAA and state law arbitration rules is an important issue that arises frequently in the commercial context. As the Second Circuit noted at the very outset of its decision, "[t]his case presents a recurring and troubling theme in many commercial contracts: to what extent must a court – confronted with a choice-of-law provision in a contract – incorporate the designated state's statutory and common law governing arbitrations even when doing so seems contrary to the Federal Arbitration Act ("FAA")?" 360 F.3d at 323. The uncertainty surrounding this issue has generated substantial litigation as parties have attempted to obtain procedural advantages and undermine the arbitration process through the application of state arbitration rules. Such situations have resulted in, as the District Court noted in the Ruling, "conclusions far too varied to mention here." 283 F. Supp. 2d at 606. Accordingly, this case would provide the Supreme Court an opportunity to bring clarity to this important issue, by resolving a persistent and important conflict among the courts of appeals and thereby potentially reducing the number of wasteful arbitration-related litigations being brought in the federal courts.

Third, as noted above, the Second Circuit concluded that the California arbitration rules at issue were "procedural," not "substantive," and then proceeded to interpret the parties' agreement to determine whether the parties intended those procedural arbitration rules to apply to, and govern, the conduct of their arbitration. Doing so, however, ran afoul of a host of Supreme Court decisions holding that it is solely for the arbitrators, not the courts, to resolve

procedural issues arising out of arbitration. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002); *see also PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 407-08 (2003); *Green Tree Fin. Corp. v. Bazzle,* 123 S. Ct. 2402, 2408 (2003) (Breyer, J., plurality op.); *Vimar Seguros y Reaseguros, S.A.* v. *M/V SKY REEFER*, 515 U.S. 528, 541 (1995). These decisions make clear not only that "'procedural' questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator," *Howsam*, 537 U.S. at 84 (citation omitted), but also that such issues include contract interpretation, *PacifiCare,* 538 U.S. at 407-08; *Bazzle*, 123 S. Ct. at 2408 (Breyer, J., plurality op.), including the proper interpretation of a "choice-of-law" provision, *Vimar Seguros*, 515 U.S. at 541. In short, having determined that the issue before the court involved what procedures would govern the arbitration, the Second Circuit (and this Court) should have allowed the arbitrators to decide the issue. The Second Circuit's failure to do so provides another reason why the Supreme Court would grant TIG's petition for *certiorari*. *See* Sup. Ct. R. 10(c).

In sum, these are compelling reasons why the Supreme Court likely will grant TIG's petition for a writ of *certiorari* and hear the issues arising out of this Court's decision to stay the Arbitration pending the completion of the litigation. Indeed, during its October 2002 term, the Supreme Court issued the *Howsam*, *PacifiCare,* and *Bazzle* decisions that are discussed immediately above. *See also* Robert A. Holtzman & Jeff Kichaven, *Recent Developments in Alternative Dispute Resolution*, 38 Tort Trial & Ins. Prac. L.J. 167, 168 (2003) (noting that "during its October 2000 Term, the U.S. Supreme Court decided at least six important arbitration cases and granted *certiorari* in a seventh"). There are thus compelling reasons to conclude that the Supreme Court is likely to grant TIG's petition for a writ of *certiorari*.

**B.     TIG Would Be Irreparably Harmed If The Court Does Not Stay The Litigation Pending The Supreme Court's Decision On TIG's Petition For A Writ Of *Certiorari***

TIG would suffer irreparable harm if this Court does not stay this litigation pending the Supreme Court's determination of TIG's petition for a writ of *certiorari*. Indeed, the law is crystal clear that any interference with a party's right to arbitrate constitutes irreparable harm. *See WorldCrisa*, 129 F.3d at 76; *Reliance Nat'l Ins. Co. v. Seismic Risk Ins. Servs., Inc.*, 962 F. Supp. 385, 391 (S.D.N.Y. 1997) ("[Petitioner] will suffer irreparable harm if it is deprived of its federal and state contractual right to arbitrate its disputes with [Respondent]"); *Olde Discount Corp. v. Tupman*, 805 F. Supp. 1130, 1141 (D. Del. 1992) ("loss of [plaintiff's] federal substantive right to arbitrate . . . constitutes irreparable harm clearly distinguishable from purely economic loss"), *aff'd and remanded,* 1 F.3d 202 (3d Cir. 1993), *cert. denied sub nom.*, 510 U.S. 1065 (1994).

In *WorldCrisa*, the Second Circuit reversed a decision denying a motion to stay an action pending the completion of an arbitration, even though the litigation involved a party not involved in the arbitration. It did so because:

> [F]ailure to stay this action would result in substantial prejudice to [defendant], as litigating the Connecticut Action with [plaintiff parent corporation] alone would involve significant expense and inconvenience and *might adversely affect the outcome of [defendant's] arbitration against [plaintiff subsidiary company]*.

129 F.3d at 76 (emphasis added). Here, just as in *WorldCrisa*, requiring TIG to litigate this action pending the Supreme Court's decision could adversely affect the outcome of the Arbitration. Indeed, a stated basis for the Ruling was to protect Security from the "unenviable

position" of inconsistent results (283 F. Supp. 2d at 611), indicating that, at least in the District Court's view, the results of the Connecticut Litigation may be binding on the Arbitration panel.[2]

The failure to stay the Connecticut Litigation would cause irreparable harm to TIG since it would impair and perhaps even deprive TIG of its substantive right to have issues relating to the placement of the Reinsurance Agreement decided by industry professionals applying custom and practice. *See WorldCrisa*, 129 F.3d at 76. In addition, requiring TIG to proceed with the litigation pending decision on its petition for *certiorari* could result in TIG being deprived of a substantive advantage in the Connecticut Litigation, thereby causing TIG still additional irreparable harm. If, for example, TIG were to prevail (as it fully expects to) in the Arbitration, and the Arbitration Panel concludes that WEB was not fraudulently induced into providing reinsurance of TIG's workers' compensation business, that ruling would be binding on Trustmark as Security's privy and indemnitor, under both the collateral estoppel and vouching in doctrines. *See*, *e.g.*, *SCAC Transp. (USA) Inc. v. S.S. "DANAOS"*, 845 F.2d 1157, 1161-62 (2d Cir. 1988). In that event, of course, the parties and the District Court would be spared the cost, expense, resources and inconvenience required for a jury trial of Trustmark's third-party claims against TIG. Moreover, even if the arbitration award was not binding on Trustmark, such an award, issued by a panel of reinsurance industry professionals, is likely to have significant and compelling impact on a jury.

---

[2] The issue of whether the results of the Connecticut Litigation would be binding in the Arbitration is, of course, an issue for the arbitrators to decide (*see United States Fire Ins. Co. v. National Gypsum Co.*, 101 F.3d 813, 816 (2d Cir. 1996), *cert. denied sub nom.*, 521 U.S. 1120 (1997)), which the Panel would be required to decide "with regard to the custom and usage of the insurance and reinsurance business." O'Sullivan Decl., Ex. A, Art. XVII at 20-21.

In sum, as a matter of law and as a matter of simple logic, TIG would be irreparably harmed if this Court does not stay the action pending the Supreme Court's decision on TIG's petition for writ of *certiorari*.

C.  **A Balancing Of The Equities And Judicial Economy Weighs Heavily In Favor Of Staying The Litigation Pending The Supreme Court's Decision On TIG's Petition For A Writ of *Certiorari***

As discussed above, TIG would suffer irreparable harm if it were forced to proceed with the Connecticut Litigation pending the Supreme Court's decision on its petition for a writ of *certiorari*. Conversely, neither Security nor Trustmark would suffer any harm whatsoever if this litigation were stayed pending decision on TIG's petition for *certiorari*, which in all likelihood would be decided in October, a mere four months from now.[3]

Judicial economy also favors granting the stay since a decision by the Supreme Court reversing and vacating the Ruling likely will obviate (or, at least, significantly reduce the scope of) a trial in the Connecticut Litigation. As discussed above, the outcome of the Arbitration is likely to dispose of Trustmark's third-party claims against TIG under the collateral estoppel and "vouching in" doctrines. Conversely, if the Connecticut Litigation were to proceed, and the Supreme Court were to reverse the Ruling, all of the proceedings in this action could ultimately be rendered a nullity. Any judgment issued in the litigation could be vacated and the District Court could be required to proceed anew after the conclusion of the Arbitration, whether to conduct a new trial or, at a minimum, to consider TIG's summary judgment arguments based upon the dispositive impact of an arbitration award on Trustmark.

---

[3] TIG intends to file its petition for a writ of *certiorari* shortly. Security would have 30 days from the time that the case is placed on the Supreme Court's docket to submit an opposition brief. Sup. Ct. R. 15(3). The Clerk of the Supreme Court would then distribute the relevant papers to the Court "for its consideration no less than 10 days after the brief in opposition is filed," Sup. Ct. R. 15(5), which would presumably take place sometime in August 2004. Accordingly, TIG's petition would be fully briefed at least one month before the commencement of the Supreme Court's October 2004 Term.

In sum, it would be prudent and appropriate, would promote judicial economy, and would in no way result in prejudice to any party, to stay the Connecticut Litigation at this time to allow TIG to pursue its petition for a writ of *certiorari*.

## CONCLUSION

For the reasons set forth above, TIG respectfully requests that this Court issue an order staying this action pending the Supreme Court's decision on TIG's petition for a writ of *certiorari*.

THIRD PARTY DEFENDANT

By:_____
J. Daniel Sagarin CT 04289
David Slossberg CT 113116
Hurwitz, Sagarin & Slossberg, LLC
147 North Broad Street
Milford, Connecticut 06460-0112
Tel.: (203) 877-8000
Fax: (203) 878-9800

-and-

Lawrence I. Brandes, CT 23789
Harry P. Cohen, CT 20446
Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, NY  10038
Telephone:  212-504-6000
Facsimile:  212-504-6666

Attorneys for Third-Party Defendant
TIG Insurance Company

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was sent by facsimile and federal express, this 7th day of June, 2004, to counsel of record for plaintiff Security Insurance Company of Hartford and defendant/third-party plaintiff Trustmark Insurance Company, addressed to:

| | | |
|---|---|---|
| Frank F. Coulom, Jr., Esq. | Mark B. Holton, Esq. | David J. Grais, Esq. |
| Marion B. Manzo, Esq. | James L. Hallowell, Esq. | Erick M. Sandler, Esq. |
| Robinson & Cole LLP | Kathryn E. Nealon, Esq. | Robert J. Morrow, Esq. |
| 280 Trumbull Street | Gibson, Dunn & Crutcher LLP | Kathryn C. Ellsworth, Esq. |
| Hartford, CT  06103-3597 | 200 Park Avenue, 47th Floor | Dewey Ballantine LLP |
| | New York, NY  10166-0193 | 1301 Ave of the Americas |
| Attorneys for Plaintiff | | New York, NY  10019-6092 |
| | Attorneys for Plaintiff | |
| | | Attorneys for Plaintiff |
| | David M. Spector, Esq. | |
| Jeffrey Hellman, Esq. | Everett J. Cygal, Esq. | |
| Zeisler & Zeisler, PC | Ronald S. Safer, Esq. | |
| 558 Clinton Avenue | Schiff Hardin & Waite | |
| PO Box 386 | 6600 Sears Tower | |
| Bridgeport, CT  06605 | Chicago, IL  60606-6473 | |
| Attorneys for Defendant, Third Party Plaintiff | Attorneys for Defendant, Third Party Plaintiff | |

_____
David A. Slossberg

-2-

Clerk's Office
USDC – New Haven
141 Church Street
New Haven, CT  06510

Harry P. Cohen, Esq.
Brian J. O'Sullivan, Esq.
Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, NY  10038
Telephone:  212-504-6000
Facsimile:  212-504-6666