UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

SECURITY INSURANCE COMPANY OF
HARTFORD,

        Plaintiff,

        v.

TRUSTMARK INSURANCE COMPANY,

        Defendant.

---

TRUSTMARK INSURANCE COMPANY,

        Third-Party Plaintiffs,

        v.

TIG INSURANCE COMPANY,

        Third-Party Defendant.

---

CIVIL NO. 301CV2198(PCD)

June 21, 2004

**SECURITY INSURANCE COMPANY OF HARTFORD'S
MEMORANDUM OF LAW IN OPPOSITION TO
TIG INSURANCE COMPANY'S MOTION TO STAY THIS ACTION**

TIG has not convinced a single jurist -- not this Court, not one of the three Judges of the Second Circuit on the Panel that affirmed this Court's order staying the arbitration, and not one of the other 10 Judges of the Second Circuit on active service who considered TIG's petition for rehearing -- that its position can be squared with the decision of the Supreme Court in *Volt Information Sciences, Inc. v. Board of Trustees*, 489 U.S. 468 (1989), the vitality of which the Supreme Court reaffirmed in *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293 n.9 (2002). Yet TIG now asks the Court to stay

this case in the inexplicable hope that four Justices of the Supreme Court will vote to grant *certiorari* and that five Justices will vote to reverse the decision of the Second Circuit, either because they see a distinction between this case and *Volt* that has eluded the 14 Judges who have considered this case already or because they want to revisit the vitality of *Volt* after the Supreme Court reaffirmed it just two years ago.

The Court should deny TIG's motion for three reasons. First, the chance that the Supreme Court will even grant *certiorari* (much less go on to reverse the decision of the Second Circuit) is vanishingly small. The Supreme Court grants approximately one of every 30 petitions for *certiorari*.[1] That this case is indistinguishable from *Volt* makes it less, not more, likely than average that the Supreme Court will grant TIG's petition. Second, if the Court denies TIG a stay, the only harm that TIG will suffer is that the hearing of its arbitration will follow, rather than precede, the trial of this case. This is not harm at all, much less irreparable harm. Finally, the equities are strongly opposed to a stay. At TIG's instance, the Second Circuit stayed this case for nearly 10 months. The Second Circuit affirmed this Court's stay of the arbitration well over three months ago, yet TIG has not even produced a petition for *certiorari*. For these reasons, the Court should deny TIG's motion for a stay and instead proceed to try this nearly three-year-old case.

---

[1] *See* ROBERT L. STERN, ET AL., SUPREME COURT PRACTICE § 4.1, at 221 (8th ed. 2002) (the success rate of *certiorari* petitions on the Supreme Court's regular docket is approximately 3.5%).

## ARGUMENT

Although district courts have the power to stay cases in certain circumstances, "the movant bears a heavy burden of showing necessity for the stay." *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991). TIG falls far short of meeting its heavy burden.

### I.

**TIG'S petition for a writ of *certiorari* is very unlikely to be granted.**

While considering the reasons TIG gives for its hopeful view that the Supreme Court will grant its petition for *certiorari*, the Court should keep in mind two pervasive faults in TIG's argument. First, each of TIG's arguments has been rejected previously by 14 Judges of this Court and of the Second Circuit. There is little reason to believe that TIG will sway the Supreme Court to a view that has not persuaded one of 14 Judges. Second, a party seeking a stay must establish not only a reasonable probability that the Supreme Court will grant *certiorari*, but also a significant possibility that a majority of the Court will then reverse the decision of the court of appeals. *See, e.g., Curry v. Baker*, 479 U.S. 1301, 1302 (1986) (Powell, J., in chambers). TIG makes no effort to explain why the Supreme Court, if it even were to find a conflict among the circuit courts and grant *certiorari*, would not agree with the Second Circuit instead of the others. The Court should deny TIG's motion for that reason alone.

A.    **There is no conflict for the Supreme Court to resolve.**

*Certiorari* is not necessary or appropriate to reconcile the decision of the Second Circuit with the decisions of other courts of appeals, including *Roadway Package System, Inc. v. Kayser*, 257 F.3d 287 (3d Cir.), *cert. denied,* 534 U.S. 1020 (2001), and *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205 (9th Cir. 1998). If there is any conflict

between these decisions, it is at most a conflict solely on matters of state law, which the Supreme Court does not sit to resolve. *See Ruhlin v. New York Life Ins. Co.*, 304 U.S. 202, 206 (1938) ("As to questions controlled by state law [] conflict among circuits is not of itself a reason for granting a writ of *certiorari*.").

*Roadway Package* considered whether the parties intended in their contract, which was governed by Pennsylvania law, to replace the standards for vacating an arbitral award under the Federal Arbitration Act with the standards provided by Pennsylvania law. A divided panel of the Third Circuit construed the contract not to replace the federal standards with the Pennsylvania standards. There are two reasons why the decision of the Second Circuit and *Roadway Package* are not in conflict. First, the contract in *Roadway Package* was governed by Pennsylvania law and thus did not require an examination of California's rules regarding the effect of choice-of-law clauses, which this Court and the Second Circuit found decisive on the issue whether California's arbitration rules applied to the agreement between Security and TIG. *See Security Ins. Co. of Hartford v. TIG Ins. Co.*, 360 F.3d 322, 327-29 (2d Cir. 2004) ("*Security II*"), *aff'g Security Ins. Co. of Hartford v. Trustmark Ins. Co.*, 283 F. Supp. 2d 602, 608-10. (D. Conn. 2003) ("*Security I*"). Second, in *Roadway Package*, there was no evidence of the intent of the parties other than their choice of Pennsylvania law generally to govern their contract. In this case, there were at least two provisions of the contract and some parol evidence that illuminated the intent of the parties on the application of state arbitration law. *Cf. Roadway Package*, 257 F.3d at 292, *with Security II*, 360 F.3d at 328, *and Security I*, 283 F. Supp. 2d at 611 n.9. For these two reasons, there is no conflict between the two decisions.

Neither does the Second Circuit's decision conflict with *Wolsey*, at least not on a point of federal law. It is true that *Wolsey* decided that Section 1281.2(c) of the California Code of Civil Procedure was not incorporated by a general choice-of-law clause. But the court in *Wolsey* was construing the first clause of Section 1281.2(c), which reads "the court…may refuse to enforce the arbitration agreement." CAL. CIV. PROC. CODE § 1281.2(c)(1). In contrast, this Court and the Second Circuit relied on the fourth clause of Section 1281.2(c), which permits the court to "stay arbitration pending the outcome of the court action." CAL. CIV. PROC. CODE § 1281.2(c)(4). *Wolsey* therefore involved a complete denial of a party's right to arbitrate, whereas this case involves only the timing of the arbitration between TIG and Security. The Supreme Court recognized precisely this distinction in *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681 (1996). A statute that "would not enforce the arbitration clause in the contract" is antithetical to the Federal Arbitration Act, the Supreme Court held, but the fourth clause of Section 1281.2(c), which determines "only the efficient order of proceedings" does not. *Id.* at 688. Thus, this case and *Wolsey* addressed different issues, and there is no conflict between them.

It is true that the Second Circuit in this case and the Ninth Circuit in *Wolsey* reached different conclusions about California law on the interpretation of choice-of-law clauses. But the Supreme Court does not review conflicts between circuit courts on questions of state law and, in any event, the California courts have already resolved the conflict. The decision in *Wolsey* was rejected by a later decision of the California Court of Appeal, *Mount Diablo Medical Center v. Health Net of California, Inc.*, 101 Cal. App. 4th 711 (Cal. App. 2002). In *Wolsey*, faced with only a general

choice-of-law clause, the Ninth Circuit did characterize Section 1281.2(c) as a statute affecting the "allocation of power between alternative tribunals," therefore constituting a "special rule[] limiting the authority of arbitrators," such as the New York rule in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995), prohibiting arbitrators from awarding punitive damages. *Wolsey*, 144 F.3d at 1212. As a result, the Ninth Circuit decided that a clear statement was necessary for Section 1281.2(c) to apply. But after *Wolsey* the California Court of Appeal in *Mount Diablo* expressly rejected the Ninth Circuit's interpretation of California law: "Section 1281.2(c) is not a provision designed to limit the rights of parties who choose to arbitrate or otherwise to discourage the use of arbitration. Rather, it is part of California's statutory scheme designed to enforce the parties' arbitration agreement, as the FAA requires." *Mount Diablo*, 101 Cal. App. 4th at 726. Moreover, the *Mount Diablo* court clarified that a "generic" choice-of-law clause in the context of California law is deemed to be "broad, unqualified and all encompassing," *id.* at 722, a view well-grounded in opinions of California's highest courts. *See Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 11 Cal Rptr. 330, 834 P.2d 1148 (1992); *Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.*, 38 Cal. App. 4th 1532, 1548, 46 Cal. Rptr. 2d 33 (1995). Thus, the conflict between the Second and Ninth Circuits has been resolved, but even if it had not, conflict among circuits on such questions of state law is not a reason for granting a writ of *certiorari*. *See Ruhlin*, 304 U.S. at 206.

    **B.**    **The Supreme Court already has decided the principal issue involved in TIG's promised petition for *certiorari*.**

TIG states that -- in general -- the interplay between the FAA and state arbitration rules is an important issue in the commercial context. But the Supreme Court

in *Volt* decided the precise issue in this case, which is the interplay between the FAA and Section 1281.2(c) in particular. TIG gives no reason why the Supreme Court will find it necessary or desirable to reconsider *Volt*, which it has reaffirmed repeatedly and recently. *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293 n.9 (2002) ("*Volt* and *Mastrobuono* both direct courts to respect the terms of the agreement without regard to the federal policy favoring arbitration."); *Doctor's Assocs.* 517 U.S. at 681. As long as *Volt* is still the law, and the Supreme Court has made clear that it is, there is no reason for the Supreme Court to review the Second Circuit's ruling.

### C. The Courts were the proper forum to decide whether Section 1281.2(c) applies.

TIG argues that a court, when presented with a motion to stay an arbitration pursuant to Section 1281.2(c), must refer to the arbitration panel the question whether the parties intended Section 1281.2(c) to apply to their contract. TIG did not make this argument to this Court, nor to the Second Circuit in its brief or at oral argument. TIG first made this argument in its unsuccessful petition to the Second Circuit for reconsideration or reconsideration *en banc*. Apart from being untimely, TIG's argument is wrong.

It is important to remember that Section 1281.2(c) applies when there are both a litigation and an arbitration arising out of the same controversy. Under Section 1281.2(c), a motion for a stay of the parallel arbitration is to be made to the court in which the related litigation is pending. When the parties incorporated Section 1281.2(c) into their agreement, they incorporated this provision along with the rest of Section 1281.2(c). There is no reason why the court must in turn refer that issue to the parallel arbitration. Indeed, if TIG were correct, then the Supreme Court in *Volt* would have

required the lower court to refrain from deciding whether the parties intended their agreement to be governed by Section 1281.2(c), but instead to refer that issue to the arbitrators in the parallel arbitration. Of course, the Supreme Court did no such thing.

Not surprisingly, none of the cases TIG relies on involved situations like the one that Section 1281.2(c) addresses, in which there are simultaneous, plenary judicial and arbitral proceedings about the same dispute. One case, *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002), involved an effort to put before a court a single issue (a six-year time limit on claims) in a controversy that was otherwise to be decided solely by arbitration. *Howsam*, 537 U.S. at 84. Both *PacifiCare Health Systems, Inc. v. Book*, 538 U.S. 401 (2003), and *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528 (1995), decided that it was premature for a court to decide certain issues that should await the rendition of an award and the ensuing action to confirm or vacate it. Finally, the plurality opinion in *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 123 S. Ct. 2402 (2003), explicitly distinguished the issue involved in *Green Tree* from the issue in *Volt* (and therefore here): "[T]he relevant question here is what *kind of arbitration proceeding* the parties agreed to. That question does not concern a state statute or judicial procedures, cf. *Volt*. ..." *Id.*, 123 S. Ct. at 2407 (emphasis in original).

## II.

### TIG Will Suffer No Harm, Irreparable Or Otherwise, Without A Stay.

TIG's argument that its right to arbitrate will be interfered with, and thus it will suffer irreparable harm if this action proceeds, is based entirely on TIG's speculation about the preclusive effects of the litigation and arbitration vis-à-vis each other. TIG argues that this action may have a preclusive effect on the arbitration (in which case, according to TIG, if this action precedes the arbitration, TIG will be deprived "of its

substantive right to have issues relating to the placement of the Reinsurance Agreement decided by industry professionals") and *vice versa* (in which case, according to TIG, if this action precedes the arbitration, TIG will be deprived of its "substantive advantage" to use the preclusive effect of the arbitration in this litigation). There are two fallacies in TIG's argument that it is entitled to have its preclusive cake and eat it, too.

The most fundamental fallacy is that TIG assumes that it was somehow entitled to have the hearing of the arbitration occur before the trial of this action, just because the arbitrations set a date for the hearing before this Court set a date for trial. But TIG had no such right. Whether the trial of an action or the hearing of a related arbitration takes place first is a matter of scheduling happenstance. Even after the arbitrators set the date for the hearing, this Court could have called this case for trial before the hearing (and might well have done so if the parties had completed discovery on schedule). Surely TIG could not then have argued that the Court could not control its own calendar but instead must await the completion of the hearing of the arbitration.

A second fallacy in TIG's argument is that it rests on speculation about the preclusive effects of the litigation and arbitration on each other. On the one hand, TIG argues that a judgment in this action is likely to preclude important issues in the arbitration, yet on the other hand TIG argues that whether such a judgment would be binding at all in the arbitration is an issue for the arbitrators to decide. TIG Br. at 10 n. 2 (citing *U.S. Fire Ins. Co. v. Nat'l Gypsum Co.*, 101 F.3d 813, 816 (2d Cir. 1996) (holding that issue-preclusive effect of district court decision was arbitrable), *cert. denied sub nom. U.S. Fire Ins. Co. v. Asbestos Claims Mgt. Corp.*, 521 U.S. 1120(1997)). Similarly, TIG's discussion of the preclusive effect of an arbitration award on this action is mere

- 9 -

speculation. *See, e.g., Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995) ("it is never possible to determine the preclusive effects of a given arbitration on a proceeding until after the arbitration has ended").

### III.

### The Equities Do Not Favor A Stay.

TIG's argument on the equities is that neither Security nor Trustmark will suffer irreparable harm if the litigation is stayed pending a decision on TIG's *certiorari* petition and that judicial economy favors the stay since a decision by the Supreme Court reversing or vacating the Second Circuit's ruling will obviate a trial in this Court.

TIG's scenario in which a trial in this action goes forward only to become a nullity following a decision from the Supreme Court is implausible. TIG may seek a stay of this action from the Supreme Court in conjunction with the filing of its *certiorari* petition. *See* SUP. CT. R. 23.3. If the Circuit Justice decides that there is a likelihood that the *certiorari* petition will be granted and that the Supreme Court will reverse on *certiorari* review, she may stay this action at any time.

Furthermore, TIG inexplicably fails to state in its moving papers when it will file its *certiorari* petition, providing only the vague promise that it intends to do "shortly." TIG Br. at 11, n.3. The time for TIG to file its petition will not expire until late August 2004. *See* SUP. CT. R. 13 (a party may file a petition for a writ of *certiorari* within 90 days of the lower court's denial of a petition for rehearing). TIG could petition the Supreme Court to extend that deadline by 60 more days, SUP. CT. R. 13(5), and may well do so if this Court grants TIG a stay. TIG provides no insight on what date between now and August and even October would constitute "shortly."

More problematic, there is no explanation for why TIG, if actually concerned about considerations of judicial economy, has yet to file its *certiorari* petition and an accompanying application in the Supreme Court for a stay of this action. Although the parties hotly contested the stay of the arbitration, the issues involved were easily defined and have been well-known to TIG since the stay was briefed before this Court in June 2003, and certainly by the time the parties briefed the appeal in the Second Circuit in August 2003. And since early March of this year, when the Second Circuit issued its opinion, TIG has known the precise issues it needs to frame for the Supreme Court in its *certiorari* petition. In fact, TIG addressed those issues in its petition for rehearing or rehearing *en banc* and has done so again in support of its motion to this Court. There is no excuse for why TIG was not in a position to go directly to the Supreme Court following the Second Circuit's denial of TIG's rehearing petition, or to at least request that the Second Circuit withhold issuance of its mandate and reinstate its stay of this action pending a decision on TIG's *certiorari* petition. Instead, after two weeks of inaction on TIG's part, TIG invokes claims of hardship and equitable considerations in seeking relief from this Court that it could have sought weeks ago from the Second Circuit or Supreme Court - and presumably will seek from those courts should this Court deny TIG's motion. Because it is TIG's inaction that has delayed a resolution of this issue, the equities are not in its favor.

## CONCLUSION

For all of the foregoing reasons, the Court should deny TIG's motion for a stay of this action pending the decision of the Supreme Court on TIG's petition for a writ of *certiorari*.

Dated: June 21, 2004

SECURITY INSURANCE COMPANY
OF HARTFORD

By: [signature]

Frank F. Coulom, Jr. (ct 05230)
Marion B. Manzo (ct 22068)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, Connecticut 06103
Tel.: (860) 275-8200
Fax: (860) 275-8299
Email: fcoulom@rc.com
         mmanzo@rc.com

DEWEY BALLANTINE LLP
David J. Grais (ct 23352)
Kathryn C. Ellsworth (ct 24988)
Erick M. Sandler (ct 25029)
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 259-8000
Fax: (212) 259-6333

GIBSON, DUNN & CRUTCHER LLP
Mark B. Holton (ct 21727)
Kathryn E. Nealon (ct 22754)
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
Fax: (212) 351-4035

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 21, 2004, a true and correct copy of the foregoing was sent via facsimile and first class mail, postage prepaid, to:

| | |
|---|---|
| Lawrence J. Brandes, Esq.<br>Harry P. Cohen, Esq.<br>Caldwalader, Wickersham & Taft<br>100 Maiden Lane<br>New York, NY 10038 | David M. Spector, Esq.<br>Everett J. Cygal, Esq.<br>Ronal S. Safer, Esq.<br>Schiff Hardin & Waite<br>6600 Sears Tower<br>Chicago, IL 60606-6473 |
| J. Daniel Sagarin, Esq.<br>David Slossberg, Esq.<br>Hurwitz, Sagarin & Slossberg, LLC<br>147 North Broad Street<br>Milford, CT 06460-0112 | Jeffrey Hellman, Esq.<br>Zeisler & Zeisler, P.C.<br>558 Clinton Avenue<br>P.O. Box 386<br>Bridgeport, CT 06605 |
| Attorneys for TIG Insurance Co. | Attorneys for Trustmark Insurance Co. |

_____
Marion Manzo

NY1 861873v3