# Exhibit B

# UNDERWRITING/ADMINISTRATIVE MANAGEMENT AGREEMENT

No. 96200

This Agreement is made by and between:

### WEB MANAGEMENT LLC
Bloomfield, CT
(hereinafter referred to as "Manager")

and

### TRUSTMARK INSURANCE COMPANY
Lake Forest, Illinois
(hereinafter referred to as the "Company")

This Agreement is made and entered into as of January 1, 1997, by and between WEB Management LLC, hereinafter called "Manager", and Trustmark Insurance Company, hereinafter called "Company".

K000582

# Table of Contents

## ARTICLES

| | | |
|---|---|---|
| I. | Business Covered | 3 |
| II. | Term | 3 |
| III. | Authority and Duties | 3 |
| IV. | Trust Accounts | 6 |
| V. | Compensation | 7 |
| VI. | Accounts, Records, and Reports | 7 |
| VII. | Indemnification | 8 |
| VIII. | Publicity | 9 |
| IX. | Extra Contractual Damages | 9 |
| X. | Confidentiality | 10 |
| XI. | Change of Terms | 10 |
| XII. | Termination | 10 |
| XIII. | Responsibilities Following Termination | 12 |
| XIV. | Errors and Omissions | 13 |
| XV. | Arbitration | 13 |
| XVI. | Controlling Law | 15 |
| XVII. | Entire Agreement | 15 |

## SCHEDULES

| | | |
|---|---|---|
| A. | Business Included and Excluded | 17 |
| B. | Compensation | 18 |
| C. | Extra Contractual Damages Clause | 21 |
| D. | Retrocession Contingent Profit Commission | 22 |
| E. | Underwriting Process | 23 |
| F. | Target Profitability | 26 |

2

K000583

# ARTICLE I

## BUSINESS COVERED

A.    The Company hereby appoints the Manager to have the right to underwrite, administer, and manage on the Company's behalf a portfolio of Group and Special Risk Accident & Health reinsurance subject to the terms of this agreement. The Manager is an independent contractor and nothing herein contained shall be construed to create a relationship of employer-employee, partnership or joint venture between the Company and the Manager.

B.    The products and limits are as indicated in Schedule A.

C.    The underwriting process is as indicated in Schedule E.

# ARTICLE II

## TERM

A.    The first Agreement Period shall commence on January 1, 1997, and shall remain in force until December 31, 1998, or until terminated as provided for in Article XII, TERMINATION. This agreement will automatically renew for subsequent two-year Agreement Periods, beginning January 1, 1999. It is understood that in the event of termination all original risks shall continue in force until their natural expiration as specified in Article XIII, RESPONSIBILITES FOLLOWING TERMINATION.

B.    The first Underwriting Period shall be January 1, 1997 through and including December 31, 1997. Thereafter, each subsequent calendar year, January 1 through and including December 31, shall be a separate Underwriting Period.

# ARTICLE III

## AUTHORITY AND DUTIES

A.    The Company grants the Manager authority to do the following on behalf of the Company:

    1. Underwrite, administer, and manage a portfolio of Group and Special Risk Accident & Health reinsurance, according to amounts and types of reinsurance as specified in Schedule A;

3

K000584

2. Receive submissions, proposals, or applications; underwrite, negotiate, bind, sign and accept reinsurance; and execute and deliver reinsurance contract(s) including cancellations thereof;

3. Place ceded reinsurance with any Company approved corporation, underwriting association, insurer or reinsurer, on the whole or in part of reinsurance contract(s) effected pursuant to the provisions of this Agreement; in connection therewith, placing shall mean negotiate for and execute and deliver binders, policies, contracts, agreements, treaties, endorsements, and other evidences of such ceded reinsurance, including in all cases renewals, and cancellations thereof;

4. Collect and receive premiums and other sums due in respect of all reinsurance contracts(s) written on the Company's behalf; collect premium refunds and other sums due in respect of all such reinsurance contract(s); pay premiums in respect of any ceded reinsurance placed on the Company's behalf; collect any premium refunds in respect of such ceded reinsurance;

5. Admit, settle, compromise, adjust, and pay claims, losses and loss adjustment expenses, and refunds; to arrange and collect recoveries including recoveries from ceded reinsurance and other reinsurance and retrocessions, with such recoveries to be deposited into the premium trust account;

6. Fix the rates, terms and conditions of any insurance and/or reinsurance contract(s) assumed pursuant to the provisions of this Agreement;

7. Anything in this Agreement notwithstanding, may accept a risk which to its knowledge or expectation exceeds the total authorized if the Manager has prior to such acceptance arranged for reinsurance or retrocession of a portion of such risk so that the amount of such risk retained by the Company after such reinsurance or retrocession shall not exceed the total authorized, as outlined in Schedule A and subject to Article III.A.3 above;

8. Give and receive notices pursuant to the terms and conditions of any insurance and/or reinsurance contract(s) assumed pursuant to the provisions of this Agreement;

9. Select persons from whom it solicits insurance and/or reinsurance and the time and place of solicitation, provided such persons are properly licensed as required by applicable laws and regulations and are not convicted felons; and

10. Have the fullest discretion as to the methods and means of its day-to-day operation of its business, unless specifically addressed in this Agreement.

K000585

B. The Manager accepts the following duties and responsibilities relative to business placed hereunder:

1. Provide and perform all sales, marketing, underwriting, administration, treaty issuance, and pricing of all business written;

2. Only accept risks that are expected to meet the profitability guidelines, as specified in Schedule F, unless the Manager receives prior approval from the Company to do otherwise;

3. Provide prompt responses to any reasonable requests made by the Company;

4. Provide monthly reporting using a mutually agreed upon format, including that specified in Article VI below;

5. Provide the necessary administration of ceded reinsurance on behalf of the Company;

6. Give formal presentations, at least annually, to the Company on the status of the business;

7. Promptly notify the Company of any situation, once the Manager becomes aware of such situation, that could reasonably lead to legal issues involving the Company, and keep the Company well informed of and involved in the situation;

8. Maintain and administer trust accounts as specified in Article IV;

9. Maintain, at the Manager's own expense, offices and adequate office staff necessary to perform Manager's administrative responsibilities under this Agreement;

10. Maintain, at the Manager's own expense, Errors and Omissions coverage and Fidelity Bond coverage with limits and terms acceptable to the Company, to the extent that such coverage is reasonably available;

11. Obtain the Company's prior approval of all treaty and agreement wordings, provided that they are materially different from those already approved by the Company;

12. Obtain the Company's prior approval of any authorized corporation, underwriting association, reinsurer or retrocessionaire to which the Company would cede reinsurance pertaining to this Agreement.

5

K000586

13. Obtain prior approval from the Company before committing the Company to cede business to a proposed reinsurer or retrocessionaire, if the proposed reinsurer or retrocessionaire has less than an "A" rating from A.M. Best and if the Company is not able to take reserve credit in its NAIC annual statement.

14. Fully cooperate with all reasonable audit requests.

15. Maintain all necessary state insurance licenses, as mutually determined by the Manager and the Company.

C.   The Company accepts the following duties and responsibilities:

1.  Provide timely responses to reasonable requests made by the Manager. Examples include, but are not limited to, requests for approvals of treaty and arrangement wordings, policy wordings, and fronting opportunities.

2.  Perform reasonable audits on the Manager, no more frequent than semi-annually, at times agreed to in advance by the Manager.

## ARTICLE IV

### TRUST ACCOUNTS

A.   Premium Account

The Manager assumes responsibility for premium collection to be held in a fiduciary account on behalf of the Company. The Manager, on a timely basis, shall remit the net premiums to the Company as defined elsewhere in this Agreement. Investment Income on the Premium Account accrues to the benefit of the Manager.

B.   Working Fund

For each Underwriting Period, a Working Fund shall be accumulated by withholding ten percent (10%) of all retained gross premiums that are received, not to exceed $500,000, including interest thereon, and taken down as the Underwriting Period develops.

K000587

If at any time the funds in the Premium Account are not sufficient to pay the outstanding obligations of the Company, such balance shall be first drawn down from the Working Fund. If the sum of the funds in the Premium Account and the Working Fund are not sufficient to pay the outstanding obligations of the Company, the Manager will request such balance from the Company who will then remit the funds to the Manager within five (5) business days of receipt of such request.

## ARTICLE V

### COMPENSATION

In consideration of the service provided by the Manager hereunder, the Company agrees to pay the Manager a Underwriting Management Fee, a Fronting Management Fee, and a Contingent Profit Commission as shown in Schedule B, which is attached to and made part of this Agreement. Said compensation shall be payable for as long as the business is administered under the terms of this Agreement remains in force and as may be required under Article XV, TERMINATION.

## ARTICLE VI

### ACCOUNTS, RECORDS, AND REPORTS

A.  The Manager shall keep all proper books and records as are necessary to indicate the business underwritten and the amounts from time to time payable to or by the Company in connection therewith. Such books and records which pertain in any way to this Agreement shall be open, at all reasonable times, for inspection by the Company's officers or any other people designated by the Company.

B.  The Manager shall furnish monthly <u>cash statements</u>, for Life, Accident, Medical, and combined, displaying the following:

 1. Gross premiums written;
 2. Gross premiums received;
 3. Gross fronting fees received;
 4. Investment income received;
 5. Expenses paid, including Acquisition cost, Underwriting Management Fees, Fronting Management Fees and Profit Commissions;
 6. Claims, losses, and Loss Adjustment Expenses paid;
 7. Outward reinsurance and retrocession premiums paid;
 8. Recoveries received from ceded reinsurance or retrocession protections;
 9. Increase in funds allocated to the Working Fund; and
10. Funds Due the Company.

7

C.    The Manager shall furnish monthly <u>underwriting statements</u>, for Life, Accident, Medical, and combined, displaying the following:

1.  Gross earned premiums, indicating change in gross premiums due and outstanding, and change in unearned gross premiums;
2.  Premiums incurred for Outward reinsurance and/or retrocession protections;
3.  Net earned premiums;
4.  Gross fronting fees received;
5.  Investment income accrued to Working Fund:
6.  Deemed investment income earned by the Company on funds previously submitted;
7.  Expenses incurred, including Acquisition cost, Underwriting Management Fees, and Fronting Management Fees;
8.  Incurred Losses, including Claims, and Loss Adjustment Expenses paid, Outstanding Claims and Outstanding Loss expenses;
9.  Recommended changes in liability reserves;
10. Recoveries incurred from Outward reinsurance and/or retrocession protections;
11. Underwriting Gain/(Loss);
12. Profit Commission Accounting.

D.    The monthly statements and The Funds Due the Company shall be furnished and remitted to the Company within ten (10) days after the close of each calendar month. The Manager shall also provide a full accounting giving such information that may be required to complete the Company's Annual Statement; such accounts shall be prepared within fifteen (15) days after the close of each calendar year.

E.    The monthly statements will also include notification of any claim(s) that is expected to exceed $150,000 retained by the Company, to the extent such claim(s) are reported to the Manager.

## ARTICLE VII

## INDEMNIFICATION

A.    The Manager is not authorized and is expressly forbidden on behalf of the Company to incur any indebtedness or liability or to make, alter or discharge agreements or to waive payment in cash, or to receive any money due or to become due to the Company except as herein provided.

B.    The Manager shall have no authority to institute, prosecute, or maintain any legal proceedings in connection with any matter pertaining to the Company's business.

8

K000589

C.   In the event any legal process or notice is served on the Manager, in a suit or proceeding against the Company or any complaint from any insurance department or policyholder, the Manager shall forthwith forward the process, notice, or complaint to the Company via facsimile and Certified Mail, Return Receipt Requested. The Company agrees to hold the Manager harmless from any litigation or expenses of such litigation that are a result of an action taken by the Company or its employees that was not specifically authorized by the Manager.

D.   The Manager shall indemnify and hold the Company harmless from any and all liability, loss, damage, claim or expense of any kind, including costs and reasonable attorneys' fees which result from negligent or willful acts or omissions by the Manager, its agents or employees regarding the duties and obligations of the Manager under this Agreement. The Manager expressly authorizes the Company to charge against all compensation due or to become due to the Manager under this Agreement, any monies paid or liabilities incurred by the Company as a result of such negligent or willful acts or omissions. Additionally, the Company agrees to indemnify and hold the Manager harmless from any and all liability, loss, damage, claim or expense of any kind, including costs and reasonable attorneys' fees which result from negligent or willful acts or omissions by the Company, its agents or employees regarding the duties and obligations of the Company under this Agreement.

## ARTICLE VIII

PUBLICITY

All advertisements, circulars, training aids and other matters intended for publication or distribution by the Manager or its sub-agents and referring to the Company must be approved by the Company before its use or distribution.

## ARTICLE IX

EXTRA CONTRACTUAL DAMAGES

The Manager shall have the right to accept business which contains Extra Contractual Obligations (ECO) coverage, provided that the ECO clause is understood to contain the provision of "Counsel and Concur" which in intent, as opposed to verbiage, is substantially similar to the wording contained in Schedule C.

If a proposed ECO clause is substantially different from either that in Schedule C or that previously approved by the Company then the Manager will first obtain written approval from the Company before the Manager agrees to its use.

9

K000590

## ARTICLE X

CONFIDENTIALITY

All material and information which has or will come into either party's possession or knowledge in connection with the activities as required under this Agreement are deemed to be confidential in nature. The Company and the Manager agree to hold such material and information in the strictest confidence and to not make use thereof other than for the performance of duties as required under this Agreement.

## ARTICLE XI

CHANGE OF TERMS

This Agreement may be altered, amended or changed by mutual consent of the parties at any time this Agreement remains in force.

## ARTICLE XII

TERMINATION

A.    This Agreement will automatically renew for subsequent two-year Agreement Periods beginning January 1, 1999, unless either party gives written notice to the other party, via facsimile and Certified Mail, Return Receipt Requested, at least ninety (90) days prior to the end of the current Agreement Period.

B.    This Agreement may be terminated by the Company at any time by written notice effective immediately upon receipt if:

1.   The Manager commits any breach of this Agreement and, in the case of a breach which is capable of remedy, fails to remedy the same within thirty (30) days after receipt of a written notice requiring the breach to by remedied; or

2.   The Manager is found guilty of fraud, embezzlement, willful misconduct or intentional violation of any insurance law or any ruling of a State Insurance Department or other regulatory agency having supervisory powers over the business of insurance or intentional breach of any of its conditions or provisions of this Agreement; or

3.   There is a material change in ownership, control or management of the Manager; or

4.   The Manager files bankruptcy (immediate notice of which shall be given from the Manager to the Company); or

10

K000591

5. The Manager loses its license to solicit business provided in this Agreement; or

6. The Manager becomes the subject of rehabilitation or liquidation proceedings; or

7. The Manager ceases, or threatens to cease, to carry on business.

C. This Agreement may be canceled by the Manager at any time by written notice effective immediately upon receipt if:

1. The Company commits any breach of this Agreement and, in the case of a breach which is capable of remedy, fails to remedy the same within thirty (30) days after receipt of a written notice requiring the breach to by remedied; or

2. The Company is found guilty of fraud, embezzlement, willful misconduct or intentional violation of any insurance law or any ruling of a State Insurance Department or other regulatory agency having supervisory powers over the business of insurance or intentional breach of any of its conditions or provisions of this Agreement; or

3. The Company is notified from A.M. Best's that its rating will be below the level of "A" (immediate notice of which shall be given from the Company to the Manager); or

4. The Company files bankruptcy (immediate notice of which shall be given from the Company to the Manager); or

5. The Company loses its license to solicit business provided in this Agreement;

6. The Company becomes the subject of rehabilitation or liquidation proceedings;

7. The Company ceases, or threatens to cease, to carry on business; or

8. The Company enters into a substantially similar agreement as this Agreement with another underwriting entity without prior written approval from the Manager.

D. For purposes of this Article, a breach shall be considered capable of remedy if the party in breach can comply with the provision in question in all respects other than as to the time of performance, provided that the time of performance is not of the essence.

K000592

E.    Notification to the Company will be addressed to :

      Mr. Frank Gramm
      Senior Vice President
      Trustmark Insurance Company
      400 Field Drive
      Lake Forest, Illinois  60045
      Facsimile: (847) 615-3908

F.    Notification to the Manager will be addressed to:

      Mr. Robin B. Ekwall
      Managing Principal
      WEB Management LLC
      45 Wintonbury Avenue
      Bloomfield, CT  06002
      Facsimile: (860) 243-5494

G.    Upon termination, the Manager agrees to handle claims during run-off, and shall furnish the Company with all necessary records, claims files, agreements, and notices concerning this business.  The Manager shall continue to service the in-force business until the natural expiry of each treaty.

## ARTICLE XIII
## RESPONSIBILITIES OF TERMINATION

A.    As of the effective date of termination, the Company revokes the Manager's authority under Article V, Authority and Duties, to perform those activities relating to soliciting, binding, or renewing reinsurance on behalf of the Company directly or through a pooling arrangement.

B.    Upon termination of this Agreement, the Manager shall be entitled to continue to receive all forms of Compensation as specified in Article V, COMPENSATION, at the rates specified in Schedule B of this Agreement until the earlier of the anniversary date of the risk or termination by the Insured or Reinsured, except in the case where the Company must assume responsibility for administration based on unsatisfactory performance on the part of the Manager to perform its administrative duties as outlined in this Agreement no compensation would be paid to the Manager after termination of this Agreement.

C.    The termination of this Agreement will not affect obligations owed by the parties to insureds and/or insurers and/or reinsureds and/or reinsurers which will continue beyond the expiry of this Agreement.

K000593

D.    Upon termination of this Agreement, the Company's record or knowledge of names of Insureds or Reinsureds and expiration dates with respect to business covered by this Agreement shall not be disclosed by the Company to any agent, broker or other person(s) unless required by law nor used by the Company for any purpose which shall abridge the Manager's rights or ownership, use, and control. The Company, nor its affiliates, subsidiaries, parent company(ies), successors or assigns, will not endeavor to solicit, underwrite or otherwise secure the new or renewal business of any policyholder originally underwritten by the Manager and for a substantially similar reinsurance arrangement as was placed by the Manager for a period of twenty-four (24) months after the termination date of this Agreement. Excluded from this clause will be all business that is initiated by the Company or its affiliated companies. This clause shall not apply in the event that the Company terminates this Agreement due to conditions stated in Article XII.A items 2, 4, 6, and 7. In addition, this clause will not apply in the event that this Agreement terminates and none of the original Managing Principals of the Manager (Robin B. Ekwall, Charles J. Bastan, and Steven F. Wright) are then currently actively involved in day-to-day generation of business pursuant to this Agreement.

## ARTICLE XIV

### ERRORS AND OMISSIONS

Inadvertent delays, errors and omissions made in connection with this Agreement shall not relieve either party from any liability which would have attached had such delays, errors or omissions not occurred, provided always that such errors or omissions shall be rectified as soon as possible after its discovery.

## ARTICLE XV

### ARBITRATION

A.    Basis for Arbitration

The wording and interpretation of this Agreement is based on the usual customs and practices of the insurance and reinsurance industry. While it is agreed to act in good faith in dealings with each other, it is understood and recognized that situations arise in which the parties to this Agreement may not reach an agreement.

In the event that any dispute cannot be resolved to a mutual satisfaction, the dispute will first be subject to good-faith negotiation as described below in an attempt to resolve the dispute without the need to institute formal arbitration proceedings.

13

K000594

B.    Negotiation

Within ten (10) days after either party has given the other the first written
notification of the specific dispute, the party will appoint a designated officer to
attempt to resolve the dispute. The officers will meet at a mutually agreeable
location as early as possible and as often as necessary, in order to gather and
furnish the other with all appropriate and relevant information concerning the
dispute. The officers will discuss the problem and will negotiate in good faith
without the necessity of any formal arbitration proceedings. During the
negotiation process, all reasonable requests made by one officer to the other for
information will be honored. The specific format for such discussions will be
decided by the designated officers.

If the officers cannot resolve the dispute within thirty (30) days of their first
meeting, it is agreed that the parties will submit the dispute to formal arbitration.
However, the parties may agree in writing to extend the negotiation period for an
additional thirty (30) days.

C.    Arbitration Proceeding

No later that fifteen (15) days after the final negotiation meeting, in accordance
with the negotiation period above, the officers taking part in the negotiation will
give both parties written confirmation that they are unable to resolve the dispute
and that they recommend establishing formal arbitration.

Arbitration panel consisting of three past or present officers of Life & Health
insurance and/or reinsurance companies not affiliated with either party in any way
will settle the dispute. Each party will appoint one arbitrator and the two
arbitrators will select a third. If the two arbitrators cannot agree on the choice of a
third, the choice will be made by the Chairman of the American Arbitration
Association.

The arbitration proceedings will be conducted according to the Commercial
Arbitration Rules of the American Arbitration Association which are in effect at
the time the arbitration begins.

The arbitration will take place in the Company's state of domicile unless mutually
agreed otherwise.

14

K000595

Within sixty (60) days after the beginning of the arbitration proceedings, the arbitrators will issue a written decision on the dispute and a statement of any award to be paid as a result of their decision. The decision will be based on the terms and conditions of this Agreement as well as the usual customs and practices of the insurance and reinsurance industry, rather than on strict interpretation of the law. The decision will be final and binding on both parties and there will be no further appeal, except that either party may petition any court having jurisdiction regarding the award rendered by the arbitrators.

The parties may agree to extend any of the negotiation or arbitration periods shown in this Article.

Unless otherwise decided by the arbitrators, the party will share equally in all expenses resulting from the arbitration, including the fees and expenses of the arbitrators, except that each party will be responsible for its own attorneys' fees.

## ARTICLE XVI

### CONTROLLING LAW

This Agreement shall be interpreted in all respects in accordance with the laws of the state of Illinois.

## ARTICLE XVII

### ENTIRE AGREEMENT

This Agreement, consisting of 26 pages, and Schedules A, B, C, D, E and F, constitutes the entire Agreement between the parties and may be varied only in writing signed by the parties hereto. The headings of the Articles herein and Schedules are for convenience only and are not part of this Agreement.

K000596

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the date recorded below:

In Bloomfield, Connecticut, for and on behalf of:

### WEB MANAGEMENT LLC

Signature: _____

Name:    Steven F. Wright, FSA

Title:    Managing Principal

Date:    5/22/97

In Chicago, Illinois, for and on behalf of:

### TRUSTMARK INSURANCE COMPANY

Signature: _____

Name:    ROBERT P. STAHNKE ASA MAA

Title:    ASSOCIATE ACTUARY, GROUP

Date:    5/21/97

16

K000597

## SCHEDULE B - COMPENSATION

**A.**   UNDERWRITING MANAGEMENT FEE

The Underwriting Management Fee for any one program, expressed as a percentage of gross assumed premium:

|  | Accident | Medical |
|---|---|---|
| Treaty | 0.5% up to 5.0% | 0.5% up to 3.0% |
| Facultative | 1.5% up to 7.5% | 1.5% up to 5.0% |

In addition, the Underwriting Management Fees in aggregate per Underwriting Period, expressed as a percentage of gross assumed premium:

|  | Accident | Medical |
|---|---|---|
| Treaty | up to 2.5% | up to 1.5% |
| Facultative | up to 4.5% | up to 3.0% |

**B.**   FRONTING MANAGEMENT FEE

Twenty percent (20%) of fronting fees paid to the Company.  Fronting fees shall not be included as income or expense for purposes of the contingent profit commission or deemed investment income.

**C.**   CONTINGENT PROFIT COMMISSION

The first profit sharing calculation shall be for the Underwriting Period from January 1, 1997 through December 31, 1997.  Subsequent profit sharing calculations shall be for Underwriting Periods from January 1 to December 31 each year thereafter.

For each Underwriting Period, the first calculation shall be computed at eighteen (18) months following the end of each Underwriting Period. For every six months thereafter, the same calculation shall be computed with any positive difference immediately due to the Manager and/or the Bonus Account, and any negative immediately due to the Company and/or the Bonus Account. These calculations shall continue until all losses which occurred with respect to the Underwriting Period are satisfied, at which time all remaining balances in the Working Fund will be promptly released to the Company.

A profit sharing calculation will be done separately for 1) the Quota Share Treaty, and 2) for the Retrocession Treaty.

K000598

1) The UNDERWRITING GAIN/(LOSS) for the Quota Share Treaty business shall equal the sum of all CREDITS less the sum of all DEBITS, with the individual components defined as follows:

CREDITS:
1. RETAINED PREMIUM EARNED, and shall equal the actual premium retained (received less retroceded to Excess of Loss and Retrocession treaties) for the Underwriting Period, plus any premiums due and unpaid, less any unearned premiums.
2. WORKING FUND INVESTMENT INCOME RECEIVED, and shall equal the investment income received on the Working Fund defined in Article IV.
3. DEEMED INVESTMENT INCOME, and shall be calculated using the average monthly rate equal to the two (2) year U.S. Treasury Rate plus fifteen (15) basis points during the Underwriting Period. The deemed investment income shall calculated as follows:

$$II_m = \sum_{t=1}^{m} \{ [ (1 + i^{avg})^{(m-t+1/2)} - 1 ] \times F_t \}$$

where,

$II_m$ = Deemed Investment Income earned through month m
$i^{avg}$ = average monthly rate, defined above
$F_t$ = funds submitted to Company in month t, less funds paid by Company in month t, less Underwriting Gain previously declared associated with profit commission paid in month t

DEBITS:
3. ACQUISITION EXPENSES, and shall equal all expenses incurred in acquiring the business, less proportional expenses allocated to the Retrocession Treaty.
4. NET CLAIMS PAID AND/OR IN THE COURSE OF SETTLEMENT, and shall include all claims paid by or reported to the Company including those which are known and outstanding, net of any retrocession recoveries.
5. INCURRED BUT NOT REPORTED (IBNR) RESERVE, and shall equal the reserve for retained losses incurred but not reported in respect to the loss occurrences arising out of the Underwriting Period.
6. MANAGER'S UNDERWRITING MANAGEMENT FEE INCURRED, and shall be calculated according to Schedule B as shown above, less the proportional expenses allocated to the Retrocession Treaty.
7. COMPANY'S EXPENSES equal to 5.0% of CREDITS.
8. LOSS CARRY FORWARD from previous year, and shall equal any LOSS(es), as defined below, incurred in the previous three (3) Underwriting Periods to the extent that they were not offset by any subsequent GAIN(s).

19

K000599

If there is an UNDERWRITING GAIN, then thirty-seven and one-half percent (37.5%) of the UNDERWRITING GAIN will be shared with the Manager as a CONTINGENT PROFIT COMMISSION. Seventy percent (70%) of the CONTINGENT PROFIT COMMISSION will be immediately due to the Manager, and the remaining thirty percent (30%) will be credited to the BONUS ACCOUNT described below.

If there is an UNDERWRITING LOSS, then seventy percent (70%) of the UNDERWRITING LOSS will be allocated to the LOSS CARRYFORWARD described above, and the remaining thirty percent (30%) will be debited to the BONUS ACCOUNT described below.

The BONUS ACCOUNT will be maintained in aggregate for all Underwriting Periods, and will be credited and debited as described above. The balance at the beginning of any calendar year, and all credits and debits made during the year, will be credited with interest calculated using the interest rate used to credit the Company's insured experience rated group accounts, however any negative interest will not be debited from the BONUS ACCOUNT.

Should the BONUS ACCOUNT exceed $1,000,000 at the end of any calendar year, Ninety-three and thirty-three one-hundredths percent (93.33%) of any subsequent CONTINGENT PROFIT COMMISSION will be immediately due to the Manager, and the remaining six and sixty-seven one-hundredths percent (6.67%) will be credited to the BONUS ACCOUNT described below.

Notwithstanding the above, should the BONUS ACCOUNT exceed $2,000,000 at the end of any calendar year, the Manager shall have the right to immediately withdraw the amount that exceeds $2,000,000.

Upon termination of this Agreement, subsequent profit sharing calculations will continue to be calculated as described above, however, all CONTINGENT PROFIT COMMISSIONS that would otherwise have been immediately due the Manager are instead retained by the Company, with interest credited thereon at the same rate as for the BONUS ACCOUNT, for a period not to exceed forty-eight (48) months from date of termination at which time the IBNR RESERVE is set equal to zero and the final CONTINGENT PROFIT COMMISSION calculation(s) is(are) done with all resulting monies in the BONUS ACCOUNT immediately due to the Manager.

2) The CONTINGENT PROFIT COMMISSION for the Retrocession Treaty will be as specified in the Retrocession Treaty, which will be attached to this Agreement as Schedule D.

K000600

## SCHEDULE C - EXTRA CONTRACTUAL DAMAGES

Below is an example of the ECO wording that the Manager will insist on in any assumption of business, which basically centers around the agreement that the ceding company will counsel with the Manager on all threatened or possible litigation and that the Manager, on behalf of the Company and in accordance with Article XI EXTRA CONTRACTUAL OBLIGATIONS, must concur before we are liable for any damages.

Please note that the Company will assume the role of the Reinsurer in the following wording.

### Example of Counsel and Concur

"The Reinsurer is not liable for judgments in excess of policy limits or for other extra contractual damages, such as statutory damages, punitive damages, bad faith damages or other damages which may arise from the willful or negligent acts or omissions of the [Ceding Company], including its agents or employees, unless the Reinsurer has concurred both in writing and in advance of the [Ceding Company's] conduct which leads to the award of extra contractual damages.

It is recognized that the [Ceding Company] cannot counsel with the Reinsurer unless its Manager first notifies the [Ceding Company] of the threatened or pending action for which the Manager has unilaterally taken action, then the extra contractual obligation coverage afforded hereunder shall apply. However, the Reinsurer shall be notified by the [Ceding Company] as soon as the [Ceding Company] is aware of the action by the Manager. Any extra contractual damage awards will be offset by any recoveries made from the Manager.

Neither party shall be liable for the fraudulent, grossly negligent, dishonest and/or criminal acts by any officer, director or employee of the other acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the presentation, defense, or settlement of any claim covered hereunder.

Extra contractual damages shall be deemed to have occurred on the same date as the loss covered or alleged to be covered under the underlying policy.

Recoveries from any form of insurance or reinsurance which protects the Company against claims which are the subject matter of the Article shall inure to the benefit of this Agreement."

21

K000601

## SCHEDULE D - RETROCESSION CONTINGENT PROFIT COMMISSION

To be added upon completion.

22

K000602

# SCHEDULE E - UNDERWRITING PROCESS

The following is the underwriting process to be adhered by the Manager.

## 1. Underwriting Process for Excess of Loss Reinsurance

a) Production Source
   - Individual and firm represented
   - Relationship with individual and firm represented
   - Length of time individual and firm has been in business
   - Individual and firm's relationship with ceding company

b) Competition at the production source level
   - WEB's competition for the risk under consideration
   - Time frame quote is required for the risk under consideration

c) Structure of Risk
   - The current and/or proposed reinsurance arrangement
   - The current participants involved and the level (s) they participate in the program

d) Structure of Fees
   - Detailed breakdown of all fees associated with risk under consideration

e) Premium and Claims Experience
   - Minimum of three years experience provided program has been in existence for at least three years
   - Evaluation date of experience
   - Explanation of how outstanding reserves are calculated
   - Accurate matching of earned premiums and incurred losses

f) Net profit target analysis
   - A numerical flow chart showing the bottom line net profit target expected to be realized

g) Terms and Conditions proposed by WEB Management
   - Structure of reinsurance arrangement
   - All conditions and exclusions associated with reinsurance structure
   - Reinsurance rate charged accompanied by basis on which rate is applied

23

K000603

2. Underwriting Process for Quota Share Reinsurance

   a) Product
- Description of product(s)

   b) Production Source
- Individual and firm represented
- Relationship with individual and firm represented
- Length of time individual and firm has been in business
- Competition at the production source level
- Time frame quote for evaluation

   c) Underwriting
- Underwriting philosophy
- Manuals / Guidelines
- Work experience of key underwriters, if MGU
- Any key change in personnel

   d) Claims
- Claims management
- Who will be responsible
- Previous audits

   e) Administration
- Systems
- Who will be responsible
- Reporting

   f) Distribution
- Major competitors
- Product/marketing advantage
- How sold

   g) Structure of Risk
- The current and/or proposed reinsurance arrangement and risk structure
- The current participants involved in the program

24

h) Structure of Fees
  - Detailed breakdown of all fees associated with risk under consideration, and how these expenses relate to competition

i) Experience
  - Minimum of three years experience provided program has been in existence for at least three years
  - Evaluation date of experience
  - Explanation of how outstanding reserves are calculated
  - Accurate matching of earned premiums and incurred losses

j) Net profit target analysis
  - Review of underlying pricing
  - A numerical flow chart showing the bottom line net profit target expected to be realized to WEB facility

k) Terms and Conditions proposed by WEB Management
  - Structure of reinsurance arrangement
  - All conditions and exclusions associated with reinsurance structure

K000605

## SCHEDULE F - TARGET PROFITABILITY

| Product | Distribution | Expected Profit |
|---|---|---|
| Occupational Accident | 30% | 7.5% |
| Medical | 25% | 5% |
| Personal Accident | 15% | 7.5% |
| Catastrophe Covers | 10% | 50% |
| Occupational Carve-Out | 10% | 10% |
| Group Life and AD&D | | |
| • Group Life | 1% | 5% |
| • Bulk ADB | 1% | 5% |
| • Other AD&D | 2% | 10% |
| • Accidental Death Carve-Out | 1% | 10% |
| All others | 5% | 10% |
| Total | 100% | 11.5% |

Comments:
1. Minimum profit load will be 5.0%, after expenses
2. Catastrophe Cover expected profit of 50% is after allocation of cost of excess protection (assumed to be 25% of cat premium).

26

K000606

# Amendment No. 1

# UNDERWRITING/ADMINISTRATIVE MANAGEMENT AGREEMENT

### No. 96200

This Agreement is made by and between:

### WEB MANAGEMENT LLC
Bloomfield, CT
(hereinafter referred to as "Manager")

#### and

### TRUSTMARK INSURANCE COMPANY
Lake Forest, Illinois
(hereinafter referred to as the "Company")

It is hereby mutually agreed that effective January 1, 1998, that the following articles, subarticles, schedules, and/or items have been amended to read as follows and not as heretofore.

1.    Article II, Term, subarticle A shall be amended to read as follows:

The first Agreement Period shall commence on January 1, 1997, and shall remain in force until December 31, 1998, or until terminated as provided for in Article XII, TERMINATION. This agreement will automatically renew for twenty-four month Agreement Periods, beginning January 1, 1999. It is understood that in the event of termination all original risks shall continue in force until their natural expiration as specified in Article XIII, RESPONSIBILITIES FOLLOWING TERMINATION.

2.    Article III, Authority and Duties, subarticle A, item 10 shall be amended to read as follows:

10.    Have the fullest discretion as to the methods and means of its day-to-day operation of its business, subject to the terms and conditions of this Agreement.

K000607

3.   Article III. Authority and Duties, subarticle B, item 10 shall be amended to read as follows:

   10.   Maintain, at the Manager's own expense, Errors and Omissions coverage and Fidelity Bond coverage with limits and terms acceptable to the Company; Company shall be named as an additional insured under the Errors and Omissions coverage.

4.   Article III. Authority and Duties, subarticle B shall have the following items added to read as follows:

   16.   Provide Company with the opinion of an Actuary attesting to the adequacy of loss reserves established for losses incurred and outstanding on business produced by WEB on a gross and net basis with respect to Company.

   17.   Provide Company with a statement of its financial condition prepared by an independent certified public accountant and provide Company with a certification of an independent certified public accountant that Manager's allocations of premiums and losses to Company have been made on a timely and proper basis on or before July 1 of each year this Agreement is in force in whole or in part in a form acceptable to the Company.

5.   Article III. Authority and Duties shall have the following subarticle D added to read as follows:

   D.   If Company suspects Manager of fraud, unapproved withholding of funds, specious accounting practices, or acts outside the terms of this Agreement, and Manager has not acted to resolve Company's suspicions in a manner satisfactory to Company within thirty (30) days as specified after Company's written request, Company may suspend any or all authority granted under this Agreement with additional written notice to the Manager.

6.   Article V. Compensation, shall be amended to read as follows:

   In consideration of the service provided by the Manager hereunder, the Company agrees to pay the Manager a Underwriting Management Fee, a Fronting Management Fee, and a Contingent Profit Commission as shown in Schedule B, which is attached to and made part of this Agreement. Said compensation shall be payable for as long as the business administered under the terms of this Agreement remains in force and as may be required under Article XII, TERMINATION.

7.   Article XI. Change of Terms, shall be amended to read as follows:

   This Agreement may be altered, amended or changed by mutual consent of the parties at any time this Agreement or portions thereof remain in force.

2

K000608

8.  Article XII. Termination. subarticle A shall be amended to read as follows:

This Agreement will automatically renew each January 1 beginning January 1, 1999, for a new twenty-four month Agreement Period unless either party gives written notice to the other party, via facsimile and Certified Mail, Return Receipt Requested, at least ninety (90) days prior to each January 1 beginning January 1, 1999.

9.  Article XII. Termination. subarticle B. item 3 shall be amended to read as follows:

3.  There is a material change in ownership, control or management of the Manager including the event that one or more of the three principals, Charles J. Bastan, Robin B. Ekwall, and/or Steven F. Wright, are no longer owners, managers, or active employees of Manager; or

10. Article XII. Termination. subarticle G shall be amended to read as follows:

Upon termination, the Manager shall, at Manager's own expense, handle claims during run-off, and shall furnish the Company with all necessary records, claims files, agreements, and notices concerning this business. The Manager shall continue to service the in-force business until the natural expiry of each treaty.

11. Article XIII. Responsibilities of Termination. subarticle D shall be amended to read as follows:

D.  Upon termination of this Agreement, the Company's record or knowledge of names of Insureds or Reinsureds and expiration dates with respect to business covered by this Agreement shall not be disclosed by the Company to any agent, broker or other person(s) unless required by law nor used by the Company for any purpose which shall abridge the Manager's rights or ownership, use, and control. The Company, nor its affiliates, subsidiaries, parent company(ies), successors or assigns, will not endeavor to solicit, underwrite or otherwise secure the new or renewal business of any policyholder originally underwritten by the Manager and for a substantially similar reinsurance arrangement as was placed by the Manager for a period of twenty-four (24) months after the termination date of this Agreement. Excluded from this clause will be all business that is initiated by the Company or its affiliated companies. This clause shall not apply in the event that the Company terminates this Agreement due to conditions stated in Article XII.B items 2, 4, 6, and 7. In addition, this clause will not apply in the event that this Agreement terminates and none of the original Managing Principals of the Manager (Robin B. Ekwall, Charles J. Bastan, and Steven F. Wright) are then currently actively involved in day-to-day generation of business pursuant to this Agreement.

3

K000609

12. Article XV. Arbitration. subsection C. fifth paragraph shall be amended to read as follows:

Within sixty (60) days after the beginning of the arbitration proceedings, the arbitrators will issue a written decision on the dispute and a statement of any award to be paid as a result of their decision. The decision will be based on the terms and conditions of this Agreement as well as the usual customs and practices of the insurance and reinsurance industry, rather than on strict interpretation of the law. The decision will be final and binding on both parties and there will be no further appeal, except that either party may petition any court having jurisdiction to enforce the award rendered by the arbitrators.

13. Article XVII. Entire Agreement, shall be amended to read as follows:

This Agreement, consisting of 26 pages, and Schedules A, B, C, D, E and F, constitutes the entire Agreement between the parties and may be varied only in writing signed by the parties hereto. The headings of the Articles herein and Schedules are for convenience only and have no legal effect with respect to interpretation of this Agreement.

14. Schedule B. Compensation. subsection C. Contingent Profit Commission. subsection 1), item 2 under Credits shall be amended to read as follows:

2. DEEMED INVESTMENT INCOME, and shall be calculated using the monthly two (2) year U.S. Treasury Rate plus fifteen (15) basis points. The deemed investment income shall be calculated as follows:

$$II_t = II_{t-1} + [ i_t^{(12)} \times ( II_{t-1} + \Sigma F_m + \tfrac{1}{2} F_t ) ]$$

where,

$II_t$ = Deemed Investment Income earned in month t

$i_t$ = monthly index rate on first business day of month t, with index being 2-year Treasury rate plus 15 basis points.

$i_t^{(12)} = (1 + i_t)^{1/12} - 1$

$F_t$ = funds submitted to Company in month t, less funds paid by Company in month t, less Underwriting Gain previously declared associated with profit commission paid in month t."

This Amendment No. 1, consisting of 5 pages, constitutes the entire Amendment No. 1 between the parties and may be varied only in writing signed by the parties hereto. All terms and conditions of the Agreement not specifically addressed in this Amendment remain unchanged.

4

K000610

IN WITNESS WHEREOF the parties hereto have executed this Amendment No. 1 as of the date recorded below:

In Bloomfield, Connecticut, for and on behalf of:

WEB MANAGEMENT LLC

Signature: _____

Name:  Steven F. Wright, FSA

Title:  Managing Principal

Date:  8/26/98

In Chicago, Illinois, for and on behalf of:

TRUSTMARK INSURANCE COMPANY

Signature: _____

Name:  MICHAEL J. HAWKSWORTH, ASA MAAA

Title:  ASSOCIATE ACTUARY

Date:  8/27/98

5

K000611

IN WITNESS WHEREOF the parties hereto have executed this Amendment No. 1 as of the date recorded below:

In Bloomfield, Connecticut, for and on behalf of:

**WEB MANAGEMENT LLC**

Signature: _____

Name: _____Steven F. Wright, FSA_____

Title: _____Managing Principal_____

Date: _____8/26/98_____

In Chicago, Illinois, for and on behalf of:

**TRUSTMARK INSURANCE COMPANY**

Signature: _____

Name: _____MICHAEL J. HAWKSWORTH, ASA MAAA_____

Title: _____Associate Actuary_____

Date: _____8/27/98_____

5

K000611