# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

SECURITY INSURANCE COMPANY OF :
HARTFORD,                        :
               Plaintiff,        :        Case. No. 3:01cv2198 (PCD)
                           :
        -vs-               :
                            :
TRUSTMARK INSURANCE COMPANY, :
               Defendant.       :

## RULING ON MOTION TO COMPEL

Pursuant to Fed. R. Civ. P. 37(a), Plaintiff Security Insurance Company of Hartford

("Security") moves to compel Defendant Trustmark Insurance Company ("Trustmark") to

produce documents and make other discovery.  For the reasons stated below, Security's Motion

[Doc. No. 338] is **granted** in part.

## I.      BACKGROUND:

Familiarity with this Court's prior Rulings is presumed.  Security seeks to conduct

discovery into the negotiations surrounding settlement agreements that Trustmark entered into

with two of its ceding companies, CNA Reinsurance Company Limited and Lloyd's Syndicate

9027.  Security contends that this discovery is relevant to its Connecticut Unfair Trade Practices

Act, Conn. Gen. Stat. §§ 42-110a <u>et seq</u> ("CUTPA") and Connecticut Unfair Insurance Practices,

Conn. Gen. Stat. §§ 38a-815 <u>et seq</u> ("CUIPA") claims.  Security also seeks production of certain

documents that Trustmark has asserted are privileged.  The facts will be discussed in more detail,

as needed, below.

1

## II.    STANDARD OF REVIEW:

"[T]he scope of discovery under Fed. R. Civ. P. 26(b) is very broad, 'encompass[ing] any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'" <u>Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.</u>, 964 F.2d 106, 114 (2d Cir. 1992), <u>quoting</u> <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 351, 98 S. Ct. 2380, 2389, 57 L. Ed. 2d 253 (1978).  "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . .  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).  The scope of discovery, however, is not without bounds, and limitations are imposed where the discovery is "unreasonably cumulative or duplicative," overly "burdensome . . . [or] expensive" or "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2).  An order compelling discovery is rendered after consideration of the arguments of the parties, and such order may be tailored to the circumstances of the case.  <u>Gile v. United Airlines, Inc.</u>, 95 F.3d 492, 496 (7th Cir. 1996).  The burden is on the party asserting a privilege to establish its existence. <u>See</u> <u>In re Grand Jury Subpoena</u>, 599 F.2d 504, 510 (2d Cir. 1979) ("[I]n claiming the protection of the attorney-client privilege '(t)he corporation has the burden of showing that the communication was made for the purpose of securing Legal advice, i.e., that it was made in contemplation of future professional action by the attorney'") (citation omitted).

## III.    DISCUSSION:

<u>A.    Whether Discovery as to the Settlements is Warranted:</u>

Fed. R. Evid. 408 provides that "[e]vidence of (1) furnishing or offering or promising to

furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount." Furthermore, it provides that evidence "of conduct or statements made in compromise negotiations" is similarly not admissible. Fed. R. Evid. 408. However, the "exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations" is not required and "when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution" it is not necessarily barred. Fed. R. Evid. 408.

Security argues that even if some of the information it might elicit in discovery would be inadmissible under Rule 408, Rule 408 "is not a bar to discovery of settlement negotiations" only admissibility. Security Mem. Supp. Mot. to Compel at 8. Rather, the relevance standard under Fed. R. Evid. 26, which does not require that the information sought be itself admissible, is the only applicable limit on the discovery at issue here. Trustmark counters that even if Security's argument concerning discoverability is technically correct, its request for discovery should be denied because it has "failed to establish the relevance of the requested discovery and has failed to establish any compelling need for the information." Trustmark Mem. Opp. Mot. to Compel at 13.

Trustmark refers to the argument that because settlement negotiations are in a certain sense protected by the rules of evidence and because such negotiations are often conducted in confidence with the expectation that they will not be disclosed, parties seeking discovery into the

3

negotiations should be subject to a higher standard than the basic relevance threshold in demonstrating the need for such documents.  See e.g Bottaro v. Hatton Assocs., 96 F.R.D. 158, 160 (E.D.N.Y. 1982) ("Given the strong public policy of favoring settlements and the congressional intent to further that policy by insulating the bargaining table from unnecessary intrusions, we think the better rule is to require some particularized showing of a likelihood that admissible evidence will be generated by the dissemination of the terms of a settlement agreement").  This rule has not, however, found universal support.  Indeed, for all those cases requiring a heightened level of scrutiny, there are at least as many that do not.  See In re Initial Pub. Offering Sec. Litig., 21 MC 92 (SAS), 2003 U.S. Dist. LEXIS 23102, *23 n. 35, *25 n.38 (S.D.N.Y., Dec. 24, 2003) (collecting cases).  The issue does not appear to have been widely addressed in this District.  The only opinion found supports discovery relating to settlement negotiations.  See Shirvani v. Capital Investing Corp., 112 F.R.D. 389, 392 (D. Conn. 1986) (Burns, J.) ("While compromise offers and the like would not be admissible as such at trial, Rule 408, Fed. R. Evid., that rule itself is not a total bar to any use whatsoever of all settlement-linked information, and it is not certain that these seven items could not 'lead to the discovery of admissible evidence', Rule 26(b)(1), Fed. R. Civ. P., so that pretrial disclosure should be made").

The parties have not pointed to any binding authority resolving the two positions, thus no requirements beyond those specified by Fed. R. Civ. P. 26 will be imposed here.  While there are policy reasons supporting limiting intrusion into settlement negotiations, Rule 408 permits those interests to give way when the settlement is relevant for a reason other than proving liability and, as a consequence, discovery should not be limited so as to preclude or otherwise burden inquiries directed towards exploring such legitimate uses.  Furthermore, Rule 26 provides an appropriate

check on those circumstances where a party can articulate no possible legitimate use for the information.  Accordingly, Security must show only that "the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

Security sets forth two arguments in support of the relevance of its discovery request. The first is that while Rule 408 may control the admissibility of certain evidence, its request is reasonably calculated to lead to admissible evidence because it "does not seek to introduce evidence relating to Trustmark's settlements with CNA and Syndicate 9027 for the purpose of proving Trustmark liable to those entities in connection with the claims that were settled through those agreements."  Security Mem. Supp. Mot. to Compel at 8.  Instead, Security "seeks to introduce such evidence to demonstrate that Trustmark is liable to Security in this case under CUTPA and CUIPA."  Security Mem. Supp. Mot. to Compel at 8.

Security's second argument is that Trustmark is going to attempt to use the "good faith" provisions of the settlement agreements to counter Security's CUTPA and CUIPA claims that Trustmark has engaged in a practice of "refusing in bad faith to pay claims on which liability is reasonably clear" to suggest that it did not act in fact act bad faith with respect to the reinsured. Security Mem. Supp. Mot. to Compel at 7.  As such, Security contends that Trustmark has "put the agreements at issue" and that Security is therefore entitled "to explore the circumstances of the negotiation and execution of the agreements so as to develop evidence that" such claims are not worthy of credence.  Security Mem. Supp. Mot. to Compel at 7.

With respect to the first argument, as Trustmark points out, this use would necessarily entail proving or at least suggesting liability on the settled action in order to establish liability in

the present one.[1]  Security's arguments suggest that because two separate actions are involved and the settlement negotiations do not pertain to the present action, Rule 408's prohibition is rendered inapplicable.  There is nothing on the face of the rule that would suggest such a limitation and Security does not cite to any authority finding it so.[2]  Thus, without further guidance, Security fails to demonstrate that such discovery appears reasonably calculated to lead to admissible evidence.

As to the second argument, Trustmark responds that it did not put the agreements at issue, as it was required to produce them pursuant to a prior Court order.  Trustmark Mem. Opp. Mot. to Compel at 12.  Notably, however, Trustmark does not deny that it intends to use the good faith clauses to counter Security's CUTPA and CUIPA claims.  Rather, Trustmark seems to hedge its bets on that point by denying that it put the agreements at issue, but not going so far as to say it has no intention to use the agreements as Security suggests it will.  Nevertheless, Trustmark argues that the information is not reasonably calculated to lead to admissible evidence for the same reason, as any use Security could put to evidence uncovered through discovery would

---

[1]    Resolution of this argument is complicated by the fact that although Security submitted copies of the settlement agreements, the full nature of the claims at issue have not been briefed.  See Decl. of Mark Holton, Exh. 2, 3.  Thus, the position taken is based more on Security's burden to demonstrate at least the possibility of producing admissible evidence, than the actual admissibility of the agreements and any evidence adduced as to the circumstances surrounding them.

[2]    It is noted that there is a difference between proving liability on the settled contract claims and the present CUIPA claim.  While the contract claim originally asserted likely "focuse[d] on the nature of the loss, the coverage of the policy and whether the parties have complied with all of the terms of the policy[,]" the CUIPA based CUTPA claim here focuses "on the conduct of the insurer ... [with] the insurer's duty stem[ming] not from the private insurance agreement but from a duty imposed by statute."  Lees v. Middlesex Ins. Co., 219 Conn. 644, 653, 594 A.2d 952, 956 (1991).  This difference is not, however, likely to be dispositive because under the statute liability must be "reasonably clear," Conn. Genn. Stat. § 38a-816(6)(f), and thus the merits of the contract based claim are at issue in proving the CUIPA claim.  Thus, Security would likely need to use the settlement negotiations to prove liability on the underlying claim in order to use them here and Rule 408 would apply.

necessarily entail using the settlement agreements to demonstrate that Trustmark improperly

rescinded contracts with either CNA or Syndicate 9027. Trustmark Mem. Opp. Mot. to Compel

at 14-15.

Trustmark, however, misses the mark on Security's second argument, which turns on the

need to rebut or impeach Trustmark's offer of the settlements agreements as evidence of its good

faith. See Security Reply Br. at 1-2. As such, use of the evidence discovered, if there is any,

would tend to cast doubt on Trustmark's assertions/defense rather than substantively prove

Security's claim as, at that point, Trustmark would have put the agreements at issue. Such a use

is clearly relevant. However, the use of the evidence for impeachment purposes may overlap

with proving the actual merit of Security's claims, thus making the distinction between

impeachment use and substantive use arguably tenuous requiring, at a minimum, potentially

confusing limiting instructions to the jury. In this sense, it is unfortunate that Trustmark did not

clarify its position on this argument beyond its noncommittal argument that it did not put the

agreements at issue, thus failing to respond to Security's argument that Trustmark intended to use

the language in the manner discussed. Had Trustmark's response stated forthrightly that it did

not intend to use the language in the agreements as Security suggests, Security's rebuttal

argument could be denied as clearly unfounded. In the alternative, had Trustmark stated clearly

that it was planning on using the language as discussed, or was at least considering it, this dispute

could be resolved with more clarity.

As it stands, Trustmark's relative silence leaves open the possibility that it could seek to

use the "good faith" clauses of the settlement agreements to its benefit. This potential use is not

without its problems. Just as Trustmark argues Security cannot use the circumstances

surrounding the settlement agreement to prove the invalidity of Trustmark's defense in that matter, Trustmark cannot use the same circumstances to demonstrate the invalidity of its opposition's claims in the same matter. See Fed. R. Evid. 408 (Evidence of offers to settle are "not admissible to prove liability for *or invalidity* of the claim or its amount") (emphasis added). Furthermore, the "good faith" clause used in that manner is arguably inadmissible hearsay. Nevertheless, the issue has not been fully developed and it would be inappropriate to foreclose either parties' arguments based on the current record. Accordingly, Security is authorized to conduct limited discovery into the circumstances surrounding the settlement agreements for the purpose of seeking to rebut Trustmark's potential use of the "good faith" clauses of those agreements. However, any attempt to use such evidence at trial or in any substantive motions will be carefully scrutinized. For this purpose alone, Security's Motion is **granted**.

      B.    Whether the Documents Requested are Privileged:

Trustmark categorizes the documents Security seeks as falling into one of three categories: 1) Communications between Trustmark and WEB, its agent and subsequent litigation consultant, and communications between Trustmark and Transamerica, its agent; 2) Communications between Trustmark and U.S. Life, its partner in the WEB facility; and 3) Communications among Trustmark's management and Associate General Counsel. Trustmark Mem. Opp. Mot. to Compel at 1-2. Trustmark argues that all documents associated with those communications are protected as work product, or privileged under the common interest doctrine or attorney-client privilege.

It should be noted at the outset that in a diversity action, the rule of decision with respect to whether a privilege exists is determined by state law. Fed. R. Evid. 501; see also In re

American Tobacco Co., 880 F.2d 1520, 1527 (2d Cir. 1989) ("in a diversity case the existence of a privilege is to be determined by reference to state law"); Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 470 (S.D.N.Y. 2003) (holding same). Thus, Connecticut law provides the scope of any privilege asserted. Neither of the parties, at least with respect to the common interest rule,[3] briefed the issues accordingly. However, because Connecticut law tracks federal law, the oversight is of little practical consequence. See Metropolitan Life Ins. Co. v. Aetna Cas. & Sur. Co., 249 Conn. 36, 61-62, 730 A.2d 51, 65 (1999) (citing federal caselaw to help define the common interest rule); State DOT v. Steinman Boynton Gronquist & Birdsall, Inc., CV 970571964, 1998 Conn. Super. LEXIS 1651, *6-11 (Conn. Super. Ct. May 26, 1998) (defining rule with reference to state and federal caselaw); Carrier Corp. v. Home Ins. Co., No. 35 23 83, 1992 Conn. Super. LEXIS 1713, *30-31 (Conn. Super. Ct. June 10, 1992) (discussing approvingly both federal and state caselaw).

"As a general rule, communications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice." Olson v. Accessory Controls & Equip. Corp., 254 Conn. 145, 157, 757 A.2d 14, 22 (2000). Thus, communications "made in confidence by the client, are at [the client's] instance permanently protected from disclosure by [the client] or by the legal adviser, so long as the protection has not been waived." Shew v. Freedom of Info. Comm'n, 245 Conn. 149, 157, 714 A.2d 664, 669 (1998) (brackets in original). The "privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him [or her] to give sound and

---

[3]    Trustmark does cite some state law in its discussion of the attorney-client privilege. Trustmark Mem. Opp. Mot. to Compel at 11.

informed advice." Id., 714 A.2d at 670.  However, because the privilege has the effect of

shielding relevant information from disclosure, "it protects only those disclosures -necessary to

obtain informed legal advice -- which might not have been made absent the privilege." Id. At

157-58, 714 A.2d at 670.  Ordinarily, disclosures made in the presence of third-parties are not

protected.  Olson, 254 Conn. at 157, 757 A.2d at 22.  However, the presence of third-parties

"who are agents or employees of an attorney or client, and who are necessary to the consultation,

will not destroy the confidential nature of the communications." Id. at 157, 757 A.2d at 22.

The common interest rule is an extension of attorney-client privilege and "serves to

protect the confidentiality of communications passing from one party to the attorney for another

party where a joint defense effort or strategy has been decided upon and undertaken by the parties

and their respective counsel." United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989).

As such, "[o]nly those communications made in the course of an ongoing common enterprise and

intended to further the enterprise are protected." Id.  In order to be protected under the common

interest rule, all other elements of the attorney-client privilege must be met.  Gulf Islands

Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 470 (S.D.N.Y. 2003).  Thus, the

communication must be made in confidence and reasonably understood to be in confidence.

Schwimmer, 892 F.2d at 244.  Thus, with respect to the common legal interest requirement, it is

not necessary that there be actual litigation in progress or that "the attorney representing the

communicating party be present when the communication is made to the other party's attorney[,]"

so long as "multiple clients share a common interest about a legal matter[.]" Id. at 243-44.

The work product doctrine "encompasses work that is essentially the result of an

attorney's activities when those activities have been conducted with a view toward litigation."

Metropolitan Life, 249 Conn. at 52 n. 17, 730 A.2d at 60 n. 17.  "The work product doctrine

protects an attorney's "interviews, statements, memoranda, correspondence, briefs, mental

impressions, personal beliefs and countless other tangible and intangible [items]."  Barksdale v.

Harris, 30 Conn. App. 754, 760, 622 A.2d 597, 601 (1993) (brackets in original).  "The mere fact

that a party has the report prepared because he anticipates future litigation is insufficient to clothe

the report with the attorney-client privilege."  Stanley Works v. New Britain Redevelopment

Agency, 155 Conn. 86, 95, 230 A.2d 9, 14 (1967).  An attorney's work "must have formed an

essential step in the procurement of the data which the opponent seeks, and the attorney must

have performed duties normally attended to by attorneys."  Id. at 95, 230 A.2d at 14.  Lack of

involvement of counsel is "dispositive" over claims of work product protection.  Id. at 95, 230

A.2d at 14.

      1.     Communications Between Trustmark and its Agents or Consultants:

This category of communications includes requests for documents 318 and 282.

Document 318 "is a communication from Michael Hawksworth, Trustmark's Vice President and

Corporate Actuary, to Robin Ekwall ... In this correspondence, Mr. Hawksworth communicates

issues he discussed with Trustmark's Associate General Counsel, Mr. Ray Lester, in order for

Mr. Ekwall to assist in the formation of Trustmark's legal strategy."  Trustmark Mem. Opp. Mot.

to Compel at 3.  As such, "Mr. Hawksworth worked with Mr. Lester, and created an inventory of

issues potentially resulting in litigation.  These issues were relayed to Mr. Ekwall, as Trustmark's

consultant and agent."[4]  Trustmark Mem. Opp. Mot. to Compel at 4.

---

[4]    WEB was Trustmark's "managing general agent for the placement of the reinsurance agreements" at issue in this case.  Trustmark Mem. Opp. Mot to Compel at 2 n. 3.  However, when this role ceased, Trustmark retained Mr. Ekwall as a litigation consultant.  Trustmark Mem. Opp. Mot to

Trustmark's assertion that the document is protected by the common interest rule is without merit.  Trustmark has not even conclusorily pointed to a common legal interest between the individuals receiving the communication.  Mr. Ekwall does not appear to be involved in any actual or potential litigation, other than the present litigation, and with no role in that matter other than his status as agent or consultant.  Thus, his status as an agent or consultant suggests that he should not be treated as a separate entity with potentially divergent interests of his own, engaging in a common legal strategy, but that for purposes of this litigation, he might be treated as synonymous with the entity Trustmark.  The relevant question, then, with respect to attorney-client privilege is whether Ekwall qualifies as an "agent[] or employee[] of an attorney or client," who is "necessary to the consultation," and does "not destroy the confidential nature of the communications."  Olson, 254 Conn at 157, 757 A.2d at 22.  Because Ekwall's status as an agent/consultant is not in dispute, the crucial question is whether his involvement was "'inextricably linked to the giving of legal advice' so as to bring [it] within the attorney-client privilege."  Id. at 158, 757 A.2d at 23, citing Shew, 245 Conn. at 162, 714 A.2d at 672.  Ekwall's "personal services agreement" clearly reflects that his purpose is to "assist and consult with the United States Life Group and/or Trustmark and their affiliates, agents and counsel in the prosecution or defense of any claims, suits, litigation, arbitrations, investigations, or other proceedings...."  Trustmark Mem. Opp. Mot. to Compel, Exh. C.  Thus, it is reasonable to assume that at least some of his services were "connected intimately to the rendering of legal advice, and hence, properly [within] the attorney-client privilege."  Id. at 168, 757 A.2d at 28.

Of course, even if the mere disclosure to Ekwall of the information does not destroy the

---

Compel at 2 n. 3.

privilege, when dealing with consultants, the line must still be drawn between "technical, factual information that is necessary for legal advice and technical information that is not essential to such advice." Id. at 159-60, 757 A.2d at 24. This line is a difficult one to draw. Trustmark submitted a redacted version of the document, which purportedly excludes only privileged information. This may be the case, but the Court will conduct an *in camera* review of the unredacted document to ensure that no otherwise discoverable information has been excluded. Trustmark shall produce the document for that purpose.

Document 282 is "a communication from Gene Wilkinson of Transamerica to Mr. Hawksworth and Phillip Chapman of U.S. Life...." Trustmark Mem. Opp. Mot. to Compel at 4. At the time of the communication, "Transamerica had replaced WEB as Trustmark's agent for the purposes of monitoring and administering the business previously managed by WEB. ...[As such, the] communication discusses the legal position Trustmark and AAL (as partners in the WEB facility) will take relative to certain business administered by Transamerica." Trustmark Mem. Opp. Mot. to Compel at 4. Trustmark alleges that this document is protected by the common interest rule as well as the work product doctrine.

In explaining the common interest at stake Trustmark explains that "[a]s the agent of Trustmark and its partner AAL, Transamerica was assisting Trustmark and AAL with respect to actual and potential claims involving the WEB Facility." Trustmark Mem. Opp. Mot. to Compel at 5. It asserts that "Transamerica has a common legal interest with its principals, Trustmark and AAL, and communications made between them for the purpose of obtaining legal advice are privileged." Trustmark Mem. Opp. Mot. to Compel at 5.

Admittedly, Trustmark would seek to be circumspect about what it reveals in discussing

13

the common interest that is allegedly at stake, and is not required to compromise the confidentiality of the communication in attempting to prove that it is privileged. However, some information must be provided such that it can be decided with reasonable specificity that as a factual matter that a common interest does exist and that the communication "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." Schwimmer, 892 F.2d at 243. Trustmark does not provide that information. Furthermore, the common interest rule does not alleviate Trustmark from proving the other elements of the attorney-client privilege. Gulf Islands Leasing, 215 F.R.D. at 470. No lawyer is listed in the privilege log as having either sent or received the communication, thus it is difficult to understand how this could be a communication "between client and attorney ... made in confidence for the purpose of seeking legal advice." Olson, 254 Conn. at 157, 757 A.2d at 22. The fact that a legal matter is contemplated is not by itself dispositive. The lack of any reference to a lawyer's involvement at all is also sufficient to defeat Trustmark's work product argument. Stanley Works, 155 Conn. at 95, 230 A.2d at 14. Accordingly, Security's Motion is **granted** and Trustmark is ordered to produce document 282.

2.    Communications Between Trustmark and AAL:

This group of nine documents includes numbers 263, 264, 266, 267, 289, 311, 314, 366, and 367. Trustmark argues that each of the documents are protected by either work product, the attorney-client privilege, or the common interest rule. Trustmark states that

> Documents 266, 289, 314, 366, and 367 were authored by counsel [footnote omitted] and specifically discuss potential pending litigation risks related to the VQS and Lloyd's Syndicate, which would affect both Trustmark and AAL as partners. Document 266

14

includes correspondence from the English law firm to counsel for AAL and Trustmark, discussing the representation of the Trustmark/AAL partnership in an English dispute. Document 389 contains correspondence from the English law firm discussing arbitration strategy for a matter involving the Trustmark/AAL partnership.  Document 314 reports on three matters involved in litigation.  Documents 366 and 367 are correspondence from Trustmark's counsel to AAL's counsel regarding an agreement involving potential litigation."

     ...In addition, Documents 263, 264, 267 and 311 discuss various Trustmark/AAL partnership issues involving pending or potential litigation, including the representation of AAL and Trustmark in future litigation relating to these issues.  In fact, Document 267 contains correspondence and a lengthy legal analysis under English law of various issues related to the Trustmark/AAL partnership.  Document 311 outlines the position AAL should take in a dispute regarding certain WEB Facility business.  Documents 263 and 264 are status reports of various pending and potential litigation.

Trustmark Mem. Opp. Mot. to Compel at 7-8.  Trustmark goes on to acknowledge that documents 263, 264, 267, and 311 were not authored by an attorney, but states that they were authored with litigation in mind and discuss those "pending and potential" matters.  Trustmark Mem. Opp. Mot. to Compel at 8.

Although Trustmark argues that the communications are protected by work product as well as attorney-client privilege, the issue is more appropriately analyzed under the common interest test.  Trustmark characterizes AAL as its partner and thus its status would likely be different from that of an agent or employee of an attorney to whom the disclosure of information might not destroy the confidentiality of the communications.  See Olson, 254 Conn at 157, 757 A.2d at 22.  Similarly, with work product, disclosure of confidential communications to a third party will constitute a waiver of that protection.  Harp v. King, 266 Conn. 747, 767, 835 A.2d 953, 966 (2003).  Because AAL is a separate entity, albeit a partner of Trustmark's, it has interests capable of diverging from Trustmark's, and, in contrast to Ekwall, seems capable of being party to a litigation involving Trustmark and should not be treated as synonymous with it.

15

Thus, the relevant question is whether those interests do in fact diverge such that the common interest rule does not apply and disclosure to AAL destroys the confidentiality of the communications.

With respect to the common interest rule, Trustmark characterizes documents 289, 314, 366, and 367 as "exchanges between Trustmark's counsel and AAL's counsel[;]" documents 263, 264, 266, and 311 as "communications among counsel and business people[,]" and document 267 as "a communication between members of Trustmark's management ... relaying information provided by counsel and management of Trustmark's partner, for the purpose of facilitating their common interest." Trustmark Mem. Opp. Mot. to Compel at 8-9. Trustmark argues that because "they are partners and have joint liability on various reinsurance treaties, Trustmark and AAL undeniably share a common legal interest in the outcome of litigation relating to those treaties." Trustmark Mem. Opp. Mot. to Compel at 9. Thus, although they "have retained separate counsel, the documents reflect communications among the parties and their counsel, aimed at coordinating the Trustmark/AAL litigation strategy related to retrocessional coverage...." Trustmark Mem. Opp. Mot. to Compel at 9.

Security argues that Trustmark has not made a sufficient showing demonstrating that a common legal interest, that no such interest can exist when AAL is not party to the present litigation, and that to the extent that there is a common legal interest, Trustmark has simply been "cc-ing" attorneys on the communication and that it is therefore unlikely the documents were created at the request of an attorney for the purpose of obtaining legal advice. Security Reply Br. at 11-12.

Although Security cites to several district court opinions in favor of its argument that

because AAL is not party to this litigation it cannot share a common interest with Trustmark, this argument is not supported by Second Circuit decisions.  Indeed, it seems in direct contradiction.  See Schwimmer, 892 F.2d at 243-244 ("'The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter,' [citation omitted], and it is therefore unnecessary that there be actual litigation in progress for the common interest rule of the attorney-client privilege to apply").  If there need not be actual litigation in progress, the strict requirement that both entities be party to the same litigation cannot stand.

Security does raise a legitimate point concerning the vague description of the common legal interest asserted.  While partners certainly may share a legal interest, there is no guarantee that they will and their interests may very well diverge.  Trustmark's argument is sufficiently devoid of detail such that if accepted, it could only support the proposition that anytime a partnership is involved and the conclusory assertion is made that a coordinated legal strategy is being developed or vague references to an "English dispute" are included, the common interest rule applies.  Some description of the contours of the common interest can presumably be made without compromising the allegedly confidential and privileged information.  Accordingly, Trustmark shall produce the documents in question for *in camera* review[5] for the purpose of determining whether in fact a common interest is reflected in the documents and whether the communications are tailored to that interest or more akin to business communications with legal implications.  See United States v. United Techs. Corp., 979 F. Supp. 108, 111 (D. Conn. 1997)

---

[5]     In contrast to the discussion surrounding document 282, Trustmark has established the other elements of the privilege and thus *in camera* review is appropriate, and not simply an order that Trustmark disclose the documents.

("[T]he common interest doctrine does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation").

3.    Communications Between Management and Counsel:

This category of allegedly privileged communications includes documents 298, 299, 300, 301, 307, 308, 309, and 316. Trustmark asserts that the documents are covered by both attorney-client privilege and the work product doctrine.

As an initial matter, Trustmark acknowledges that the documents were not prepared by a lawyer, but argues that, because they were prepared in anticipation of litigation, they are still entitled to work product protection. Trustmark Mem. Opp. Mot. to Compel at 11-12, citing Viacom, Inc. v. Sumitomo Corp. (In re Copper Mkt. Antitrust Litig.), 200 F.R.D. 213, 221 (S.D.N.Y. 2001). However, this is not how the doctrine has been articulated under Connecticut law which states that the involvement of an attorney is a prerequisite. See Stanley Works, 155 Conn. at 95, 230 A.2d at 14 (An attorney's work "must have formed an essential step in the procurement of the data which the opponent seeks, and the attorney must have performed duties normally attended to by attorneys"). While, as discussed below, Trustmark explains that the documents were prepared at the request of counsel, "[t]he mere fact that a party has the report prepared because he anticipates future litigation is insufficient to clothe the report with the attorney-client privilege." Id. at 95, 230 A.2d at 14. The work product doctrine covers "interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs and countless other tangible and intangible" items. Barksdale, 30 Conn. App. at 760, 622 A.2d at 601. It is not at all clear how these documents fall into any category of documents or other intangibles that are protectible as an *attorney's* work product and not simply the work

product of a company employee created with litigation in mind.  Thus, Trustmark fails to meet its

burden to demonstrate the privilege and the documents are not accorded work product protection.

With respect to attorney-client privilege, Trustmark states that documents 298, 299, 300,

and 301 "are copies of a single memorandum prepared in November 2000 by Michael

Hawksworth, a Vice President and Corporate Actuary for Trustmark, and addressed to several

other members of Trustmark's senior management ... as well Trustmark's Associate General

Counsel, Mr. Ray Lester."  Trustmark Mem. Opp. Mot. to Compel at 10.  Documents 307, 308,

and 309 "are copies of a similar memorandum prepared in February 2001 by Mr. Hawksworth,

directed again to the same members of Trustmark's senior management and Trustmark's

Associate General Counsel."  Trustmark Mem. Opp. Mot. to Compel at 10.  Finally, document

316 "was prepared by Mr. Hawksworth to the same members of Trustmark's senior management

and Trustmark's Associate General Counsel."  Trustmark Mem. Opp. Mot. to Compel at 10.

Each document was purportedly prepared "at the request of counsel, and was prepared in order to

assess the strengths and weaknesses of pending and threatening litigation."  Trustmark Mem.

Opp. Mot. to Compel at 10.

Security argues that because non-lawyers received the documents, "and the fact that the

single attorney recipient received only a courtesy copy, it is highly unlikely that every word in the

memorandum constitutes a communication by client to lawyer for the purpose of securing legal

advice or that every word is work product prepared at the behest of counsel in anticipation of

litigation."  Trustmark Mem. Opp. Mot. to Compel at 12.  Security's arguments reflect mistrust

more than a legally cognizable basis to attack the claim of privilege, which on its face appears

quite defensible.  See Shew, 245 Conn. at 157, 714 A.2d at 669 (The "privilege exists to protect

not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him [or her] to give sound and informed advice").  It is certainly possible, even probable, that counsel for a corporation would need to gather information from multiple members of management in order to prepare for litigation pending or otherwise. There is no necessity here to inquire further into the nature of the legal interest, as there was in the common interest discussion, for there has been no disclosure outside of the entity asserting the privilege that could destroy the confidentiality of the communications.  Accordingly, Security's Motion to Compel production of these documents is **denied**.

**IV.     CONCLUSION:**

For the reasons stated herein, Security's Motion to Compel [Doc. No. 338] is **granted** in part.  Trustmark shall produce before the Court all documents subject to *in camera* review on or before September 10, 2004.

SO ORDERED.

Dated at New Haven, Connecticut, August  25 , 2004.

_____
                    /s/
Peter C. Dorsey, U.S. District Judge
United States District Court