## In The Matter Of:

*SECURITY INSURANCE COMPANY OF HARTFORD v. TRUSTMARK INSURANCE COMPANY*

---

*MICHAEL J. HAWKSWORTH*

*January 10, 2003*

---

*ELISA DREIER REPORTING CORP.*
*780 THIRD AVENUE*
*7TH FLOOR*
*NEW YORK, NY 10017*
*(212) 557-5558*

Original File 0110SECU.TXT, 238 Pages
Min-U-Script® File ID: 0378192530

**Word Index included with this Min-U-Script®**

Page 29

*Hawksworth*

[1]  
[2] A: If you mean any interest — let  
[3] me ask you, what do you mean by "any  
[4] interest"?  
[5] Q: Did Trustmark reinsure U.S. Life  
[6] on that business in any way?  
[7] A: Yes.  
[8] Q: What was the nature of that  
[9] reinsurance?  
[10] A: It was a partnership. We shared  
[11] 50 percent of the net results.  
[12] Q: Was that partnership reflected in  
[13] a written agreement, or written documents?  
[14] A: No.  
[15] Q: Who were the individuals involved  
[16] in that understanding, if it's not reflected  
[17] in writing?  
[18] Who would we want to talk to to  
[19] ask questions about it or to get the details  
[20] about it?  
[21] MR. MEYER: I think I've given  
[22] you a little bit of latitude just for  
[23] background purposes.  
[24] But I think we're going afield of  
[25] the 30(b)(6) complaint topics here.

Page 30

*Hawksworth*

[1]  
[2] I'm going to lodge that objection.  
[3] And I strongly suggest you move  
[4] on back to the topic of the  
[5] Third-Party Complaint.  
[6] MR. COHEN: I think this is  
[7] squarely within the scope of the  
[8] deposition.  
[9] Q: Will you please answer the  
[10] question?  
[11] A: I guess I'm not sure. Are you  
[12] looking for the person who would know the  
[13] most about it? Or anyone who ever knew  
[14] anything about it?  
[15] I guess I'm not sure how to  
[16] answer.  
[17] Q: Who agreed to the partnership?  
[18] DI MR. MEYER: This is going beyond  
[19] the scope of this 30(b)(6) deposition.  
[20] I'm going to instruct the witness  
[21] not to answer.  
[22] Why don't you ask your next  
[23] question?  
[24] MR. COHEN: You're instructing on  
[25] scope?

Page 31

*Hawksworth*

[1]  
[2] MR. MEYER: I'm instructing on  
[3] what I'm instructing on. You may take  
[4] your next question.  
[5] MR. HOLTON: You know that's not  
[6] a proper instruction.  
[7] MR. COHEN: We're going to take a  
[8] break and get Judge Dorsey on the  
[9] phone right now.  
[10] Are you going to hold by that  
[11] instruction?  
[12] MR. MEYER: You're calling the  
[13] judge? Go ahead.  
[14] (Discussion off the record.)  
[15] BY MR. COHEN:  
[16] Q: In connection with the 4/1/98  
[17] treaty, was there anybody involved in the  
[18] underwriting of that treaty, and in  
[19] particular, the decision to enter into the  
[20] treaty other than people at WEB?  
[21] A: I can't say for certain. My best  
[22] guess is yes, but I'm not certain.  
[23] Q: Giving us your best guess, who do  
[24] you believe may have been involved in the  
[25] underwriting of the 4/1/98 treaty?

Page 32

*Hawksworth*

[1]  
[2] MR. MEYER: Objection. Calls for  
[3] speculation. Calls for a guess. You  
[4] may answer subject to the objection.  
[5] A: I guess I'm not sure. I could  
[6] guess, but I don't know if that's really  
[7] useful.  
[8] Q: Is it your understanding that  
[9] WEB's underwriting of individual accounts  
[10] had to be approved by anybody at U.S. Life?  
[11] A: I'd say in general, no.  
[12] Q: And was WEB's underwriting of  
[13] individual accounts subject to the approval  
[14] or review of anybody from Trustmark?  
[15] A: On certain cases I would say yes.  
[16] But in general, no.  
[17] Q: And what criteria were enforced  
[18] to determine which case had to be approved  
[19] by Trustmark and which did not?  
[20] A: I assume you're talking at the  
[21] time that they wrote it?  
[22] Q: Yes.  
[23] A: Which was June.  
[24] I think by that point, WEB only  
[25] needed approval to write business that

Page 33

*Hawksworth*

[1]
[2] would — that was forecast to be over
[3] $2 million of net premium to the facility.
[4]   Q: And was this TIG account one such
[5] account?
[6]   A: I believe it was.
[7]   Q: Can you tell me who at Trustmark
[8] was involved in the process of reviewing and
[9] approving the TIG account?
[10]  A: I'm not certain.
[11]  Q: What information was provided by
[12] WEB to Trustmark in connection with that
[13] review and approval?
[14]  A: I believe they submitted their
[15] usual, I think what we call — it was a
[16] pricing memo that would lay out the key
[17] aspects of the deal in terms of the
[18] producing company, the broker, the
[19] production source, and a financial analysis
[20] of the proposed deal.
[21]  Q: Anything other than that pricing
[22] memo?
[23]  A: I mean, other than conversations
[24] I might have had, I'm not aware of any.
[25]  Q: So there may have been other oral

Page 34

*Hawksworth*

[1]
[2] discussions between Trustmark and WEB
[3] regarding an individual account, you're just
[4] not aware whether that happened on this
[5] particular case, the TIG account?
[6]   A: Right.
[7]   Q: Let me ask the same questions
[8] with respect to the 1/1/99.
[9]      Was WEB's underwriting subject to
[10] review or approval by anybody at Security?
[11]     MR. HOLTON: Objection.
[12]  A: I guess I don't know for certain.
[13] My best guess is that it wasn't, but, you
[14] know, I could be wrong.
[15]  Q: I'll share your counsel's
[16] instruction that when you really are just
[17] guessing, you don't need to do that because
[18] that's not going to help anybody.
[19]  A: Okay.
[20]  Q: I appreciate your wanting to
[21] answer the questions as fully as possible.
[22] If you have a basis for your belief, as
[23] vague as it may be, that's a little
[24] different than a pure guess.
[25]     But you can eliminate the guesses

Page 35

*Hawksworth*

[1]
[2] from your answers.
[3]   A: Okay.
[4]   Q: With respect to the 1/1/99
[5] treaty, was WEB's underwriting subject to
[6] review and approval by Trustmark?
[7]   A: I would say no because it was
[8] really just a rewrite of the old treaty
[9] which they had already sought permission on.
[10]  Q: So even if an account met the
[11] size of the criteria by premium volume, if
[12] there was a renewal, there was no
[13] requirement on WEB's part to go back to
[14] Trustmark to get approval of the renewal?
[15] That's your understanding?
[16]     MR. HOLTON: Objection.
[17]  A: You called it a renewal, this is
[18] not a renewal. This is a rewrite.
[19]  Q: I'm sorry. I meant to say
[20] rewrite. I'm modifying my question.
[21]  A: Well, in this instance, really
[22] what was happening is they were putting in
[23] Security as a property and casualty fronting
[24] company and not really changing the
[25] fundamentals of the deal, the pricing

Page 36

*Hawksworth*

[1]
[2] structure and so on.
[3]     So that's the reason that I don't
[4] think they needed to get approval on.
[5]   Q: What did you mean in your last
[6] answer by "the fundamentals of the deal"?
[7]   A: Well, basically, the layers they
[8] would be assuming, you know, it's the same
[9] business they're reinsuring, it is the same
[10] broker, for the most part, the same
[11] reinsurance structure. Those things were to
[12] be the same as the old deal.
[13]  Q: Did WEB reunderwrite the account
[14] when it was rewritten?
[15]  A: Yes, I believe they did.
[16]  Q: And they reviewed their pricing?
[17]  A: Yes. It's my understanding.
[18]  Q: And that reunderwriting and
[19] repricing was not something that was subject
[20] to a requirement of review and approval by
[21] Trustmark?
[22]  A: No. I guess I — I mean, I don't
[23] believe it was, no.
[24]  Q: In these ten items that you
[25] listed, these were all items that