# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SECURITY INSURANCE COMPANY OF )
HARTFORD, )
 )
                     Plaintiff, )
 )
v. )
 )
TRUSTMARK INSURANCE COMPANY )
 )
                     Defendant. )
_____) Civil No. 301CV2198(PCD)
 )
TRUSTMARK INSURANCE COMPANY, )
 )
                 Third Party Plaintiff, )
 )
v. )
 )
TIG INSURANCE COMPANY, ) **JURY DEMAND**
 )
               Third Party Defendant. )

FILED
MAY 3  I 05 PM '02
U.S. DISTRICT COURT
NEW HAVEN, CONN.

## THIRD PARTY COMPLAINT

Third Party Plaintiff Trustmark Insurance Company ("Trustmark"), through its undersigned counsel, brings this Complaint against Third Party Defendant TIG Insurance Company ("TIG"), for fraud and negligent misrepresentation based upon the material misrepresentations and omissions made by the Defendant in its attempt to transfer to its unsuspecting reinsurers tens of millions of dollars in losses stemming from its under-performing workers' compensation business. In support of this Complaint, Trustmark states as follows:

## I.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 in that this is a civil action between citizens of different states where the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

2. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## II.

## FACTS COMMON TO ALL COUNTS

### A. The Nature of the Case

3. This case is about TIG's attempt to knowingly defraud the reinsurance marketplace so that it could pass on to its reinsurers hundreds of millions of dollars of poorly performing workers' compensation business. As it turns out, these workers' compensation risks were poorly underwritten, managed and reserved by TIG or its agents. In an effort to secure reinsurance at prices inconsistent with the true nature of these risks, TIG, through its agents, provided false and misleading information to the marketplace with the intent to induce the marketplace to rely on these misrepresentations and omissions.

4. As a result, TIG fraudulently induced WEB Management LLC ("WEB"), the managing general agent for both Security Insurance Company of Hartford ("Security") and Trustmark, to bind Security and then subsequently Trustmark to provide excess of loss reinsurance with respect to TIG's 1999 and 2000 workers' compensation risks. TIG knew WEB would rely on its material omissions and

misrepresentations when accepting this business for Trustmark. Had the truth about these risks been known to WEB at the time of analyzing these risks, WEB would not have bound Trustmark to provide reinsurance to Security. Because of TIG's fraud, Trustmark seeks damages from TIG in the amount of any net losses that it may be required to pay on this business to Security, its attorneys' fees and costs associated with its on-going litigation with Security, punitive damages and an order requiring TIG to indemnify Trustmark for any further losses not otherwise recovered in this action.

**B.     The Relationship of the Parties and Their Agents**

5.     Plaintiff Trustmark is a mutual insurance company organized under the laws of the State of Illinois, and having its principal place of business in Lake Forest, Illinois. Trustmark is a life and health insurance company that, among other things, is also engaged in the business of reinsurance.

6.     Defendant TIG is an insurance company domiciled in California with its principal place of business in Irving, Texas. TIG is a property and casualty insurance company that, among other things, provides workers' compensation insurance directly to policyholders across the United States. TIG also provides reinsurance to other property and casualty companies that write workers' compensation insurance.

7.     Security is a Connecticut insurance company with its principal place of business in Connecticut. Security is a property and casualty insurance company that has participated in the reinsurance market, including providing reinsurance for workers' compensation risks.

3

8.  From late 1996 through the middle of 2000, WEB, who is not a party to this litigation, acted as a reinsurance managing general agent ("MGA"). In the reinsurance business, MGA's are customarily given broad authority to act on behalf of their principals. Among other things, MGA's are usually given the authority to underwrite, administer and manage portfolios of reinsurance business. This usually includes the authority, subject to conditions, to bind principals to contracts of reinsurance.

9.  At all relevant times herein, WEB was the MGA for both Security and Trustmark. As MGA for both, WEB, subject to certain conditions, had the authority to bind both Security and Trustmark to contracts of "inward reinsurance," whereby Security or Trustmark would provide reinsurance to other insurance or reinsurance companies. WEB also had the authority to collect premiums and pay claims for both Security and Trustmark. Finally, WEB had the authority to secure for both Security and Trustmark contracts of "outward reinsurance," whereby all or some of the risks reinsured by Security or Trustmark were ceded to other reinsurance companies. This is commonly referred to in the reinsurance industry as a "retrocession" and the reinsurance companies that reinsure reinsurers are commonly referred to as "retrocessionaires."

## C. TIG's Workers' Compensation Portfolio

10.  In 1999 and 2000, TIG had a significant workers' compensation portfolio (the "TIG Workers' Compensation Portfolio" or sometimes the "Portfolio"). This Portfolio exceeded $425,000,000 (Four Hundred and Twenty Five Million Dollars) in annual premium. As part of this Portfolio, TIG provided workers' compensation insurance directly to policyholders ("TIG Direct Business"). TIG also provided

4

reinsurance to other property and casualty insurance companies that wrote direct workers' compensation insurance for policyholders (the "TIG Assumed Business"). Thus, TIG was itself both a direct insurer and a reinsurer.

11. With respect to the TIG Assumed Business, TIG received 100% of the risks written on the paper of other insurance companies through a series of Quota Share agreements. By far, the largest single piece of the TIG Assumed Business was the business written on Virginia Surety Insurance Company ("VSC") paper (the "VSC Block"). The VSC Block exceeded over $100,000,000 (One Hundred Million Dollars) in annual premium and was, in terms of premium, approximately 25% of TIG's entire Workers' Compensation Portfolio.

12. VSC's MGA, Muirfield Underwriters, marketed, underwrote, priced and administered this business.

**D.   TIG's Purchase of Low Layer Reinsurance in the Middle of 1998**

13. Historically, (at least until April of 1998) TIG retained a large amount of the risk associated with the claims that were made under its Workers' Compensation Portfolio. Prior to April, 1998, TIG purchased "high layer reinsurance." Specifically, TIG purchased a variety of excess of loss reinsurance protections with attachment points starting at $1,000,000 (One Million Dollars) per occurrence. In other words, TIG was required to pay the first $1,000,000 (One Million Dollars) of each and every claim prior to seeking reimbursement from its reinsurers. In the insurance industry, this is known interchangeably as a "retention" or "attachment point."

14. By early 1998, TIG decided that it no longer wanted to have such a high level of retention. TIG instructed its agent, Aon Re Worldwide ("AON"), to find it

reinsurance with an attachment point of $100,000 (One Hundred Thousand Dollars). With this low attachment point, TIG was only responsible for the first $100,000 (One Hundred Thousand Dollars) of each claim as opposed to being responsible for the first $1,000,000 (One Million Dollars) per claim under its old reinsurance structure. In terms of percentage of risk retained by TIG on its Workers' Compensation Portfolio, TIG reduced its retention (and financial exposure) by 90%. By July of 1998, TIG had in place a three year excess of loss reinsurance agreement with United States Life Insurance Company ("USL") with a retention of $100,000 (One Hundred Thousand Dollars).

### E.   Security's Reinsurance of TIG

15.   Almost immediately after finalizing this three year excess of loss agreement, TIG decided that it wanted to "shop" its Workers' Compensation Portfolio. Accordingly, on September 11, 1998, TIG provided USL with a provisional notice of cancellation. TIG also instructed AON to prepare new placement material relating to its Workers' Compensation Portfolio (the "Placement Material").

16.   In the reinsurance industry, underwriters for reinsurance companies review and rely upon placement material in order to evaluate the risk, price the reinsurance and decide whether to offer any reinsurance on the risk in the first instance.

17.   Among other things, the Placement Material included information relating to the historical performance of the TIG Workers' Compensation Portfolio, its reserves, and a written description of each segment of business included in the Portfolio. The written description of the segments of TIG Workers' Compensation Portfolio described such things as the underwriting philosophy associated with that

particular segment, the types of risks that were insured, what TIG expected to happen to those segments in the future and the results of any audits conducted with respect to those segments.

18. With respect to the VSC Block, the Placement Materials stated, *inter alia*:

### Changes for 1999

This Program is expected to expand geographically somewhat from its traditional Midwestern base. Expansion states include FL, CA, & PA.

\*   \*   \*

### Controls

In addition to day to day Program Management, TIG conducts annual Underwriting, Claims, and Actuarial reviews of this business unit. Major findings to date include a need to implement stronger managed care and injury management practices.

19. AON prepared a draft of the Placement Material, which TIG reviewed and approved. In or about October, 1999, AON finalized the Placement Materials and provided it to WEB.

### F. TIG's Audit of Muirfield Underwriters

20. On May 5-8, 1998, more than five months before AON prepared the Placement Material, TIG personnel conducted an Actuarial, Claims and Underwriting Audit of Muirfield Underwriters, the MGA for the VSC Block (the "Muirfield Audit").

21. The TIG auditors found significant and systemic problems with the VSC Block. With respect to reserving, the TIG auditors found that the VSC Block was woefully under-reserved. In particular, the Muirfield Audit states:

7

**RESERVING**

The establishment of adequate reserves is critical to the financial stability of the program. Case reserves impact premiums and losses used in VRP and dividend adjustment plans. At two years every claim should be reserved for ultimate claim exposure. Some claims were not reserved for known permanency despite the medical reports reviewed in the file until one month before the award was paid and the file closed. A reserve worksheet demonstrating reserve rationale should be in each file every time the reserve changes.

*A significant number of files are below these standards, with most under-reserved. . . .*

(emphasis added)

22.  The TIG auditors also discovered that Muirfield Underwriters' actuarial efforts with respect to the VSC Block were significantly inadequate. Specifically, Muirfield was under-pricing this business. Among two of the major problems identified by the TIG auditors was that Muirfield was systematically failing to include insurance charges as well as expense costs in their pricing.

23.  With respect to the pricing problems associated with the VSC Block, the TIG auditors, stated, *inter alia*:

**INSURANCE CHARGES**

None of the files explicitly included a provision for the insurance charge needed to account for losses that exceed the maximum limitation of the VRP's or premium for dividends.

\*   \*   \*

It appears loss picks are influenced by the current competitive marketplace. This aggravates the need for an insurance charge that specifically recognizes the size and hazards of each risk.

\*   \*   \*

**EXPENSE NEEDS**

For the files reviewed, the average rating provision for ALAE, insurance charge and loss development was 32.9% (see summary). We estimate the

8

expense load needed to satisfy the combined expense needs of Virginia Surety and TIG is 35.8% and this does not include any provision for insurance charge and loss development. *Consequently, for the files reviewed, the average provision was 3% deficient even if we assumed there is no need for an insurance charge, a loss development provision beyond 36 months or a profit load.*

AON actuaries indicated that the rates used to develop standard premium did not include any provision for TIG expenses. To promote a win - win partnership, a primary carrier needs to price adequately for its own needs and the needs of its reinsurance partners.

(emphasis added)

24. As a result of the above described failure on Muirfield Underwriter's part to include insurance charges and appropriate expenses in the insurance rates paid by VSC's policyholders, the VSC Block was under-priced and completely unprofitable.

### G. The Real But Undisclosed Reason for TIG's Purchase of Low Layer Reinsurance

25. TIG, through AON, falsely informed WEB that TIG was purchasing low layer reinsurance (*i.e.* reducing its retention by 90%), not because this particular business was performing poorly, but because TIG was for sale at the time and the reinsurance would provide financial stability to the purchaser.

26. In reality, TIG was not passing off this risk to provide financial stability to a prospective purchaser of the company. Rather, TIG was passing off this risk because of the poor performance of TIG's Workers' Compensation Portfolio.

### H. The Reinsurance Obtained by TIG for 1999 and 2000

27. WEB reviewed the Placement Materials in order to decide whether it was interested in providing a quote on the TIG Workers' Compensation Portfolio and, if so, at what price and on what terms. In addition to reviewing the Placement

9

Material, WEB consulted verbally with employees of AON about the TIG Workers' Compensation Portfolio, and relied on statements made by AON about the Portfolio. Based on the information WEB was provided by TIG, WEB submitted a proposal for reinsuring the TIG Business on behalf of Security.

28. TIG accepted WEB's proposal, and in late 1998, WEB bound Security to an excess of loss reinsurance agreement with TIG (the "TIG/Security Agreement"). The TIG/Security Agreement was amended from time to time by WEB and AON.

29. Pursuant to the TIG/Security Agreement, Security agreed to provide excess of loss reinsurance to TIG on its Workers' Compensation Portfolio. The Portfolio was comprised of the following five segments: General Agency; the VSC Block and business known as Alternative Programs; business underwritten by Managed Comp General; business underwritten or produced by Innovus Integrated benefits; and Commercial Specialty. With respect to the VSC Block, Alternative Programs and business underwritten by Managed Comp General, Security agreed to indemnify TIG for all claims that exceeded TIG's retention of $50,000 (Fifty Thousand Dollars) up to a limit of $1,000,000 (One Million Dollars) per claim. For the remainder of the business, Security agreed to indemnify TIG for all claims that exceeded TIG's retention of $100,000 (One Hundred Thousand Dollars) up to a limit of $1,000,000 (One Million Dollars) per claim.

30. With respect to Security's obligations to report losses, TIG agreed in the Security/TIG Agreement to report the claims and losses on a monthly basis. The TIG/Security Agreement states, *inter alia*: "The Company shall provide monthly bordereaux of losses within 30 days." In the reinsurance industry, a claims

bordereau, with respect to workers' compensation business, is commonly understood to mean a detailed listing of, among other things, description of loss, date of loss, description of injury and name of claimant.

31.  At the same time, WEB was also acting as an agent for Trustmark. In that capacity, WEB considered whether Trustmark would accept a retrocession of a majority of the risks in the TIG Workers' Compensation Portfolio that had been reinsured by Security. In connection with its consideration of the possibility of the retrocession of some of the business to Trustmark, WEB reviewed and relied upon the information that had been provided to WEB by AON on behalf of TIG. Included in this information were all of the materials and statements made by TIG and AON to WEB.

32.  In March, 1999, Trustmark entered into an agreement to reinsure a portion of the risks for which Security was reinsuring TIG. The Security/Trustmark Agreement required Security to, among other things, supply "reinsurance reports . . . within 45 days."

### I. TIG's Inability and Unwillingness to Timely and Accurately Report Losses

33.  At the time that it entered into the TIG/Security Contract, as TIG was well aware, TIG did not have the capability to provide an accurate and timely bordereau of losses to Security with respect to the TIG Workers' Compensation Portfolio.

34.  Prior to TIG's entry into the TIG/Security Agreement, TIG's upper management was informed by the person responsible for providing the monthly bordereau of losses that TIG could not comply with the requirements of the TIG/Security Agreement. This warning was ignored by TIG's upper-management and

11

TIG agreed to provide a monthly bordereau of losses to Security as part of the TIG/Security Agreement.

35.  In fact, when TIG entered into the TIG/Security Agreement, TIG had no ability or system whatsoever to timely and accurately report losses to Security or its agents. Even though TIG agreed to report losses on a monthly basis, losses associated with the TIG Assumed Business, which, based on premium, was approximately one-half of the entire TIG Workers' Compensation Portfolio, were only reported to TIG on a quarterly basis. Accordingly, TIG had no capability to comply with the reporting obligations that it had under the TIG/Security Contract.

### III.
### COUNT I -- FRAUD

36.  Trustmark incorporates by reference paragraphs 1 through 35 above as if fully set forth herein.

37.  TIG, through AON, made knowingly false representations of fact to WEB with the intent to induce WEB to rely upon them and WEB did reasonably and justifiably rely upon those false representations.

38.  TIG, knowingly made the following misrepresentations of material fact with respect to the TIG Workers' Compensation Portfolio to WEB:

   a. TIG represented in the TIG/Security Agreement that it could timely and accurately report losses monthly by way of bordereau. This representation was false and TIG knew it was false when made because TIG's upper management was advised prior to entering into the Security/TIG Agreement that it did not have the capability to perform these obligations.

   b. TIG, through AON, represented to WEB that it was purchasing for the first time low layer reinsurance protection because TIG was for

12

sale and this cover would facilitate the transaction. This representation was false, and TIG knew it was false when made because the true motivation behind TIG's decision to lower its retention with respect to this business was TIG's knowledge that loss experience was going up and that there was a deterioration in the underwriting results of the VSC Block.

c. TIG, through AON, represented that the VSC Block was one of the most desirable and profitable segments of the TIG Workers' Compensation Portfolio. This representation was false and TIG knew it was false when made given the systemic pricing and reserving problems discovered by TIG when it audited Muirfield Underwriters.

d. TIG, through AON, represented in the Placement Materials that the one major finding of the Muirfield Audit was "a need to implement stronger managed care and injury management practices." This representation was false and TIG knew that it was false when made because other findings of the Muirfield Audit disclosed significant reserving and pricing problems with the VSC Block.

39. These misrepresentations and omissions were material to WEB as it decided first, whether to bid on this business on behalf of Trustmark, and second, on what terms. For example, had WEB been informed that TIG would not be able to timely and accurately report losses, WEB, would have never bound Trustmark to reinsure Security for these risks. Moreover, had TIG not deliberately misled WEB about the pricing, underwriting and performance of the VSC Block, WEB would have either declined to bind Trustmark or would have done so on materially different terms.

40. TIG knew that Security would not keep all the risk but that Security itself would seek its own retrocessional protection. TIG also knew that Security, through WEB, would present the Placement Material as accurate and truthful information regarding TIG's Workers' Compensation Portfolio to prospective retrocessionaires.

41. As a result of the material misstatements and omissions of material facts in the Placement Material as well as TIG's representation that it could timely and accurately report loss information monthly, Trustmark has been forced to rescind its reinsurance agreement with Security. Security has resisted Trustmark's rescission and filed suit against Trustmark. Trustmark has and will continue to expend significant sums of money in that litigation.

42. By reason of TIG's misrepresentations and omissions inducing WEB (on behalf of Trustmark) to reinsure part of the TIG Business, Trustmark has been damaged. Trustmark's damages consist of all net losses it may suffer on the TIG Business, including losses it may be required to pay to Security above and beyond the premium it receives on the TIG Business.

43. To avoid either a windfall or inadequate damages, Trustmark seeks an order requiring TIG to indemnify Trustmark for any such net losses it does or may incur, to the extent the damages cannot be adequately proved or estimated at the time of trial.

44. Because these deliberate and repeated fraudulent actions and omissions reflect TIG's malicious, reckless, willful and wanton disregard for the truth and the rights of others, Trustmark is entitled to recover punitive damages.

### COUNT II – NEGLIGENT MISREPRESENTATION

45. Trustmark incorporates by reference paragraphs 1 through 35 above as if fully set forth herein.

46. TIG, in the course of its insurance and reinsurance business, supplied through its agents information for the guidance of others in their business

14

transactions. This information was supplied to the marketplace by TIG with the knowledge, understanding and intent that the participants in this particular marketplace would rely on it.

47. It was reasonably foreseeable that the reinsurance marketplace would rely on the Placement Material. Furthermore, TIG knew that Security would cede to other reinsurers most of the risk that it assumed from TIG.

48. TIG was under a duty to use reasonable care and caution in communicating accurate information to the reinsurance marketplace and to Trustmark as Security's reinsurer.

49. In breach of this duty, TIG knew or should have known that the following statements of material fact were false:

- a. TIG represented in the TIG/Security Agreement that it could timely and accurately report losses monthly by way of bordereau. This representation was false and TIG knew it was false when made because TIG's upper management was advised prior to entering into the Security/TIG Agreement that it did not have the capability to perform these obligations.

- b. TIG, through AON, represented to WEB that it was purchasing for the first time low layer reinsurance protection because TIG was for sale and this cover would facilitate the transaction. This representation was false, and TIG knew it was false when made because the true motivation behind TIG's decision to lower its retention with respect to this business was TIG's knowledge that loss experience was going up and that there was a deterioration in the underwriting results of the VSC Block.

- c. TIG, through AON, represented that the VSC Block was one of the most desirable and profitable segments of the TIG Workers' Compensation Portfolio. This representation was false and TIG knew it was false when made given the systemic pricing and reserving problems discovered by TIG when it audited Muirfield Underwriters.

15

    d. TIG, through AON, represented in the Placement Materials that the one major finding of the Muirfield Audit was "a need to implement stronger managed care and injury management practices." This representation was false and TIG knew that it was false when made because other findings of the Muirfield Audit disclosed significant reserving and pricing problems with the VSC Block.

50. As a result of the material misstatements and omissions of material facts in the Placement Material as well as TIG's representation that it could timely and accurately report loss information monthly, Trustmark has been forced to rescind its reinsurance agreement with Security. Security has resisted Trustmark's rescission and filed suit against Trustmark. Trustmark has and will continue to expend significant sums of money in that litigation.

51. By reason of TIG's misrepresentations and omissions inducing WEB (on behalf of Trustmark) to reinsure part of the TIG Business, Trustmark has been damaged. Trustmark's damages consist of all net losses it may suffer on the TIG Business, consisting of losses it may be required to pay to Security above and beyond the premium it receives on the TIG Business.

52. To avoid either a windfall or inadequate damages, Trustmark seeks an order requiring TIG to indemnify Trustmark for any such net losses it does or may incur, to the extent the damages cannot be adequately proved or estimated at the time of trial.

### IV.

### DEMAND FOR RELIEF

WHEREFORE, Trustmark demands the following relief against TIG:

a. an award of damages equal to the amount of all net losses Trustmark has paid or is required to pay to Security on the TIG Business retroceded to Trustmark by Security,

b. an order requiring TIG to indemnify Trustmark for all net losses Trustmark incurs on the TIG Business not otherwise recovered in damages,

c. Trustmark's attorneys' fees and costs associated with defending itself against Security;

d. punitive damages; and

e. such further relief as this Court deems just.

**Third Party Plaintiff demands a trial by jury.**

DATED: May 3, 2002                    TRUSTMARK INSURANCE COMPANY

_____
One of its Attorneys

David M. Spector CT 21679
Ronald S. Safer CT 22766
Everett J. Cygal CT 22765
Schiff Hardin & Waite
6600 Sears Tower
Chicago, Illinois 60606-6473

Jeffrey Hellman CT 04102
Zeisler & Zeisler
558 Clinton Avenue
P.O. Box 3186
Bridgeport, CT 06605

CHI_DOCS2\584439.3 04.25.02 12:06

17