# EXHIBIT B

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SECURITY INSURANCE COMPANY OF HARTFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TRUSTMARK INSURANCE COMPANY | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | Civil No. 301CV2198(PCD) |
| | ) | |
| TRUSTMARK INSURANCE COMPANY, | ) | |
| | ) | |
| Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TIG INSURANCE COMPANY, | ) | |
| | ) | |
| Third Party Defendant. | ) | |

### TRUSTMARK INSURANCE COMPANY'S SECOND SUPPLEMENTAL RESPONSE TO THIRD-PARTY DEFENDANT TIG INSURANCE COMPANY'S FIRST SET OF INTERROGATORIES

Defendant, Third-Party Plaintiff, Trustmark Insurance Company ("Trustmark") hereby responds to Third-Party Defendant TIG Insurance Company's ("TIG") First Set of Interrogatories as follows:

### GENERAL OBJECTIONS APPLICABLE TO ALL INTERROGATORIES

1.    Trustmark objects to TIG's First Set of Interrogatories to the extent any interrogatory seeks information subject to the attorney/client privilege, the work product privilege, or any other applicable privilege.

2.    Trustmark objects to the wording of any interrogatory to the extent it assumes legal conclusions or facts not proven or not true, and by answering any such

interrogatory, Trustmark does not waive any right or claim and expressly reserves its right to contest all matters in this action.

3.     Trustmark objects to these contention interrogatories on the grounds that they are premature and appropriate only after the completion of substantial discovery.

4.     Trustmark objects to these contention interrogatories on the grounds that it would be inherently unfair to require Trustmark to respond to interrogatories that are likely to require multiple supplemental answers or prematurely require Trustmark to commit to positions.

5.     Trustmark objects to these interrogatories to the extent that Trustmark has not had an opportunity to conduct discovery in this matter. Trustmark hereby reserves the right during or at the completion of discovery to amend, change or supplement these answers as it deems appropriate.

6.     Trustmark objects to the extent that these interrogatories exceed 25 in number, including subparts, as permitted by the Federal Rules of Civil Procedure.

## INTERROGATORIES

1.     Identify each individual involved in the decision(s) to appoint WEB as Trustmark's agent and that individual's involvement in that decision(s).

**ANSWER:**

- Leonard Koloms; and

- Robert Stahnke.

Messrs. Koloms and Stahnke decided to sign a managing general underwriting agreement with WEB.

2.        Identify each individual involved in the decision(s) to limit, revoke and/or terminate WEB's authority to conduct business on Trustmark's behalf and that individual's involvement in that decision(s).

**ANSWER AND OBJECTION:**

- Leonard Koloms; and

- Michael Hawksworth

Trustmark objects to the characterizations contained in this interrogatory. Without prejudice to Trustmark's objection, Messrs. Koloms and Hawksworth, in consultation with WEB, requested WEB to suspend underwriting new business on behalf of Trustmark. WEB ultimately ceased underwriting functions.

3.        Identify each individual involved in reviewing, monitoring, auditing and/or supervising WEB and/or its principals.

**ANSWER:**

- Leonard Koloms;

- Robert Stahnke;

- Michael Hawksworth; and

- Various employees of Alternative Risk Transfer Insurance Strategies ("Artis").

**SUPPLEMENTAL RESPONSE**

- Various employees of All American Life and/or U.S. Life.

4.        Identify each individual involved in the decision(s) whether or not Trustmark would assert a claim(s) against WEB and/or its principals.

**ANSWER AND OBJECTION:**

Trustmark objects to this requests to the extent that it assumes conclusions or facts not proven to be true and seeks information that is protected by the attorney-client and work product privileges. Without prejudice

3

to its objections, Trustmark has never asserted any claims against WEB and/or its principals.

## SUPPLEMENTAL RESPONSE

To extent that these issues were considered, they were considered by in-house counsel (Raymond J. Lester, Esq.) and outside counsel (David M. Spector).

5.     State the basis for, and identify each document tending to support or refute, the allegations contained in ¶ 3 of Trustmark's Third Party Complaint that: (a) the workers' compensation risks referred to therein "were poorly underwritten, managed and reserved by TIG or its agents;" (b) TIG or its agents knew such risks were poorly underwritten, managed and reserved; (c) TIG attempted "to knowingly defraud the reinsurance marketplace so that it could pass on to its reinsurers hundreds of millions of dollars of poorly performing workers' compensation business;" (d) TIG attempted "to secure reinsurance at prices inconsistent with the true nature of these risks"; and (e) "TIG, through its agents, provided false and misleading information to the marketplace with the intent to induce the marketplace to rely on these misrepresentations and omissions."  As part of your response to this interrogatory, identify each piece of "false and misleading information," each "misrepresentation" and each "omission" referred to in ¶ 3 of Trustmark's Third Party Complaint, including (a) the document(s) containing the alleged "false and misleading information" and "misrepresentations;" and/or (b) if any of the alleged "false and misleading information" was provided orally or any of the alleged "misrepresentations" made orally, identify (i) the person(s) who provided the alleged "false and misleading information" and/or made the alleged "misrepresentations," (ii) the person(s) to whom the alleged "false and misleading information" was provided and/or the alleged "misrepresentations" were made, (iii) the date(s) and place(s) the alleged "false and misleading information" was provided and/or the alleged "misrepresentations" were made, (iv) the method by which the alleged "false and misleading information" was provided and/or the alleged "misrepresentations" were made (i.e., telephone, face-to-face) and (v) the circumstances under which the alleged "false and misleading information" was provided and/or the alleged "misrepresentations" were made.

**ANSWER AND OBJECTION:**

Trustmark objects to this interrogatory as premature, in that Trustmark has not been able to conduct substantial discovery in this matter with Security, TIG and various third parties, and overbroad and unduly burdensome to the extent that any of these interrogatories call for Trustmark to identify all facts, documents or conversations responsive to any particular interrogatory or subpart thereof. Trustmark's investigation continues and Trustmark will supplement as it deems appropriate. Without prejudice to this objection, see Trustmark's November 2, 2001 letter to Security generally for a description of the basis for Trustmark's rescission.

With respect to the individual requests and without prejudice to Trustmark's objections, Trustmark states as follows:

(a)    the workers' compensation risks referred to therein "were poorly underwritten, managed and reserved by TIG or its agents;"

Not having had an opportunity to review all documents produced by TIG, Security or various third parties in this matter, and subject to further discovery, Trustmark refers TIG to the following:

(i)    the deposition of Gary Wood taken in the matter styled as: *Security insurance Company of Hartford v. Trustmark Insurance Company*, 300CV1247(PCD);

(ii)    the general loss development of this business, which is in excess of 200%;

(iii)    the AON Actuarial Study (AR000106-120);

(iv)    The April 1, 1998 Jay Chase memorandum to Mary Hennessy in which Mr. Chase states, *inter alia*: "We further discussed that there are alternative strategies both partners can employ to get us through more difficult financial times

(i.e. the current 115 combined ratio could be improved with significant buy down of the retention etc.) but that such a transaction would likely need to be on a longer term arrangement with the reinsurers and we may not want to do that if plans are underway to materially improve the result." (TIG/T 108013);

(v)   the various e-mails from TIG senior management stating that reinsurance was purchased from Security on this case because, among other things, "the loss experience was going up." (TIG/T 015636-15639; TIG/T 015648; TIG/T 015678-15682);

(vi)  Various documents produced by VSC describing the problems with TIG's management and underwriting, including, without limitation: (VSC 000343-346; VSC 002271-2296; VSC 001362-1378; VSC 001312-1317; VSC 001300-1301; and VSC 001380-1387);

(vii) The May 5-8, 1998 Audit Report of Muirfield Underwriters (TIG/T 014436-14461);

(viii) The Draft Audit Report of Muirfield Underwriters (TIG/T 105660-64);

(ix)  The April 8, 1998 Tony Tio memorandum, which identifies, among other things, various problems with the Virginia Surety experience including: loss ratios "tend to deteriorate when volume increases radically;" competition pressures "causing policies to be written at lower margins (sometimes below cost);" and a 1997 underwriting year loss ratio 24.3% higher than the 1996 underwriting year at comparable durations. (TIG/T105817);

(x)   *See* TIG/T 015907 and TIG/T 017443 for issues regarding reserving; and

(xi)  Investigation continues.

### SUPPLEMENTAL RESPONSE

In addition, see **Exhibit A** attached hereto for a non-exhaustive list of documents that, among other things, form the basis of Trustmark's allegation that TIG's workers' compensation risks "were poorly underwritten, managed and reserved by TIG or its agents."

6

(b)    TIG or its agents knew such risks were poorly underwritten, managed and reserved;

Not having had an opportunity to review all documents produced by TIG, Security or various third parties in this matter, and subject to further discovery, Trustmark refers TIG to the following:

(i)    the deposition of Gary Wood taken in the matter styled as: *Security insurance Company of Hartford v. Trustmark Insurance Company*, 300CV1247(PCD);

(ii)    the general loss development of this business, which is in excess of 200%;

(iii)    the AON Actuarial Study (AR000106-120);

(iv)    The April 1, 1998 Jay Chase memorandum to Mary Hennessy in which Mr. Chase states, *inter alia*: "We further discussed that there are alternative strategies both partners can employ to get us through more difficult financial times (i.e. the current 115 combined ratio could be improved with significant buy down of the retention etc.) but that such a transaction would likely need to be on a longer term arrangement with the reinsurers and we may not want to do that if plans are underway to materially improve the result." (TIG/T 108013);

(v)    the various e-mails from TIG senior management stating that reinsurance was purchased from Security on this case because, among other things, "the loss experience was going up." (TIG/T 015636-15639; TIG/T 015648; TIG/T 015678-15682);

(vi)    Various documents produced by VSC describing the problems with TIG's management and underwriting, including, without limitation: (VSC 000343-346; VSC 002271-2296; VSC 001362-1378; VSC 001312-1317; VSC 001300-1301; and VSC 001380-1387);

(vii)    The May 5-8, 1998 Audit Report of Muirfield Underwriters (TIG/T 014436-14461);

(viii)    The Draft Audit Report of Muirfield Underwriters (TIG/T 105660-64);

(ix)    The April 8, 1998 Tony Tio memorandum, which identifies, among other things, various problems with the Virginia

7

Surety experience including: loss ratios "tend to deteriorate when volume increases radically;" competition pressures "causing policies to be written at lower margins (sometimes below cost);" and a 1997 underwriting year loss ratio 24.3% higher than the 1996 underwriting year at comparable durations. (TIG/T105817);

(x)    *See* TIG/T 015907 and TIG/T 017443 for issues regarding reserving; and

(xi)   Investigation continues.

## SUPPLEMENTAL RESPONSE

In addition, see **Exhibit A** attached hereto for a non-exhaustive list of documents that, among other things, form the basis of Trustmark's allegation that TIG or its agents knew such risks were poorly underwritten, managed and reserved.

(c)    TIG attempted "to knowingly defraud the reinsurance marketplace so that it could pass on to its reinsurers hundreds of millions of dollars of poorly performing workers' compensation business;"

Not having had an opportunity to review all documents produced by TIG, Security or various third parties in this matter, and subject to further discovery, Trustmark refers TIG to the following:

(i)    the deposition of Gary Wood taken in the matter styled as: *Security insurance Company of Hartford v. Trustmark Insurance Company*, 300CV1247(PCD);

(ii)   the general loss development of this business, which is in excess of 200%;

(iii)  the AON Actuarial Study (AR000106-120);

(iv)   The April 1, 1998 Jay Chase memorandum to Mary Hennessy in which Mr. Chase states, *inter alia*: "We further discussed that there are alternative strategies both partners can employ to get us through more difficult financial times (i.e. the current 115 combined ratio could be improved with significant buy down of the retention etc.) but that such a

transaction would likely need to be on a longer term arrangement with the reinsurers and we may not want to do that if plans are underway to materially improve the result." (TIG/T 108013);

(v)    the various e-mails from TIG senior management stating that reinsurance was purchased from Security on this case because, among other things, "the loss experience was going up." (TIG/T 015636-15639; TIG/T 015648; TIG/T 015678-15682);

(vi)   Various documents produced by VSC describing the problems with TIG's management and underwriting, including, without limitation: (VSC 000343-346; VSC 002271-2296; VSC 001362-1378; VSC 001312-1317; VSC 001300-1301; and VSC 001380-1387);

(vii)  The May 5-8, 1998 Audit Report of Muirfield Underwriters (TIG/T 014436-14461);

(viii) The Draft Audit Report of Muirfield Underwriters (TIG/T 105660-64);

(ix)   The April 8, 1998 Tony Tio memorandum, which identifies, among other things, various problems with the Virginia Surety experience including: loss ratios "tend to deteriorate when volume increases radically;" competition pressures "causing policies to be written at lower margins (sometimes below cost);" and a 1997 underwriting year loss ratio 24.3% higher than the 1996 underwriting year at comparable durations. (TIG/T105817);

(x)    *See* TIG/T 015907 and TIG/T 017443 for issues regarding reserving; and

(xi)   Investigation continues.

        In addition to the above, Trustmark understands, among other things, that TIG made false statements of material fact and failed to disclose others as follows: (a) on several occasions during telephone conversations, Shelia Bohuslav informed Robin Ekwall that, among other things, TIG was securing this cover in order to facilitate the proposed sale of TIG to potential purchasers; (b) that the Virginia Surety business was well written and profitable; and (c) that TIG's loss development was much better than the

9

national average because of TIG's and its agent's superior claims handling (*See,* *e.g.* AON 002245) even though AON, TIG's agent, knew of significant problems with Virginia Surety and Martin Boyer (*See, e.g.* TIG/T 017443). Further, despite knowing that it failed to send to WEB complete and accurate data, AON, TIG's agent, failed to inform WEB of this fact or take any action to correct this situation (AON 10098; 10062-71; AON 2029). Trustmark's investigation continues.

Trustmark also believes that TIG was required as a matter of, among other things, the law, utmost good faith and industry custom and practice to disclose: the May 5-8, 1998 Audit Report of Muirfield Underwriters and its findings (TIG/T 014436-14461); its own actuarial report (AR 000106-000120) and the fact that it could not accurately or timely report losses (the Gary Wood Deposition). Trustmark also contends that TIG should have disclosed its own profit calculation with respect to this transaction (AON 02159-2161; AON 02008-0212) and the true purpose of purchasing this reinsurance from Security (*i.e.* "to mitigate [TIG's] losses while riding out . . . soft market conditions." (VSC 001362-1378).

## SUPPLEMENTAL RESPONSE

In addition, see **Exhibit B** attached hereto for a non-exhaustive list of documents that, among other things, form the basis of Trustmark's allegation that TIG attempted "to knowingly defraud the reinsurance marketplace so that it could pass on to its reinsurers hundreds of millions of dollars of poorly performing workers' compensation business."

10

(d)   TIG attempted "to secure reinsurance at prices inconsistent with the true nature of these risks"; and

Not having had an opportunity to review all documents produced by TIG, Security or various third parties in this matter, and subject to further discovery, Trustmark refers TIG to the following:

(i)   the deposition of Gary Wood taken in the matter styled as: *Security insurance Company of Hartford v. Trustmark Insurance Company*, 300CV1247(PCD);

(ii)   the general loss development of this business, which is in excess of 200%;

(iii)   the AON Actuarial Study (AR000106-120);

(iv)   The April 1, 1998 Jay Chase memorandum to Mary Hennessy in which Mr. Chase states, *inter alia*: "We further discussed that there are alternative strategies both partners can employ to get us through more difficult financial times (i.e. the current 115 combined ratio could be improved with significant buy down of the retention etc.) but that such a transaction would likely need to be on a longer term arrangement with the reinsurers and we may not want to do that if plans are underway to materially improve the result." (TIG/T 108013);

(v)   the various e-mails from TIG senior management stating that reinsurance was purchased from Security on this case because, among other things, "the loss experience was going up." (TIG/T 015636-15639; TIG/T 015648; TIG/T 015678-15682);

(vi)   Various documents produced by VSC describing the problems with TIG's management and underwriting, including, without limitation: (VSC 000343-346; VSC 002271-2296; VSC 001362-1378; VSC 001312-1317; VSC 001300-1301; and VSC 001380-1387);

(vii)   The May 5-8, 1998 Audit Report of Muirfield Underwriters (TIG/T 014436-14461);

(viii)   The Draft Audit Report of Muirfield Underwriters (TIG/T 105660-64);

(ix)   The April 8, 1998 Tony Tio memorandum, which identifies, among other things, various problems with the Virginia

11

Surety experience including: loss ratios "tend to deteriorate when volume increases radically;" competition pressures "causing policies to be written at lower margins (sometimes below cost);" and a 1997 underwriting year loss ratio 24.3% higher than the 1996 underwriting year at comparable durations. (TIG/T105817);

(x)     *See* TIG/T 015907 and TIG/T 017443 for issues regarding reserving; and

(xi)    Investigation continues.

## SUPPLEMENTAL RESPONSE

In addition, see **Exhibit B** attached hereto for a non-exhaustive list of documents that, among other things, form the basis of Trustmark's allegation that TIG attempted TIG attempted "to secure reinsurance at prices inconsistent with the true nature of these risks."

(e)     "TIG, through its agents, provided false and misleading information to the marketplace with the intent to induce the marketplace to rely on these misrepresentations and omissions."

Not having had an opportunity to review all documents produced by TIG, Security or various third parties in this matter, and subject to further discovery, Trustmark refers TIG to the following:

(i)     the deposition of Gary Wood taken in the matter styled as: *Security insurance Company of Hartford v. Trustmark Insurance Company*, 300CV1247(PCD);

(ii)    the general loss development of this business, which is in excess of 200%;

(iii)   the AON Actuarial Study (AR000106-120);

(iv)    The April 1, 1998 Jay Chase memorandum to Mary Hennessy in which Mr. Chase states, *inter alia*: "We further discussed that there are alternative strategies both partners can employ to get us through more difficult financial times (i.e. the current 115 combined ratio could be improved with significant buy down of the retention etc.) but that such a

12

transaction would likely need to be on a longer term arrangement with the reinsurers and we may not want to do that if plans are underway to materially improve the result." (TIG/T 108013);

(v)     the various e-mails from TIG senior management stating that reinsurance was purchased from Security on this case because, among other things, "the loss experience was going up." (TIG/T 015636-15639; TIG/T 015648; TIG/T 015678-15682);

(vi)    Various documents produced by VSC describing the problems with TIG's management and underwriting, including, without limitation: (VSC 000343-346; VSC 002271-2296; VSC 001362-1378; VSC 001312-1317; VSC 001300-1301; and VSC 001380-1387);

(vii)   The May 5-8, 1998 Audit Report of Muirfield Underwriters (TIG/T 014436-14461);

(viii)  The Draft Audit Report of Muirfield Underwriters (TIG/T 105660-64);

(ix)    The April 8, 1998 Tony Tio memorandum, which identifies, among other things, various problems with the Virginia Surety experience including: loss ratios "tend to deteriorate when volume increases radically;" competition pressures "causing policies to be written at lower margins (sometimes below cost);" and a 1997 underwriting year loss ratio 24.3% higher than the 1996 underwriting year at comparable durations. (TIG/T105817);

(x)     *See* TIG/T 015907 and TIG/T 017443 for issues regarding reserving; and

(xi)    Investigation continues.

In addition to the above, Trustmark understands, among other things, that TIG made false statements of material fact and failed to disclose others as follows: (a) on several occasions during telephone conversations, Shelia Bohuslav informed Robin Ekwall that, among other things, TIG was securing this cover in order to facilitate the proposed sale of TIG to potential purchasers; (b) that the Virginia Surety business was well written and profitable; and (c) that TIG's loss development was much better than the

13

national average because of TIG's and its agent's superior claims handling (*See,
e.g.* AON 002245) even though AON, TIG's agent, knew of significant problems
with Virginia Surety and Martin Boyer (*See, e.g.* TIG/T 017443).   Further,
despite knowing that it failed to send to WEB complete and accurate data, AON,
TIG's agent, failed to inform WEB of this fact or take any action to correct this
situation (AON 10098; 10062-71; AON 2029).   Trustmark's investigation
continues.

Trustmark also believes that TIG was required as a matter of,
among other things, the law, utmost good faith and industry custom and
practice to disclose:  the May 5-8, 1998 Audit Report of Muirfield Underwriters
and its findings (TIG/T 014436-14461); its own actuarial report (AR 000106-
000120) and the fact that it could not accurately or timely report losses (the
Gary Wood Deposition).   Trustmark also contends that TIG should have
disclosed its own profit calculation with respect to this transaction (AON 02159-
2161; AON 02008-0212) and the true purpose of purchasing this reinsurance
from Security (*i.e.* "to mitigate [TIG's] losses while riding out  .  .  .  soft market
conditions." (VSC 001362-1378).

### SUPPLEMENTAL RESPONSE

In addition, see **Exhibit C** attached hereto for a non-exhaustive
list of documents that, among other things, form the basis of Trustmark's
allegation that "TIG, through its agents, provided false and misleading
information to the marketplace with the intent to induce the marketplace to rely
on these misrepresentations and omissions."

14

## ORAL MISREPRESENTATIONS

The following oral misrepresentations were made to Trustmark's agents: (a) the reason for TIG's reduction of its historical and customary retention of $1,000,000 per occurrence was to provide financial stability in order to facilitate a sale of TIG; (b) the Virginia Surety Company segment was the most desirable segment of business in that it was the best underwritten and managed segment in TIG's workers' compensation portfolio; (c) the loss development factors for the segments other than the TIG Direct segment were unavailable; (d) the loss development factors for the TIG Direct segment were applicable to the entire TIG Workers' Compensation Portfolio; (e) TIG's better than average loss development was attributable to its superior claims handling; and (f) TIG had substantially improved its book of workers' compensation business from an underwriting and profitability perspective and that TIG had withdrawn from states where it could not make an underwriting profit.

    (a)    Representations relating to the reason for TIG's buy-down of its historical and customary retention:

        (i)    The misrepresentation was made by Shelia Bohuslav of Aon Re;

        (ii)    The misrepresentation was made to Charles Bastan and Robin Ekwall;

        (iii)    The misrepresentation was made after WEB Management, LLC ("WEB") received the 1998 Placement Material in May of 1998 and before WEB bound United States Life Insurance Company ("USL") to reinsure TIG in July of 1998. The exact date and time are unknown.

        (iv)    The misrepresentation was made over the telephone.

        (v)    The misrepresentation was made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of

the 1998 reinsurance contract between TIG and USL. WEB continued to rely upon this misrepresentation as part of the its underwriting, due diligence and fact finding relating to the placement of the renewal reinsurance contract between TIG and Security Insurance Company of Hartford ("Security") and the retrocession between Security and Trustmark.

    (b)    Representations relating to the Virginia Surety Company segment:

        (i)    The misrepresentation was made by Shelia Bohuslav of Aon Re;

        (ii)    The misrepresentation was made to Robin Ekwall;

        (iii)    The misrepresentation was made by Aon Re in connection with the placement of the 50,000 xs 50,000 layer of the Virginia Surety Company segment in the 1999 renewal contract. The exact date and time are unknown.

        (iv)    The misrepresentation was made over the telephone.

        (v)    The misrepresentation was made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of the 50,000 xs 50,000 layer of the 1999 reinsurance contract between TIG and Security and the retrocession between Security and Trustmark.

    (c)    Representations relating to unavailability of loss development factors for non-TIG Direct business:

        (i)    The misrepresentation was made by Shelia Bohuslav of Aon Re;

        (ii)    The misrepresentation was made to Robin Ekwall;

        (iii)    The misrepresentation was made in or around June 1, 1998. The exact date and time are unknown.

        (iv)    The misrepresentation was made over the telephone.

        (v)    The misrepresentation was made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of

16

the 1998 reinsurance contract between TIG and USL. WEB continued to rely upon this misrepresentation as part of the its underwriting, due diligence and fact finding relating to the placement of the renewal reinsurance contract between TIG and Security and the retrocession between Security and Trustmark.

(d)    Representations relating to the applicability to all segments of the TIG Direct loss development factors:

(i)    The misrepresentation was made by Shelia Bohuslav of Aon Re;

(ii)    The misrepresentation was made to Robin Ekwall;

(iii)    The misrepresentation was made in or around June 1, 1998. The exact date and time are unknown.

(iv)    The misrepresentation was made over the telephone.

(v)    The misrepresentation was made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of the 1998 reinsurance contract between TIG and USL. WEB continued to rely upon this misrepresentation as part of the its underwriting, due diligence and fact finding relating to the placement of the renewal reinsurance contract between TIG and Security and the retrocession between Security and Trustmark.

(e)    Representations relating to TIG's better than average loss development:

(i)    The misrepresentation was made by Shelia Bohuslav of Aon Re;

(ii)    The misrepresentation was made to Robin Ekwall;

(iii)    The misrepresentation was made in or around June 1, 1998. The exact date and time are unknown.

(iv)    The misrepresentation was made over the telephone.

(v)    The misrepresentation was made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of the 1998 reinsurance contract between TIG and USL. WEB continued to rely upon this misrepresentation as part of the its underwriting, due diligence and fact finding relating to the placement of the renewal reinsurance contract between TIG and Security and the retrocession between Security and Trustmark.

    (f)    Representations relating to TIG's underwriting:

        (i)    The misrepresentations were made by Shelia Bohuslav of Aon Re;

        (ii)    The misrepresentations were made to Robin Ekwall;

        (iii)    The misrepresentations were made after WEB received the 1998 Placement Material in May of 1998 and before WEB bound USL to reinsure TIG in July of 1998. The exact date and time are unknown.

        (iv)    The misrepresentation was made over the telephone.

        (v)    The misrepresentations were made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of the 1998 reinsurance contract between TIG and USL. WEB continued to rely upon this misrepresentation as part of the its underwriting, due diligence and fact finding relating to the placement of the renewal reinsurance contract between TIG and Security and the retrocession between Security and Trustmark.

    6.    Identify: (a) each person at WEB who, as alleged in ¶ 4 of Trustmark's Third Party Complaint, was "fraudulently induced . . . to bind Security and then subsequently Trustmark to provide excess of loss reinsurance with respect to TIG's 1999 and 2000

workers' compensation risks;" and (b) each person at WEB or Trustmark involved in the review, analysis, underwriting, decision to bind and/or approval of the decision to bind the 1998 Treaty, the 1998 Retrocession Contract, the 1999 Treaty and/or the 1999 Retrocession Contract.

**ANSWER AND OBJECTION:**

(a)    Robin Ekwall. Investigation continues.

(b)    Trustmark objects to this request to the extent that it seeks information relating to the 1998 Treaty and 1998 Retrocession Contract as defined by TIG. Trustmark objects to those requests on the grounds that this information is not relevant nor likely to lead to the discovery of relevant information. With respect to the remainder of the interrogatory, Robin Ekwall. Investigation continues.

### SUPPLEMENTAL ANSWER

(a)    Robin Ekwall and Chuck Bastan.

(b)    Robin Ekwall and Chuck Bastan.

### SECOND SUPPLEMENTAL ANSWER

(a)    Robin Ekwall.

(b)    Robin Ekwall.

7.    State whether Trustmark alleges that WEB was fraudulently induced by TIG and/or its agents to bind U.S. Life to the 1998 Treaty and/or Trustmark on the 1998 Retrocession Contract and, if so, state the basis for such allegations. As part of your response to this interrogatory, identify each piece of "false and misleading information," each "misrepresentation" and each "omission" underlying Trustmark's allegation that WEB was fraudulently induced by TIG and/or its agents to bind U.S. Life to the 1998 Treaty, including (a) the document(s) containing the alleged "false and misleading information" and "misrepresentations;" and (b) if any of the alleged "false and misleading information" was provided orally or any of the alleged "misrepresentations" made orally,

identify (i) the person(s) who provided the alleged "false and misleading information" and/or made the alleged "misrepresentations," (ii) the person(s) to whom the alleged "false and misleading information" was provided and/or the alleged "misrepresentations" were made, (iii) the date(s) and place(s) the alleged "false and misleading information" was provided and/or the alleged "misrepresentations" were made, (iv) the method by which the alleged "false and misleading information" was provided and/or the alleged "misrepresentations" were made (*i.e.*, telephone, face-to-face), and (v) the circumstances under which the alleged "false and misleading information" was provided and/or the alleged "misrepresentations were made.

**ANSWER AND OBJECTION:**

Trustmark objects to this request to the extent that it seeks information relating to the 1998 underwriting year, which is not at issue in this litigation and is therefore not relevant to this litigation, nor likely to lead to the discovery of relevant information. Trustmark also objects to this request to the extent that TIG and United States Life Insurance Company are in arbitration with respect to this contract and only U.S. Life can speak to these issues.

Without prejudice to these objections, Trustmark refers to its answers to Interrogatory No. 5. Trustmark believes that most, if not all, of TIG's misrepresentations and omissions apply with equal force with respect to the 1998 underwriting year and that U.S. Life would be justified in rescinding its contract with TIG on those grounds.

**SUPPLEMENTAL ANSWER**

Trustmark understands that USL has rescinded its reinsurance contract with TIG based upon, among other things, material misstatements and omissions made by TIG and its agents in connection with the placement of the 1998 reinsurance contract between TIG and USL. Trustmark understands that the material misstatements and omissions that form the basis of USL's

rescission of its reinsurance agreement with TIG are set forth in Trustmark's answer and supplemental answer to Interrogatory Number 5, which Trustmark incorporates by reference herein.

        8.     Identify each of the alleged "significant and systematic problems with VSC Block" referred to in ¶ 20 of Trustmark's Third Party Complaint.

**SUPPLEMENTAL ANSWER:**

The Virginia Surety Block suffered from, among other things, the following problems: (a) it was under-reserved; (b) it was under-priced; (c) claims were not competently handled by Virginia Surety's various third party administrators; (d) Virginia Surety failed to successfully implement a managed care initiative; and (e) Virginia Surety could not accurately and timely report and/or remit to TIG claims and premium. In addition, see May 5, 1998 Muirfield audit report and **Exhibit D** attached hereto for a non-exhaustive list of documents referencing the problems associated with the Virginia Surety block.

        9.     State the basis for: (a) the allegation contained in ¶ 25 of Trustmark's Third Party Complaint that "TIG, through AON, falsely information WEB that TIG was purchasing low layer reinsurance (*i.e.*, reducing its retention by 90%), not because this particular business was performing poorly, but because TIG was for sale at the time and the reinsurance would provide financial stability to the purchaser;" and (b) the allegation contained in ¶ 26 of Trustmark's Third Party Complaint that "TIG was not passing off this risk to provide financial stability to a prospective purchaser of the company[;] [r]ather, TIG was passing off this risk because of the poor performance of TIG's Workers' Compensation Portfolio." As part of your response to this interrogatory, identify each piece of false information referred to in ¶ 25 of Trustmark's Third Party Complaint, including (a) the document(s) containing the alleged false information; and (b) if any of the alleged false information was provided orally, identify (i) the person(s) who provided the alleged false information, (ii) the person(s) to whom the alleged false information was provided, (iii) the date(s) and

place(s) the alleged false information was provided, (iv) the method by which the alleged false information was provided (*i.e.,* telephone, face-to-face), and (v) the circumstances under which the alleged false information was provided.

**SUPPLEMENTAL ANSWER:**

(a)     Representations relating to the reason for TIG's buy-down of its historical and customary retention:

    (i)     The misrepresentation was made by Shelia Bohuslav of Aon Re.

    (ii)    The misrepresentation was made to Charles Bastan and Robin Ekwall.

    (iii)   The misrepresentation was made after WEB Management, LLC ("WEB") received the 1998 Placement Material in May of 1998 and before WEB bound United States Life Insurance Company ("USL") to reinsure TIG in July of 1999. The exact date and time are unknown.

    (iv)    The misrepresentation was made over the telephone.

    (v)     The misrepresentations were made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of the 1998 reinsurance contract between TIG and USL. WEB continued to rely upon this misrepresentation as part of the its underwriting, due diligence and fact finding relating to the placement of the renewal reinsurance contract between TIG and Security and the retrocession between Security and Trustmark.

    (vi)    In addition, see **Exhibit D** attached hereto for a non-exhaustive list of documents referencing the problems associated with the Virginia Surety block.

(b)     The true but undisclosed poor performance of the Virginia Surety Block:

See **Exhibit D** attached hereto for a non-exhaustive list of documents referencing the problems associated with the Virginia Surety block.

10.  Identify (a) each person at "WEB" and each of the "employees of AON" with whom WEB allegedly consulted, and (b) each of the "statements made by AON about the Portfolio," "referred to in ¶ 27 of Trustmark's Third Party Complaint. As part of your response to this interrogatory, identify each "statement" referred to in ¶ 27 of Trustmark's Third Party Complaint, including (a) the document(s) containing the alleged statement; and (b) if any of the alleged statement was provided orally, identify (i) the person(s) who made the alleged statement, (ii) the person(s) to whom the alleged statement was made, (iii) the date(s) and place(s) the alleged statement was made, (iv) the method by which the alleged statement was made (*i.e.*, telephone, face-to-face), and (v) the circumstances under which the alleged statement was made.

**SUPPLEMENTAL ANSWER:**

(a)    Charles Bastan, Robin Ekwall, Shelia Bohuslav and Robert Bima.

(b)    Statements referenced in paragraph 27 of Trustmark's Third Party Complaint:

### ORAL MISREPRESENTATIONS

The following oral misrepresentations were made to Trustmark's agents:  (a) the reason for TIG's reduction of its historical and customary retention of $1,000,000 per occurrence was to provide financial stability in order to facilitate a sale of TIG; (b) the Virginia Surety Company segment was the most desirable segment of business in that it was the best underwritten and managed segment in TIG's workers' compensation portfolio; (c) the loss development factors for the segments other than the TIG Direct segment were unavailable; (d) the loss development factors for the TIG Direct segment were applicable to the entire TIG Workers' Compensation Portfolio; (e) TIG's better than average loss development was attributable to its superior claims handling; and (f) TIG had substantially improved its book of workers' compensation

23

business from an underwriting and profitability perspective and that TIG had

withdrawn from states where it could not make an underwriting profit.

    (a)    Representations relating to the reason for TIG's buy-down of its historical and customary retention:

        (i)    The misrepresentation was made by Shelia Bohuslav of Aon Re;

        (ii)    The misrepresentation was made to Charles Bastan and Robin Ekwall;

        (iii)    The misrepresentation was made after WEB Management, LLC ("WEB") received the 1998 Placement Material in May of 1998 and before WEB bound United States Life Insurance Company ("USL") to reinsure TIG in July of 1998. The exact date and time are unknown.

        (iv)    The misrepresentation was made over the telephone.

        (v)    The misrepresentation was made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of the 1998 reinsurance contract between TIG and USL. WEB continued to rely upon this misrepresentation as part of the its underwriting, due diligence and fact finding relating to the placement of the renewal reinsurance contract between TIG and Security Insurance Company of Hartford ("Security") and the retrocession between Security and Trustmark.

    (b)    Representations relating to the Virginia Surety Company segment:

        (i)    The misrepresentation was made by Shelia Bohuslav of Aon Re;

        (ii)    The misrepresentation was made to Robin Ekwall;

        (iii)    The misrepresentation was made by Aon Re in connection with the placement of the 50,000 xs 50,000 layer of the Virginia Surety Company segment in the 1999 renewal contract. The exact date and time are unknown.

        (iv)    The misrepresentation was made over the telephone.

(v)     The misrepresentation was made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of the 50,000 xs 50,000 layer of the 1999 reinsurance contract between TIG and Security and the retrocession between Security and Trustmark.

(c)     Representations relating to unavailability of loss development factors for non-TIG Direct business:

   (i)     The misrepresentation was made by Shelia Bohuslav of Aon Re;

   (ii)    The misrepresentation was made to Robin Ekwall;

   (iii)   The misrepresentation was made in or around June 1, 1998. The exact date and time are unknown.

   (iv)    The misrepresentation was made over the telephone.

(v)     The misrepresentation was made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of the 1998 reinsurance contract between TIG and USL. WEB continued to rely upon this misrepresentation as part of the its underwriting, due diligence and fact finding relating to the placement of the renewal reinsurance contract between TIG and Security and the retrocession between Security and Trustmark.

(d)     Representations relating to the applicability to all segments of the TIG Direct loss development factors:

   (i)     The misrepresentation was made by Shelia Bohuslav of Aon Re;

   (ii)    The misrepresentation was made to Robin Ekwall;

   (iii)   The misrepresentation was made in or around June 1, 1998. The exact date and time are unknown.

   (iv)    The misrepresentation was made over the telephone.

     (v)    The misrepresentation was made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of the 1998 reinsurance contract between TIG and USL. WEB continued to rely upon this misrepresentation as part of the its underwriting, due diligence and fact finding relating to the placement of the renewal reinsurance contract between TIG and Security and the retrocession between Security and Trustmark.

    (e)    Representations relating to TIG's better than average loss development:

       (i)    The misrepresentation was made by Shelia Bohuslav of Aon Re;

      (ii)    The misrepresentation was made to Robin Ekwall;

     (iii)    The misrepresentation was made in or around June 1, 1998. The exact date and time are unknown.

     (iv)    The misrepresentation was made over the telephone.

     (v)    The misrepresentation was made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of the 1998 reinsurance contract between TIG and USL. WEB continued to rely upon this misrepresentation as part of the its underwriting, due diligence and fact finding relating to the placement of the renewal reinsurance contract between TIG and Security and the retrocession between Security and Trustmark.

    (f)    Representations relating to TIG's underwriting:

       (i)    The misrepresentations were made by Shelia Bohuslav of Aon Re;

      (ii)    The misrepresentations were made to Robin Ekwall;

    (iii)    The misrepresentations were made after WEB received the 1998 Placement Material in May of 1998 and before WEB bound USL to reinsure TIG in July of 1998. The exact date and time are unknown.

    (iv)    The misrepresentation was made over the telephone.

    (v)    The misrepresentations were made during the course of WEB's underwriting, due diligence and fact finding relating to the placement of the 1998 reinsurance contract between TIG and USL. WEB continued to rely upon this misrepresentation as part of the its underwriting, due diligence and fact finding relating to the placement of the renewal reinsurance contract between TIG and Security and the retrocession between Security and Trustmark.

## WRITTEN MISREPRESENTATIONS

Among others, Aon made the following written misrepresentations in the 1999 Renewal Submission on behalf of TIG:

    (a)    The Virginia Surety segment would expand;

    (b)    TIG conducts annual Underwriting, Claims and Actuarial reviews of Virginia Surety;

    (c)    That the major finding of TIG's audit of Virginia Surety was a need to implement stronger managed care and injury management practices;

    (d)    That the TIG's workers' compensation business was properly reserved;

    (e)    That, with respect to the placement of 1998 contract between TIG and USL, the TIG.EXE file contained loss information for all segments of TIG's workers' compensation business;

    (f)    That, with respect to the placement of the 1999 renewal contract between TIG and Security and the retrocession

between Security and Trustmark that three data files e-mailed to WEB on November 24, 1998 contained losses for all segments of TIG's workers' compensation business;

(g)    That TIG could provide an accurate bordereau of losses on a monthly basis within thirty days; and

(h)    That, after questioning by WEB, Shelia Bohuslav informed WEB that it had complete and accurate individual loss data at the time of underwriting the 1999 renewal contract.

11.    Identify (a) "the information that had been provided to WEB by AON on behalf of TIG," and (b) "all of the materials and statements made by TIG and AON to WEB," referred to in ¶ 31 of Trustmark's Third Party Complaint.    As part of your response to this interrogatory, identify each piece of "information," each of the "materials," and each of the "statements" referred to in ¶ 31 of Trustmark's Third Party Complaint, including (a) the document(s) containing the alleged information, materials and/or statement; and (b) if any of the alleged information, materials and/or statements was provided orally, identify (i) the person(s) who provided or made the alleged information, materials and/or statements, (ii) the person(s) to whom the alleged information, materials and/or statements was provided or made, (iii) the date(s) and place(s) the alleged information, materials and/or statements was provided or made, (iv) the method by which the alleged information, materials and/or statements was provided or made (*i.e.*, telephone, face-to-face) and (v) the circumstances under which the alleged information, materials and/or statements were provided or made.

**SUPPLEMENTAL ANSWER:**

(a)    "the information that had been provided to WEB by AON on behalf of TIG,"

Aon provided WEB: (1) the 1998 written placement submission; (2) an electronic file know as "TIG.EXE;" (3) loss triangles with respect to the TIG Direct book of business; (4) the 1999 renewal written placement submission; and (5) and three electronic data files on November 24, 1998.  Neither TIG nor Aon at any time prior to the placement of the 1998 contract between TIG and USL or the 1999 renewal contract between TIG and Security and the retrocession contract between Security and Trustmark, however, provided WEB with Virginia Surety and MCI historical loss information despite making representations to the contrary.

28

Trustmark has made available for inspection the original WEB underwriting file relating to the placement of the 1999 renewal contract between TIG and Security.  Separately, USL has made available the original WEB underwriting file relating to the placement of the 1998 contract between TIG and USL.

In addition, see **Exhibit E** for a non-exhaustive list of documents relating to:  (1) information provided to WEB; (2) information provided to other markets, which was different than the information provided to WEB; and (3) Aon's knowledge of WEB's lack of complete information at the time of placement.

     (b)     Oral representations

See Trustmark's response to Interrogatory Numbers, 5, 9 and 10.

12.    Identify and state the basis for each of the "false representations of fact" and "misrepresentations of material fact" referred to in ¶¶ 37 and 38 of Trustmark's Third Party Complaint, including, without limitation, the allegations contained in those paragraphs that: (a) such representations and misrepresentations were false, known by TIG to be false and intended by TIG to induce WEB to rely upon them, (b) "TIG represented in the TIG/Security Agreement that it could timely and accurately report losses monthly by way of bordereau," (c) "TIG, through AON, represented to WEB that it was purchasing for the first time low layer reinsurance protection because TIG was for sale and this cover would facilitate the transaction," and (d) "TIG, through AON, represented that the VSC Block was one of the most desirable and profitable segments of the TIG Workers' Compensation Portfolio." As part of your response to this interrogatory, identify (a) the document(s) containing the alleged representation and/or misrepresentation; and (b) if the alleged representation and/or misrepresentation was made orally, the person(s) who made the representation and/or misrepresentation, the person to whom the representation was made, the date and place of the representation and/or misrepresentation, the method by which the representation was made (*i.e.*, telephone, face-to-face) and circumstances under which the representation and/or misrepresentation was made.

**SUPPLEMENTAL ANSWER:**

See Trustmark's response to Interrogatory Numbers, 5, 9 and 10.

13.    State the basis for the allegations contained in ¶ 40 of Trustmark's Third Party Complaint that (a) "TIG knew that Security would not keep all the risk but that Security itself would seek its own

retrocessional protection," and (b) "TIG also knew that Security, through WEB, would present the Placement Material as accurate and truthful information regarding TIG's Workers' Compensation Portfolio to prospective retrocessionaires."

**SUPPLEMENTAL ANSWER:**

(a) & (b)    WEB informed AON prior to entering into the 1998 contract between TIG and USL that WEB was the agent for two life and health insurance companies (All American Life Insurance Company/USL sometimes referred to as AAL/USL and Trustmark). WEB also informed Aon that the two companies that were part of its facility shared equally in the risk and that the AAL/USL and Trustmark paper was interchangeable. As part of this process, WEB provided AON with a description of its facility as well as, among other things, letters of authority signed by representatives of AAL/USL and Trustmark. Aon inquired from WEB whether WEB could provide full conditions excess of loss reinsurance for TIG. WEB informed Aon that it did not have the ability at that time to provide full conditions cover but that WEB was pursuing this option. WEB also informed Aon that if it was to provide full conditions cover that such cover would increase the cost to TIG because a property and casualty insurance company would be providing additional cover and acting as a front for WEB's two life and health companies. In connection with the 1998 reinsurance agreement, TIG ultimately chose USL over Trustmark as its reinsurer.

With respect to the renewal, WEB and AON discussed the fact that WEB was in a business relationship with ARTIS, which, among other things, represented a property and casualty insurance company (Security). In connection with the renewal, WEB and AON discussed the option of inserting

30

Security as a fronting carrier between TIG and Trustmark and AAL/USL. Ultimately, AON chose this option because it provided full conditions reinsurance coverage. WEB informed AON that Security was acting only as a front and that the majority of the risks would be shared by the two life and health insurance companies represented by WEB. See **Exhibit F**, for a non-exhaustive list of documents.

> 14.     Identify all other written or oral statements, representations, misrepresentations or omissions not identified in response to the previous interrogatories on which Trustmark intends to rely in support of its fraud and negligent misrepresentation claims against TIG. As part of your response to this interrogatory, identify (a) the document(s) containing the alleged statements, representations, misrepresentations or omissions; and (b) if the alleged statements, representations, misrepresentations or omissions was made orally, the person(s) who made the statements, representations, misrepresentations or omissions, the person to whom the representation was made, the date and place of the statements, representations, misrepresentations or omissions, the method by which the representation was made (*i.e.*, telephone, face-to-face) and circumstances under which the statements, representations, misrepresentations or omissions was made.

**SUPPLEMENTAL ANSWER:**

Trustmark's investigation continues and Trustmark will supplement as required under the Rules.

31

Dated:  May 27, 2003                    Signed as to objections and form only:


*Amy M. Rubenstein*
One of the Attorneys for Trustmark
Insurance Company

David M. Spector CT 21679
Paula J. Morency CT 24740
Everett J. Cygal CT 22765
Amy M. Rubenstein CT 24387
Schiff Hardin & Waite
6600 Sears Tower
Chicago, Illinois 60606-6473
312-258-5500
312-258-5722 (fax)

Jeffrey Hellman CT 04102
Zeisler & Zeisler
558 Clinton Avenue
P.O. Box 3186
Bridgeport, CT 06605
203-368-4234

32

I, Michael J. Hawksworth, FSA, MAAA, pursuant 28 U.S.C. § 1746, hereby depose and state that I am Second Vice President and Actuary of Trustmark Insurance Company, and that I have read the foregoing answers to interrogatories, and they are true and correct to the best of my knowledge and belief.

Michael J. Hawksworth

## CERTIFICATE OF SERVICE

I, Amy M. Rubenstein, do certify that a true and correct copy of the foregoing Trustmark Insurance Company's Second Supplemental Response to Third Party Defendant TIG Insurance Company's First Set of Interrogatories was sent by United States mail May 27, 2003 addressed to:

Frank F. Coulom, Jr., Esq.
Marion Manzo
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103

Mark B. Holton, Esq.
David J. Grais, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193

David A. Slossberg, Esq.
Hurwitz & Sagarin
147 North Broad Street
Milford, CT 06460-0112

Harry P. Cohen, Esq.
Brian J. O'Sullivan, Esq.
Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, NY 10038

Amy M. Rubenstein