# EXHIBIT E

# EXPERT WITNESS REPORT OF RICHARD J. JESSEL

I have prepared this report to describe the subject matter, areas and opinions about which I testify in the trial of this lawsuit. My report reflects my wholly independent views and in expressing my views I have relied solely on my experience as a reinsurance underwriter. To the extent that I believe that I am not qualified to offer an opinion, or where there is insufficient material on which to express a view, I have not done so. This report also includes additional information as required by Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

## I    Background and Qualifications

A full copy of my curriculum vitae appears at Appendix III. In summary, however, I started my career working for the Eagle Star group in 1974 in the Statistics and Research department working for Dr. Reid. I then moved to the Home Foreign Department covering facultative, liability, Personal Accident ("PA") and miscellaneous other classes of business. I moved to the reinsurance underwriting department in 1975 and through various promotions, I worked my way up to being in charge of excess of loss underwriting, writing a wide variety of business at Eagle Star from 1984 to 1989.

In 1989, I left to start up syndicate 1163 at Lloyd's, underwriting excess of loss business including property, casualty and PA. From 1990 to 1995, I was also the underwriter for various other syndicates. In 1991, I took over four other syndicates including syndicates, 512 and 530, which specialised in PA and included within their portfolios an element of WCA carve-out business. In particular, my experience of underwriting for 512 and 530 is relevant to the views that I express in the current matter, as at the time I took them over, they were leading PA syndicates. The surviving active syndicate was number 512, which became a composite non-marine syndicate including property excess of loss business, certain non-PA LMX business and PA. In 1992, syndicate 512 was underwriting over £100,000,000 of capacity.

In 1995, I left the Syndicates and set up a consulting company, IRMAC, and provided consulting services to the Lloyd's Equitas project. I continued consulting for various companies until 1999 including Tempest Re in Bermuda and ACE in Bermuda. In 1999 I set up my own company, Quote and Buy which was a business to business operation selling software and services to companies wishing to develop their own insurance solution online. Quote and Buy has developed leading edge tools for the creation of full cycle straight through processes for all financially oriented online sales and compliance. Quote and Buy is now restructured and new company has been formed called Andromeda Solutions.

I have testified as an expert in a case recently between Manufacturers Life Insurance Company and Chubb. This case was concerning the London LMX Spiral and Personal Accident Excess of Loss Reinsurance.

1

I have also been involved as an expert on various cases concerning Home and Overseas and Seguros La Seguridad, Home and Overseas and Public Service Mutual and Home and Overseas and DARAG.

Prior to these cases I was involved in a mediation case in US Virgin Islands concerning a WCA claim.

I have not authored any publications within the last ten years.

## II   Compensation

I am being compensated for my services at the rate of £175 per hour, plus expenses.

## III   Data and Information Considered

I have had access to all depositions and exhibits and in particular I have examined materials listed below before making this report.

i) Tabs 1 to 70 of information provided by Schiff Hardin Waite – particularly Tab 1 entitled "Underwriting Information", Tab 2 entitled "Muirfield Underwriters Actuarial, Claims & Underwriting Audit" (An index to those Tabs is attached as Appendix I)
ii) Depositions of amongst others Bima, Bohuslav, Woods, Conway, Ekwall and Hennessey.
iii) Security vs Trustmark Complaint dated 27 November 2001
iv) Third Party Complaint filed 3 May 2002
v) Letter from David M. Spector to David J Grais dated 2 November 2001

## IV   Opinions, Conclusions and Bases

There are two questions that I have been asked to give my professional opinion on. These two questions are laid out below:

1. Whether the representations, late disclosures and non-disclosures by TIG/AON would have been material to a prudent underwriter in evaluating whether to reinsure the risks presented by the TIG workers' compensation portfolio ("WCA").

2. Whether, based upon the information and representations provided to it by TIG/AON, WEB acted as a prudent underwriter with respect to the TIG workers' compensation portfolio.

2

## Question 1.

A prudent underwriter will use all available material and anything else that is at hand in order to evaluate a risk. This material usually consists of claims data provided in some useable form, feedback from questions asked of the intermediary (or the reinsured if necessary), historical records and generally communication in any form between the parties. These communications can be in person, by telephone, by fax, by e-mail or in writing and the relationship between underwriter and intermediary has to be one of trust. If the underwriter is not able to trust the intermediary then the transaction will not take place. The confidence is enhanced by, amongst other things, a speedy and accurate response to questions, a reliable source of data and confirmation that the underwriter is responding, within reason, to the needs of the reinsured.

A prudent underwriter will take into account three essential elements. These three elements are (not necessarily in order of importance) risk selection, risk management and rate. Generally all considerations and deliberations by a prudent underwriter would be covered by these three elements.

If we use the above premise in this particular case we can assume that a certain amount of risk selection had been done prior to AON's first approach to WEB. WEB had determined that the companies that it was underwriting for were interested in WCA business. After that initial part of the risk selection process WEB had to determine whether this particular risk fitted into its underwriting requirement. Everything that WEB saw relating to this contract gave them an assurance that this was indeed a suitable risk to select. Indeed Robin Ekwall writes in his memo to Mike Hawksworth in July 1998 that "TIG targets states where they can make an underwriting profit and writes workers comp as a stand alone product through limited distribution sources. Their results have been excellent over the years and when they can't get their rates they don't write the business (1990 premium was $456mm and dropped to 209mm in 1996!) This statement underlines the fact that WEB was comfortable with TIG's attitude and TIG seems to show that they were willing to follow their principles and not write poor business – hence the reduction in premium from $456m million to $209 million.

Within the placement material there was considerable information concerning the risk management. The "Underwriting Information" dated 1 April 1998 provided within the placement material included reference to improving management and excellence as far as TIG was concerned. This information included such statements as *"TIG targets exposures in states with adequate rates"* and *"a stable operating environment"* and *"TIG audits on a regular basis"*. The report continued with, *"ManagedComp Inc. focus and expertise is in managed care. TIG is capitalising on their strengths in service, networking and policyholders' commitment. TIG in their turn, complement these strengths with their expertise in the areas on underwriting, pricing, managed care control, claims, loss control and premium audits"*.

3

The contract provided considerable comfort to a prudent underwriter in that it allowed for monthly reporting of claims. This monthly reporting of claims would indicate good risk management in that it shows an efficient office that keeps on top of its claims and it indicates that there is an efficacious reserving policy in place. A prudent underwriter's second element is therefore satisfied.

The third element is the rate. WEB were provided with a CD-ROM that they were unable to access, confirmed in an e-mail from Ekwall to Bohuslav dated 21 April 1999 *"Thanks Sheila. As you will recall, we were unable to use the CD-ROM thus the need for e-mailing the excess $25k files."* AON had previously provided WEB with an alternative means of accessing the data shown in an e-mail (with attachments Eval98XS25K, Eval97XS25K, Eval96XS25K) from Bohuslav to Ekwall on 24 November 1998 and entitled *"TIG XS 25K"* (again indicating that this was a complete data set). This data was then processed and analysed by WEB in order to produce a rate for the required layers.

As it turns out there was a problem with two of the vital elements mentioned above; the risk management turned out to be considerably different than that which WEB had been led to believe. The data provided to WEB was supposed to be the entire data and in fact was missing the data for VSC, which invalidated the original rating exercise that WEB had performed. See facsimile from Bohuslav to Ekwall on 17 November 1998 which states "As respects the CD-ROM you should have received, there are division codes which correspond as follows: ....".

Had WEB known the information contained in the Muirfield Audit of May 1998 (marked as Exhibit 123) that AON had in its possession but saw fit not to disclose to WEB with the rest of the placing information and had WEB been provided with the full data set that contained all the claims including those for Virginia Surety then WEB may well have chosen not to provide any quote at all or at least provided a quote that was more in line with those of the rest of the market. Had WEB also known that TIG had no way of fulfilling its stated intention to provide monthly claims data it might have considerably reduced the comfort level that WEB had assumed when that feature was promised. WEB was under the impression from a communication with Sheila Bohuslav that TIG were buying lower reinsurance cover because of the fact that they were in negotiations with Fairfax for a sale of the company. But contrary to that AON mentions in an internal memo in December 1997 (Jay Chase to Jon Rotenstreich and Mary Hennessy and others 13 December 1997) that "Illinois filed an advisory rate decrease of 7.9%. VSC adopted the decrease. We need to examine more aggressive use of retrocessional reinsurance on this program to see if we can structure combined ratio relief in the short term".

So, the answer to Question 1 is that late disclosures and non-disclosures by TIG/AON were extremely material to a prudent underwriter in evaluating whether to reinsure the risks presented by the TIG workers' compensation portfolio.

<u>Question 2</u>

Moving on to Question 2 concerning the prudence of WEB with respect to the TIG workers' compensation portfolio. A "prudent" underwriter takes many factors into

4

consideration when assessing a risk. As described above I condense all these factors into three elements. The test here is whether WEB were prudent and in order to answer that I would consider going over these three elements. The selection of the risk is something that WEB would be considering at a strategic level and at a submission level. It has to be assumed that the strategic level of risk selection is acceptable, as it is entirely possible to make a profit from this type of business. At the submission level, in this case, WEB was provided with a highly persuasive set of information by AON, including communications between WEB and AON. Given the nature of that information a prudent underwriting analysis could have concluded that this was an acceptable risk. As far as the risk management is concerned WEB were provided with information which led it to believe that the management was excellent and improving, as shown above. That leaves the rating. WEB were provided with information that was missing a vital element (being the VSC data). Therefore the prudent underwriter could not have possibly been able to tell that there was anything wrong with the information that in good faith they understood to be complete.

In my opinion AON compounded the error later on when they discovered that there was data missing from the original information provided to WEB for rating purposes. At that point they could have fully disclosed the omission and its significance and at least attempted to negotiate a suitable solution at that time. (see Bohuslav facsimile to Ekwall 9 June 1999) Instead they did not take that opportunity thereby passing up any chance of solving the problem.

### Rating Analysis

I have been asked to do an analysis of the data that was originally provided to WEB by AON for quoting the 1999 contract in question.

I received by e-mail an attachment that contained data in columns and rows. This file contained data that included a year column, in which the loss occurred, and a column showing an amount in US dollars of each loss. Each individual claim was shown on a separate row. The attachment was entitled Eval98XS25K.

There were 20,962 rows and 14 columns of data that represented the entire set of data for the latest development year that was available, which was 1998.

In order to simplify the analysis that I had to do I sorted the whole spreadsheet firstly by year and then in ascending order of size of claim. I then prepared a side table, effectively doing manually what a pivot table would do, which summarised the required information into a table. This table is attached as Appendix II and shows the years, the number of contracts and the total amount of claims in each year. From this sorted data I effected some general allowances for expenses and profit and commission. The results can be seen on Appendix II but are also shown on a comparison chart below alongside the rates that WEB produced from the same data at the time. I also took the stance that there were certain elements of the results of my workings that should be ignored, for example the more recent years of underwriting where the losses were not sufficiently developed to produce a meaningful result. One simple difference between my calculations and those done by WEB at the time is also

5

that I applied a general development figure per layer of across all the years and WEB applied different development numbers for each year.

| Percentages | Layer | | |
|---|---|---|---|
| | 50,000 xs 50,000 | 400,000 xs 100,000 | 500,000 xs 500,000 |
| WEB RATES | 13.6364 | 12.5152 | 2.0303 |
| RJJ RATES | 13.89 | 12.29 | 1.75* |

* see appendix

In conclusion from my analysis of the data, WEB's underwriting of the risk based on the information provided to it was a prudent and reasonable one.

I have further confirmed that the missing and undisclosed information would have been material to the underwriting of this business.

From the pivot tables provided by the three missing files I have concluded the information shown in the table below.

| Percentages | Layer | | |
|---|---|---|---|
| | 50,000 xs 50,000 | 400,000 xs 100,000 | 500,000 xs 500,000 |
| Effect of Missing Data | 5.92 | 4.89 | 0.58 |

Dated this 9th day of June 2003

Signed  R. J. Jessel

RICHARD JAMES JESSEL

Westfield Barn House
North Lane
Weston on the Green
Oxfordshire
OX25 3RG
United Kingdom

6

1

## INDEX TO TABS 1 - 70

| TAB | DATE | DOCUMENT DESCRIPTION |
|---|---|---|
| 1 | 05/05/98 | Underwriting Information (TM/S01031 – 37) and (TM/S00789 – 909) |
| 2 | 05/08/98 | Muirfield Underwriters Actuarial, Claims & Underwriting Audit (TIG/T014436 – 61) |
| 3 | 05/27/98 | Fax Cover Sheet to Bohuslav from Ekwall (TM/S01029) |
| 4 | 06/01/98 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S01011) & (AON02218 – 2224) |
| 5 | 06/03/98 | Letter to Ekwall from Bohuslav (TM/S01028) |
| 5A | 06/03/98 | Letter to Dunn from Bima, Bohuslav & Bautista (AON02194 – 2205) |
| 6 | 06/04/98 | Fax Cover Sheet to Bohuslav from Ekwall (TM/S01010) |
| 7 | 06/05/98 | Fax Cover Sheet to Chase from Bohuslav (AON02159 – 61) |
| 8 | 06/11/98 | Fax Cover Sheet to Ekwall from Bohuslav re: release for Milliman & Robertson (TM/S01001 – 04) |
| 9 | 06/11/98 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S01014 – 21) |
| 10 | 06/12/98 | Fax Cover Sheet to Bohuslav from Bastan (TM/S01013) |
| 11 | 06/24/98 | Fax Cover Sheet to Ekwall from (TM/S00989 – 01000) |
| 12 | 06/25/98 | Fax Cover Sheet to Bohuslav from Ekwall (TM/S01012) |
| 13 | 06/25/98 | Fax Cover Sheet to Ekwall from Bohuslav & Bima (TM/S00987 – 88) |
| 14 | 06/29/98 | Interoffice Memorandum to Kelley from Bohuslav (AON02008 – 12) |
| 15 | 06/29/98 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S00985 – 86) |

| TAB | DATE | DOCUMENT DESCRIPTION |
|---|---|---|
| 16 | 07/01/98 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S00981 – 82) |
| 17 | 07/02/98 | E-Mail to Paul & McElhiney from (TIG/T000024) |
| 18 | 07/08/98 | Fax Cover Sheets to Hawksworth & Lowe from Ekwall attaching 07/08/98 Memo (TM/S00975 – 80) and (TM/S00388 – 91) |
| 19 | 07/09/98 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S00972 – 74) |
| 20 | 07/15/98 | Letter to Ekwall from Bohuslav & Bautista (TM/S00971) |
| 21 | 07/23/98 | Signed 1998 Placement Slip (TM/S00778 – 87) |
| 22 | 08/17/98 | Letter to Ekwall from Bohuslav & Bautista (TM/S00959 – 68) |
| 22A | 10/02/98 | Fax Cover Sheet to Ekwall from Bohuslav (AON09787 – 9790) |
| 23 | 11/10/98 | Fax Cover Sheet to Chase from Bohuslav (AON09113 – 21) |
| 24 | 11/11/98 | Letter to Ekwall from Bohuslav & Bautisat (TM/S00664 – 66) and (WEB00137 – 394) |
| 25 | 11/17/98 | Fax Cover Sheet to Ekwall from Bohuslav & Bautista (TM/S00944 – 54) |
| 26 | 11/25/98 | Fax Cover Sheet to Bohuslav from Ekwall (TM/S00942) |
| 27 | 12/02/98 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S00926 – 30) |
| 28 | 12/06/98 | Fax Cover Sheet to Bohuslav from Ekwall (TM/S00924) |
| 28A | 12/07/98 | Fax Cover Sheet to Ekwall from Bohuslav & Bautista (TM/S00922 – 923) |
| 29 | 12/10/98 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S00919 – 20) |

| TAB | DATE | DOCUMENT DESCRIPTION |
|---|---|---|
| 29A | 12/11/98 | Fax Cover Sheet to Washburn from Bohuslav (AON08481) |
| 29B | 12/11/98 | Letter to Wittlich from Bohuslav (AON07748 – 7777) |
| 30 | 12/14/98 | Fax Cover Sheet to Bohuslav from Ekwall (TM/S00917) |
| 31 | 12/15/98 | Fax Cover Sheet to Scholl from Bohuslav (AON08488 – 96) |
| 32 | 12/15/98 | Fax Cover Sheet to Conway & Stahnke from Donahue (TM/S00651 – 63) |
| 33 | 12/18/98 | Fax Cover Sheet to Scholl from Bohuslav (AON08464 – 66) |
| 34 | 12/18/98 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S01181) |
| 35 | 12/18/98 | E-Mail to Chase from Scholl (TIG11163) |
| 36 | 12/21/98 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S01169 – 71) |
| 37 | 12/31/98 | Fax Cover Sheet to Bohuslav from Ekwall (TM/S00643) |
| 38 | 12/31/98 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S00644 – 45) |
| 39 | 01/07/99 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S01163 – 64) |
| 40 | 01/08/99 | Fax Cover Sheet to Bohuslav from Ekwall (TM/S00640) |
| 41 | 01/11/99 | Fax Cover Sheet to Scholl from Bohuslav (TIG133 – 34) |
| 42 | 01/11/99 | Letter to Ekwall from Bohuslav (TM/S00639) |
| 43 | 01/18/99 | Letter to Scholl from Bima & Bohuslav (TIG00303 – 08) |
| 44 | 01/19/99 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S00635 – 38) |
| 45 | 01/28/99 | Letter to Ekwall from Bohuslav & Bautista (TM/S00632 – 33) |

| TAB | DATE | DOCUMENT DESCRIPTION |
|---|---|---|
| 46 | 02/03/99 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S00631) |
| 47 | 02/09/99 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S00629) |
| 48 | 02/16/99 | Fax Cover Sheet to Ekwall from Bohuslav (TM/S00626 – 28) |
| 49 | 03/1999 | Signed 1999 Placement Slip (TM/S001040 – 50) |
| 50 | 03/07/99 | Signed "Revised" Addendum No. 1 to 1999 Placement Slip (S01389 – 91) |
| 51 | 03/11/99 | Signed Certificate of Workers Compensation Facultative Reinsurance (TM/S00505 – 06) |
| 52 |  | Blank Certificate of Workers Compensation Facultative Reinsurance with General Conditions attached (S09377 – 81) |
| 53 | 03/22/99 | Fax Cover Sheet to Ekwall from Bohuslav & Bautista (TM/S01784 – 88) |
| 54 | 04/19/99 | Signed Certificate of Workers Compensation Reinsurance (S00731 – 32) |
| 55 | 04/20/99 | E-mail to Ekwall from Bohuslav (AON10098) |
| 56 | 05/04/99 | Interoffice Memo to Bima from Bohuslav (AON10062 – 71) |
| 57 | 05/17/99 | Letter to Smith from Kelley & Bima (AON10008 – 10) |
| 58 | 07/07/99 | E-Mail to O'Brien (et. al.) from Churchill (TIG/T015648) |
| 59 | 07/16/99 | E-Mail to Hay & Monroe from McElhiney (TIG/T015678 – 82) |
| 60 | 07/22/99 | Memorandum to McElhiney from Hay (TM/S00392 – 407) |
| 61 | 10/25/99 | Fax Cover Sheet to Hawksworth from Chapman attaching 7/22/99 Memo from Hay re: WEB Buy-Down Treaties (TM/S00408 – 27) |

| TAB | DATE | DOCUMENT DESCRIPTION |
|---|---|---|
| 62 | 11/09/99 | Letter to Chapman from Bohuslav & Bautista (TM/S00256 – 343) |
| 63 | 01/05/00 | E-Mail to McElhiney from Smith (TIG/T015636 – 39) |
| 64 | 05/09/00 | Signed Fully Worded Workers Compensation Underlying 1st, 2nd and 3rd Excess of Loss Reinsurance Agreement (TIG00354 – 91) |
| 65 | 10/26/01 | Letter to Spector from Holton |
| 66 | 11/02/01 | Letter to Grais from Spector |
| 66A | 11/10/99 | Draft Fully Worded Agreement (Security / Trustmark) (S01592 – 1649) |
| 67 | 11/15/01 | Letter to Spector from Grais |
| 68 | 11/26/01 | Letter to Grais from Spector |
| 69 | 11/27/01 | Complaint for Declaratory Judgment and for Damages for Breach of Contract filed by Security in the United States District Court for the District of Connecticue (#01CV2198) |
| 70 | 11/30/01 | Letter to Spector from Grais |

2

| | losses | Losses as % of EPI | EPI | 50 x 50 | Pure Burn | 134% Loaded | add back Comm | 400 x 100 | Pure Burn | 145% Loaded | add back Comm | 500 x 500 | Pure Burn | 145% Loaded | add back Comm |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1988 | 1,151 | 0.0003150% | 365,339,000 | 33,601,374 | 9.20% | 12.32% | 15.04% | 27,610,925 | 7.56% | 10.96% | 13.37% | 3,587,298 | 0.98% | 1.42% | 1.74% |
| 1989 | 1,424 | 0.0003569% | 399,018,000 | 40,712,317 | 10.20% | 13.67% | 16.68% | 30,271,461 | 7.59% | 11.00% | 13.42% | 2,486,040 | 0.62% | 0.83% | 1.02% |
| 1990 | 1,664 | 0.0003588% | 463,712,000 | 47,573,130 | 10.26% | 13.75% | 16.77% | 34,389,851 | 7.42% | 10.75% | 13.12% | 2,038,610 | 0.44% | 0.59% | 0.72% |
| 1991 | 1,636 | 0.0003496% | 467,985,000 | 48,037,299 | 10.26% | 13.75% | 16.78% | 39,329,714 | 8.40% | 12.19% | 14.87% | 3,401,035 | 0.73% | 0.97% | 1.19% |
| 1992 | 1,189 | 0.0002648% | 448,965,000 | 34,916,194 | 7.78% | 10.42% | 12.71% | 28,626,962 | 6.38% | 9.25% | 11.28% | 1,699,009 | 0.38% | 0.51% | 0.62% |
| 1993 | 959 | 0.0002241% | 427,951,000 | 28,731,838 | 6.71% | 9.00% | 10.98% | 26,305,628 | 6.15% | 8.91% | 10.87% | 3,358,057 | 0.78% | 1.05% | 1.28% |
| 1994 | 696 | 0.0002193% | 317,354,000 | 21,029,836 | 6.63% | 8.88% | 10.83% | 21,218,198 | 6.69% | 9.69% | 11.83% | 3,055,188 | 0.96% | 1.29% | 1.57% |
| 1995 | 557 | 0.0002185% | 254,901,000 | 16,664,575 | 6.54% | 8.76% | 10.69% | 13,724,114 | 5.38% | 7.81% | 9.52% | 832,499 | 0.33% | 0.44% | 0.53% |
| 1996 | 491 | 0.0003473% | 141,384,000 | 14,194,417 | 10.04% | 13.45% | 16.41% | 9,349,470 | 6.61% | 9.59% | 11.70% | 1,569,582 | 1.11% | 1.49% | 1.81% |
| 1997 | 341 | 0.0002436% | 140,000,000 | 8,976,170 | 6.41% | 8.59% | 10.48% | 6,520,568 | 4.66% | 6.75% | 8.24% | 2,500,000 | 1.79% | 2.39% | 2.92% |
| 1998 | 141 | 0.0001068% | 132,000,000 | 3,293,701 | 2.50% | 3.34% | 4.08% | 1,607,075 | 1.22% | 1.77% | 2.15% | 329,099 | 0.25% | 0.33% | 0.41% |
| | | | | 297,730,851 | | | | 238,953,966 | | | 122% | 24,856,417 | | | 122% |

Take years 1988 to 1995 as they have more stable development.
Take average of 1988 to 1995 (8 years) for all three layers.
Add a % for layer proportion, progression, administration and profit.
Add back the commission to gross the rates up.
The rates dictated by the loss information provided on this sheet (being 1998) are as follows:-
$50,000 xs $50,000      13.81%
$400,000 xs $100,000    12.29%
$500,000 xs $500,000     1.08%   This top layer would attract a higher progression rate as the losses less frequent and a prudent underwriter would want to ensure that there was enough premium to pay for several losses - so the rate might be increased to between 1.5% and 1.75%

3

# CURRICULUM VITAE

| | |
|---|---|
| **NAME:** | Richard James Jessel |
| **D.O.B:** | 5th January 1954 |
| **STATUS:** | Married.    3 children 2 step-children<br>Nationality - British. |
| **ADDRESS:** | Westfield Barn, North Lane, Weston on the Green, Oxfordshire OX25 3RG, UK |
| **TELEPHONE:** | 01869 350 470    FAX: 01869 351 470<br>Mobile 07831 871 395 –<br>e-mail – jessel@ukonline.co.uk |
| **EDUCATION:** | 1967-1971    Eton College<br>1971-1973    Highbury Technical College |
| **QUALIFICATIONS:** | 10 'O' levels<br>'A' level in Accountancy<br>OND Business Studies |

**WORK**

| | |
|---|---|
| 1974-1989 | Eagle Star Insurance Company |
| 1974 | Statistical & Research Department |
| 1975-1980 | Home Foreign Accident Department |
| 1980-1989 | Non-Proportional Reinsurance Dept.<br>(1984-1989 Treaty Underwriter) |

**Lloyd's**

| | |
|---|---|
| 1990-1993 | London Wall Managing Agencies (Lloyd's)(Director) |
| 1990-1991 | Underwriter Syndicate 1163 |
| 1991-1995 | Underwriter Syndicate 512 et al |
| 1994-1995 | Moved to Tower Managing Agents (part of the Archer Group) |
| 1995 | Set up consulting company - IRMAC Consulting with Lloyd's Equitas project. |
| 1996/7 | Chief Underwriting Officer Hedge Re. |
| 1998 | Consulting with various companies |
| 1999 -2002 | Quote and Buy |
| 2002 – 2003 | Andromeda Solutions |

**EXPERIENCE:**

- Started with Eagle Star working in various departments including Statistics and Research under Dr. Reid.
- Worked in Eagle Star's Home Foreign Department covering facultative liability, accident, PA and miscellaneous classes.
- Underwrote an excess of loss account covering all aspects of reinsurance including property, casualty, PA and on and offshore oil rigs.
- Extensive management training with BAT/Eagle Star including personnel, business development and other management skills. Worked on management projects with Eagle Star (Direct Marketing)
- Travelled on business in Europe and the U.S.A.
- Responsible for dealing with Eagle Star's Travel Department Reinsurances.
- Contacts with many Lloyd's and Insurance Company individuals.
- Considerable experience in the design and use of computer applications for reinsurance.
- Experience in negotiating claims, dealing with complex insurance related legal issues including US courts, property, financial institutions, personal accident and reinsurance.
- Started Lloyd's Syndicate and underwrote and excess of loss account covering all aspects of reinsurance including property, casualty and PA.
- Took over 4 other Lloyd's Syndicates two of which specialised in PA.
- Managed merged syndicate controlling underwriting of LMX, XSL Property, Direct Property, PA, Financial Institutions, Aviation XSL and Casualty including handling of all outwards reinsurance.
- Worked with many individuals and companies involved in the reinsurance market in Bermuda.
- Completed full audit of Tempest Re in preparation for sale to ACE Limited. Reported to the Chairman and sub-committee of the board of ACE.
- Completed full review of ACE Limited's specialist ART department.
- Started specialist hedging company in Bermuda under the direction of Richard Sandor.
- Consulted in UK developing and expanding fledgling companies.
- Started Quote and Buy with the aim to develop a full online business to consumer online insurance solution. Developed Quote and Buy to be a business to business operation selling software and services to companies wishing to develop their own insurance solution online. Quote and Buy developed leading edge tools for the creation of full cycle STP processes online for all financially orientated online sales and compliance.
- Fully conversant with Microsoft Office products, 'Excel', 'Word' and 'Powerpoint' as well as 'Pagemaker', Project and 'Quicken'.
- Knowledge of web-enabling insurance products and e-commerce in all areas.

LEISURE:      Skiing, sailing, tennis, shooting, aeroplane construction

OTHER:        Trustee to Blenheim Estates in Oxfordshire

## MORE DETAILS FOR RJJ CV

1995   Started consultancy company specialising in reinsurance matters.

Consulting for ACE Limited (Bermuda) on the acquisition of Tempest Re. My task was to complete a due diligence exercise on all aspects of the company and report to a committee of the Board of ACE. This involved a review of all underwriting, systems, personnel and services of Tempest and resulted in ACE taking over Tempest for just under US$ one billion.

Other projects include, designing a business plan for a prospective new underwriting venture, creating a new and innovative insurance/banking system and researching the problems associated with the new US regulations governing the way that Lloyd's accepts certain types of business within the US.

Also worked at Equitas, which involved an in-depth study of syndicates with the largest asbestos, pollution and health hazard liabilities often going back to 1940's and 1950's reinsurance programmes. Considerable computer skills were required to complete this task and involved working with Microsoft Access, XL and word products. The end result of this consultancy was to determine the precise contributions (or recoveries) for each of the worst 50 syndicates in Lloyd's in order to finalise the establishment of Equitas.

Worked on a new project for ACE specifically with Brian Duppereault, Chairman, which involved finite risks, catastrophe underwriting and reinsurance within the Financial Lines Division. I was asked to report on the current contracts, to assist with new contracts, to advise on details within the contracts, to devise a methodology whereby they can better handle the information needed to judge the risks and finally to find a reinsurance solution to the potential catastrophe accumulation.

Worked on a new project with a leading Lloyd's Broker setting up a company to handle the insurance and reinsurance of Charity Organisations in the UK including all aspects of services for these organisations. (sold company to partners)

1996   August. Started as Chief Underwriting Officer for a new company being set up in Bermuda.

The company specialised in the securitisation and commoditisation of insurance and reinsurance risks. Dr. Richard Sandor raised $200 million in capital for the purpose of taking on insurance and reinsurance business and then hedging those risks into the capital and commodity markets. My task was to underwrite and provide the reinsurance expertise and the marketing in order to generate the original reinsurance business for the capital markets experts to then hedge. The company was taken over in June 1997.

1997   I was asked to help start a new reinsurance company in Bermuda in July. I worked on this until December when following the fall in the stock markets in

October and delays in registration in Bermuda the investors decided to pull out.

1998    Involved in starting a new company, specialising in assisting small to medium sized companies in enhancing their shareholder value. This basically involving all aspects of management consulting and would typically involve a complete review of each company with a 'health' checklist of over 100 points, then assisting the companies with reorganisation for maximum efficiency and development in four main stages; the final aim for the shareholders to realise value in one way or another within a five year time-scale. Each company that we contracted agreed for our company to be a non-executive director and we received part of our remuneration in the form of options on the increased value in the company from the time that we became involved to the time the company was sold.

1999 to present

   Appointed Director of new company, Quote and Buy Limited, set up to develop full cycle STP insurance online primarily through developing a web site and selling to consumers. Direction of company changed as business-to-business solution developed for insurance products including innovative 'Product Writer' software. Leading edge development includes online 'Desktop' as electronic filing cabinet, 'product scripter', mid term policy adjustments online and full 'roll-back' transaction system. Quote and Buy restructured and IP acquired by Andromeda Solutions in 2003, development of software continuing.

   Also working as consultant on various reinsurance related cases in UK and USA