# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITY INSURANCE COMPANY, OF HARTFORD , )<br><br>Plaintiff, )<br><br>v. )<br><br>TRUSTMARK INSURANCE COMPANY, )<br><br>Defendant. )<br><br>TRUSTMARK INSURANCE COMPANY, )<br><br>Third-Party Plaintiff, )<br><br>v. )<br><br>TIG INSURANCE COMPANY )<br><br>Third-Party Defendant.) | Civil Action No. 301CV2198(PCD) |

## EXPERT WITNESS REPORT OF PAUL C. THOMSON III

I have prepared this report to describe the subject matter areas and opinions about which I expect to testify in the trial of this lawsuit. This report also includes additional information as required by Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

I.    **Background and Qualifications**

I am President of Reassess, Inc., a New York corporation formed in 1994 to provide professional services to the insurance and reinsurance industry. Since 1977, I have worked for insurance and reinsurance companies as an employee or as a consulting or testimonial expert witness. I have also served as a reinsurance arbitrator or umpire in

more than 40 proceedings. Further, I am a certified arbitrator, a certified umpire and a member of ARIAS·US. My work experience has included: SOREMA North America Reinsurance Company (1990-1994), where I was Vice President and Director of Claims, and a member of the Board of Directors of a subsidiary company, Fulcrum Insurance Company; U.S. International Reinsurance Company (1982-1990) where I held various positions including Vice President, Claims; Royal Insurance (1978-1982), where I was responsible for the management of complex claims; and Reliance Insurance Company (1977-1978), where I worked as a casualty claims representative.

As a result of my experience in the insurance and reinsurance industry, I have extensive experience in handling complex insurance and reinsurance claims and I have developed expertise in various insurance and reinsurance areas, including disclosure of information and data during the reinsurance placement process, other reinsurance reporting and disclosure practices, the duty to act in utmost good faith when transacting the business of reinsurance, and industry custom and practice in respects to these and other areas.

Exhibit A to this Report is my Curriculum Vitae that sets forth my biographical information. Exhibit B to this Report identifies testimonial expert undertakings where I have provided testimony within the past four years.

II.    **Compensation**

I am being compensated for my services at an hourly rate of $350, plus expenses.

III.    **Data and Information Considered**

I reviewed the transcripts of depositions and accompanying exhibits that are listed on Exhibit C to this Report. Further I reviewed the transcripts of depositions and

accompanying exhibits in <u>Security Insurance Company of Hartford v. Trustmark Insurance Company</u>, United States District Court, District of Connecticut, No. 300 CV 1247. Additionally, I reviewed all pleadings and Security's Memorandum of Law in Support of its Motion for Summary Judgment and other supporting papers (including letters exchanged by the Parties as more fully described and discussed below) and Trustmark's responsive Motion and supporting papers, as well as excerpts of hearing transcripts in the matter of an arbitration between Fire Casualty Insurance Company (a company affiliated with Security) and Trustmark, prior to formulating the opinions which follow.

III.    **Opinions, Conclusions and Bases**

This lawsuit arises out of the conduct of Security Insurance Company of Hartford (Security) and TIG Insurance Company (TIG) and its agents in the management and reinsurance of TIG's portfolio of workers compensation insurance and assumed reinsurance business. The litigation further arises from the conduct of TIG and its agent, or agents, as TIG solicited, ultimately procured and then maintained reinsurance of nearly all of what TIG had previously retained in the first $1 million of each loss. Additionally, this litigation, and the other litigation cited in the preceding section, arises out of Security's conduct in its dealings with Trustmark under a contract of retrocessional reinsurance, the subject matter of which was substantially related to the underlying TIG workers compensation business.

For a period of years during the 1990's, TIG arranged for reinsurance of its workers compensation business under a series of excess of loss reinsurance agreements. Excess of loss reinsurance effects the transfer of the risk of loss to interested reinsurers in

3

excess of an agreed to loss threshold, usually retained by the company purchasing the reinsurance. In this case, TIG and its agents underwrote and managed the workers compensation business and its excess of loss reinsurers assumed liability for individual losses that exceeded $1 million and TIG agreed to keep the first $1 million of each loss. At some time during 1998, TIG decided to "buy down" its existing retained liabilities flowing from its workers compensation business and explored opportunities directly with potentially interested reinsurers. TIG also approached other reinsurance markets with the assistance of AON, a reinsurance intermediary that acted on TIG's behalf in facilitating the placement of the desired reinsurance protections. In that capacity AON received and considered information and data prepared and provided by TIG, then prepared and presented that information and data to potentially interested reinsurers. AON made such a presentation to WEB, a managing underwriting agent of Security. On Security's behalf, WEB considered the information and eventually entered into reinsurance agreements with TIG. WEB further acted in its capacity to act on Security's behalf and effected the placement of retrocessional reinsurance of a significant part of Security's assumed reinsurance interests and liabilities flowing from the underlying TIG workers compensation business. WEB then placed that retrocessional reinsurance with Trustmark Insurance Company (Trustmark), a life company that had also authorized WEB to act as a managing underwriting agent.

I have been asked to provide opinions on the following issues:

A. Whether the presentation of information and data respecting the TIG workers compensation portfolio, which TIG and its agent made to Security and Trustmark through WEB, conformed to the obligations imposed by the custom and practice of the insurance and reinsurance industry.

4

B. Whether TIG and its agent were under an affirmative and ongoing duty, pursuant to the obligations imposed by the custom and practice of the insurance and reinsurance industry, to disclose accurate and complete information and data concerning the TIG workers compensation portfolio to all potentially interested reinsurance markets.

C. Whether TIG and its agent had an affirmative duty, pursuant to the obligations imposed by the custom and practice of the insurance and reinsurance industry, to correct any inaccuracies or omissions in the reinsurance placement information and data respecting TIG workers compensation portfolio.

D. Whether the custom and practice of the insurance and reinsurance industry imposed on WEB an obligation to independently verify the accuracy of representations made by TIG and its agents in connection with the placement of the TIG workers compensation portfolio.

E. Whether Security, as a ceding company seeking retrocessional reinsurance protection, bears the risk, pursuant to the obligations imposed by the custom and practice of the insurance and reinsurance industry, if the information and data it conveys to prospective retrocessionaires, such as Trustmark, is not accurate and reliable.

F. Whether, pursuant to the obligations imposed by the custom and practice of the insurance and reinsurance industry, Security had a duty to act promptly to rescind its reinsurance agreement with TIG, upon receiving information from its retrocessionaire, Trustmark, identifying grounds for doing so.

G. Whether Trustmark violated the standards set by the custom and practice of the insurance and reinsurance industry in rescinding its reinsurance agreement with Security.

My considered opinions regarding each of the foregoing points are as follows:

A. **TIG's reinsurance placement presentation and disclosure of information and data concerning TIG's workers compensation portfolio did not conform to industry custom and practice.**

Certain industry custom and practice has developed over the years in connection with the obligations of ceding companies. Such custom and practice was already well

established in the insurance industry prior to the time that TIG arranged to further reinsure its workers compensation business with Security.

Industry custom and practice imposes upon ceding companies (companies seeking to procure reinsurance protections) the duties to exercise the utmost good faith in making full disclosure of information and data concerning the underlying subject business at the time the ceding company seeks the placement of the reinsurance.

TIG failed to provide accurate and complete information and data concerning its portfolio of workers compensation business when it approached potential reinsurance markets. Notable misrepresentations and omissions include incomplete loss data, the withholding of audit reports and actuarial studies relating to the subject business, misrepresenting the status, nature and performance of the underlying business and failing to disclose TIG's concerns about the deteriorating loss experience of its workers compensation portfolio.

Among other things, TIG's employees testified that significant problems existed that affected the manner in which TIG received and internally recorded claim reserve information, particularly in respects to the Virginia Surety component of the underlying portfolio. Further, discovery of TIG's internal memoranda and e-mails provided evidence that TIG's senior management was aware of and sensitive to the deteriorating loss experience of its workers compensation portfolio.

Those concerns also focused upon Virginia Surety, an AON subsidiary, and a Virginia Surety book of business underwritten and managed on TIG's behalf by Muirfield Underwriters, another wholly owned AON subsidiary. Although TIG audited the Virginia Surety book in May of 1998 and detailed the problems discovered during the

6

audit concerning the management, claims and underwriting practices of Muirfield Underwriters, neither TIG nor its agent made reinsurers aware of the audit findings. Further, while TIG and its agent touted the composition of its workers compensation book of business and represented that they expected geographical growth of the portfolio, reinsurers were not advised that the Virginia Surety business segment (which generated approximately one-third of the projected subject premium) was already under provisional notice of cancellation and that that part of the TIG portfolio was most likely to be placed into run-off by mid-1999. Although when TIG and AON approached reinsurers in 1999 they knew that the AON subsidiary, Muirfield, had already given TIG the contractually required one year's advance provisional notice of cancellation in the middle of 1998, potentially interested reinsures were not advised of this important development. Further, the existence of AON's own internal actuarial report about the TIG portfolio was not shared with reinsurers, nor was the report passed along to potentially interested reinsurers.

As a result of TIG's, and its agent's, failures to openly and candidly share this type of information with each prospective reinsurer, TIG's, and its agent's, conduct did not conform to established industry custom and practice during the placement of its reinsurances.

B.    **TIG and its agents had affirmative and ongoing disclosure obligations with respects to the presentation of information and data concerning TIG's workers compensation portfolio, but its actions in this regard did not conform with industry custom and practice.**

It is the established industry custom and practice that a ceding company has an ongoing duty to take reasonable steps to assure that the information originally conveyed to all potentially interested reinsurers was accurate and reliable. Consistent with that established industry custom and practice, TIG and its agents, here AON, had such an affirmative and ongoing duty. TIG and its agent, AON, should have candidly and timely shared with all potentially interested reinsurers the concerns, described above, about the unreliability of the information. Further, TIG and AON failed to make full and accurate disclosure of the data they possessed on this business. When supplemental loss information was eventually passed along, TIG and AON represented that the missing information was updated material, further disguising TIG's and AON's failure to disclose that fact. TIG's, and its agent's failures to so communicate such matters fully or timely to all potentially interested reinsurers, is contrary to established industry custom and practice.

**C.** **TIG and its agents had affirmative and ongoing disclosure obligations to correct any significant inaccuracies or omissions in the reinsurance placement information and data concerning TIG's workers compensation portfolio, but its actions in this regard did not conform with industry custom and practice.**

Understandably, when a ceding company or its placement agent discovers that the original reinsurance placement materials contain significant inaccuracies or omissions in information and data, industry custom and practice requires that all potentially interested reinsurers be informed about such inaccuracies or omissions. In this case, when such inaccuracies or omissions were discovered, neither TIG nor AON took prompt steps to communicate them to all potentially interested reinsurers. TIG and AON should have communicated that the loss data did not include Virginia Surety information and promptly provided full disclosure of corrected data. Each potentially interested reinsurer

8

should have had access to and been treated in a fair and equal manner in respects to the dissemination of accurate loss data. TIG and its agent, AON, failed to comply with the obligation imposed upon them by industry custom and practice.

D.    **Industry custom and practice does not impose upon a reinsurer, or its underwriting agent, an obligation to independently verify the accuracy of the representations made by a ceding company or its agents in connection the placement of reinsurance.**

Industry custom and practice has evolved over the years that a reinsurer may rely upon the accuracy of the representations made to it by companies seeking to purchase reinsurance protections. That custom and practice was certainly in place throughout the placement of the reinsurance at issue in this lawsuit, and remains so to this day. Further, it is established industry custom and practice that a reinsurer need not take steps to independently verify the accuracy of the representations it receives as part of the placement process.

The fundamental underpinning to this established practice is the duty of utmost good faith upon which each reinsurance undertaking is premised. The company that desires reinsurance protection must act with utmost good faith in its dealings with potentially interested reinsurers. Practical considerations also support this custom and practice. Requiring full and accurate disclosures of information and data concerning the subject business underwritten and managed by, or on behalf of, the company desiring reinsurance protections makes obvious sense, as the ceding company is uniquely positioned to make such disclosures. Additionally, detailed and often proprietary information concerning the portfolio rests exclusively with the ceding company. Even if

9

one were able to fashion a rationale for requiring a reinsurer to independently verify the accuracy of its cedent's placement representations, such a process would be unworkable as it would hinder the desired efficiency of traditional risk transfer, add immeasurably to the cost of each transaction and undermine the spirit inherent in each reinsurance relationship. Accordingly, neither Trustmark nor WEB had an obligation under industry custom and practice to independently verify the accuracy of the information TIG and AON passed along during the placement process, and both were entitled to rely upon the information provided to them.

**E.    Security, as a ceding company seeking retrocessional reinsurance protection, bears the risk, pursuant to the obligations imposed by the custom and practice of the insurance and reinsurance industry, that the information and data it conveyed to Trustmark was not accurate and reliable.**

As previously discussed, certain industry custom and practice developed over the years in connection with the obligations of ceding companies. Those obligations extend to ceding companies, such as Security here, that seek retrocessional reinsurance coverages. As was previously noted, these customs and practices were already well established in the insurance industry prior to when Security arranged to retrocede the subject business to Trustmark.

It is consistent that Security, as the ceding company, owed Trustmark, its retrocessional reinsurer, the customary duties to exercise the utmost good faith in making good faith and full disclosure of information concerning the underlying subject business at the time Security arranged placement of the reinsurance with Trustmark. The reinsurance placement document (Bates stamped S00731 – 732) transferring risk from

Security (the "Ceding Company") to Trustmark acknowledges the conveyance of such customary underwriting information, "As provided by the Ceding Company." Security was obligated by custom to convey accurate and reliable information to Trustmark. It is the custom and practice of the insurance and reinsurance industry that the ceding company, here Security, bears the risk if the information it conveyed to prospective retrocessionaires was inaccurate and unreliable. Such a custom and practice facilitates and promotes the orderly transference of risk.

It is further the established custom of the industry that a reinsurer, or retrocessional reinsurer (some of which may be three or four times, or even further removed from the originating insurance or reinsurance agreement or agreements) may rely upon the accuracy of the information its cedent provides to it. A reinsurer such as Trustmark, or another reinsurer situated further along the chain of the risk transference, need not demonstrate that its ceding company's failings were intentional or even of its own making. Nor is it necessary for a retrocessional reinsurer to look beyond the party with whom it contracted to seek redress should placement representations be defective or inaccurate. It is understandably the established custom and practice of the industry to place the duty to make accurate and reliable representations on the party seeking to acquire reinsurance protection, otherwise the progressive flow of risk transference information would become inherently suspect and thereby virtually shut down the placement process. It makes sense, therefore, that there exists no custom or practice requiring a reinsurer to demonstrate intent or fault on the ceding company's part should the information so conveyed be found to be either inaccurate or unreliable before it may pursue appropriate remedies.

**F.**    **Pursuant to the obligations imposed by the custom and practice of the insurance and reinsurance industry, Security had a duty to act promptly to rescind its reinsurance agreement with TIG, upon receiving information from its retrocessionaire, Trustmark, identifying grounds for doing so.**

In November 2001, Trustmark provided Security with detailed information, sufficient to serve as a basis for Security to rescind the underlying reinsurance agreement with TIG. Upon receipt of those written communications from Trustmark, Security was obligated, consistent with established industry custom and practice, to act promptly on that information and then move to rescind the underlying TIG reinsurance agreement. Rather than acting upon the information Trustmark provided, however, Security failed to take reasonable steps to address the concerns raised in the letter. Security's failure to do so constitutes a breach of the obligations it owed Trustmark under existing industry custom and practice.

In this litigation and elsewhere, Security has continually portrayed itself as a non-risk taking facilitator. Under the custom and practice of the insurance and reinsurance industry, when examining the question of whether Security had the duty to act promptly to rescind its reinsurance agreement with TIG, it is important to note that, despite Security's professed position that it was a simple facilitator with no real financial interest in the underlying TIG reinsurance, it chose not to act upon the information Trustmark provided to it in November 2001. That Security chose not to act, despite the fact that Security had always understood that Trustmark was the true risk taker in the transaction, is even more troubling than it would have been had Security had a significant financial stake in the matter.

Security's conduct, examined above, is but one of many instances which have come to light and have emerged as a pattern conduct, inconsistent with Security's duty to exercise the utmost good faith and is not in keeping with industry customs and practices. Other instances in which Security's conduct was not consistent with Security's duty to act in utmost good faith and which violated industry custom and practice include:

a) **Security's conduct in "negotiating" cancellation of its reinsurance with TIG.** Despite the fact that Trustmark had clearly communicated its decision to Security that the reinsurance of the TIG workers compensation portfolio would terminate at December 31, 1999 on a cutoff basis, Security "negotiated" the cancellation of its reinsurance of TIG on a runoff basis.

b) **Security's "negotiation" of revised claims reporting terms with TIG.** Security altered TIG's existing claims reporting requirements under the underlying TIG/Security reinsurance agreement without consulting with Trustmark.

c) **Security's conduct in refusing Trustmark access to inspect the records of the original ceding company or exercise reasonable claims oversight.** In the matter of an arbitration between Fire and Casualty Insurance Company, a company affiliated with Security, and Trustmark, details came to light that Security, while again maintaining that it was a mere front providing accommodation services to Trustmark, acted to frustrate Trustmark's stated

desires to inspect the records of the company that managed the business that was ultimately retroceded to Trustmark. That same pattern of conduct is evident in regards to the underlying TIG workers compensation portfolio, which is the subject matter of this litigation. In both instances, and despite professing to be a simple facilitator, Security actively interjected itself into the administrative process, but then failed to exercise good faith by refusing or frustrating Trustmark's stated desires to inspect the records of the underlying subject business. Once it had interjected itself into the claims management and oversight process, Security had the duty to act responsibly. Security's conduct here, and in the other instance referred to above, was is not in keeping with its duty to exercise utmost good faith and was contrary to industry custom and practice.

Whatever the motivation, Security's conduct examined above disregarded its duty to exercise utmost good faith in its dealings with Trustmark and its conduct was contrary to industry custom and practice.

G.     **Trustmark did not violate the standards set by the custom and practice of the insurance and reinsurance industry in rescinding it reinsurance agreement with Security.**

In accordance with well-established industry custom and practice, Trustmark reasonably, carefully and comprehensively considered whether to rescind its reinsurance agreement with Security prior to doing so. Trustmark investigated the facts available to it

14

at the time and timely communicated those facts to Security.  Further, Trustmark sought

and relied upon advice of counsel prior to rescinding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 10, 2003.

Paul C. Thomson III

15

A

*Curriculum Vitae*

## Paul C. Thomson III
12 Crescent Beach Drive
Huntington, NY  USA 11743
Business: 631•673•1243
Fax: 631•547•8419
e-mail: reassess@optonline.net
website: www.reassessinc.com

**EXPERIENCE**
**July 1994 to**
**Present:**

**REASSESS, INC., a New York corporation**

**President**

- Arbitrations (Party appointed arbitrator or umpire in 40˚ proceedings)
- Loss portfolio evaluations and reassessments
- Testimonial expert in insurance and reinsurance arbitrations and litigations
- Consulting expert in insurance and reinsurance matters
- Insurance and reinsurance portfolio assessments
- Workers compensation (including WC Carve-out) and Marine Employers' Liability claims audits
- Specialty claims audits including Computer Warranty, Homeowner Warranty, Malicious Products Tampering, Political Risk, D&O Liability and all other Professional Liability lines
- Commutation evaluations and negotiations
- Insurance and Reinsurance inspection of records projects
- Dispute resolutions, facilitations and mediations
- Due diligence work

**1990 to 1994:**

**SOREMA N. A. REINSURANCE COMPANY, New York, NY**

**(SOREMA N. A. acquired Copenhagen Re of America in 1989 and Le Mans Re USA in 1993)**

**Vice President and Director of Claims**

- Management of SOREMA N.A. technical property insurance, assumed casualty and property treaty, facultative and special risk reinsurance losses
- Management of Copenhagen Re USA's and Le Man Re USA's domestic property and casualty assumed treaty business runoff loss portfolio
- Director on Board, Fulcrum Insurance Company (a wholly owned subsidiary of SOREMA N. A., underwriting E & S casualty and property insurance)
- Budget and administration of claims department
- Client company claims audits
- Commutation evaluations and negotiations
- Due diligence reviews and arbitrations

**1982 to 1990:**

**US INTERNATIONAL REINSURANCE COMPANY, New York, NY**
**(Formerly Home Reinsurance Company)**

**Vice President 1989-1990   Corporate Secretary 1986-1989**

**Assistant Manager 1984-1986       Senior Analyst 1982-1984**

2

- Claims department management, including budget, administration and technical matters
- Responsible for all professional indemnity, directors & officers liability and special risk losses
- Commutation evaluations and negotiations
- Client company claims audits
- Accounted for excess of loss retrocessional loss recoveries

**1978 to 1982:**     ROYAL INSURANCE COMPANY OF AMERICA, New York, NY

**Home Office Liability Claims Supervisor 1980-1982**
**Home Office Liability Claims Examiner 1978-1980**

- Management of litigation involving the companies (including "bad faith" and declaratory judgment actions seeking extra-contractual/ excess of policy limits damages)
- Supervised national accounts products liability and professional indemnity claims for client companies
- Managed the runoff of Royal's aviation portfolio
- Responsible for branch office claim reserves exceeding field office authority levels and trial/ settlement authority
- Creation and maintenance of ISO coverage library

**1977 to 1978:**     RELIANCE INSURANCE COMPANY, Radnor, PA

Casualty Lines Claims Adjuster: Workers Comp & Liability

**OTHER INDUSTRY INFORMATION:**

- Member of ARIAS • US Certified Arbitrator and Umpire - http://www.arias-us.org/
- Member American Arbitration Association
- Approved Arbitrator - International Association of Insurance Receivers -http//www.IAIR.org
- Listed in Reinsurance Association of America's Arbitrators Directory - http://www.reinsurancearbitrators.com/arbdir/index.html
- Approved for expert witness and audit work by the Liquidation Bureaus of California, Florida and New York

**EDUCATION:**     Franklin and Marshall College, Lancaster, PA

- Bachelor of Arts, History Major (Major GPA 3.46)
- Dean's List- four of eight semesters
- Varsity football and lacrosse

Touro College School of Law, Huntington, NY

- Completed 68 credits toward Juris Doctorate degree (84 credits required)
- Dean's List

B

PAUL C. THOMSON III

TESTIMONIAL EXPERT WITNESS UNDERTAKINGS WITH

TESTIMONY PROVIDED WITHIN THE PAST FOUR YEAR

(UPDATED MAY 3003)

Confidential (under court seal) Deposition Testimony

North River Insurance Company and International Insurance Company
vs. Ace American Reinsurance Company
U.S. District Court
Southern District of New York
Civil Action 00 civ. 7993.

Deposition Testimony

Security Insurance Company of Hartford
vs. Trustmark Insurance Company

U.S. District Court
District of Connecticut
No. 300 CV 1247

Confidential (under court seal) Deposition Testimony

International Insurance Company and North River Insurance Company
vs. Certain Underwriters at Lloyd's of London, et al.

U.S. District Court
Southern District of Ohio
Eastern Division
Case no.: C2 - 00 - 983

PAUL C. THOMSON III

TESTIMONIAL EXPERT WITNESS UNDERTAKINGS WITH

TESTIMONY PROVIDED WITHIN THE PAST FOUR YEAR

(UPDATED MAY 3003)

Deposition Testimony

Lexington Insurance Company
vs. Seneca Insurance Company

U.S. District Court
Southern District of New York
Case No.: 01-9246 (BSJ) (KNF)

Deposition Testimony

American Employers' Insurance Company
vs. Swiss Reinsurance Corporation, formerly known as
North American Reinsurance Corporation

U.S. District Court
Southern District of New York
Civil Action No. 00 CV 12266 (JLT)

c

EXHIBIT C
DEPOSITION TRANSCRIPTS REVIEWED BY PAUL C. THOMSON
IN PREPARATION OF EXPERT REPORT DATED JUNE 10, 2003

| | | | |
|---|---|---|---|
| ANDERSON | 03/14/03 | RIVARA | 03/12/03 |
| BASTAN (1) | 02/05/03 | RYAN | 04/01/03 |
| BASTAN (2) | 05/01/03 | SCHOLL | 04/16/03 |
| BIMA | 02/26/03 | SHULTZ | 01/31/03 |
| BOHUSLAV (1) | 03/03/03 | SMITH | 02/13/03 |
| BOHUSLAV (2) | 03/04/03 | STAHNKE | 04/28/03 |
| CHASE (1) | 02/12/03 | TIO | 03/07/03 |
| CHASE (2) | 03/17/03 | WALKER | 03/07/03 |
| CHURCHILL | 03/18/03 | WESTOVER | 04/15/03 |
| CONWAY | 03/06/03 | WRIGHT | 05/03/03 |
| DONOVON | 03/18/03 | | |
| EKWALL (1) | 02/06/03 | | |
| EKWALL (2) | 05/02/03 | | |
| FUHRMANN | 04/29/03 | | |
| HAWKSWORTH | 01/10/03 | | |
| HAWKSWORTH (2) | 03/10/03 | | |
| HANSON | 02/20/02 | | |
| HAY | 02/04/03 | | |
| HENNESSEY | 03/14/03 | | |
| KELLEY | 03/11/03 | | |
| KOLOMS | 03/21/03 | | |
| LOVELL | 02/27/03 | | |
| McELHINEY | 02/21/03 | | |
| MURPHY | 03/12/03 | | |
| O'BRIEN | 04/21/03 | | |
| PAUL | 02/19/03 | | |
| POWELL | 02/14/03 | | |
| RALPHS | 03/06/03 | | |
| RAYMOND | 03/11/03 | | |