## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SECURITY INSURANCE COMPANY OF HARTFORD, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| TRUSTMARK INSURANCE COMPANY, | ) ) | |
| Defendant. | ) ) | Civil No. 301 CV 2198(PCD) |
| TRUSTMARK INSURANCE COMPANY, | ) ) ) | |
| Third Party Plaintiff, | ) ) | |
| v. | ) ) | |
| TIG INSURANCE COMPANY, | ) ) | October 18, 2004 |
| Third Party Defendant. | ) ) | |

### TRUSTMARK'S OPPOSITION TO TIG'S MOTION TO COMPEL
### DISCOVERY OF WEB'S LOCAL AREA NETWORK SERVER

Trustmark Insurance Company ("Trustmark") respectfully submits its opposition to Third Party Defendant TIG Insurance Company's ("TIG") Motion to Compel Trustmark and WEB Management LLC ("WEB") to produce documents and other data from the WEB local access network server ("the Motion").[1]

TIG's Motion should be denied for the simple reason that TIG already has electronic copies of all relevant electronic data files that were found on WEB's Local Area Network ("LAN") Server, and preserved by WEB and Trustmark's partner, U.S. Life, in 2000,

---

[1] TIG's motion is, on its face, directed to both Trustmark and WEB. However, Trustmark submits this response on its own behalf, and undertakes no obligation to respond on behalf of WEB, a non-party to this litigation.

the period when the disputes initially arose regarding the issues before this Court.  Based upon

little more than rank speculation, TIG now asks this Court to order an entirely unproductive,

unreliable and burdensome electronic discovery re-review of the 2004 remains of WEB's LAN

Server—a review which would impose a significant burden on Trustmark with no discernable

benefit to TIG.

## DISCUSSION

Federal Rule of Civil Procedure 26(b)(2) imposes limitations on the scope of

discovery in the form of a "proportionality test."  Zubulake v. UBS Warburg LLC, 217 F.R.D.

309, 316 (S.D.N.Y. 2003); Fed. R. Civ. P. 26(b)(2).[2]  Here, TIG seeks an expenditure of time and

resources far out of proportion to any alleged marginal value to this litigation.  It is significant

that this request arises after the close of fact discovery and after TIG and its parent have been

subject to attack in the Canadian courts for their flat-out destruction of documents and electronic

data.  It is evident that TIG seeks some counterbalance to the very serious spoliation issues it is

facing for the Fairfax decision to empty the office and discard the files of the person principally

responsible for due diligence on its acquisition of TIG.  This occurred in the same time period

when counsel for TIG and Fairfax was aware of a request for those documents, and is therefore

_____

[2]  Rule 26(b)(2) provides in pertinent part:

> The frequency or extent of use of the discovery methods . . . shall be limited by the court
> if it determines that: (1) the discovery sought is unreasonably cumulative or duplicative,
> or is obtainable from some other source that is more convenient, less burdensome, or less
> expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the
> action to obtain the information sought; or (iii) the burden or expense of the proposed
> discovery outweighs its likely benefit, taking into account the needs of the case, the
> amount in controversy, the parties' resources, the importance of the proposed discovery
> in resolving the issues.

Fed. R. Civ. P. 26(b)(2)).

the subject of a current proceeding in Toronto.[3]  In a "best defense is a good offense" style, TIG

asks this court to order Trustmark to request that non-party WEB undertake a new search of the

remains of WEB's old LAN server, four years after the relevant LAN files were identified and

preserved (complete with file properties) for business use and any litigation.  Accordingly,

because "burden or expense of the proposed discovery outweighs its likely benefit" for any party

in this case, TIG's motion should be denied.

## I.    TIG'S REQUESTED DISCOVERY IS UNNECESSARY AND CUMULATIVE BECAUSE TIG ALREADY HAS THE DOCUMENTS IT SEEKS

TIG has no basis for its motion because it already possesses all the relevant

documents identified from WEB LAN Server.  TIG admits, as it must, that it was provided with

copies of the CDs which contained WEB's electronic data files relating to the 1998 and 1999

reinsurance agreements with TIG.  (Mot. at 3-4.)  Indeed, TIG admits that Mr. David Stone of

US Life testified that WEB has represented that the three CDs contained all of the electronic data

files relating to the business written on behalf of Trustmark.  (Mot. at 4.)  So, on the record

before the Court, no further discovery is either required or possible.

Indeed, TIG presents no basis other than speculation that any additional relevant

information exists beyond the LAN Server documents it was already provided.  As Mr. Stone

has testified, before Security filed this lawsuit, US Life exercised its authority to require that

WEB provide all of its electronic files pertaining to US Life and Trustmark business.  (See

Transcript of D. Stone testimony, at 1192–93, attached as **Exhibit 1**; see also Ex. F. to

---

[3]    As this Court is aware, Trustmark is pursuing discovery of evidence of what TIG was telling its potential purchaser, Fairfax, about its workers compensation business, at the same time as TIG was defrauding and telling a different story to its reinsurers.  To that end, Trustmark requested, and this Court granted, discovery of Fairfax with respect to its due diligence for the purchase of TIG.  The precise scope of discovery is the subject of Trustmark's Motion For Clarification, now pending before this Court.  Fairfax's compliance, on the other hand, is the subject of Trustmark's Motion For Contempt, now pending before the Ontario court.

O'Sullivan Decl.)  WEB did so, produced the three CDs, and "attested" that the CDs contained all of its relevant documents.  (Ex. 1, Tr. at 1302-03, 1305, 1323.)  Mr. Stone was present while the documents were collected, but did not examine files that had nothing to do with US Life or Trustmark business.  (Ex. 1, Tr. at 1323-24.)  TIG sets forth Mr. Stone's testimony that he did not in detail "test the accuracy" of WEB's representation, but offers no reason whatsoever to doubt the accuracy of WEB's representation in the first place.

TIG fails to articulate any plausible reason why anyone should expect to find any documents on the LAN Server that have not already been produced.  Indeed, it is likely that the documents preserved electronically in 2000 in pristine form will only exist in partial form on the remains of the LAN today.  TIG speculates weakly that "just like with respect to the WEB hard drive, the files on the LAN Server <u>may</u> contain useful and relevant information."  (Mot. at 6 (emphasis added).)  But even that rationale is misplaced.  In the case of the WEB Hard Drive, Trustmark originally produced those documents on paper—the file properties were not available. In the case of the LAN Server documents at issue here, TIG was provided with an <u>electronic</u> copy of the documents and TIG can readily identify the file properties associated with each document and, if it chooses, can print out its own directory "reflecting the file properties for such files."  Trustmark respectfully offers the Court a copy of the CDs if the Court wishes to examine for itself the ready access it provides to file properties.

In sum, TIG's motion offers no reason why Trustmark or WEB should be burdened with the exercise of attempting to duplicate discovery that has already been  provided to TIG, other than private speculation that other information might exist and "may" be useful.

## II.    TIG'S REQUESTED DISCOVERY WOULD BE UNDULY BURDENSOME

The burden on Trustmark would not be insubstantial.  As TIG is aware, in order to do what is asks this Court to order, Trustmark would first need to:  (i) request access from

WEB to the LAN Server (which, if it still exists, has been in operation for five years since it was examined last); (ii) through the use of an e-discovery vendor, put the data in a searchable form; (iii) once a reviewable set of documents is identified, review the documents for privilege and responsiveness; (iv) engage in the expensive exercise of comparing the documents and fragments to the materials that were already been produced to TIG by US Life, to determine if there are any "new" documents; (v) burn images of the documents onto CDs for production to TIG together with a directory of file properties. Even if this work were possible, at its conclusion TIG would have at best all WEB's electronic data files relating to the 1998 and 1999 reinsurance agreements with TIG—exactly what the record shows TIG already possesses.

Trustmark does not shirk from its legitimate discovery obligations in this case, and to date has diligently produced required documents to TIG and Security. E-discovery is often a valuable tool, but here it is being used as a weapon. TIG seeks a pointless waste of resources, in what appears to be a quest for some leverage against the heavy consequences that await its parent and counsel for the destruction of the Fairfax documents.

## CONCLUSION

Accordingly, for all the foregoing reasons, Trustmark respectfully asks this Court to deny TIG's Motion to Compel in its entirety.

Date:   October 18, 2004

TRUSTMARK INSURANCE COMPANY

_____
Counsel for Trustmark Insurance Company

David M. Spector CT 21679
Paula J. Morency CT 24740
John A. Bannon
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, Illinois 60606-6473

David R. Schaefer CT 04334
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, Connecticut 06511

## In The Matter Of:

*TIG INSURANCE COMPANY v.*
*UNITED STATES LIFE INSURANCE COMPANY*

---

### ARBITRATION
### April 26, 2004

---

## LEGALINK MANHATTAN
### 420 Lexington Avenue - Suite 2108
### New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

### ARBITRATION - Vol. 5



LEGALINK
A WORDWIDE COMPANY

TIGR002 012666
CONFIDENTIAL

Page 1191

DAVID STONE - DIRECT

1
2  United States Life, All American Life or
3  Trustmark would assume business from cedents
4  and then retrocede portions of the risks
5  or -- well, they would retrocede portions of
6  the risk to the retrocessional market and
7  the retention that was left over would be
8  split 50/50 between Trustmark and the
9  relevant now AIG company.
10     Q.   Did there come a point in time
11  when All American and US Life terminated
12  their agency relationship with WEB?
13     A.   Yes.  United States Life/All
14  American did terminate the relationship with
15  WEB.
16     Q.   Can you tell the panel when
17  that happened?
18     A.   The notification for
19  termination was sent in September of '98
20  effective I believe it was 12/31/98.
21     Q.   After that agency relationship
22  was terminated, who then handled the runoff
23  of the business post-12/31/98?
24     A.   Immediately following the
25  termination, WEB continued to handle the

Page 1192

DAVID STONE - DIRECT

1
2  administration of the facility.
3     Q.   For how long did WEB continue
4  to handle the runoff of the business?
5     A.   There was a period of
6  transition, but generally, the
7  administrative duties were transferred from
8  WEB in the late spring/early summer of 2000.
9     Q.   Who took over that
10  responsibility in late spring/early summer
11  of 2000 from WEB?
12     A.   The responsibilities were
13  transferred to Transamerica Re who we hired
14  to perform the runoff responsibilities for
15  WEB.
16     Q.   Now, you also mentioned that
17  Trustmark was a part of the facility.  Now,
18  was Transamerica hired by just American
19  General or both American General and
20  Trustmark?  Tell us how that worked.
21     A.   Both Trustmark and at that
22  time American General hired Transamerica
23  jointly.
24     Q.   Can you tell us what happened
25  to WEB's files in connection with this

Page 1193

DAVID STONE - DIRECT

1
2  transfer of administration from WEB to
3  Transamerica?
4     A.   At the time of the official
5  transfer, which again would be the late
6  spring/early summer of 2000, I actually
7  drove up to Bloomfield, Connecticut, with a
8  van, loaded WEB's original files onto the
9  van and obtained from WEB the -- some
10  compact disks that were represented to be
11  the entirety of their electronic files.
12     I then proceeded to make
13  copies of those files and make sure that
14  each of Trustmark and Transamerica Re had
15  copies.
16     Q.   I take it that one option that
17  would have been available to American
18  General other than retaining Transamerica
19  could have been to bring the administration
20  in-house.  Can you tell us why that wasn't
21  done?
22     A.   No, that was definitely
23  an option.  We felt that Transamerica had
24  more relevant expertise in this area,
25  especially with respect to claims handling.

Page 1194

DAVID STONE - DIRECT

1
2  We also were looking for a company that
3  already had a computer system that could
4  handle the retrocessional complexities of
5  the book of business written by WEB.
6     Q.   At the time of the transfer,
7  can you give us some sense as to what the
8  claim volume was and what WEB's capabilities
9  were to deal with the claim volume?
10     A.   I forget the exact number of
11  claims that had been reported at that time,
12  but they would have approached or been more
13  than 20,000 claims.  And, you know, WEB had
14  at the time three principals, an
15  administrative officer and a claims officer,
16  and, you know, my feeling was that that was
17  just inadequate to continue to run off this
18  volume of business.
19     Q.   What type of resources was
20  Transamerica bringing to the WEB facility
21  runoff?
22     A.   I would categorize
23  Transamerica's resources by, you know, first
24  of all, their claims handling resources,
25  they had an operation in Warren, New Jersey,

30 (Pages 1191 to 1194)

LEGALINK MANHATTAN (212) 557-7400

TIGR002 012696
CONFIDENTIAL

Page 1299

DAVID STONE - CROSS

1 of 1998, she specifically told him that
2 business codes 21, 22 and 23 are for the TIG
3 Primary business?
4     A.    I remember that those business
5 codes were identified and they had labels
6 beside them. I'm not exactly -- I don't
7 remember what exactly those labels said,
8 so...
9     Q.    Do you know whether on the
10 actual diskette that Ms. Bohuslav sent to
11 Mr. Ekwall back in May of 1998 there were
12 losses with business codes other than 21, 22
13 and 23?
14     A.    I don't know.
15     Q.    You can't know it because the
16 diskette is gone, right?
17     A.    The original files can't be
18 located, yes.
19     Q.    Was the diskette there when
20 you took possession of WEB's files?
21     A.    I have absolutely no idea.
22     Q.    And you don't know whether
23 either of the CD-ROMs, the one that was sent
24 in November of '98 or the one that was sent

Page 1301

DAVID STONE - CROSS

1 subpoenas you produced from your files
2 materials that you had taken from WEB in the
3 summer of 2000 time frame, correct?
4     A.    That's where the source of the
5 documents would have been.
6     Q.    And each time you did that,
7 you represented either in person or through
8 the counsel who was working with you that
9 you were producing everything you had in
10 your possession that was responsive to the
11 subpoena; isn't that right?
12     A.    We made a best effort attempt
13 at supplying the documents that had been
14 demanded in the subpoenas, yes.
15     Q.    But you didn't produce
16 everything the subpoenas called for, did
17 you?
18     MR. AMER: I'm going to object
19 to that question.
20     MR. BRANDES: Why?
21     MR. AMER: I don't know
22 anything about what was negotiated
23 concerning the scope of the subpoena in a
24 different action. I don't know if the

Page 1300

DAVID STONE - CROSS

1 in August of '99, you don't know if they
2 were there either when you took possession,
3 right?
4     A.    No, I do not.
5     Q.    If they were there when you
6 took possession of the files then the
7 disappearance of these is your
8 responsibility, correct?
9     A.    If I took possession of those
10 files and we now don't have them, yes, I
11 would agree that it's my responsibility.
12     Q.    Now, as recently as 10 days
13 ago you discovered information that you had
14 in your possession from WEB that you didn't
15 know you had before, correct?
16     A.    I wouldn't characterize it
17 that like.
18     Q.    You wouldn't. Do you recall
19 receiving subpoenas served on US Life in the
20 Security of Hartford/Trustmark/TIG
21 litigation?
22     A.    I remember receiving a series
23 of subpoenas, yes.
24     Q.    And in response to these

Page 1302

DAVID STONE - CROSS

1 parties agreed that certain things didn't
2 have to be produced or if the judge ordered
3 that different things didn't have to be
4 produced. I don't know unless the witness
5 has a foundation --
6     MR. BRANDES: You should have
7 known.
8     MR. AMER: I'm not counsel in
9 that case.
10     MR. BRANDES: How about in
11 this case where you are counsel and you
12 represented to us in writing a year ago that
13 everything had been produced.
14     MR. AMER: Ask him about that.
15     Q.    Were you the source of
16 Mr. Amer's representation?
17     A.    Yes, I was.
18     Q.    And things were not produced;
19 isn't that right?
20     A.    Yes. I mean we can cut right
21 to the chase on this. We have -- I have the
22 electronic files that were taken from WEB on
23 a series of three compact disks. Those
24 compact disks contain both e-mails in

57 (Pages 1299 to 1302)

TIGR002 012723
CONFIDENTIAL

Page 1303

DAVID STONE - CROSS

1   Microsoft Outlook format and a series of
2   Excel, Word and various other files. I went
3   through the exercise of getting the e-mails
4   from each of those disks from each of the
5   employees of WEB, and what I failed to do, I
6   realize now, is once that exercise was
7   complete was go back and get the non-e-mail
8   electronic files which you now have in your
9   possession. It's something I didn't realize
10  at the time.
11         I want you to know it's quite
12  an exercise to go through the e-mails and
13  pick out the ones from TIG. It's not like
14  it's just a few minutes of my time. And
15  it's not something that I wish would have
16  happened, it's obviously caused a lot of
17  problems. I've obviously taken a little bit
18  of heat for it, both internally and now.
19  But I want to assure you that in terms of
20  electronic files what's on those CDs is what
21  we have and I have now gone through those
22  CDs looking for files specifically for TIG
23  and you have now everything that pertains to
24  TIG that I can identify.

Page 1304

DAVID STONE - CROSS

1   Q.   When did you do that exercise,
2   finally, of going through everything on
3   there and looking for TIG and making sure we
4   had everything that we were supposed to have
5   years ago?
6        A.   This was done two weeks ago
7   now. It was the day, or just prior to the
8   day that you received the files.
9        Q.   And how long did it take you
10  to do that?
11       A.   You mean from the time you
12  asked for the original files until that
13  time?
14       Q.   No, I mean from the time Robin
15  Ekwall called up and said, hey, I know
16  there's stuff that exists that TIG says is
17  missing? How long did it take to do this
18  massive exercise of looking through
19  everything and weeding out the non-TIG? It
20  took a day, less?
21       A.   For these electronic files?
22       Q.   Yes.
23       A.   No, it didn't take anywhere
24  near a day. It took, you know, half an

Page 1305

DAVID STONE - CROSS

1   hour, an hour to go through the files.
2   There's a lot less --
3        Q.   So where -- I'm sorry.
4        A.   There's a --
5        Q.   So it wasn't such a massive
6   exercise, was it?
7        MR. AMER:  Would you let him
8   finish.
9        Q.   I apologize.
10       A.   You don't understand. It's
11  not a massive exercise that I didn't wanted
12  to or refuse to do. It's just that the
13  files -- I didn't realize I had missed them
14  until it was brought to my attention. And
15  if you would like to go on about that, fine,
16  but there's nothing I can do about that.
17       Q.   And you're sure there's still
18  nothing you've missed?
19       A.   Well, every single one of
20  WEB's electronic files that I'm aware of
21  that WEB attested to conformed the complete
22  population of their electronic files are on
23  these compact disks, and that's the only
24  source of information I have to go back to

Page 1306

DAVID STONE - CROSS

1   to find electronic files at least relating
2   to TIG.
3        Q.   I'm confused, Mr. Stone, I
4   have to confess. I think there were a total
5   of like eight subpoenas and document
6   requests and I take it that in connection
7   with none of those did you actually do the
8   exercise of actually going through the
9   electronic files that you have to make sure
10  that you were producing everything that was
11  required to be produced; isn't that right?
12       MR. AMER:  I'm going to object
13  to the question. I think if we're going to
14  limit it to Mr. Stone's efforts to discovery
15  in this case that's fair game. I don't know
16  anything about the discovery process in
17  other actions relating to other subpoenas
18  and it's not fair to take him through what
19  was done for other cases.
20       MR. BRANDES:  These are
21  subpoenas that were served on US Life. I
22  don't care if Mr. Amer knows or not. If his
23  client chose not to share things with him
24  that's not my fault. That's point 1.

58 (Pages 1303 to 1306)

TIGR002 012724
CONFIDENTIAL

Page 1323

DAVID STONE - CROSS

1  Q.  Except it develops the losses
2  in the layer 400 excess of 100, right?
3  A.  Where does it do that? Show
4  me.
5  Q.  By the way, you testified on
6  your direct, I think you said three CD-ROMs
7  you have of all of WEB's electronic files?
8  A.  Yes.
9  Q.  I think actually the words you
10  used on your direct examination were that
11  WEB attested to you that these constituted
12  all their electronic files, correct?
13  A.  Yes.
14  Q.  Did you ever test the accuracy
15  of that attestation?
16  A.  When I was at WEB's premises
17  the day that we took over the files I sat
18  down with Kelly Olmstead and looked at the
19  sections of her computer that contained this
20  data. But no, past that I didn't do any
21  testing. You know, there were files that
22  WEB had that pertained to the actual entity
23  WEB that, quite frankly, we had no right to
24  look at. So it's -- you know, it -- I felt

Page 1324

DAVID STONE - CROSS

1  at the time that was the best I could do and
2  WEB wasn't exactly willing to let me look at
3  the files that they were saying were
4  unrelated to the business written on behalf
5  of All American and United States Life and
6  Trust Company.
7  Q.  So you don't really know
8  whether you have all of the WEB electronic
9  files, do you?
10  A.  I have WEB's attestation that
11  they are all of the files.
12  Q.  Right. By the way, you
13  remember testifying that in Mr. Ekwall's
14  report to his principals, to WEB and US Life
15  about the 1998 treaty, he -- actually, I
16  think you testified -- strike that.
17  You testified that as respects
18  the 9 X of 1 layer the actual rate that was
19  charged on the treaty was 7.5 percent above
20  the burn cost, the developed burn cost that
21  Mr. Ekwall had calculated for the 900 excess
22  of 100 layer, right?
23  A.  That's correct.
24  Q.  And you came out something

Page 1325

DAVID STONE - CROSS

1  more than 7.5 percent above the undeveloped
2  burn cost on the 4 X of 1 layer, correct?
3  A.  That's correct.
4  Q.  But you never did the exercise
5  of how much, if any, above the developed
6  burn cost on the 4 X of 1 layer because you
7  didn't think there was one, right?
8  A.  I -- the theory behind the
9  exercise was to gross-up what we thought
10  reflected WEB's premium over burn cost that
11  was built into the contract. So if Robin
12  Ekwall felt that his burn cost -- whether he
13  knew it was developed or undeveloped and it
14  definitely looks like he didn't -- excuse
15  me -- didn't know, if he was trying to
16  achieve the result around 8.5, 8.9 percent
17  over burn cost, then -- and he was using a
18  development -- or an undeveloped burn cost I
19  should say, then I'm going to be consistent
20  with that in my methodology.
21  Q.  My question was a simple one.
22  You didn't do the exercise of how much, if
23  anything, his rate was above the developed
24  burn cost on the 4 X of 1 layer, did you?

Page 1326

DAVID STONE - CROSS

1  A.  No, I didn't.
2  Q.  Did you look at the numbers
3  Mr. Thirkill prepared doing that?
4  A.  I reviewed Mr. Thirkill's
5  analysis or quantitative analysis in his
6  exhibits, yes.
7  Q.  And assuming, or using a
8  developed burn cost for the 4 X of 1,
9  Mr. Thirkill's numbers were exactly correct,
10  weren't they?
11  A.  I don't recall having any
12  problem with Mr. Thirkill's numbers in that
13  area, no.
14  Q.  I'd like to just cover one
15  more topic and then we can quit for the day.
16  I'll try and do this quick.
17  Transamerica did an audit of
18  TIG, gives you an audit report, I think it
19  was November -- no, August of 2001. Do you
20  recall that?
21  A.  Yes, I do.
22  Q.  And these are my words not
23  yours, but I think that what you said was
24  something along the lines of that you found

63 (Pages 1323 to 1326)

TIGR002 012729
CONFIDENTIAL

## CERTIFICATE OF SERVICE

I, Sharon Doherty, an attorney, certify that on October 18, 2004, I caused a true and correct copy of **Trustmark's Opposition to TIG's Motion to Compel Trustmark Ito Produce Documents and Other Data from the WEB Local Access Network Server** to be served by facsimile and overnight delivery upon:

Harry P. Cohen, Esq.
Brian O'Sullivan, Esq.
Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, NY 10038

Mark B. Holton, Esq.
Kate Nealon, Esq.
Gibson Dunn & Crutcher
200 Park Avenue, Floor 48
New York, New York 10166

David Grais, Esq.
Kay Ellsworth, Esq.
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY 10019-6092

Frank F. Coulom, Jr., Esq.
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

David A. Slossberg, Esq.
Hurwitz & Sagarin
147 North Broad Street
Milford, CT 06460-0112


Sharon Doherty

CH2\ 1152515.3

-7-