UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

SECURITY INSURANCE COMPANY OF HARTFORD,

    Plaintiff,

-against-

TRUSTMARK INSURANCE COMPANY,

    Defendant.

---

TRUSTMARK INSURANCE COMPANY,

    Third Party Plaintiff,

-against-

TIG INSURANCE COMPANY,

    Third Party Defendant.

---

FILED
2004 NOV 15 P 12: 13
U.S. DISTRICT COURT
NEW HAVEN, CT

Civil No. 301CV2198 (PCD)

June 27, 2003

---

**THIRD-PARTY DEFENDANT TIG INSURANCE COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT DISMISSING THE THIRD-PARTY COMPLAINT**

HURWITZ & SAGARIN, LLC
147 North Broad Street
Milford, Connecticut 06460-0112
(203) 877-8000

CADWALADER, WICKERSHAM & TAFT LLP
100 Maiden Lane
New York, New York 10038
(212) 504-6000

Attorneys for Third Party Defendant
TIG Insurance Company

# TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| TABLE OF AUTHORITIES | | iii |
| PRELIMINARY STATEMENT | | 1 |
| STATEMENT OF UNDISPUTED FACTS | | 2 |
|     A. | TIG's Workers' Compensation Portfolio | 3 |
|     B. | TIG's Reinsurance of Its Workers' Compensation Portfolio | 3 |
| |     1. The 1998 Treaty | 5 |
| |     2. The 1999 Treaty | 10 |
| |     3. The $50,000 excess of $50,000 layer | 15 |
| |     4. Trustmark's Retrocession of Security | 15 |
| ARGUMENT | | 17 |
| POINT I | THE ECONOMIC LOSS RULE BARS TRUSTMARK'S NEGLIGENT MISREPRESENTATIION CLAIM | 18 |
| POINT II | TRUSTMARK'S FRAUDULENT NON-DISCLOSURE CLAIM FAILS AS A MATTER OF LAW SINCE TIG DID NOT OWE ANY DUTIES TO TRUSTMARK | 20 |
| POINT III | TRUSTMARK'S FRAUDULENT MISREPRESENTATION CLAIMS FAIL AS A MATTER OF LAW | 22 |
| | A. Trustmark Cannot Demonstrate Clear And Convincing Evidence Of Reasonable Reliance On Any Material Misrepresentation Of Fact | 22 |
| |     1. The Alleged Misrepresentations in Connection with the Placement of the 1998 Treaty | 23 |
| |         a. "TIG was being put for sale and they wanted to buy down their retention to stabilize their balance sheet." | 25 |
| |         b. "Loss development factors for the TIG Primary business segment were representative of TIG's entire workers' compensation portfolio." | 26 |

|  |  |  | | PAGE |
|---|---|---|---|---|
|  |  | c. | "TIG's better than average loss development was attributable to its superior claims handling." | 27 |
|  |  | d. | "TIG had substantially improved its book of workers' compensation business from an underwriting and profitability perspective and that TIG had withdrawn from states where it could not make an underwriting profit." | 29 |
|  | 2. | | The Alleged Misrepresentations in Connection with the Placement of the 1999 Treaty | 30 |
|  |  | a. | "The Virginia Surety segment will expand." | 30 |
|  |  | b. | "TIG conducts annual underwriting, claims, and actuarial reviews of Virginia Surety." | 31 |
|  |  | c. | "The major findings of TIG's audit of Virginia Surety *was* a need to implement stronger managed care and injury management practices." | 31 |
|  |  | d. | "TIG workers' compensation business was properly reserved." | 32 |
|  |  | e. | "TIG could provide an accurate bordereau of losses on a monthly basis within thirty days." | 33 |
|  |  | f. | The "three data files E-mailed to WEB on November 24, 1998 contained losses for all segments of TIG's workers' compensation business." | 34 |
|  | 3. | | The Alleged Misrepresentation in Connection with the Placement of the $50,000 Excess $50,000 Layer | 36 |
| B. | | | Trustmark Has Failed To Demonstrate That It Has Suffered Any Damages Proximately Caused By TIG's Alleged Fraud | 38 |
| CONCLUSION | | | | 40 |

ii

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES:**

*AIG, Inc. v. London Am. Int'l Corp. Ltd.*,
664 F.2d 348 (2d Cir. 1981) .................................................................................. 17

*All-Tech Telecom, Inc. v. Amway Corp.*,
174 F.3d 862 (7th Cir. 1999) ............................................................................. 28, 36

*Allstate Ins. Co. v. Administratia Asigurarilor De Stat*,
948 F. Supp. 285 (S.D.N.Y. 1996) ....................................................................... 4

*Anderson Elec., Inc. v. Ledbetter Erection Corp.*,
503 N.E.2d 246 (Ill. 1986) ................................................................................. 18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................... 17

*Bailey Employment Sys., Inc. v. Hahn*,
655 F.2d 473 (2d Cir. 1981) ............................................................................... 18

*Bastian v. Petren Resources Corp.*,
892 F.2d 680 (7th Cir.), *cert. denied*, 496 U.S. 906 (1990) ........................... 39, 40

*Board of Educ. of Chi. v. A, C & S, Inc.*,
546 N.E.2d 590 (Ill. 1989) ................................................................................. 22

*Breckenbridge v. Cambridge Homes, Inc.*,
616 N.E.2d 615 (Ill. App. Ct.), *appeal denied*,
622 N.E.2d 1201 (Ill. 1993) ........................................................................... 28, 36

*Carlingford Australia Gen. Ins. Ltd. v. St. Paul Fire & Marine Ins. Co.*,
722 F. Supp. 48 (S.D.N.Y. 1989) ....................................................................... 25

*Castellano v. Young & Rubicam, Inc.*,
257 F.3d 171 (2d Cir. 2001) ............................................................................... 39

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................................... 17

*Central States Jt. Bd. v. Central Assur. Co.*,
435 N.E.2d 932 (Ill. App. Ct. 1983) ................................................................... 23

*China Union Lines, Ltd. v. American Marine Underwriters, Inc.*,
755 F.2d 26 (2d Cir. 1985) ........................................................................... 23, 25-26

NYLIB2 202459.1

**PAGE(S)**

*Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*,
  979 F.2d 268 (2d Cir. 1992) .................................................................................. 21

*Citibank, N.A. v. K-H Corp.*,
  968 F.2d 1489 (2d Cir. 1992) ................................................................................ 40

*City of Chicago v. Michigan Beach Hous. Coop.*,
  696 N.E.2d 804 (Ill. App. Ct.), *appeal denied*, 705 N.E.2d 435 (Ill. 1998) ............... 38-39

*Compagnie De Reassur. D'Ile De France v. New England Reins. Corp.*,
  57 F.3d 56 (1st Cir.), *cert denied*, 516 U.S. 1009 (1995) ........................................ 4

*Connick v. Suzuki Motor Co., Ltd.*,
  675 N.E.2d 584 (Ill. 1996) .................................................................................... 20, 24

*Continental Bank, N.A. v. Meyer*,
  10 F.3d 1293 (7th Cir. 1993) ................................................................................ 28, 29, 36, 37

*Danis v. USN Comms., Inc.*,
  121 F. Supp. 2d 1183 (N.D. Ill. 2000) .................................................................... 23

*Danman Associates v. Porter*,
  43 B.R. 423 (D. Conn. 1984) ................................................................................ 17

*Delta Holdings, Inc. v. National Distillers & Chem. Corp.*,
  945 F.2d 1226 (2d Cir. 1991), *cert denied*, 503 U.S. 985 (1992) ............................ 4

*Doctor's Assocs., Inc. v. Distajo*,
  944 F. Supp. 1010 (D. Conn. 1996) ...................................................................... 38

*Donnelly v. Guion*,
  467 F.2d 290 (2d Cir. 1972) .................................................................................. 17

*Dressler v. MV Sandpiper*,
  331 F.2d 130 (2d Cir. 1964) .................................................................................. 17

*Economu v. Borg-Warner Corp.*,
  652 F. Supp. 1242 (D. Conn.), *aff'd*, 829 F.2d 311 (2d Cir. 1987) .......................... 18

*Fax Telecommunicaciones, Inc. v. AT&T*,
  138 F.3d 479 (2d Cir. 1998) .................................................................................. 26

*Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*,
  679 N.E.2d 1197 (Ill. 1997) ................................................................................... 18

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995) ............................ 39, 40

iv

|  | **PAGE(S)** |
|---|---|
| *Gert v. Elgin Nat'l Indus., Inc.*, 773 F.2d 154 (7th Cir. 1985) | 23 |
| *Glass v. Kemper Corp.*, 949 F. Supp. 1341 (N.D. Ill. 1997), *aff'd*, 133 F.3d 999 (7th Cir. 1998) | 30 |
| *Golden v. Marshall Field & Co.*, 479 N.E.2d 1211 (Ill. App. Ct. 1985) | 39 |
| *Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997) | 36 |
| *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317 (2d Cir. 1975) | 17 |
| *Holland v. Arthur Andersen & Co.*, 571 N.E.2d 777 (Ill. App. Ct. 1991), *appeal dismissed*, 591 N.E.2d 22 (Ill. 1992) | 39 |
| *In re RazorFish, Inc. Sec. Litig.*, No. 00 Civ. 9474, 2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001) | 36-37 |
| *International Ins. Co. v. Certain Underwriters at Lloyd's London*, No. 88 C 9838, 1991 WL 349907 (N.D. Ill. Sept. 16, 1991) | 29 |
| *International Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co.*, No. 88 C 320, 1989 WL 99771 (N.D. Ill. Aug. 18, 1989) | 19 |
| *International Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co.*, No. 88 C 320, 1989 WL 165045 (N.D. Ill. Dec. 29, 1989) | 21 |
| *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) | 18 |
| *Lang v. Consumers Ins. Serv., Inc.*, 583 N.E.2d 1147 (Ill. App. Ct. 1991) | 19 |
| *LaScola v. US Sprint Comms.*, 739 F. Supp. 431 (N.D. Ill. 1990), *aff'd*, 946 F.2d 559 (7th Cir. 1991) | 37 |
| *LaScola v. US Sprint Comms.*, 946 F.2d 559 (7th Cir. 1991) | 29, 37 |
| *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F. Supp. 1358 (N.D. Ill. 1996) | 22 |

**PAGE(S)**

*Lidecker v. Kendall College,*
  550 N.E.2d 1121 (Ill. App. Ct. 1990) ................................................................ 20

*Martin v. Heinold Commodities, Inc.,*
  643 N.E.2d 734 (Ill. 1994) .................................................................................. 39

*Miller v. William Chevrolet/GEO, Inc.,*
  762 N.E.2d 1 (Ill. App. Ct. 2001), *appeal denied*, 766 N.E.2d 240 (Ill. 2002) .......... 20

*Mitchell v. Skubiak,*
  618 N.E.2d 1013 (Ill. App. Ct. 1993) ................................................................ 23

*Moorman Mfg. Co. v. National Tank Co.,*
  435 N.E.2d 443 (Ill. 1982) .................................................................................. 18

*Morgan v. American Risk Mgmt., Inc.,*
  No. 89 Civ. 2999, 1990 WL 106837 (S.D.N.Y. July 20, 1990) ........................ 20

*Mutuelle Generale Francaise Vie v. Life Assur. Co. of Pa.,*
  688 F. Supp. 386 (N.D. Ill. 1988) ...................................................................... 32

*NBC, Inc. v. Sonneborn,*
  630 F. Supp. 524 (D. Conn. 1985) .................................................................... 18

*Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor,*
  692 N.E.2d 812 (Ill. App. Ct.), *appeal denied*, 699 N.E.2d 1033 (Ill. 1998) ........... 22

*North River Ins. Co. v. CIGNA Reins. Co.,*
  52 F.3d 1194 (3d Cir. 1995) ............................................................................... 4

*Overbey v. Illinois Farmers Ins. Co.,*
  525 N.E.2d 1076 (Ill. App. Ct. 1988) ................................................................ 21

*Patch v. Stanley Works (Stanley Chem. Co. Div.),*
  448 F.2d 483 (2d Cir. 1971) ............................................................................... 18

*People ex rel. Baylor v. Highway Ins. Co.,*
  316 N.E.2d 633 (Ill. 1974) .................................................................................. 20

*People ex rel. Peters v. Murphy-McKnight,*
  618 N.E.2d 459 (Ill. App. Ct. 1993) .................................................................. 30

*Power v. British Vita, P.L.C.,*
  57 F.3d 176 (2d Cir. 1995) ................................................................................. 39

*Quinn v. McGraw-Hill Cos.,*
  168 F.3d 331 (7th Cir. 1999) .............................................................................. 23, 26

NYLIB2 202459.1

|   | **PAGE(S)** |
|---|---|
| *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980) | 17 |
| *Robacki v. Allstate Ins. Co.*, 468 N.E.2d 1251 (Ill. App. Ct. 1984) | 21 |
| *Runnemede Owners, Inc. v. Crest Mtg. Corp.*, 861 F.2d 1053 (7th Cir. 1988) | 30, 38 |
| *Ryan v. Wersi Electronics GmbH & Co.*, 3 F.3d 174 (7th Cir. 1983) | 30, 38 |
| *SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978) | 17 |
| *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862 (7th Cir. 1999) | 22 |
| *Spiegel v. Sharp Electronics Corp.*, 466 N.E.2d 1040 (Ill. App. Ct. 1984) | 36 |
| *Steinberg v. Chicago Med. Sch.*, 371 N.E.2d 634 (Ill. 1977) | 30 |
| *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) | 39 |
| *Topf v. Warnaco, Inc.*, 942 F. Supp. 762 (D. Conn. 1996) | 23 |
| *Travelers Indem. Co. v. Scor Reins. Co.*, 62 F.3d 74 (2d Cir. 1995) | 4 |
| *2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346 (Ill. 1990) | 18 |
| *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049 (2d Cir. 1993) | 4 |
| *Uniroyal Chem. Co. v. Drexel Chem. Co.*, 931 F. Supp. 132 (D. Conn. 1996) | 18 |
| *United States v. Diebold, Inc.*, 369 U.S. 654 (1962) | 17 |
| *University of Chi. Hosps. v. United Parcel Serv.*, 596 N.E.2d 688 (Ill. App. Ct. 1992) | 19 |

NYLIB2 202459.1

|  | PAGE(S) |
|---|---|
| *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926 (7th Cir. 1997) | 25 |
| *West v. Western Cas. & Sur. Co.*, 846 F.2d 387 (7th Cir. 1988) | 22, 23, 30, 38 |
| *Williams v. State Farm Mut. Auto. Ins. Co.*, 229 Conn. 359, 641 A.2d 783 (1994) | 18 |

**STATUTES AND OTHER AUTHORITIES:**

| | |
|---|---|
| Fed. R. Civ. P.: | |
| 32(a) | 33 |
| 56(c) | 17 |
| *Restatement (Second) of Torts* § 538A (1977) | 22 |
| 11 James Wm. Moore, *Moore's Federal Practice* § 56.13[2] (3d ed. 1997) | 17 |
| 8A Charles Alan Wright et al., *Federal Practice & Procedure: Civil 3d* § 2142 (1994) | 33 |

NYLIB2 202459.1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITY INSURANCE COMPANY OF HARTFORD,<br><br>      Plaintiff,<br><br>   -against-<br><br>TRUSTMARK INSURANCE COMPANY,<br><br>      Defendant. | Civil No. 301CV2198 (PCD) |
| TRUSTMARK INSURANCE COMPANY,<br><br>      Third Party Plaintiff,<br><br>   -against-<br><br>TIG INSURANCE COMPANY,<br><br>      Third Party Defendant. | June 27, 2003 |

### THIRD-PARTY DEFENDANT TIG INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT DISMISSING THE THIRD-PARTY COMPLAINT

   Third Party Defendant TIG Insurance Company ("TIG"), by its undersigned attorneys, respectfully submits this memorandum of law in support of its motion for an order pursuant to Federal Rules of Civil Procedure 56 and Local Rule of Civil Procedure 56(a) granting summary judgment and dismissing the Third Party Complaint of Third Party Plaintiff Trustmark Insurance Company ("Trustmark").

NYLIB2 199299.5

## PRELIMINARY STATEMENT

Trustmark has asserted fraud and negligent misrepresentation claims against TIG based upon allegations that TIG made material misrepresentations and omissions in connection with the placement of various reinsurance contracts. These claims are unavailing for the following reasons.

As a threshold matter, Trustmark's negligent misrepresentation claim is barred as a matter of law by the economic loss rule. *See* Point I below. Similarly, Trustmark's fraudulent non-disclosure claim fails as a matter of law because there was no fiduciary or other relationship between TIG and Trustmark and, thus, TIG owed no duty to Trustmark. *See* Point II below.

Finally, none of the fraudulent misrepresentations allegedly made by TIG are sufficient as a matter of law to support a fraud claim against TIG. As explained in detail below, each claim is defective because Trustmark has not, and cannot, come forward with clear and convincing evidence to establish each element of a fraudulent misrepresentation claim. *See* Point II.A, below. For example, certain of the alleged misrepresentations were truthful and accurate; most of the alleged misrepresentations were merely opinions or puffery which are not actionable as a matter of law; there is no evidence of scienter by TIG; and most of the alleged oral misrepresentations were immaterial or so flatly inconsistent with written information that no reasonable underwriter could possibly have relied, let alone reasonably relied, on them. In addition, summary judgment is appropriate because Trustmark has failed to demonstrate that it has suffered *any* damages that were proximately caused by the alleged misrepresentations described above. *See* Point II.B, below.

## STATEMENT OF UNDISPUTED FACTS

The undisputed facts relevant to TIG's motion for summary judgment are as follows:

### A. TIG's Workers' Compensation Portfolio.

At all relevant times, TIG was an insurance company that wrote numerous lines of business, including workers' compensation insurance on a direct and reinsurance basis in its Managed Compensation Division. *See* Ex. 79 at WEB00140-52.[1] The executive responsible for the operation of TIG's Managed Compensation Division was Jay Chase. *See id.* at WEB00146. Workers' compensation insurance provides coverage to employers for medical expenses and lost wages incurred in connection with injuries sustained by employees within the scope of their employment (typically referred to as "Part A" coverage), and also provides coverage for employers' liability to third parties (referred to as "Part B" coverage).

The workers' compensation business written by TIG consisted of several separate and distinct business segments: TIG Primary, Virginia Surety, Alternative Programs, Innovus, ManagedComp Inc. ("MCI"), and Commercial Specialty. *See id.* at WEB00146-52. Each of TIG's business segments had its own unique risk characteristics (*e.g.*, geographic scope, average account size, hazard group classifications) and was underwritten, priced and administered differently, including by different entities. *See id.*

### B. TIG's Reinsurance of Its Workers' Compensation Portfolio.

TIG entered into reinsurance agreements with other insurance companies pursuant to which those companies agreed to indemnify TIG for a portion of the losses arising from TIG's

---

[1] The exhibits and deposition testimony that TIG relies upon in support of its summary judgment motion are attached to the accompanying declaration of Brian J. O'Sullivan. Documents with an exhibit number between 1 and 877 refer to exhibits that were marked during one of the depositions in the proceeding.

NYLIB2 199299.5                    -3-

workers' compensation business.[2] Historically, TIG generally retained the first $1 million of risk on each workers' compensation claim. *See* Chase Dep. Tr. 78:6-17. In other words, for each individual workers' compensation claim, TIG would pay the entire claim (medical expenses, lost wages and liability to third parties) and then obtain indemnification from its reinsurers to the extent the amounts of the claims exceeded $1 million.

In late 1997, Mr. Chase came to learn that other workers' compensation insurance companies were lowering, or "buying down," their per claim retentions to levels that had not previously been readily available in the reinsurance market. Chase Dep. Tr. 185:11-186:15, 279:12-280:15; *see also* Ryan Dep. Tr. 175:5-176:3. As a result, in early 1998, TIG asked Aon Re, Inc. ("Aon"), a reinsurance intermediary (or broker), to obtain information regarding the options available to TIG to lower, or "buy down," its retention on its workers' compensation book of business. Chase Dep. Tr. 180:3-20, 286:10-287:15; Bohuslav Dep. Tr. 14:5-15:5. Aon acted as TIG's agent in connection with the placement of reinsurance of TIG's workers

---

[2] Reinsurance is purchased by insurance companies to insure their liability under policies issued to insureds. *See Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049, 1053 (2d Cir. 1993); *North River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1199 (3d Cir. 1995). According to the Second Circuit Court of Appeals, "[t]he mechanics of reinsurance can be simply described." *Travelers Indem. Co. v. Scor Reins. Co.*, 62 F.3d 74, 76 (2d Cir. 1995).

> One insurer (a "ceding insurer") "cedes" all or part of the risk relating to a policy, or group of policies, to a reinsurer. A portion of risk not "ceded" is "retained." The reinsurer indemnifies the ceding insurer for any liability incurred that is covered by the reinsurance.

*Id.*; *see also Unigard*, 4 F.3d at 1053. In turn, a reinsurer may "retrocede" all or part of the risk it assumed under the reinsurance contract to another reinsurer (its "retrocessionaire"). *See Delta Holdings, Inc. v. National Distillers & Chem. Corp.*, 945 F.2d 1226, 1229 (2d Cir. 1991), *cert denied*, 503 U.S. 985 (1992); *Compagnie De Reassur. D'Ile De France v. New England Reins. Corp.*, 57 F.3d 56, 62 (1st Cir.), *cert denied*, 516 U.S. 1009 (1995); *see also Allstate Ins. Co. v. Administratia Asigurarilor De Stat*, 948 F. Supp. 285, 290 (S.D.N.Y. 1996) ("[t]he goal of retrocession is to indemnify the retrocedent for losses that the retrocedent sustains under the reinsurance policies that it has issued to insurance companies").

compensation business. The individual broker at Aon with principal responsibility for the TIG account was Sheila Bohuslav. *See* Bima Dep. Tr. 49:21-50:20.

1. **The 1998 Treaty.**

Aon prepared a package of underwriting information describing the nature and performance of TIG's workers' compensation business (the "1998 Underwriting Information"). *See* Ex. 70. In early May 1998, Aon sent the 1998 Underwriting Information to certain specific companies, including WEB Management LLC ("WEB"), a managing general underwriter which acted on behalf of, *inter alia*, United States Life Insurance Company ("U.S. Life") and Trustmark.[3] *See* Exs. 69, 70. The cover letter to WEB, dated May 5, 1998, requested that WEB "quote a new underlying Workers' Compensation program effective April 1, 1998," and indicated that "TIG is looking to buy down their current retentions . . . possibly to as low as $100,000." Ex. 69 at WUW021481.

The 1998 Underwriting Information included 120 pages of narrative descriptions of TIG's business segments, including information relating to the underwriting philosophy and methodologies associated with the segment and details regarding each business segment's unique risk characteristics, *see* Ex. 70 at WUW021242-44, and detailed statistical information regarding the loss history of TIG's workers' compensation and the reserves established for the business, historical and projected premium information as well as premium information broken down by state and business segment, and detailed individual loss information for incurred claims excess of $15,000. *See* Exs. 69, 70.[4]

---

[3] Unbeknownst to TIG, U.S. Life and Trustmark had an unwritten agreement pursuant to which they shared equally all of the business written by WEB. *See* Hawksworth 01/10/03 Dep. Tr. at 29:5-14.

[4] Incurred claims include the amount actually paid on the claim to date as well as the amount of the reserve established for the claim to cover amounts the company expects in the future to pay based on the information available at the time.

In particular, the 1998 Underwriting Information contained information showing the historical performance of TIG's workers' compensation business, including incurred and projected ultimate loss ratios on an accident year basis going back as far as 1988. Ex. 70 at WUW021311-13. Those loss ratios reflected that the results of TIG's workers' compensation business had steadily deteriorated throughout the mid-1990s, with projected ultimate loss ratios ranging from 61% for the 1994 accident year to a range of 69.3% to 78.2% for the 1997 accident year. *Id.* at WUW021311; *see also* Ekwall Dep. Tr. 69:7-70:9. Significantly, the incurred and projected loss ratios demonstrated not only that the results of the Virginia Surety business segment were also deteriorating, Ex. 70 at WUW021313, but that the loss ratios for the Virginia Surety business segment were significantly higher, and thus the business less profitable (or more unprofitable, as the case may be), than the balance of TIG's workers' compensation portfolio.

| TIG MANAGED COMPENSATION DIVISION PROJECTED ULTIMATE LOSS RATIOS @ 12/97 | | | |
|---|---|---|---|
| AY | ALL TIG BUSINESS | TIG BUSINESS EXCLUDING VIRGINIA SURETY | VIRGINIA SURETY |
| 1994 | 61.0-61.5% | 60% | 67.1-71.1% |
| 1995 | 61.2-62.7% | 58.5% | 68.5-74% |
| 1996 | 65.7-67.8% | 65% | 67.5-74.1% |
| 1997 | 69.3-78.2% | 67.3-75.5% | 72.6-82.4% |

*See id.* at WUW021311-13.

Robin Ekwall was the individual at WEB who underwrote, priced, negotiated, and ultimately made the decision to bind U.S. Life to the 1998 Treaty. *See* Ekwall Dep. Tr. 33:10-19, 44:2-45:18, 63:21-64:6, 83:11-86:22, 156:22-163:24; *see also* Ex. 907 (Trustmark's Second Supplemental Response to TIG's First Set of Interrogatories ("Interrogatory Response")) at 19. No one else at WEB had any meaningful involvement in the TIG account, *see* Wright Dep. Tr. 48:9-57:24; Bastan Dep. Tr. 104:7-19, and, with one exception discussed below, all of

Trustmark's oral misrepresentation claims are based on allegedly false misrepresentations made to Mr. Ekwall by Sheila Bohuslav of Aon.

Trustmark alleges that, after receiving the 1998 Underwriting Information, Mr. Ekwall and his partner, Charles Bastan, called Ms. Bohuslav and were told by Ms. Bohuslav that TIG was being put up for sale and wanted to lower its retention through the purchase of reinsurance in order to stabilize its balance sheet. Ekwall Dep. Tr. 36:2-4; *see also* Bastan Dep. Tr. 114:20-115:24; *see also* Ex. 907, Interrogatory Response at 15.

Thereafter, Mr. Ekwall reviewed and analyzed the 1998 Underwriting Information and, using a "burn cost" analysis, calculated the price he needed to charge TIG for the proposed reinsurance. Simply stated, Mr. Ekwall estimated the anticipated ultimate losses to the layers he was quoting by summarizing the aggregate losses in the applicable layers (utilizing the historical loss detail provided by Aon), applied loss development factors in order to estimate how those actual losses would develop to ultimate, and then added a "load" to account for applicable expenses and profit. *See* Ekwall Dep. Tr. 52:2-53:15, 65:6-68:13. The resulting figure was then expressed as a percentage of TIG's subject premium.

On May 27, 1998, Mr. Ekwall issued an initial quote to provide "A&H carve-out" reinsurance to TIG: (a) for the MCI business segment for 100% of the layer $400,000 excess of $100,000 at the rate of 10.1% of subject premium; and (b) for all of TIG's other business segments for 100% of the layer $900,000 excess of $100,000 at the rate of 10.6% of subject premium. Ex. 71.[5]

---

[5] "A&H carve out" reinsurance provides reinsurance for the "accident and health" exposures, *i.e.*, the medical expenses and lost wages arising from Part A of a workers compensation insurance policy. By contrast, "full conditions" reinsurance provides reinsurance for all exposure arising from a workers compensation policy, *i.e.*, both Part A and Part B (employers' liability).

The layer for the MCI business segment differed because TIG had in place an existing reinsurance agreement that covered all MCI losses excess of $500,000. Ex. 69 at WUW021483.

On June 2, 1998, Aon provided WEB with "the latest Loss Development Triangles" for the TIG Primary business segment. Ex. 86. Aon's cover facsimile specifically stated that the triangles did not include the MCI or Virginia Surety business segments. *Id.* Loss development triangles graphically depict the development of losses over time and can be used by actuaries and underwriters to create loss development factors which, in turn, as explained above, can be used by underwriters to price reinsurance business. *See* Ekwall Dep. Tr. 19:6-7.

Mr. Ekwall testified that, after receiving the TIG Primary loss development triangles, he called Ms. Bohuslav and requested loss development factors, or the data necessary to prepare such factors, for the Virginia Surety business segment. Ekwall Dep. Tr. 24:11-16. Mr. Ekwall now alleges that, in response, Ms. Bohuslav advised him that loss development factors and/or data which could be used to create loss development factors for the Virginia Surety business segment "were not available." *Id.* at 24:24-25:7. Mr. Ekwall testified that he did not insist that the Virginia Surety loss development information be obtained because he was assured by Ms. Bohuslav that the loss development triangles for the TIG Primary were "representative" of TIG's entire workers' compensation portfolio. Ekwall Dep. Tr. 255:7-24; *see also* Ex. 907, Interrogatory Response at 15, ¶¶ (c), (d).

Mr. Ekwall also testified that, based on his review of the TIG Primary triangles received on June 2, 1998, he noticed that development of the TIG Primary business "was better than national average" and was told by Ms. Bohuslav that TIG's development was better than national average because of the "superior claims handling" by "TIG and [its] agents":

> And I do recall that I had noticed that the development, that TIG's development was better than national average. I asked Sheila about that. And she told me that that was due to their superior claims handling. I don't recall what else. But it was because of their superior claims handling.

Ekwall Dep. Tr. 122:21-123:3; *see also id.* at 125:22-126:3, 128:1-18, 195:23-196:6; Ex. 907, Interrogatory Response at 15, ¶ (e). Mr. Ekwall did not ask what Ms. Bohuslav meant by "superior," or why she believed, or how she knew, that TIG's claims handling was "superior." Ekwall Dep. Tr. 125:3-10.

Mr. Ekwall has also alleged that, at some point during the negotiation of the 1998 Treaty, he was told by Ms. Bohuslav that TIG "had really cleaned up the book of business from the late '80s, early '90s. Got out of the states . . . where they couldn't be competitive, and that the more recent years were more reflective of what the experience would be going forward." Ekwall Dep. Tr. 432:7-433:5; *see also* Ex. 907, Interrogatory Response at 15, ¶ (f).

On June 4, 1998, Mr. Ekwall issued a revised quote, reducing the rate for the $900,000 excess of $100,000 layer from 10.1% to 9.5% and reducing the rate for the $400,000 excess of $100,000 layer from 10.1% to 7.83%, with "[a]ll other terms and conditions apply[ing] from earlier quote/fax dated 5/27/98." Ex. 88.

By facsimile dated June 11, 1998, Ms. Bohuslav advised Mr. Ekwall that TIG "had a very competitive full conditions quote from a direct market," but indicated that WEB would possibly land the account if it reduced its quote on the business segments other than MCI from 9.5% to 9%. Ex. 72. Without doing any further qualitative or quantitative analysis (Ekwall Dep. Tr. 136:22-137:7), Mr. Ekwall agreed to reduce WEB's quote. Ex. 73.

On June 25, 1998, Mr. Ekwall again agreed to decrease WEB's quote on the MCI segment in response to another competitive quote. *See* Ex. 6 at AON02010. In addition, Aon agreed to reduce its brokerage (from 7.5% to 5% of ceded premium), resulting in a further decrease in WEB's quoted rate (without a reduction in the premium which would be paid to U.S. Life). Ex. 90. Ms. Bohuslav further advised Mr. Ekwall that TIG was prepared to bind WEB's quote "if we can make this a 3 year deal with no more than 10% annual increase each

anniversary." *Id.* Mr. Ekwall agreed, and, by facsimile dated June 29, 1998 (Ex. 76), Ms. Bohuslav confirmed that "we have bound [WEB, on behalf of U.S. Life] 100% . . . effective April 1, 1998." *Id.* The Placement Slip for the 1998 Treaty was signed by WEB on behalf of U.S. Life on July 27, 1998 (Ex. 68), and the final contract wording was executed by WEB on November 12, 1998. Ex. 908.

### 2. The 1999 Treaty.

On September 17, 1998, TIG, through Aon, sent WEB provisional notice of cancellation of the 1998 Treaty effective January 1, 1999. Ex. 860. This allowed TIG the option, but not the obligation, to terminate the 1998 Treaty and, thus, the opportunity to determine whether, as of January 1, 1999, more favorable terms were available in the reinsurance market. *See* Exs. 860, 872.

By cover letter dated November 11, 1998, Aon sent to certain specific companies, including WEB, a "1999 underwriting memorandum . . . for TIG's Workers Compensation renewal effective January 1, 1999" (the "1999 Renewal Submission"). *See* Ex. 78 at WEB00525. The cover letter set forth certain information regarding TIG's business and indicated that Aon "intend[ed] to present alternative quotes to TIG," including both a "full conditions coverage quote" and "a carve out conditions quote," and invited WEB to "quote both ways" if it had the ability to do so. *Id.*

Like the 1998 Underwriting Information, the 1999 Renewal Submission contained a significant amount (in total, 257 pages) of narrative and statistical information concerning TIG's workers' compensation business, including an overview describing the business written in each TIG segment, its risk characteristics, the types of products being issued (*i.e.*, guaranteed cost, dividend or retrospective rated policies), the underwriting approaches and methodologies

applied and the different entities that were underwriting the business and administering the claims. *See* Ex. 79 at WEB00146-52.

The 1999 Renewal Submission also contained detailed premium and loss information, including listings of large losses (referred to as bordereaux) for the various business segments, *see id.* at WEB00313-43, and projected loss ratios for the TIG Primary, Virginia Surety and Innovus business segments. *See id.* at WEB00213-312. In particular, the projected loss ratios for the Virginia Surety business segment (as of June 30, 1998) were consistent with the projected loss ratios contained in the 1998 Underwriting Information, showing that the business written in that segment consistently deteriorated from 1994 through 1997, and that the deterioration had continued since the placement of the 1998 Treaty.

| VIRGINIA SURETY PROJECTED ULTIMATE LOSS RATIOS @ 6/98 | | |
|---|---|---|
| AY | SELECTED LOSS RATIO @ 3/98 | SELECTED LOSS RATIO @ 6/98 |
| 1994 | 67.7% | 67.6% |
| 1995 | 70.7% | 70.2% |
| 1996 | 70.4% | 71.7% |
| 1997 | 77.3% | 80.2% |
| 1994-97 | 72.3% | 73.4% |

*See id.* at WEB00217.

Significantly, the 1999 Renewal Submission contained numerous loss development triangles and loss development factors for the Virginia Surety, TIG Primary, MCI and Commercial Specialty business segments. *See id.* at WEB00227-28, WEB00241-46, WEB00254-62, WEB00264-65 and WEB00284-302.

Robin Ekwall was the individual at WEB who underwrote, priced, negotiated, and ultimately made the decision to bind Security Insurance Company of Hartford ("Security") to the