1999 Treaty. *See* Ekwall Dep. Tr. 313:11-16. Trustmark now alleges that the 1999 Renewal Submission contains the following written misrepresentations:

    a.    "the Virginia Surety segment would expand;"

    b.    "TIG conducts annual Underwriting, Claims and Actuarial reviews of Virginia Surety;"[6]

    c.    "the major finding of TIG's audit of Virginia Surety was a need to implement stronger managed care and injury management practices;"

    d.    "the TIG's workers' compensation business was properly reserved;" and

    e.    "TIG could provide an accurate bordereau of losses on a monthly basis within thirty days."

Ex. 907, Interrogatory Response at 27-28.

        Shortly thereafter, Aon sent WEB a CD-Rom containing individual claim data for each of the TIG workers compensation business segments that would be subject to the 1999 Treaty. *See* Ex. 224. Mr. Ekwall testified that when he tried to open the CD-Rom he found it to be "blank" and "useless" and that he called Ms. Bohuslav and "asked her to E-mail any data or put it on diskette." Ekwall Dep. Tr. 329:8-11. Subsequently, on November 24, 1998, Ms. Bohuslav sent an e-mail to Mr. Ekwall, with no note or text at all, attaching three data files containing individual losses excess of $25,000, evaluated as of three different points in 1996, 1997 and 1998. Ex. 227. Trustmark has alleged that TIG misrepresented that the "three data files e-mailed to WEB on November 24, 1998 contained losses for all segments of TIG's workers compensation business" when, in fact, the data files were missing loss information for the Virginia Surety business segment. Ex. 907, Interrogatory Response at 27-28, ¶ (f).

---

[6] Mr. Ekwall admitted at his deposition that he did not request copies of any of the reports of TIG's audits of Virginia Surety. *See* Ekwall Dep. Tr. 584:5-13.

Mr. Ekwall testified at his deposition that he underwrote and priced the January 1, 1999 renewal based **solely** on the November 11, 1998 cover letter, the 1999 Renewal Submission and the claim data he received.

> Q: Okay. Did you request any other information from Aon or TIG in connection with the -- your underwriting and pricing of the 1/1/99 renewal?
>
> A: Not that I recall.
>
> Q: Do you recall -- did you ask any questions of Aon or TIG in connection with your underwriting and pricing of the 1/1/99 renewal?
>
> A: I don't recall.
>
> A: So best as you can recall today, you underwrote, priced and made the decision to quote based on the cover letter, the renewal submission and the claim data that you received.
>
> Correct?
>
> A: I believe so, yes.

Ekwall Dep. Tr. 313:2-16. In other words, Mr. Ekwall has confirmed that there were no oral representations on which he relied in connection with the placement of the 1999 Treaty.[7]

By fax dated December 6, 1998, WEB provided an initial quote on behalf of Security to provide "full conditions" reinsurance to TIG: (a) for 100% of the layer $900,000 excess $100,000 at the rate of 10.7% of subject premium; and (b) for 100% of the layer $400,000 excess $100,000 at the rate of 9.7% of the subject premium. Ex. 262. The following day, TIG

---

[7] Indeed, Mr. Ekwall testified that he was able to recall only two topics discussed with Ms. Bohuslav in connection with the placement of the 1999 Treaty. *See* Ekwall Dep. Tr. 325:14-24. First, Mr. Ekwall recalled discussing with Ms. Bohuslav the fact that WEB would be able to provide a full conditions quote. *See id.* at 325:25-326:9. Second, Mr. Ekwall recalled discussions with Ms. Bohuslav in connection with WEB's subsequent quote to provide reinsurance to TIG for an additional layer of coverage ($50,000 excess of $50,000) for the Virginia Surety and Innovus business segments. *See id.* at 326:10-327:2. That additional layer will be discussed below at page 15.

rescinded its provisional notice of cancellation on the 1998 Treaty, meaning that the 1998 Treaty would continue in full force and effect, thus rendering moot WEB's quote for the January 1, 1999 renewal. Ex. 872.

WEB nevertheless continued to negotiate the January 1, 1999 renewal. By fax dated December 14, 1998, WEB provided alternative, lower quotes on both a "full conditions" and "carve-out" basis. Ex. 876. As Mr. Ekwall explained, he exercised "a judgment call" to reduce his quote because "looking at the more recent years . . . the experience had been improving and I was comfortable . . . with lowering that rate based on the more recent years." Ekwall Dep. Tr. 431:8-12. Mr. Ekwall further asserted that his understanding of the improved results in the most recent years was based on an alleged discussion with Ms. Bohuslav during the placement of the 1998 Treaty that TIG "had really cleaned up the book of business from the late '80s, early '90s [and] got out of the states . . . where they couldn't be competitive." *Id.* at 432:6-433:5.

WEB reduced its quote twice more, again with no further quantitative or qualitative analysis. Exs. 909, 910. According to Ms. Bohuslav's contemporaneous fax to TIG, WEB advised her that it was WEB's "goal" to replace U.S. Life with Security as the reinsurer of the TIG business. Ex. 909. As a result, WEB ultimately quoted full conditions coverage for the layer $900,000 excess of $100,000 at the rate of 9.64%, and full conditions coverage for the MCI business segment at the rate of 6.8%. Ex. 269. In other words, WEB, on behalf of Security, agreed to provide TIG with greater coverage – full conditions as opposed to carve-out – for less than U.S. Life would have been entitled to under the 1998 Treaty.

By facsimile dated December 21, 1998 (Ex. 877), Ms. Bohuslav outlined Mr. Ekwall's terms and Mr. Ekwall returned the facsimile with a note stating "All OK, RBE,

12/21/98." By facsimile dated December 31, 1998 (Ex. 269), Ms. Bohuslav confirmed the binding of WEB's quote.

### 3. The $50,000 excess of $50,000 layer.

In her December 21, 1998 facsimile (Ex. 877), Ms. Bohuslav advised Mr. Ekwall that "[TIG] will likely buydown Virginia Surety, possibly even the Commercial Specialty to $50,000." Ms. Bohuslav further advised in her December 31, 1998 facsimile (Ex. 269) that "TIG is interested in pursuing buying down the [Virginia Surety] and Innovus portions [and] would consider a rate in the range of 7.327%." The same day, Mr. Ekwall responded (Ex. 270) that "at best we would be at 9.00% [rate, but w]e would also want the [$50,000 excess of $50,000] buy down on all business and not just [Virginia Surety] & Innovus."

Mr. Ekwall testified that he was then told by Ms. Bohuslav that "Virginia Surety was one of the better or the best segments of [TIG's workers' compensation] business." Ekwall Dep. Tr. 189:2-5. Mr. Ekwall did not recall asking any questions regarding how the Virginia Surety business was being managed. *Id.* at 192:20-22. Instead, Mr. Ekwall simply *interpreted* that Ms. Bohuslav's alleged comment "meant for us as an excess of loss reinsurer that we could expect better results on the Virginia Surety book." *Id.* at 192:6-19.

On January 19, 1999, Mr. Ekwall issued a quote on behalf of Security of 9% of subject premium for 100% of the $50,000 excess of $50,000 layer for the Virginia Surety and Innovus business segments. Ex. 271. By facsimile dated February 3, 1999 (Ex. 274), Ms. Bohuslav confirmed the binding of WEB's quote. *Id.*

### 4. Trustmark's Retrocession of Security.

As explained above, WEB bound Security to the 1999 Treaty in late 1998. *See also* Ex. 1, ¶ 28 ("TIG accepted WEB's proposal, and in late 1998, WEB bound Security to [the

1999 Treaty]"). WEB bound Security to the $50,000 excess of $50,000 layer for the Virginia Surety and Innovus business segments in February 1999.

In March 1999, Security entered into a Retrocession Agreement with Trustmark (Ex. 469) pursuant to which Security retroceded to Trustmark 100% of the accident and health risk it assumed under the 1999 Treaty. *See* Ex. 1, ¶ 32. The Retrocession Agreement was not signed by WEB on Trustmark's behalf until April 19, 1999. Ex. 469 at TM/S 01720.

## ARGUMENT

To grant a motion for summary judgment, there can be no "genuine issue as to any material fact" and the moving party must be "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *AIG, Inc. v. London Am. Int'l Corp. Ltd.*, 664 F.2d 348, 351 (2d Cir. 1981) (*quoting Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)). In determining whether a genuine issue has been raised, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).

However, as this Court previously explained in *Danman Associates v. Porter*, 43 B.R. 423, 427 (D. Conn. 1984), "one against whom summary judgment is sought cannot rely on factually unsubstantiated conclusory assertions to sustain a claim that questions of fact exist." *See also* 11 James Wm. Moore, *Moore's Federal Practice* § 56.13[2] (3d ed. 1997). The non-moving party must "lay bare its proof" and set forth "specific facts" demonstrating there is a genuine issue of material fact requiring a trial. "'Concrete particulars'" are thus necessary to ward off summary judgment. *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978) (*quoting Dressler v. MV Sandpiper*, 331 F.2d 130, 133 (2d Cir. 1964)); *see generally Donnelly v. Guion*, 467 F.2d 290, 293-94 (2d Cir. 1972); *see also Anderson*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

For the reasons discussed below, TIG is entitled to summary judgment on each of Trustmark's claims.

POINT I

THE ECONOMIC LOSS RULE BARS TRUSTMARK'S NEGLIGENT MISREPRESENTATION CLAIM

The law is clear that a plaintiff may not recover "purely economic losses" in negligence actions except under extremely limited circumstances not applicable here. *See Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1200-01 (Ill. 1997); *2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346, 348-49 (Ill. 1990); *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249-50 (Ill. 1986); *Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443, 451-52 (Ill. 1982).[8]

With respect to negligent misrepresentation claims, the only exception to the economic loss rule is where "the defendant is in the business of supplying information for the guidance of others." *See Fireman's Fund, Ins.*, 679 N.E.2d at 1201; *Moorman*, 435 N.E.2d at 452. Generally, a defendant is not in the business of supplying information for the guidance of others where the information supplied is "merely ancillary" to the transaction. *See Fireman's Fund, Inc.*, 679 N.E.2d at 1201 (engineering firm not in the business of supplying information); *2314 Lincoln Park W. Condo.*, 555 N.E.2d at 351-52 (architects not in the business of supplying information).

---

[8] Illinois law governs the resolution of Trustmark's third-party claims against TIG. A federal court sitting in diversity is bound to apply the law of the forum state, including its choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Connecticut follows the *lex loci delicti* or "vested rights" approach to choice-of-law problems holding that, in tort actions, the law of the place of injury governs substantive issues. *See Economu v. Borg-Warner Corp.*, 652 F. Supp. 1242, 1247 (D. Conn.), *aff'd*, 829 F.2d 311 (2d Cir. 1987); *see also Williams v. State Farm Mut. Auto. Ins. Co.*, 229 Conn. 359, 369-70, 641 A.2d 783, 788-89 (1994). For choice-of-law purposes under Connecticut law, a tort is committed not where the act or omission occurs, but where the injury is sustained. *See Patch v. Stanley Works (Stanley Chem. Co. Div.)*, 448 F.2d 483, 490-91 (2d Cir. 1971); *see also NBC, Inc. v. Sonneborn*, 630 F. Supp. 524, 539 (D. Conn. 1985). Specifically, for misrepresentation cases, the injury occurs where the economic impact is felt. *See Bailey Employment Sys., Inc. v. Hahn*, 655 F.2d 473, 476 (2d Cir. 1981); *see also Uniroyal Chem. Co. v. Drexel Chem. Co.*, 931 F. Supp. 132, 140 (D. Conn. 1996). Here, Trustmark is an Illinois corporation with its principal place of business in Illinois and, thus, will sustain its economic injury in Illinois. Ex. 1, ¶ 5.

Numerous courts have held that insurance companies are not in the business of supplying information for the guidance of others and, therefore, cannot be held liable for economic loss resulting from an alleged negligent misrepresentation. *See University of Chi. Hosps. v. United Parcel Serv.*, 596 N.E.2d 688, 691 (Ill. App. Ct. 1992); *Lang v. Consumers Ins. Serv., Inc.*, 583 N.E.2d 1147, 1153 (Ill. App. Ct. 1991) (defendants "were selling insurance to members of the public [and thus] for purposes of negligent misrepresentation were not in the business of providing information for others' business guidance").

Indeed, *International Surplus Lines Insurance Co. v. Fireman's Fund Insurance Co.*, No. 88 C 320, 1989 WL 99771 (N.D. Ill. Aug. 18, 1989), is directly on point. There, the court dismissed a negligent misrepresentation claim by a reinsurer against its cedent relating to the placement of a reinsurance contract:

> Fireman's Fund is an insurance company, and the business of an insurance company is accepting a risk in return for money. Fireman's Fund is not "in the business" of supplying information as [plaintiff] suggests. To hold otherwise would render every commercial enterprise which enters into a contract a company in the business of supplying information, thereby opening the floodgates for negligent misrepresentation litigation.

*Id.* at *2.

Here, TIG is an insurance company and, thus, is not, as a matter of law, a company in the business of supplying information for the guidance of others. Trustmark is seeking monetary damages for economic losses arising from a reinsurance transaction. Accordingly, Trustmark's negligent misrepresentation claim (Count II) is barred as a matter of law and, the Court should grant summary judgment dismissing that claim in its entirety.

## POINT II

### TRUSTMARK'S FRAUDULENT NON-DISCLOSURE CLAIM FAILS AS A MATTER OF LAW SINCE TIG DID NOT OWE ANY DUTIES TO TRUSTMARK

Trustmark's claims based on fraudulent non-disclosure must likewise be dismissed as a matter of law. In order to prevail upon a claim for fraudulent concealment or non-disclosure, the plaintiff must demonstrate that "the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 593 (Ill. 1996); *see also Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 13 (Ill. App. Ct. 2001), *appeal denied*, 766 N.E.2d 240 (Ill. 2002).

Illinois courts have found that a duty to disclose arises only under very limited circumstances, such as "a fiduciary or confidential relationship" or "a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Connick*, 675 N.E.2d at 593; *see also Lidecker v. Kendall College*, 550 N.E.2d 1121, 1126 (Ill. App. Ct. 1990).

Here, no such "fiduciary or confidential relationship" existed between TIG and Trustmark. Indeed, there was no "relationship" whatsoever between TIG and Trustmark. TIG's relationship was with Security, its reinsurer. Trustmark's only relationship was with Security pursuant to the Retrocession Contract. There is simply no privity or relationship, contractual or otherwise, between TIG and Trustmark. Thus, by definition, there can be no "fiduciary or confidential relationship" between TIG and Trustmark.[9]

---

[9] "Reinsurance involves contracts of indemnity, not liability." *Unigard*, 4 F.3d at 1054. There is no privity of contract between the reinsurer and the underlying insured and, therefore, "the reinsurer is not directly liable to the original insured." *Id.* Accordingly, courts have consistently dismissed claims by policyholders against reinsurers. *See, e.g., People ex rel. Baylor v. Highway Ins. Co.*, 316 N.E.2d 633, 634 (Ill. 1974) ("'reinsurer is in no respect liable . . . to the person originally insured'") (citation omitted); *Morgan v. American Risk Mgmt., Inc.*, No. 89 Civ. 2999, 1990 WL 106837, at *6 n.8 (S.D.N.Y. July 20, 1990) ("the insured . . . cannot recover against the reinsurer, even if the insurer becomes insolvent").

NYLIB2 199299.5                              -20-

In any event, even assuming for the sake of argument that TIG and Trustmark were in privity or had any relationship, courts have held that, as a matter of law, an insurance or reinsurance relationship does not constitute a fiduciary or confidential relationship. *See Overbey v. Illinois Farmers Ins. Co.*, 525 N.E.2d 1076, 1084 (Ill. App. Ct. 1988); *Robacki v. Allstate Ins. Co.*, 468 N.E.2d 1251, 1252-53 (Ill. App. Ct. 1984). In *International Surplus Lines Insurance Co. v. Fireman's Fund Insurance Co.*, No. 88 C 320, 1989 WL 165045 (N.D. Ill. Dec. 29, 1989), the Illinois federal district court held that the reinsurance relationship between a cedent and a reinsurer was also not fiduciary in nature:

> The relationship at issue is governed by a contract negotiated at arms length by two commercial entities. It is unlikely that one of the parties was able to dominate the other in the negotiation and performance of their agreement. Indeed, the parties surrounded themselves with insurance brokers and marketing representatives, professionals in the field of insurance. Most significantly, both parties to this relationship are experts in the subject around which their relationship centers. If Illinois courts have not deemed a fiduciary relationship to exist between an individual policy holder and a sophisticated insurance company, they are not likely to imply one in a reinsurance relationship. . . .
>
> *Indeed, the parties here are so evenly matched this Court cannot conceive of a commercial relationship less likely to constitute a fiduciary relationship.*

*Id.* at *4 (emphasis added); *accord Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 280-81 (2d Cir. 1992) ("because these contracts are usually negotiated at arms length by experienced insurance companies . . . there is no reason to label the [reinsurance] relationship as 'fiduciary'") (citations omitted).

Here, because there was no privity or other relationship between TIG and Trustmark, TIG was under no duty to disclose facts to Trustmark. Accordingly, Trustmark's fraudulent nondisclosure claim fails as a matter of law, and the Court should grant TIG summary

judgment on Trustmark's fraud claim to the extent that it seeks damages as a result of any non-disclosure.

## POINT III

### TRUSTMARK'S FRAUDULENT MISREPRESENTATION CLAIMS FAIL AS A MATTER OF LAW

Trustmark's only remaining claim is that it was fraudulently induced into entering into the Retrocession Contract with Security based on alleged fraudulent misrepresentations made by TIG in connection with the placement of the 1998 Treaty between TIG and U.S. Life and in connection with the placement of the 1999 Treaty between TIG and Security. That argument, too, fails as a matter of law.[10]

**A.   Trustmark Cannot Demonstrate Clear And Convincing Evidence Of Reasonable Reliance On Any Material Misrepresentation Of Fact.**

In order for Trustmark to prevail on its fraudulent misrepresentation claim, Trustmark must first demonstrate by clear and convincing evidence that TIG made a misrepresentation of a past or present fact which is "objective, quantifiable, and verifiable [in] nature." *See Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F. Supp. 1358, 1365 (N.D. Ill. 1996). Expressions of opinion, subjective descriptions and puffery are insufficient as a matter of law to sustain a fraud claim. *See, e.g., Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999); *West v. Western Cas. & Sur. Co.*, 846 F.2d 387, 393-94 (7th Cir. 1988); *Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 692 N.E.2d 812, 816 (Ill. App. Ct.), *appeal denied*, 699 N.E.2d 1033 (Ill. 1998); *accord Restatement (Second) of Torts* § 538A (1977).

---

[10] These comments, as well as all of the arguments set forth below (except as respects scienter), apply with equal force to Trustmark's negligent misrepresentation claim. *See Board of Educ. of Chi. v. A, C & S, Inc.*, 546 N.E.2d 590, 591 (Ill. 1989).

Second, Trustmark must demonstrate by clear and convincing evidence that the alleged misrepresentation was material to WEB, *i.e.*, information that affected the "gravity of the risk" that was being reinsured. *See China Union Lines, Ltd. v. American Marine Underwriters, Inc.*, 755 F.2d 26, 29 (2d Cir. 1985).

Third, Trustmark must demonstrate by clear and convincing evidence that its reliance on the alleged misrepresentations was reasonable under the circumstances. In that regard, "[a] plaintiff has a duty to investigate further when the circumstances 'reasonably require, as a matter of prudence, that an investigation be undertaken.'" *West*, 846 F.2d at 394 (citation omitted). In considering this issue, the Court must not view the alleged misrepresentations in isolation but, instead, should view them in context of the universe of information that was provided to WEB in connection with the placement of the 1998 and 1999 Treaties. *See Quinn v. McGraw-Hill Cos.*, 168 F.3d 331, 336 (7th Cir. 1999); *see also Central States Jt. Bd. v. Central Assur. Co.*, 453 N.E.2d 932, 937 (Ill. App. Ct. 1983); *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 768-69 (D. Conn. 1996).

Finally, Trustmark must demonstrate by clear and convincing evidence that TIG acted with scienter, or the intent to defraud. *See Gert v. Elgin Nat'l Indus., Inc.*, 773 F.2d 154, 157 (7th Cir. 1985); *Danis v. USN Comms., Inc.*, 121 F. Supp. 2d 1183, 1192 (N.D. Ill. 2000); *Mitchell v. Skubiak*, 618 N.E.2d 1013, 1019 (Ill. App. Ct. 1993).

1. **The Alleged Misrepresentations in Connection with the Placement of the 1998 Treaty.**

None of the alleged misrepresentations in connection with the placement of the 1998 Treaty is sufficient as a matter of law to support a fraud claim against TIG.

As a threshold matter, none of the misrepresentations allegedly made in connection with the 1998 Treaty can possibly support a claim that Trustmark was fraudulently

induced into entering into the 1999 Treaty. The alleged misrepresentations were made in May and June of 1998, when TIG was negotiating the 1998 Treaty with WEB on behalf of U.S. Life. The 1999 Treaty was a *renewal* to the 1998 Treaty and was not discussed or negotiated until November 1998. Indeed, it was not until September 1998 that TIG issued provisional notice of cancellation of the 1998 Treaty, which initiated discussion of the January 1, 1999 renewal, and it was not until November 11, 1998 that the 1999 Renewal Submission was sent to WEB. *See supra* at 10. As a matter of simple logic, there can be no scienter since TIG could not possibly have intended to induce Trustmark (or to induce WEB on Trustmark's behalf) to enter into a contract that had not yet been contemplated, let alone proposed, by TIG. *See Connick*, 675 N.E.2d at 591 (fraud requires "intent that the statement induce the plaintiff to act"). For this reason alone, the Court should dismiss Trustmark's fraudulent misrepresentation claims to the extent they are based on alleged misrepresentations made in connection with the 1998 Treaty.

In addition, Mr. Ekwall has admitted that none of the alleged misrepresentations made in connection with the placement of the 1998 Treaty were material to his underwriting or pricing of the 1999 Treaty.

> Q: So best as you recall today, you underwrote, priced and made the decision to quote [the January 1, 1999 renewal] based on the [November 11, 1998] cover letter, the [1999] [R]enewal [S]ubmission and the claim data that you received. Correct?
>
> A: I believe so, yes.

Ekwall Dep. Tr. 313:11-16. For this reason, too, Trustmark's fraud claim based on alleged misrepresentations made in connection with the placement of the 1998 Treaty fails as a matter of law.

In any event, even if the Court were to consider alleged misrepresentations made in connection with the 1998 Treaty, and assuming the alleged misrepresentations were made (which TIG disputes), none is sufficient as a matter of law to support a fraud claim against TIG.

### a. "TIG was being put up for sale and they wanted to buy down their retention to stabilize their balance sheet."[11]

TIG's motivation for purchasing reinsurance is immaterial as a matter of law. In *Carlingford Australia General Insurance Ltd. v. St. Paul Fire & Marine Insurance Co.*, 722 F. Supp. 48 (S.D.N.Y. 1989), the reinsurer sought to amend its answer to assert a rescission claim based, in part, on the cedent's failure to disclose the fact that it purchased the reinsurance at issue because it believed that the underlying business would be unprofitable (and, in fact, it would not have written that business absent reinsurance). *Id.* at 49-50. Although the court permitted the reinsurer to amend its answer, it held that the cedent's motivation for purchasing the reinsurance was immaterial as a matter of law:

> In reaching this consideration I give no weight to whether or not plaintiff found Australian workers' compensation coverage profitable. A reinsurer fully advised of the insured's prior claims experience ... then "weighs its exposure against the premium which it, itself, receives." [*China Union*, 755 F.2d at 29]. In that calculus the reinsured's profit plays no part.

*Id.* at 53 n.1. Similarly, in *China Union*, the court held that the fact that a cedent paid higher premiums to another reinsurer is not material to the underwriting of a reinsurance agreement because "[a]n insurer weighs its exposure against the premium which it, itself, receives" and

---

[11] Mr. Ekwall testified that Aon made this representation to him in connection with the placement of the 1998 Treaty. This testimony is untrue and cannot be demonstrated with clear and convincing evidence. The undisputed evidence in this case is that TIG was not put up for sale until several months *after* the representation was allegedly made; *see* Hennessy Dep. Tr. 65:25-67:5, and that TIG's potential sale was not disclosed publicly until October 1998. *See id.*; *see also* Ex. 911. Accordingly, TIG is entitled to summary judgment on this issue as a matter of law. *See Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 939 (7th Cir. 1997) ("a plaintiffs own uncorroborated testimony is insufficient to defeat a motion for summary judgment").

there is "little if any relationship between such variances in premium and the gravity of the risk." 755 F.2d at 29.

Here, there is no relationship between TIG's motivation for buying down its retention in 1998 and "the gravity of the risk" assumed by Trustmark under the 1999 Treaty. *See id.* Just like the reinsurers in *China Union* and *Carlingford*, WEB underwrote the risk, weighed its exposure and determined the amount of premium it required to assume that exposure. In that calculus, TIG's motivation for purchasing the reinsurance is irrelevant, and immaterial, as a matter of law.

    **b.**    **"Loss development factors for the TIG Primary business segment were representative of TIG's entire workers' compensation portfolio."**

Trustmark cannot demonstrate clear and convincing evidence that Mr. Ekwall reasonably relied on this alleged misrepresentation. First, the alleged statement that the loss development factors for the TIG Primary business were representative of TIG's entire portfolio is inherently incredible given that Mr. Ekwall was supposedly told in the very same conversation that loss development information for the other business segments was not available. *See supra* at 8. Obviously, the only way to determine how different segments of business are developing relative to one another is to analyze and compare the *actual* development of each business segment. If, as Mr. Ekwall claims, he was told that such information was *not* available, he must have known that there was no legitimate basis for any comment regarding the relative development of the segments of TIG's portfolio. He thus knew that any such comment was nothing more than rank speculation, on which no experienced underwriter could reasonably rely. *See Quinn*, 168 F.3d at 336; *Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 490 (2d Cir. 1998).

Second, as explained above, the alleged misrepresentation occurred in connection with the placement of the 1998 Treaty. *See supra* at 7-8. Even if the representation was made, however, it is undisputed that the 1999 Renewal Submission contains a multitude of loss development triangles and loss development factors for the Virginia Surety business segment on a variety of bases, by accident year, on both a paid and incurred basis, by type of product, and with estimates of high and low ranges. *See supra* at 11. Indeed, the Renewal Submission contains nineteen pages of claim statistics, loss rates, triangles and development factors displaying in detail the actual and projected development of the Virginia Surety business. *See* Ex. 79 at WEB00217-35. In other words, in connection with the underwriting and pricing of the 1999 Treaty, Mr. Ekwall had the very information he says Aon told him did not exist.

Under these circumstances, as a matter of law, there was no reasonable reliance on the alleged misrepresentation that loss development factors for the Virginia Surety business segment did not exist.

### c. "TIG's better than average loss development was attributable to its superior claims handling."

As discussed above, Mr. Ekwall testified that, in connection with the placement of the 1998 Treaty, he noticed that the loss development for the TIG Primary business segment "was better than national average." *See supra* at 8. Mr. Ekwall then alleged that, when he brought his observation to Ms. Bohuslav's attention, she told him that TIG's better than average loss development was "because of TIG's and its agent's superior claims handling." Ex. 551 at 6, ¶ 17(d).[12] This alleged statement cannot support a fraud claim as a matter of law for three independent reasons.

---

[12] Trustmark, in its Interrogatory Response, erroneously attempts to portray Mr. Ekwall's observation as a representation by Ms. Bohuslav, and also improperly embellishes Mr. Ekwall's recollection, suggesting that his observation was that the TIG Primary loss development was "much better," as opposed to "better"

First, the alleged comment by Ms. Bohuslav was merely an expression of her judgment regarding the quality or value of the claims handling in the TIG Primary business segment. As a matter of law, one's view that claims handling (or anything else for that matter) is "superior" is, by definition, a statement of opinion that is not actionable as a fraud. *See All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 867-68 (7th Cir. 1999); *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1299 (7th Cir. 1993); *Breckenbridge v. Cambridge Homes, Inc.*, 616 N.E.2d 615, 623 (Ill. App. Ct.), *appeal denied*, 622 N.E.2d 1201 (Ill. 1993).

Second, Trustmark cannot demonstrate clear and convincing evidence that Mr. Ekwall reasonably relied on the alleged representation. Indeed, Mr. Ekwall admitted at his deposition that he asked no questions whatsoever regarding what Ms. Bohuslav meant by "superior," and did not ask why Ms. Bohuslav believed, or the basis of her understanding, that the TIG Primary claim handling was "superior." Ekwall Dep. Tr. 125:3-10. Similarly, Mr. Ekwall was advised in the 1999 Renewal Submission that TIG conducted annual claim audits, yet he never asked for copies of the audit reports or asked any questions regarding the results of the audits. *See id.* at 584:5-13. Clearly, the circumstances "reasonably required, as a matter of prudence" that Mr. Ekwall undertake at least a cursory investigation regarding the meaning and basis of the alleged representation. Moreover, Ms. Bohuslav was a broker with no claims handling background or expertise. *See* Bohuslav Dep. Tr. 8:20-11:7. Mr. Ekwall thus knew that any comment Ms. Bohuslav may have made regarding the quality of the TIG Primary claims handling was, at best, uninformed and, at worst, rank speculation and mere puffery. In sum, given the amorphous and subject nature of Ms. Bohuslav's alleged comment, and Mr.

---

than national averages. Ex. 907, Interrogatory Response at 9-10, 13-14. These assertions will be ignored as they are inconsistent with Mr. Ekwall's testimony.

Ekwall's utter failure to elicit any explanatory detail whatsoever, there was no reasonable reliance as a matter of law. *See Continental Bank*, 10 F.3d at 1299.[13]

In sum the alleged misrepresentation that "TIG's better than average loss development was attributable to its superior claims handling" cannot, as a matter of law, support a fraud claim against TIG.

        d.    **"TIG had substantially improved its book of workers' compensation business from an underwriting and profitability perspective and that TIG had withdrawn from states where it could not make an underwriting profit."**

First, the alleged statement that "TIG had substantially improved its book of workers' compensation business" is clearly a statement of opinion rather than fact. *See Continental Bank*, 10 F.3d at 1299; *LaScola v. US Sprint Comms.*, 946 F.2d 559, 568 (7th Cir. 1991). As such, it is not actionable. *See id.* This statement is also too vague to support a fraud claim because it is indeterminate time – when exactly did TIG take these steps to improve its business from an underwriting and profitability perspective? *See Continental Bank*, 10 F.3d at 1299. Finally, Mr. Ekwall could not reasonably have relied on this statement. As discussed above, both the 1998 Underwriting Information and the 1999 Renewal Submission contain detailed, objective and specific statistical and other information reflecting the actual historical

---

[13] Trustmark has also adduced no evidence that the alleged statement by Ms. Bohuslav was false, *i.e.*, that the TIG Primary claims handling was not "superior." Rather, Trustmark seeks to confuse the issue by suggesting that the alleged statement by Ms. Bohuslav was false because TIG allegedly was aware of significant problems with the claims handling in the Virginia Surety business segment. However, even if that was true (which TIG disputes), the quality of Virginia Surety's claims handling is not relevant to the quality of claims handling in the TIG Primary business segment which was handled by different entities than the Virginia Surety business segment. *See* Ex. 79 at WEB00146-48. Similarly, Mr. Ekwall made clear that the alleged representation by Ms. Bohuslav related to the claim handling by "TIG and [its] agents." *See* Ekwall Dep. Tr. 195:23-196:6. As a matter of law, Virginia Surety was *not* TIG's agent, but rather was an insurance company with which TIG had a reinsurance relationship. *See International Ins. Co. v. Certain Underwriters at Lloyd's London*, No. 88 C 9838, 1991 WL 349907, at **21-22 (N.D. Ill. Sept. 16, 1991). Accordingly, any alleged deficiencies with Virginia Surety's claim handling are irrelevant to any alleged misrepresentation regarding the quality of TIG Primary's claims handling.

results of the business. Whether, and, if so, the extent to which there was any improvement in TIG's workers' compensation business was thus fully disclosed to Mr. Ekwall. *See Ryan v. Wersi Electronics GmbH & Co.*, 3 F.3d 174, 183 (7th Cir. 1983) ("[a] reasonable investor would not have considered [defendant's] statement material in light of the written financial information that [plaintiff] had been provided with prior to the WEI stock purchase").[14]

### 2. The Alleged Misrepresentations in Connection with the Placement of the 1999 Treaty.

None of the alleged misrepresentations in connection with the placement of the 1999 Treaty is sufficient as a matter of law to support a fraud claim against TIG.

#### a. "The Virginia Surety segment would expand."

As a threshold matter, Trustmark's allegation grossly distorts what the 1999 Renewal Submission actually says, *i.e.*, that the "[VSC] Program **is expected** to expand geographically somewhat from its traditional Midwestern base." Ex. 79 at WEB00148 (emphasis added). This statement of Virginia Surety's "expectation" is clearly a statement of future intent "that relates to future or contingent events" and, thus, is non-actionable as a matter of law. *See West*, 846 F.2d at 393; *Steinberg v. Chicago Med. Sch.*, 371 N.E.2d 634, 641 (Ill. 1977); *People ex rel. Peters v. Murphy-McKnight*, 618 N.E.2d 459, 463 (Ill. App. Ct. 1993).

---

[14] The alleged representation that "TIG had withdrawn from states where it could not make an underwriting profit" suffers from similar deficiencies. Here, too, Mr. Ekwall could not have relied on this statement in light of the detailed information contained in the 1998 Underwriting Information and the 1999 Renewal Submission. Indeed, both contain detailed lists breaking down, on a state-by-state basis, the states in which the TIG business segments were writing business and the amount of premium that was being written in each state. Ex. 70 at WUW021275, WUW021296; Ex. 79 at WEB00160-64. Under these circumstances, any reliance upon the oral representation that "TIG had withdrawn from states where it could not make an underwriting profit" would have been unreasonable as a matter of law. *See Runnemede Owners, Inc. v. Crest Mtg. Corp.*, 861 F.2d 1053, 1058-59 (7th Cir. 1988); *Glass v. Kemper Corp.*, 949 F. Supp. 1341, 1350 (N.D. Ill. 1997), *aff'd*, 133 F.3d 999 (7th Cir. 1998).

Second, there is no evidence that this statement was false. To the contrary, the evidence demonstrates that TIG expected Virginia Surety to expand in various states, including California, Florida and Pennsylvania. *See, e.g.*, Exs. 912, 913.

      b.    **"TIG conducts annual underwriting, claims, and actuarial reviews of Virginia Surety."**

This statement was true and, to date, Trustmark has offered no explanation why it believes the statement was false. Indeed, between 1994, the inception of the reinsurance relationship between TIG and Virginia Surety, and the end of 1998, when the 1999 Renewal Submission was sent to WEB, TIG conducted regular – at least annually, and often more frequent – underwriting, claims and actuarial reviews of Virginia Surety. *See, e.g.*, Exs. 474, 102, 188, 491, 105, 914, 915, 702, 123, 488, 916, 917, 137, 54. Accordingly, this statement was true and, therefore, cannot as a matter of logic and law support a fraud claim against TIG.

      c.    **"The major finding of TIG's audit of Virginia Surety *was* a need to implement stronger managed care and injury management practices."**

Trustmark again grossly distorts what the 1999 Renewal Submission actually says, which is that "[m]ajor findings to date **include** a need to implement stronger managed care and injury management practices." Ex. 79 at WEB00149 (emphasis added). In that regard, the 1999 Renewal Submission thus makes clear on its face that "the need to implement stronger managed care and injury management practices"[15] was **among**, but not the only, "major findings" of the audit. Trustmark, however, does not contest the fact that TIG at the time was

---

[15] The Declaration of Robin Ekwall that Trustmark submitted in opposition to Security's summary judgment motion makes clear that Trustmark's real complaint is that TIG did not disclose other "findings" relating to VSC, such as the alleged pricing and reserving problems that were discussed at length in the Third Party Complaint. *See* Ex. 551 at 5, ¶ 17(b). However, as discussed above, the fact that TIG owes Trustmark no duty of disclosure is fatal to Trustmark's fraudulent concealment (or nondisclosure) claim.