seeking to improve Virginia Surety's managed care and injury management practices. *See* Exs. 795, 106, 108, 114; Chase Dep. Tr. 111:12-19, 113:3–114:20. Accordingly, the statement in the 1999 Renewal Submission – as opposed to Trustmark's mischaracterization of it – was true and, thus, by definition, cannot support a fraudulent misrepresentation claim.

Moreover, Trustmark has not, and cannot, meet its burden of demonstrating clear and convincing evidence of reasonable reliance. As explained above (11 n.5), although the 1999 Renewal Submission specifically discloses that TIG conducted "annual underwriting, claims, and actuarial reviews" of Virginia Surety, Mr. Ekwall did not request copies of the audit reports or otherwise ask questions regarding the results of those audits. Ekwall Dep. Tr. 584:5-13. Surely, the circumstances reasonably required some inquiry by Mr. Ekwall. Accordingly, Trustmark may not, as a matter of law, now argue that Mr. Ekwall reasonably relied on a blanket statement that audits had been conducted when he never even bothered to find out what those audits revealed.

### d. "TIG workers' compensation business was properly reserved."

This claim fails for the simple reason that the 1999 Renewal Submission contains no such representation. During his deposition, Mr. Ekwall conceded that he could not identify any specific representation, but, instead, testified that he believed that "implicit in providing reserve information is a representation that the reserving is adequate." Ekwall Dep. Tr. 587:7-10. Under Illinois law, however, an implicit representation is insufficient as a matter of law to support a fraud claim. *See Mutuelle Generale Francaise Vie v. Life Assur. Co. of Pa.*, 688 F. Supp. 386, 395 (N.D. Ill. 1988) (rejecting reinsurer argument that "implicit representations" are actionable in tort).

      e.    **"TIG could provide an accurate bordereau of losses on a monthly basis within thirty days."**

The sole basis for Trustmark's assertion that this alleged representation was false is its contention that Gary Wood (a former TIG employee) advised TIG's upper management prior to entering into the 1999 Treaty that it did not have the capability to perform its monthly reporting obligations under the 1999 Treaty. *See, e.g.*, Ex. 1, ¶ 34; Ex. 907, Interrogatory Response at 10. This alleged representation is insufficient as a matter of law to support a fraud claim for three independent reasons.

First, the evidence on which Trustmark relies – Mr. Wood's deposition testimony from *Trustmark I* – is inadmissible against TIG in this action. It is undisputed that TIG was not "present or represented at the taking of the deposition" Fed. R. Civ. P. 32(a). Accordingly, Mr. Wood's deposition cannot be used against TIG. *See* 8A Charles Alan Wright *et al.*, *Federal Practice & Procedure: Civil 3d* § 2142 (1994).

Second, even assuming for the sake of argument Mr. Wood's prior deposition was admissible, his testimony belies, rather than supports, Trustmark's assertion. Indeed, Mr. Wood did <u>not</u> testify that he advised TIG's management that TIG could not comply with its loss reporting obligations under the 1999 Treaty. Rather, he testified only that "it would be hard to meet the stringent requirements" of the 1999 Treaty. Wood Dep. Tr. 145:15-146:6; *see also* McElhiney Dep. Tr. 146:15-147:2, 131:13-132:11 (who testified that he was told by Mr. Wood that it would be "difficult, but doable," to comply with the loss reporting provision in the 1999 Treaty).[16] Clearly, Mr. Wood himself rebuts Trustmark's allegations that TIG knew that it "did not have the capability to perform its loss reporting obligations."

---

[16] Mr. Wood's own contemporaneous correspondence further confirms that he understood at the time that TIG had systems and programs necessary to report losses. In an e-mail dated September 20, 1999 (Ex. 203), Mr. Wood explained that, while one system (the "TRACS" system) could not be used to generate the loss reports required by the 1999 Treaty, there were alternatives, involving a software query

  f.  **The "three data files E-mailed to WEB on November 24, 1998 contained losses for all segments of TIG's workers' compensation business."**

Trustmark argues that this alleged misrepresentation was false because the data files provided to WEB were missing loss information for the Virginia Surety business segment. This alleged misrepresentation fails as a matter of law to support a fraud claim against TIG for several independent reasons.

First, the undisputed evidence demonstrates that there was no representation. Indeed, the e-mail transmitting the loss data files contains no text at all. Ex. 227. As discussed above, so-called "implicit" representations are inadequate as a matter of law to support a fraud claim. *See supra* at 31.[17]

Second, Trustmark cannot, as a matter of law, demonstrate clear and convincing evidence of scienter by TIG. As discussed above, Aon initially provided a CD-Rom containing all relevant loss data and, according to Mr. Ekwall, Ms. Bohuslav provided the data files via e-mail on November 24, 1998 as a substitute for the CD-Rom which Mr. Ekwall says he was unable to use. *See supra* at 12. In addition, it is undisputed that, in June 1999, Ms. Bohuslav, having earlier incorrectly advised Mr. Ekwall that the data files contained Virginia Surety loss information, *see* Ex. 240, voluntarily corrected herself and advised Mr. Ekwall that the loss data which he said he used to price the 1999 Treaty was, in fact, missing the Virginia Surety loss

---

tool referred to as PC Link, that were available and had been used to "provide[] this data in the past." In addition, it is undisputed that TIG uses today the very same systems and query tools to comply with the reporting requirements in the 1999 Treaty. Westover Dep. Tr. 41:10-42:12.

[17] Trustmark disingenuously attempts to cure the absence of a representation by asserting that "after questioning by WEB, Sheila Bohuslav informed WEB that it had complete and accurate individual loss data at the time of underwriting the 1999 renewal contract." Ex. 907, Interrogatory Response at 28, ¶ (h). As Trustmark knows, it is undisputed that the exchange with Ms. Bohuslav did not occur until **April 1999**, well after the placement of the 1999 Treaty had been finalized. Ex. 240. As a matter of logic and law, Mr. Ekwall could not possibly have relied on statements made by Ms. Bohuslav in April 1999 when he bound the 1999 Treaty in December 1998 (or when he bound the $50,000 excess of $50,000 layer in January 1999).

detail. *See* Ex. 243. It is simply inconceivable that someone intending to perpetrate a fraud would provide what he/she understood to be full and complete information and then later intentionally provide incomplete, inaccurate and misleading information. Likewise, it is inconceivable that someone intending to perpetrate a fraud would subsequently advise the alleged victim of the fraud that they had previously provided incomplete and inaccurate information and thereafter provide full and complete information.

Third, Mr. Ekwall has conceded that the Virginia Surety loss data that was allegedly missing from the data files provided by Ms. Bohuslav via e-mail on November 24, 1998 was immaterial to WEB's underwriting or pricing of the 1999 Treaty. Mr. Ekwall testified that: (a) when Ms. Bohuslav advised him in June 1999 that the data files did not include Virginia Surety loss information, he asked for the missing information so that he could go back and revisit his pricing including the Virginia Surety losses and see what impact it had on his calculations (Ekwall Dep. Tr. 485:5-9); and (b) when in August 1999, Mr. Ekwall received a CD-Rom containing **all** of the loss information for all of TIG's business agreements (Ekwall Dep. Tr. 488:23-489:16; Ex. 247), *i.e.*, the loss information allegedly missing from the November 24, 1998 data files which Mr. Ekwall allegedly used to price the 1999 Treaty, he reviewed and analyzed the loss information on the CD-Rom with a view towards his pricing of the account, and he concluded that "based on this updated claim information, there wasn't a real material change" in his pricing, and that he was therefore comfortable with his original pricing. Ekwall Dep. Tr. 490:5-24.

In other words, in August 1999, Mr. Ekwall analyzed all of the information that had allegedly not been disclosed to him earlier and determined that it was not material to his underwriting or pricing of the 1999 Treaty. Clearly, if the missing claims information was not material to WEB's pricing, then any alleged representations concerning the completeness of the

data that had been previously provided likewise could not ultimately have been material. Under these circumstances, there can be no disputed issue of fact concerning the materiality of the alleged representations.[18]

### 3. The Alleged Misrepresentation in Connection with the Placement of the $50,000 Excess $50,000 Layer.

Trustmark alleges that, in January 1999, in connection with the placement of the $50,000 excess $50,000 layer for the Virginia Surety and Innovus business segments, Ms. Bohuslav told Mr. Ekwall that "Virginia Surety was one of the better or the best segments of the business" in TIG's workers' compensation portfolio. Ekwall Dep. Tr. 189:2-5.[19] This allegation fails as a matter of law for three independent reasons.

First, the alleged statement by Ms. Bohuslav is a classic example of a statement of opinion or mere puffery. The alleged statement is not objective, quantifiable or verifiable in nature and, instead, merely reflects the broker's subjective view of some undefined quality of the Virginia Surety business segment relative to the other TIG business segments. *See All-Tech Telecom*, 174 F.3d at 867-68; *Continental Bank*, 10 F.3d at 1299; *Breckenbridge*, 616 N.E.2d at 623; *Spiegel v. Sharp Electronics Corp.*, 466 N.E.2d 1040, 1044 (Ill. App. Ct. 1984).[20]

---

[18] Trustmark also alleges that the loss data provided to WEB in connection with the 1998 Treaty was missing Virginia Surety loss data. *See* Ex. 907, Interrogatory Response at 27-28. However, by definition, WEB's pricing of the 1998 Treaty is irrelevant to its pricing of the 1999 Treaty, which was based on a wholly separate pool of loss data.

[19] Trustmark, in its Interrogatory Response, erroneously asserts that TIG falsely stated "that the Virginia Surety business was well written and profitable" (Ex. 907, Interrogatory Response at 9, ¶ (b)) and that "the Virginia Surety Company segment was the most desirable segment of business in that it was the best underwritten and managed segment in TIG's workers' compensation portfolio." *Id.* at 15, ¶ (b). In addition, because this alleged representation was not made until January 1999, it could not have been material to WEB's underwriting of the layers excess of $100,000, which, as discussed, was bound in December 1998, *prior* to the alleged representation being made.

[20] *See also Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122 (10th Cir. 1997) (statement that defendant had experienced "substantial success" in integrating the sales forces of two companies non-actionable because it was a "soft, puffing statement[], incapable of objective verification"); *In re RazorFish, Inc. Sec. Litig.*, No. 00 Civ. 9474, 2001 WL 1111502, at *3 (S.D.N.Y. Sept. 21, 2001) (statements that

The Seventh Circuit's decision in *LaScola* is instructive. There, plaintiff alleged that defendant had fraudulently induced him to join the company by representing, among other things, that "[it] had a 'very lucrative [compensation] plan. It's a great company to be with. We are all pros – "Straight shooters."'" *LaScola v. US Sprint Comms.*, 739 F. Supp. 431, 439 (N.D. Ill. 1990), *aff'd*, 946 F.2d 559 (7th Cir. 1991) (citation omitted). The district court granted summary judgment on the fraud claim, holding:

> these comments are too indefinite and unverifiable to be statements of fact. How does one prove whether an employee compensation plan is "very lucrative," or whether someone is a "straight shooter"?

*Id.* The Seventh Circuit affirmed the district court's granting of summary judgment, holding that the alleged representations "were merely statements of opinion [that] 'cannot qualify as fraudulent misrepresentations.'" *LaScola*, 946 F.2d at 568 (citation omitted). Similarly, here, the statement that Virginia Surety was "one of the better or the best segment" is too indefinite and unverifiable to support a fraud claim.

Second, the alleged comment by Ms. Bohuslav was so amorphous as to be meaningless. To that end, Mr. Ekwall admitted that he did not even bother asking Ms. Bohuslav what she meant or how she had come to hold her view, instead relying solely on his own subjective understanding of what Ms. Bohuslav said. Ekwall Dep. Tr. 191:3-192:22. Surely, the circumstances warranted at least a few follow up questions by Mr. Ekwall. *See Continental Bank*, 10 F.3d at 1299. Mr. Ekwall's failure to exercise ordinary prudence makes clear that, as a matter of law, any purported reliance was not reasonable.

---

defendants were "'successfully executing our growth strategy [and] do[ing] an outstanding job [are] classic expressions of optimism [or] puffery'") (citation omitted).

Third, Mr. Ekwall's purported reliance could not have been reasonable as a matter law since Ms. Bohuslav's alleged representation was contrary to specific, objective and detailed loss ratio information contained in the 1998 Underwriting Information and 1999 Renewal Submission. That information -- the ultimate bottom line regarding the quality of a book of insurance business -- made crystal clear that the Virginia Surety business segment could not possibly have been "one of the better or the best" of TIG's business segments because it was developing higher loss ratios than the balance of TIG's portfolio. As discussed above, the 1998 Underwriting Information shows that the projected ultimate loss ratios for TIG's business excluding Virginia Surety ranged from 60% in 1994 to 67.3-75.5% in 1997, whereas the projected ultimate loss ratios for Virginia Surety were substantially higher, ranging from 67.1-71.1% in 1994 to 72.6-82.4% in 1997. *See supra* at 6; *see also supra* at 10-11.

Under these circumstances, it would have been completely unreasonable for Mr. Ekwall to turn a blind eye to the specific and detailed actual historic loss information provided in writing and put his faith and confidence in an amorphous and utterly inconsistent oral comment by the broker. *See Ryan*, 3 F.3d at 183; *West*, 846 F.2d at 394; *Runnemede Owners*, 861 F.2d at 1058-59; *see also Doctor's Assocs., Inc. v. Distajo*, 944 F. Supp. 1010, 1014-15 (D. Conn. 1996).

In sum, the misrepresentation allegedly made in connection with the $50,000 excess of $50,000 layer fails as a matter of law to support a fraud claim against TIG.

B. **Trustmark Has Failed To Demonstrate That It Has Suffered Any Damages Proximately Caused By TIG's Alleged Fraud.**

Trustmark has the burden of proving its damages, both in fact and in quantum, and is entitled to recover nothing if it fails to sustain its burden of proof. *See City of Chicago v. Michigan Beach Hous. Coop.*, 696 N.E.2d 804, 809-11 (Ill. App. Ct.), *appeal denied*, 705 N.E.2d

435 (Ill. 1998); *see also Holland v. Arthur Andersen & Co.*, 571 N.E.2d 777, 782-83 (Ill. App. Ct. 1991), *appeal dismissed*, 591 N.E.2d 22 (Ill. 1992); *Golden v. Marshall Field & Co.*, 479 N.E.2d 1211, 1212 (Ill. App. Ct. 1985).

Trustmark has made no attempt to sustain its burden of proof to prove those damages that have been proximately caused by TIG's alleged fraud. Instead, Trustmark merely seeks the equivalent of "rescission damages," *i.e.*, the difference between the premiums and losses under the Retrocession Contract. *See* Ex. 1 at 17; Ex. 918, Trustmark's Rule 26(a)(1) Disclosure, ¶ (C).

However, courts have routinely rejected "rescission damages" as the appropriate measure of damages in a fraud claim. *See Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 747-48 (Ill. 1994); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769-70 (2d Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685-86 (7th Cir.), *cert. denied*, 496 U.S. 906 (1990). Rather, courts have made clear that, to recover fraud damages, a party must prove "'both transaction causation, *i.e.*, that *but for* the fraudulent statement or omission, the plaintiff would never have entered into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (*quoting Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).

Here, there is no evidence that TIG's alleged fraud was the proximate cause of any damages to Trustmark (as opposed to, for example, overall market conditions). Under similar circumstances, courts have not hesitated to dismiss fraud claims in their entirety, and this Court should do so here. *See Power v. British Vita, P.L.C.*, 57 F.3d 176, 189-90 (2d Cir. 1995);

*Gelt Funding*, 27 F.3d at 772; *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1495-96 (2d Cir. 1992); *Bastian*, 892 F.2d at 685-86.

## CONCLUSION

For all of the foregoing reasons, TIG respectfully requests that the Court enter an Order granting Summary Judgment dismissing the Third Party Complaint in its entirety.

Dated:   June 27, 2003

                HURWITZ & SAGARIN, LLC

By: _David Slossberg /ks_
     David Slossberg CT 113116

Daniel Sagarin CT 04289
147 North Broad Street
Milford, Connecticut 06460-0112
Telephone: (203) 877-8000

CADWALADER, WICKERSHAM & TAFT LLP
Lawrence I. Brandes CT 23789
Harry P. Cohen CT 20446
Brian J. O'Sullivan CT 23790
100 Maiden Lane
New York, New York 10038
(212) 504-6000

Attorneys for Third Party Defendant
TIG Insurance Company

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was sent by facsimile and federal express, this 27th day of June, 2003, to counsel of record for plaintiff Security Insurance Company of Hartford and defendant / third-party plaintiff Trustmark Insurance Company, addressed to:

Frank F. Coulom, Jr. CT 05230
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

Attorneys for Plaintiff
Security Insurance Co. of Hartford

David J. Grais CT 23352
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY 10019

Attorneys for Plaintiff
Security Insurance Co. of Hartford

Jeffrey Hellman CT 04102
Zeisler & Zeisler, P.C.
558 Clinton Avenue
P.O. Box 3186
Bridgeport, CT 06605

Attorneys for Defendant and
Third Party Plaintiff
Trustmark Insurance Co.

Mark B. Holton CT 21727
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

Attorneys for Plaintiff
Security Insurance Co. of Hartford

Everett J. Cygal CT 22765
Schiff Hardin & Waite
6600 Sears Tower
Chicago, IL 60606-6473

Attorneys for Defendant and
Third Party Plaintiff
Trustmark Insurance Co.

_____
Brian J. O'Sullivan

NYLIB2 199299.5