UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

SECURITY INSURANCE COMPANY OF HARTFORD,

                        Plaintiff,

           -against-

TRUSTMARK INSURANCE COMPANY,

                        Defendant.

Civil No. 301CV2198 (PCD)

---

TRUSTMARK INSURANCE COMPANY,

                        Third Party Plaintiff,

           -against-

TIG INSURANCE COMPANY,

                    Third Party
                    Defendant.

**June 27, 2003**

---

### THIRD-PARTY DEFENDANT TIG INSURANCE COMPANY'S
### LOCAL RULE 56(a)(1) STATEMENT IN SUPPORT OF ITS MOTION FOR
### SUMMARY JUDGMENT DISMISSING THE THIRD PARTY COMPLAINT

        Third Party Defendant TIG Insurance Company ("TIG"), pursuant to Local Rule

56(a)(1) of the Local Rules of the United States District Court for the District of Connecticut,

respectfully submits the following statement of undisputed material facts in support of its Motion

for Summary Judgment Dismissing the Third Party Complaint of Third Party Plaintiff Trustmark

Insurance Company ("Trustmark").

## TIG'S LOCAL RULE 56(a)(1) STATEMENT

1.      Trustmark is an Illinois corporation with its principal place of business in Illinois.  Ex. 1, ¶ 5.[1]

2.      At all relevant times, TIG was an insurance company that wrote numerous lines of business, including workers' compensation insurance on a direct and reinsurance basis in its Managed Compensation Division.  *See* Ex. 79 at WEB00140-52.  The executive responsible for the operation of TIG's Managed Compensation Division was Jay Chase.  *See id.* at WEB00146.

3.      The workers' compensation business written by TIG consisted of several separate and distinct business segments:  TIG Primary, Virginia Surety, Alternative Programs, Innovus, ManagedComp Inc. ("MCI"), and Commercial Specialty.  *See* Ex. 79 at WEB00146-152.  Each of TIG's business segments had its own unique risk characteristics (*e.g.*, geographic scope, average account size, hazard group classifications) and was underwritten, priced and administered differently, including by different entities.  *See id.*

4.      TIG entered into reinsurance agreements with other insurance companies pursuant to which those companies agreed to indemnify TIG for a portion of the losses arising from TIG's workers' compensation business.  Historically, TIG generally retained the first $1 million of risk on each workers' compensation claim.  *See* Chase Dep. Tr. 78:6-17.

---

[1]    The exhibits and deposition testimony that TIG relies upon in support of its summary judgment motion are attached to the accompanying declaration of Brian J. O'Sullivan.  Documents with an exhibit number between 1 and 877 refer to exhibits that were marked during one of the depositions in the proceeding.

5.     In late 1997, Mr. Chase came to learn that other workers' compensation insurance companies were lowering, or "buying down," their per claim retentions to levels that had not previously been readily available in the reinsurance market. Chase Dep. Tr. 185:11-186:15, 279:12-280:15; *see also* Ryan Dep. Tr. 175:5-176:3.  As a result, in early 1998, TIG asked Aon Re, Inc. ("Aon"), a reinsurance intermediary (or broker), to obtain information regarding the options available to TIG to lower, or "buy down," its retention on its workers' compensation book of business.  Chase Dep. Tr. 180:3-20, 286:10-287:15; Bohuslav Dep. Tr. 14:5-15:5.

6.     The individual broker at Aon with principal responsibility for the TIG account was Sheila Bohuslav.  *See* Bima Dep. Tr. 49:21-50:20.  Ms. Bohuslav was a broker with no claims handling background or expertise.  *See* Bohuslav Dep. Tr. 8:20-11:7.

7.     Aon prepared a package of underwriting information describing the nature and performance of TIG's workers' compensation business (the "1998 Underwriting Information").  *See* Ex. 70.  In early May 1998, Aon sent the 1998 Underwriting Information to certain specific companies, including WEB Management LLC ("WEB"), a managing general underwriter which acted on behalf of, *inter alia*, United States Life Insurance Company ("U.S. Life") and Trustmark.  *See* Exs. 69, 70.

8.     The cover letter to WEB, dated May 5, 1998, requested that WEB "quote a new underlying Workers' Compensation program effective April 1, 1998," and indicated that "TIG is looking to buy down their current retentions . . . possibly to as low as $100,000." Ex. 69 at WUW021481.

9.     The 1998 Underwriting Information included 120 pages of narrative descriptions of TIG's business segments, including information relating to the underwriting philosophy and methodologies associated with the segment and details regarding each business

segment's unique risk characteristics, *see* Ex. 70 at WUW021242-44, and detailed statistical information regarding the loss history of TIG's workers' compensation and the reserves established for the business, historical and projected premium information as well as premium information broken down by state and business segment, and detailed individual loss information for incurred claims excess of $15,000. *See* Exs. 69, 70.

10.    The 1998 Underwriting Information contained information showing the historical performance of TIG's workers' compensation business, including incurred and projected ultimate loss ratios on an accident year basis going back as far as 1988. Ex. 70 at WUW021311-13. Those loss ratios reflected that the results of TIG's workers' compensation business had steadily deteriorated throughout the mid-1990s, with projected ultimate loss ratios ranging from 61% for the 1994 accident year to a range of 69.3% to 78.2% for the 1997 accident year. *Id.* at WUW021311; *see also* Ekwall Dep. Tr. 69:7-70:9. The incurred and projected loss ratios demonstrated not only that the results of the Virginia Surety business segment were also deteriorating, Ex. 70 at WUW021313, but that the loss ratios for the Virginia Surety business segment were significantly higher, and thus the business less profitable (or more unprofitable, as the case may be), than the balance of TIG's workers' compensation portfolio. *See id.* at WUW021311-13.

11.    Robin Ekwall was the individual at WEB who underwrote, priced, negotiated, and ultimately made the decision to bind U.S. Life to the 1998 Treaty. *See* Ekwall Dep. Tr. 33:10-19, 44:2-45:18, 63:21-64:6, 83:11-86:22, 156:22-163:24; *see also* Ex. 907, Interrogatory Response at 19. No one else at WEB had any meaningful involvement in the TIG account. *See* Wright Dep. Tr. 48:9-57:24; Bastan Dep. Tr. 104:7-19.

12.    Trustmark alleges that, after receiving the 1998 Underwriting Information, Mr. Ekwall and his partner, Charles Bastan, called Ms. Bohuslav and were told by Ms. Bohuslav

that TIG was being put up for sale and wanted to lower its retention through the purchase of reinsurance in order to stabilize its balance sheet. Ekwall Dep. Tr. 36:2-4; *see also* Bastan Dep. Tr. 114:20-115:2; *see also* Ex. 907, Interrogatory Response at 15.

13.    In fact, TIG was not put up for sale until several months *after* the representation was allegedly made. *See* Hennessy Dep. Tr. 65:25-67:5. There was no public disclosure of TIG's potential sale until October 1998. *See id.*; *see also* Ex. 911.

14.    Mr. Ekwall reviewed and analyzed the 1998 Underwriting Information and, using a "burn cost" analysis, calculated the price he needed to charge TIG for the proposed reinsurance. Simply stated, Mr. Ekwall estimated the anticipated ultimate losses to the layers he was quoting by summarizing the aggregate losses in the applicable layers (utilizing the historical loss detail provided by Aon), applied loss development factors in order to estimate how those actual losses would develop to ultimate, and then added a "load" to account for applicable expenses and profit. *See* Ekwall Dep. Tr. 52:2-53:15, 65:6-68:13. The resulting figure was then expressed as a percentage of TIG's subject premium. *See* Ex. 69 at WUW021483.

15.    On May 27, 1998, Mr. Ekwall issued an initial quote to provide "A&H carve-out" reinsurance to TIG:  (a) for the MCI business segment for 100% of the layer $400,000 excess of $100,000 at the rate of 10.1% of subject premium; and (b) for all of TIG's other business segments for 100% of the layer $900,000 excess of $100,000 at the rate of 10.6% of subject premium. Ex. 71.

16.    On June 2, 1998, Aon provided WEB with "the latest Loss Development Triangles" for the TIG Primary business segment. Ex. 86. Aon's cover facsimile stated that the triangles did not include the MCI or Virginia Surety business segments. *Id.* Loss development triangles graphically depict the development of losses over time and can be used by actuaries and

underwriters to create loss development factors which, in turn, can be used by underwriters to price reinsurance business. *See* Ekwall Dep. Tr. 19:6-7.

17.    Mr. Ekwall testified that, after receiving the TIG Primary loss development triangles, he called Ms. Bohuslav and requested loss development factors, or the data necessary to prepare such factors, for the Virginia Surety business segment. Ekwall Dep. Tr. 24:11-16.    Mr. Ekwall alleges that, in response, Ms. Bohuslav advised him that loss development factors and/or data which could be used to create loss development factors for the Virginia Surety business segment "were not available." *Id.* at 24:24-25:4.    Mr. Ekwall testified that he did not insist that the Virginia Surety loss development information be obtained because he was assured by Ms. Bohuslav that the loss development triangles for the TIG Primary were "representative" of TIG's entire workers' compensation portfolio. *Id.* at 255:7-24; *see also* Ex. 907, Interrogatory Response at 15, ¶¶ (c), (d).

18.    Mr. Ekwall also testified that, based on his review of the TIG Primary triangles received on June 2, 1998, he noticed that development of the TIG Primary business "was better than national average" and was told by Ms. Bohuslav that TIG's development was better than national average because of the "superior claims handling" by "TIG and [its] agents." Ekwall Dep. Tr. 122:21-123:3; *see also id.* at 125:22-126:3, 128:1-18, 195:23-196:6; Ex. 907, Interrogatory Response at 15, ¶ (e).    Mr. Ekwall did not ask what Ms. Bohuslav meant by "superior," or why she believed, or how she knew, that TIG's claims handling was "superior." Ekwall Dep. Tr. 125:3-10.

19.    Mr. Ekwall has also alleged that, at some point during the negotiation of the 1998 Treaty, he was told by Ms. Bohuslav that TIG "had really cleaned up the book of business from the late '80s, early '90s.    Got out of the states . . . where they couldn't be competitive, and that the more recent years were more reflective of what the experience would

be going forward." Ekwall Dep. Tr. 432:7-433:5; *see also* Ex. 907, Interrogatory Response at 15, ¶ (f).

20.    On June 4, 1998, Mr. Ekwall issued a revised quote, reducing the rate for the $900,000 excess of $100,000 layer from 10.1% to 9.5% and reducing the rate for the $400,000 excess of $100,000 layer from 10.1% to 7.83%, with "[a]ll other terms and conditions apply[ing] from earlier quote/fax dated 5/27/98." Ex. 88.

21.    By facsimile dated June 11, 1998, Ms. Bohuslav advised Mr. Ekwall that TIG "had a competitive full conditions quote from a direct writer," but indicated that WEB would possibly land the account if it reduced its quote on the business segments other than MCI from 9.5% to 9%. Ex. 72. Without doing any further qualitative or quantitative analysis (Ekwall Dep. Tr. 136:22-137:7), Mr. Ekwall agreed to reduce WEB's quote. Ex. 73.

22.    On June 25, 1998, Mr. Ekwall again agreed to decrease WEB's quote on the MCI segment in response to another competitive quote. *See* Ex. 6 at AON02010. In addition, Aon agreed to reduce its brokerage (from 7.5% to 5% of ceded premium), resulting in a further decrease in WEB's quoted rate. Ex. 90.

23.    Ms. Bohuslav further advised Mr. Ekwall that TIG was prepared to bind WEB's quote "if we can make this a 3 year deal with no more than 10% annual increase each anniversary." Ex. 90. Mr. Ekwall agreed, and, by facsimile dated June 26, 1998 (Ex. 76), Ms. Bohuslav confirmed that "we have bound [WEB, on behalf of U.S. Life] 100% . . . effective April 1. 1998." *Id.*

24.    The Placement Slip for the 1998 Treaty was signed by WEB on behalf of U.S. Life on July 27, 1998 (Ex. 68) and the final contract wording was executed by WEB on November 12, 1998. Ex. 908.

25.    On September 17, 1998, TIG, through Aon, sent WEB provisional notice of cancellation of the 1998 Treaty effective January 1, 1999. Ex. 860. This allowed TIG the option, but not the obligation, to terminate the 1998 Treaty and, thus, the opportunity to determine whether, as of January 1, 1999, more favorable terms were available in the reinsurance market. *See* Exs. 860, 872.

26.    By cover letter dated November 11, 1998, Aon sent to certain specific companies, including WEB, a "1999 underwriting memorandum . . . for TIG's Workers' compensation renewal effective January 1, 1999" (the "1999 Renewal Submission"). *See* Ex. 78 at WEB00525. The cover letter set forth certain information regarding TIG's business and indicated that Aon "intend[ed] to present alternative quotes to TIG," including both a "full conditions coverage quote" and "a carve-out conditions quote," and invited WEB to "quote both ways" if it had the ability to do so. *Id.*

27.    The 1999 Renewal Submission contained a significant amount (in total, 257 pages) of narrative and statistical information concerning TIG's workers' compensation business, including an overview describing the business written in each TIG segment, its risk characteristics, the types of products being issued (*i.e.*, guaranteed cost, dividend or retrospective rated policies), the underwriting approaches and methodologies applied and the different entities that were underwriting the business and administering the claims. *See* Ex. 79 at WEB00146-52.

28.    The 1999 Renewal Submission also contained detailed premium and loss information, including listings of large losses (referred to as bordereaux) for the various business segments, *see* Ex. 79 at WEB00213-312, and projected loss ratios for the TIG Primary, Virginia Surety and Innovus business segments. *See id.* at WEB00313-43. The projected loss ratios for the Virginia Surety business segment (as of June 30, 1998) were consistent with the projected loss ratios contained in the 1998 Underwriting Information, showing that the business written in

that segment consistently deteriorated from 1994 through 1997, and that the deterioration had continued since the placement of the 1998 Treaty. *See id.* at WEB00217.

29.    The 1999 Renewal Submission also contained numerous loss development triangles and loss development factors for the Virginia Surety, TIG Primary, MCI and Commercial Specialty business segments. *See* Ex. 79 at WEB00227-28, WEB00241-46, WEB00254-62, WEB00264-65 and WEB00284-302. In total, the Renewal Submission contained nineteen pages of claim statistics, loss rates, triangles and development factors displaying in detail the actual and projected development of the Virginia Surety business. *See* Ex. 79 at WEB00217-35.

30.    The 1999 Renewal Submission also contained lists breaking down, on a state-by-state basis, the states in which the TIG business segments were writing business and the amount of business that was being written in each state. *See* Ex. 79 at WEB00160-64; Ex. 70 at WUW021275, WUW021296.

31.    Robin Ekwall was the individual at WEB who underwrote, priced, negotiated, and ultimately made the decision to bind Security Insurance Company of Hartford ("Security") to the 1999 Treaty. *See* Ekwall Dep. Tr. 313:11-15.

32.    Shortly after November 11, 1998, Aon sent WEB a CD-Rom containing individual claim data for each of the TIG workers compensation business segments that would be subject to the 1999 Treaty. *See* Ex. 224. Mr. Ekwall testified that when he tried to open the CD-Rom he found it to be "blank" and "useless" and that he called Ms. Bohuslav and "asked her to e-mail any data or put it on diskette." Ekwall Dep. Tr. 329:8-11. Subsequently, on November 24, 1998, Ms. Bohuslav sent an e-mail to Mr. Ekwall, with no note or text at all, attaching three data files containing individual losses excess of $25,000, evaluated as of three different points in 1996, 1997 and 1998. Ex. 227. Trustmark has alleged that TIG

misrepresented that the "three data files e-mailed to WEB on November 24, 1998 contained losses for all segments of TIG's workers compensation business" when, in fact, the data files were missing loss information for the Virginia Surety business segment. Ex. 907, Interrogatory Response at 27, ¶ (f).

33.    Mr. Ekwall testified at his deposition that he underwrote and priced the January 1, 1999 renewal based solely on the November 11, 1998 cover letter, the 1999 Renewal Submission and the claim data he received. Ekwall Dep. Tr. 313:2-16.

34.    Mr. Ekwall testified that he was able to recall only two topics discussed with Ms. Bohuslav in connection with the placement of the 1999 Treaty. *See* Ekwall Dep. Tr. 325:14-24. First, Mr. Ekwall recalled discussing with Ms. Bohuslav the fact that WEB would be able to provide a full conditions quote. *See id.* at 325:25-326:9. Second, Mr. Ekwall recalled discussions with Ms. Bohuslav in connection with WEB's subsequent quote to provide reinsurance to TIG for an additional layer of coverage ($50,000 excess of $50,000) for the Virginia Surety and Innovus business segments. *See id.* at 326:10-327:2.

35.    By fax dated December 6, 1998, WEB provided an initial quote on behalf of Security to provide "full conditions" reinsurance to TIG: (a) for 100% of the layer $900,000 excess $100,000 at the rate of 10.7% of subject premium; and (b) for 100% of the layer $400,000 excess $100,000 at the rate of 9.7% of the subject premium. Ex. 262.

36.    On December 7, 1998, TIG rescinded its provisional notice of cancellation on the 1998 Treaty, meaning that the 1998 Treaty would continue in full force and effect, thus rendering moot WEB's quote for the January 1, 1999 renewal. Ex. 872.

37.    WEB nevertheless continued to negotiate the January 1, 1999 renewal. By fax dated December 14, 1998, WEB provided alternative, lower quotes on both a "full conditions" and "carve-out" basis. Ex. 876. As Mr. Ekwall explained, he exercised "a judgment

call" to reduce his quote because "looking at the more recent years . . . the experience had been improving and I was comfortable . . . with lowering that rate based on the more recent years." Ekwall Dep. Tr. 431:8-12. Mr. Ekwall further asserts that his understanding of the improved results in the most recent years was based on an alleged discussion with Ms. Bohuslav during the placement of the 1998 Treaty that TIG "had cleaned up the book of business from the late '80s, early '90s [and] got out of the states . . . where they couldn't be competitive." *Id.* at 432:6-433:5.

38.    WEB reduced its quote twice more, again with no further quantitative or qualitative analysis. Exs. 909, 910. According to Ms. Bohuslav's contemporaneous fax to TIG, WEB advised her that it was WEB's "goal" to replace U.S. Life with Security as the reinsurer of the TIG business. Ex. 909. As a result, WEB ultimately quoted full conditions coverage for the layer $900,000 excess of $100,000 at the rate of 9.60%, and full conditions coverage for the MCI business segment at the rate of 6.8%. Ex. 269.

39.    By facsimile dated December 21, 1998 (Ex. 877), Ms. Bohuslav outlined Mr. Ekwall's terms and Mr. Ekwall returned the facsimile with a note stating "All OK, RBE, 12/21/98." By facsimile dated December 31, 1998 (Ex. 269), Ms. Bohuslav confirmed the binding of WEB's quote.

40.    In her December 21, 1998 facsimile (Ex. 877), Ms. Bohuslav advised Mr. Ekwall that "TIG will likely buy down Virginia Surety, possibly even Commercial Specialty to $50,000." Ms. Bohuslav further advised in her December 31, 1998 facsimile (Ex. 269) that "TIG is interested in pursuing buying down the [Virginia Surety] and Innovus portions, [and] would consider a rate in the range of 7.327%." The same day, Mr. Ekwall responded (Ex. 270) that "at best we could be at 9.00% [rate, but] we would want the [$50,000 excess of $50,000] buy down on all business and not just [Virginia Surety] & Innovus."

41.     Mr. Ekwall testified that he was then told by Ms. Bohuslav that "Virginia Surety was one of the better or the best segments of [TIG's workers' compensation] business." Ekwall Dep. Tr. 189:2-5. Mr. Ekwall did not recall asking any questions regarding how the Virginia Surety business was being managed. *Id.* at 192:20-22. Instead, Mr. Ekwall interpreted that Ms. Bohuslav's alleged comment "meant for us as an excess of loss reinsurer that we could expect better results on the Virginia Surety book." *Id.* at 192:6-19.

42.     On January 19, 1999, Mr. Ekwall issued a quote on behalf of Security of 9% of subject premium for 100% of the $50,000 excess of $50,000 layer for the Virginia Surety and Innovus business segments. Ex. 271. By facsimile dated February 3, 1999 (Ex. 274), Ms. Bohuslav confirmed the binding of WEB's quote. *Id.*

43.     In March 1999, Security entered into a Retrocession Agreement with Trustmark (Ex. 469) pursuant to which Security retroceded to Trustmark 100% of the accident and health risk it assumed under the 1999 Treaty. *See* Ex. 1, ¶ 32. The Retrocession Agreement was not signed by WEB on Trustmark's behalf until April 19, 1999. Ex. 469 at TM/S01720.

44.     In April 1999, Mr. Ekwall raised the question whether the data files that were e-mailed to him on November 24, 1998 contained Virginia Surety loss files. By e-mail dated April 29, 1999, Ms. Bohuslav incorrectly advised Mr. Ekwall that those data files contained Virginia Surety loss information. *See* Ex. 240. By fax dated June 9, 1999, Ms. Bohuslav voluntarily corrected herself and advised Mr. Ekwall that the data files that had been e-mailed to him on November 24, 1998 for the 1999 Treaty did not, in fact, include Virginia Surety loss detail. *See* Ex. 243. By letter dated August 9, 1999, Ms. Bohuslav provided Mr. Ekwall with a CD-Rom containing loss information for all of the TIG business segments, including Virginia Surety. *See* Ex. 247.

45.    Mr. Ekwall testified that:  (a) when Ms. Bohuslav advised him in June 1999 that the data files did not include Virginia Surety loss information, he asked for the missing information so that he could go back and revisit his pricing including the Virginia Surety losses and see what impact it had on his calculations (Ekwall Dep. Tr. 485:5-9); and (b) when he received the CD-Rom containing all of the loss information for all of TIG's business agreements *id.* at 488:23-489:16, he reviewed and analyzed the loss information on the CD-Rom with a view towards his pricing of the account, and he concluded that "based on this updated claims information, there wasn't a material change" in his pricing, and that he was therefore comfortable with his original pricing. *Id.* at 490:5-24.

46.    Trustmark has alleged that the statement in the 1999 Renewal Submission that the "[Virginia Surety] Program is expected to expand geographically somewhat from its traditional Midwestern base" (Ex. 79 at WEB00148) is a misrepresentation.  However, the evidence establishes that TIG expected Virginia Surety to expand in several states, including California, Florida and Pennsylvania. *See, e.g.*, Exs. 912, 913.

47.    Trustmark has alleged that the statement in the 1999 Renewal Submission that "TIG conducts annual Underwriting, Claims, and Actuarial reviews [of Virginia Surety]" (Ex. 79 at WEB00149) is a misrepresentation.  However, between 1994, the inception of the reinsurance relationship between TIG and Virginia Surety, and the end of 1998, when the 1999 Renewal Submission was sent to WEB, TIG conducted regular – at least annually, and often more frequent – underwriting, claims and actuarial reviews of Virginia Surety. *See, e.g.*, Ex. 474, 102, 188, 491, 105, 914, 915, 702, 123, 488, 916, 917, 137, 54.

48.    Although Mr. Ekwall was advised in the 1999 Renewal Submission that TIG conducted annual claim and underwriting audits, he never asked for copies of the audit reports or asked any questions regarding the results of the audits. *See* Ekwall Dep. Tr. 584:5-13.

49.    Trustmark has alleged that the statement in the 1999 Renewal Submission that "[m]ajor findings to date include a need to implement stronger managed care and injury management practices" (Ex. 79 at WEB00149) is a misrepresentation. However, the evidence establishes that TIG believed that Virginia Surety needed to implement stronger managed care and injury management practices, and that, during 1997 and 1998, TIG sought to improve Virginia Surety's managed care and injury management practices. *See* Exs. 795, 106, 108, 114; Chase Dep. Tr. 111:12-19, 113:3–114:20.

50.    Trustmark has alleged that the 1999 Renewal Submission contained a representation that "TIG workers' compensation business was properly reserved." However, the 1999 Renewal Submission does not contain a representation that "TIG workers' compensation business was properly reserved."

51.    In *Security Insurance Company of Hartford v. Trustmark Insurance Company*, Civ. No. 300CV1247(PCD), Gary Wood (a former TIG employee) was deposed. TIG was not present or represented at the taking of the deposition During that deposition, Mr. Wood testified that "it would be hard to meet the stringent requirements" of the 1999 Treaty. Wood Dep. Tr. 145:5-146:6. In this proceeding, Steve McElhiney, vice president of TIG's Reinsurance Services Division, testified that he was told by Mr. Wood that it would be "difficult, but doable," to comply with the loss reporting provision in the 1999 Treaty. McElhiney Dep. Tr. 146:15-147:7, 131:13-132:11.

52.    In an e-mail dated September 20, 1999, Mr. Wood explained that, while one system (the "TRACS" system) could not be used to generate the loss reports required by the 1999 Treaty, there were alternatives, involving a software query tool referred to as "PC Link," that were available and had been used to "provide this data in the past." Ex. 203.

53.    TIG uses today the same system that was in place in 1998 and 1999 to comply with the reporting requirements in the 1999 Treaty.  Westover Dep. Tr. 41:10-42:12.

54.    In this litigation, Trustmark is seeking "an award of damages equal to the amount of all net losses Trustmark has paid or is required to pay to Security on TIG Business retroceded to Trustmark by Security.  *See* Ex. 1 at 17; Ex. 918 (Trustmark's Rule 26(a)(1) Disclosure), ¶ (c).

Dated:    June 27, 2003

HURWITZ & SAGARIN, LLC

By: _David Slossberg /ks_____
        David Slossberg CT 113116

Daniel Sagarin CT 04289
147 North Broad Street
Milford, Connecticut 06460-0112
Telephone:  (203) 877-8000

CADWALADER, WICKERSHAM & TAFT LLP
Lawrence I. Brandes CT 23789
Harry P. Cohen CT 20446
Brian J. O'Sullivan CT 23790
100 Maiden Lane
New York, New York 10038
(212) 504-6000

Attorneys for Third Party Defendant
TIG Insurance Company

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a true and correct copy of the foregoing was sent by facsimile and federal express, this 27th day of June, 2003, to counsel of record for plaintiff Security Insurance Company of Hartford and defendant / third-party plaintiff Trustmark Insurance Company, addressed to:

Frank F. Coulom, Jr. CT 05230
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

Attorneys for Plaintiff
Security Insurance Co. of Hartford

David J. Grais CT 23352
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY 10019

Attorneys for Plaintiff
Security Insurance Co. of Hartford

Jeffrey Hellman CT 04102
Zeisler & Zeisler, P.C.
558 Clinton Avenue
P.O. Box 3186
Bridgeport, CT 06605

Attorneys for Defendant and
Third Party Plaintiff
Trustmark Insurance Co.

Mark B. Holton CT 21727
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193

Attorneys for Plaintiff
Security Insurance Co. of Hartford

Everett J. Cygal CT 22765
Schiff Hardin & Waite
6600 Sears Tower
Chicago, IL 60606-6473

Attorneys for Defendant and
Third Party Plaintiff
Trustmark Insurance Co.

_____
Brian J. O'Sullivan