material (and in fact central) to WEB's decision to bind Security to reinsure the TIG Portfolio, and to the creation of Trustmark's obligations to reinsure Security on that portfolio.

### 1. Prelude to the Fraud – TIG Determines To Lower Its Retention Dramatically, to Pass a Known Loss Problem to its Reinsurers

Up until April of 1998, TIG retained a large amount of the risk associated with the claims made under its Workers' Compensation Portfolio, purchasing only "high layer reinsurance" with attachment points "typically starting at $1,000,000 per occurrence." (TIG Ans. ¶ 13).   By early 1998, however, TIG decided it no longer wanted to retain such a high level of risk, and instructed its agent AON to secure reinsurance for it at a dramatically lower retention.   (Trustmark Resp. at ¶¶ 4-5). TIG's motives for this change were far from pure.  As outlined immediately below, TIG sought a lower retention in order to pass on a known deteriorating loss problem to its reinsurers, particularly with the VSC Block – the largest block of the TIG Portfolio – which had fallen into significant trouble.   As reflected in their communications with WEB, TIG/AON aggressively pursued this reinsurance, and in that process chose not to disclose the full nature of the risk to WEB, which represented Security and Trustmark (Trustmark Resp. at ¶¶ 5, 9, 13, 17, 29, 44; *see also* Trustmark Resp. at Ex. 1120, Ekwall Supp. Decl.).

### 2. TIG/AON Misrepresents The Reason For Purchasing Low Layer Reinsurance.

When AON approached WEB, Ms. Bohuslav falsely represented to them that TIG's reason for securing the cover was to stabilize its business in preparation for a sale of TIG's business.  (Trustmark Resp. at Ex. 1121, Ekwall Decl. ¶ 17a; *see also* Trustmark Resp. at ¶ 5.)).   The true motivation behind TIG's decision to lower its retention with respect to this business was TIG's knowledge that loss experience was

going up and that there was a deterioration in the underwriting results of the VSC Block.

At the same time TIG/AON began soliciting WEB, TIG actuary Tony Tio wrote an April 8, 1998 memorandum identifying numerous problems with the Virginia Surety experience including:  loss ratios "tend to deteriorate when volume increases radically", competition pressures "causing policies to be written at lower margins (sometimes below cost);" and a 1997 underwriting year loss ratio 24.3% higher than the 1996 underwriting year at comparable durations (Trustmark Resp. at Ex. 60-61, (TIG/T105817)).  Had WEB known the true reason for which TIG sought reinsurance starting with the 1998 deal, WEB would not have bound Security or its retrocessionaire to reinsure the TIG Portfolio or would have done so on substantially different terms.  (Trustmark Resp. at Ex. 1121 (Ekwall Decl. 17a)).

While challenging Mr. Ekwall's credibility (TIG Mem. p. 25, fn.11), TIG nonetheless contends that summary judgment is proper becuase its "motivation for purchasing reinsurance is immaterial as a matter of law." (TIG Mem. p. 25).  The case cited by TIG, however, does not support that proposition.  In fact, the opinion carefully distinguishes its facts from those before this Court, in a quotation that bears repeating:

> **A reinsurer fully advised of the insured's prior claims experience** ... then 'weighs its exposure against the premium which it, itself receives."... **In that calculus**, the reinsured's profit plays no part."

Carlington Australia Gen. Ins. Ltd. v. St. Paul Fire & Marine Ins. Co., 722 F. Supp. 48, 53 n.1 (S.D.N.Y. 1989)(emphasis supplied).  Those statements are very different than TIG suggests.  In the case before this Court, the reinsurers were not "fully advised of the insured's prior claims experience"  Furthermore, it is not the reinsurer's profit that TIG failed to disclose, but the deteriorating experience of the book itself that motivated

the purchase of reinsurance. TIG's motive in reinsuring this risk – and the difference between its public and its internal statements – would have been material to a prudent underwriter, and were in fact material to Mr. Ekwall in his evaluation of whether to bind his clients to this transaction [Trustmark Resp. at Ex. 950, Jessel Rpt. at 3-4).

The standard here was not caveat emptor; instead, the law reflects that reinsurer should have full disclosure of all material information when contracting. TIG/AON had an affirmative duty of utmost good faith to tell Trustmark that it was lowering its retention point because it was projecting increased exposures, and then to disclose the full extent of those losses.  It did neither.

Finally, TIG argues somewhat desperately that "there is no relationship between TIG's motivation for buying down its retention in 1998  and 'the gravity of the risk' assumed by Trustmark under the 1999 Treaty" (TIG Brf. at 26).  Telling, TIG makes this bald assertion of fact without a supporting citation.  This issue, like the other material issues of fact, is for the jury to decide.

### 3. Material Information was Withheld From or Misrepresented by AON and TIG.

TIG makes much of the number of pages in its placement materials.  The record demonstrates, though that the 1998 and 1999 placement materials were missing key information.  First, these were "ground up" numbers, which meant that they presented a snapshot of the performance of the book, as a whole, as of a particular in time (Trustmark Resp. at ¶¶ 9, 27 & Ex. 1120, Ekwall Supp. Decl. ¶ 4).  Nowhere in those many pages and charts did TIG tell the reader how a particular *layer* of risk was performing.  Because these were summary, "ground up" statistics, they did not permit an underwriter to evaluate the performance of the excess layer that WEB was

underwriting for Security and Trustmark (Trustmark Resp. at ¶¶ 10, 27 & Ex. 1120, Ekwall Supp. Decl. ¶ 4).

Second, even in the computerized data that Mr. Ekwall requested and received thereafter, significant amounts of data for the Virginia Surety book of business were missing.  In August 1999, when Sheila Bohuslav of AON finally provided more detailed Virginia Surety data, she concealed the effect of AON's prior omission of crucial data, by misrepresenting the data she provided to Mr. Ekwall as "updated" when, in fact, it was over ten months old (Trustmark Resp. at ¶ 44 & Ex. 1120, Eckwall Supp. Decl. ¶ 12).

Mr. Ekwall has examined the triangles and other data Ms. Bohuslav withheld from him, despite his request for it.  He will testify at trial that the information in Exhibit 243 shows a deterioration in the VSC block otherwise hidden from him, and would have been extremely material to his decision to bind the resinurance for both 1998 and 1999 (Trustmark Resp. at ¶ 45 & Ex. 1120, Eckwall Supp. Decl. ¶¶ 11-14). Moreover, TIG clearly knew of significant problems with the loss development and claims handling of the VSC Block and other pieces of the TIG Portfolio (Trustmark Resp. at Ex. 1121, Eckwall Decl. ¶ 17d).

TIG's knowledge of problems with the TIG Portfolio stretched to the highest levels (Trustmark Resp. at ¶ 50).  A remarkable number of other documents dated in November of 1998 and produced by Fairfax indicate known trouble overall at TIG, as well as within the Virginia Surety, Innovus, and MCI segments of the TIG Portfolio, and the motivation in bad faith to push the known problems off on reinsurers (Trustmark Resp. at ¶¶ 47, 49 & 50).[3]

---

[3] It should be noted that Fairfax acquired TIG in April, 1999, but has disposed of most of the documents concerning the acquisition during the pendency of this action.  Mr. Watsa's memorandum is on of the few survivors of what one might call the

All of this evidence creates a jury issue whether TIG acted fraudulently and in bad faith.  *See Christiana*, 979 F.2d at 280 (it is the cedent's duty "to place the underwriter [i.e. WEB] in the same position as himself [and] to give him the same means and opportunity of judging the value of the risks") (citation omitted).  The bottom line is that as Mr. Ekwall conducted his underwriting and due diligence in the summary of 1998 (which also served as a foundation for his underwriting of the 1999 Treaty just a few months later), TIG and Ms. Bohuslav carefully omitted any material that would have revealed to Mr. Ekwall the true nature of the risk to which he was binding the reinsurers he represented, all the while touting the TIG Portfolio as better than industry average, with superior underwriting and performance.  If WEB had known this information, WEB would not have bound Security to reinsure the TIG Portfolio or would have done so on substantially different terms, and WEB would not have bound Trustmark to serve as Security's retrocessionaire with respect to the TIG Portfolio or would have done so on substantially different terms (Trustmark Resp. at Ex. 1121,  Ekwall Decl. ¶ 17d).

TIG's response is to argue that Trustmark will not be able to tender clear and convincing evidence of Mr. Ekwall's reasonable reliance on Ms. Bohuslav's representation that the loss development factors he was given were representativeof the entire portfolio (TIG Brf. at 26).  As a primary matter, whether Mr. Ekwall's reliance was reasonable is a question for the jury to decide.  *See First Federal Savings*

---

great "TIG/Fairfax document clean up" (*i.e.* spoliation).  Fairfax produced a mere 527 pages of documents, containing 61 fully redacted pages and 31 pages containing partial redactions.  The remainder of the documents from the due diligence for Fairfax's $847 million acquisition of TIG were destroyed sometime after February 10, 2003 (Sammy Chan Dep. at 24-25, 36-38, 58-59, 187-190).  This conduct of spoliation merits at a minimum another issue for trial – was another "smoking gun" about TIG present in the documents destroyed?  The jury should hear the evidence of spoliation in deciding about TIG's motives.

*and Loan Assoc. v. Kijanko*, 1999 WL 73793, at *5 (Conn. Super. Ct. Feb. 4, 1999) (Denying plaintiff's motion for summary judgment because "the question of whether or not [defendant] could have reasonably relied on any promises made by [plaintiff] is an issue of fact for the jury to decide, not the court.  The issue of reasonableness is properly left for the jury to decide").  Indeed, the Connecticut] Supreme Court  has "consistently held that reasonableness is a question of fact for the trier to determine based on all of the evidence." *Williams Ford, Inc.*, 232  Conn. at 580, 657 A.2d at 222.

In addition to the fact that a jury, not a judge, should decide whether Mr. Ekwall's reliance was reasonable, Trustmark has sufficient evidence to meet its burden of demonstrating that Mr. Ekwall reasonably relied on TIG's misrepresentations. This is certainly true in light of TIG's duty of good faith to its retrocedents.  See *Unigard Security Ins. Co.* 4 F.3d at 1067.  Accordingly, it would be TIG's duty to clarify its information, not Mr. Ekwall's duty to try and figure out if he was given misinformation.

TIG also takes the unsupportable position that Mr. Ekwall could not reasonably rely on the misrepresentation because it is "inherently incredible" (TIG Brf. at 26).  In many regards, it is typical for a sample to be representative of a greater pool for statistical and evaluative purposes (*e.g.*, medical studies, politicians).  Mr. Ekwall was given loss development factors for a part and told that the part was representative of the whole, but the whole was not available.  There is nothing "inherently incredible" in the idea that a part is representative of the whole.

TIG further argues that because it is "inherently incredible" for a part to be representative of the whole (which it is not), that Mr. Ekwall "must have known" that TIG's misrepresentation was nothing more than rank speculation, upon which Mr. Ekwall could not reasonably rely. (TIG Brf. at 26).  TIG is rather bold in asserting what

Mr. Ekwall "must have known" without citing any facts to support Mr. Ekwall's alleged knowledge. The jury should hear what Mr. Ekwall has to say on the subject.[4]

Trustmark will also present the testimony of experienced London reinsurance underwriter Richard Jessel. Mr. Jessel will testify that based on his examination of the facts, "The data provided to WEB was supposed to be the entire data and in fact was missing the data for VSC, which invalidated the original rating exercise that WEB had performed" (Trustmark Resp. at Ex. 950, Jessel Rpt. at 4). Mr. Jessel will further testify that ". . . had WEB been provided with the full data set that contained all the claims including those for Virginia Surety then WEB may well have chosen not to provide any quote at all or at least provided a quote that was more in line with those of the rest of the market." (Trustmark Resp. at Ex. 950, Jessel Rpt. at 4). Mr. Jessel will also opine that when he re-underwrote the 1999 reinsurance taking into account the missing data, he arrived at significantly different pricing. Indeed, the ultimate test of materiality is what difference would the information have made. Mr. Jessel's results indicate a significant rating difference. (Trustmark Resp. at Ex. 950, Jessel Rpt. at 5).

---

[4] Finally, the cases cited by TIG to support its proposition the misrepresentation was "rank speculation, on which no experienced underwriter could reasonably rely," are inapposite. In *Quinn v. The McGraw-Hill Co. Inc.*, the Seventh Circuit found *Quinn* case found that bank owner's reliance on a seller's oral promise that particular bonds would be rated "A," was unreasonable in light of the fact that the bank owner had received written materials indicating that the rating could change. *Quinn v. The McGraw-Hill Co. Inc.*, 168 F.3d 331, 336 (7th Cir. 1999). The *Fax Telecommunicaciones* case found that a telecommunication customer's reliance on a promise of a lower rate, where the filed rate is conclusively presumed, was unreasonable. *Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 490 (2d Cir. 1998). These cases both stand for the idea that one cannot reasonably rely on an oral representation in the face of an opposing written representation and neither case contemplates a reinsurer's duty of good faith to its retrocedents. Here, Mr. Ekwall was given information in writing, and told by one who has a duty of good faith, that the information was representative, e.g. the written representation and the oral representation were the same. Mr. Ekwall's reliance was reasonable, especially in light of TIG/AON's good faith obligations.

While the evidence already presented makes a compelling fraud claim, and an issue for the jury as to AON/TIG's fraud, Ms. Bohuslav's subsequent attempts at a coverup – to lull her victim Robin Ekwall into taking no steps to expose her fraud – put a final nail in the coffin of AON/TIG's fraudulent intent.

### 4.    The Materials Withheld Were Factual In Nature.

TIG's response to certain misrepresentations, such as of the statement that TIG had better that average loss development attributable to superior claims handling, is to take the untenable positions that this statement was merely opinion, that Mr. Ekwall did not undertake any further investigation of this statement, and that he had no reasonable basis to rely on it (TIG Brf. at 27-29). Each one of these positions fails for several reasons, not the least of which is that TIG, once again, disregards the fact this statement was made during the placement of a reinsurance contract, when it owed a duty of good faith to its retrocedents.

The requirement for a fraud claim that the statement be one of fact "focuses on whether, under circumstances surrounding the statement, the representation was intended as one of fact as distinguished from one of opinion." *Anastasia v. Beautiful You Hair Designs, Inc.*, 61 Conn. App. 471, 478, 767 A.2d 118, 123 (2001); *Crowther v. Guidone*, 183 Conn. 464, 468; 441 A.2d 11, 14 (1981). The circumstances surrounding this statement were that TIG owed a duty of good faith to disclose its "claims-handling efforts." This duty, coupled with the statement on claims handling, underscores that factual nature of the statement.

Second, the statement that TIG's claims handling is superior is not "merely an expression of her opinion," because superior claims handling would result in a lower loss ratio. This is an objectively comparable numerical fact (comparing the reduction

-22-

in TIG's loss ratio through claims handling versus other insurers' reduction in loss ratio through claims handling), which takes it outside the realm of opinion.

### 5.    Other Written Misrepresentations in the 1999 Placement Materials.

In October 1998, TIG/AON provided WEB with certain placement materials relating to the TIG Portfolio that purported to provide information relating to the nature of the risks insured by TIG and the financial performance of the TIG Portfolio (Trustmark Resp. at ¶ 3, the "1999 Placement Materials"). WEB reviewed and relied upon the Placement Materials provided by TIG in order to evaluate the risk presented by the TIG Portfolio, price the reinsurance, and decide whether to offer any reinsurance on the TIG Portfolio in the first instance (Trustmark Resp. at Ex. 1121, Ekwall Decl. ¶ 10). Indeed, TIG admits that "as a general proposition, underwriters for insurance companies review and rely upon placement material in order to evaluate the risk, price the reinsurance and decide whether to offer any reinsurance on the risk in the first instance" (TIG Ans. ¶ 16). TIG, through AON, made numerous misrepresentations and omissions of material facts to WEB in its Placement Materials relating to the TIG Portfolio and during the verbal consultations which WEB had with Ms. Bohuslav at AON. (Ekwall Decl. 16; *see also* Trustmark's Second Supp. Resp. to TIG Interrogatories) (verified by M. Hawksworth).

### a.    Geographic Expansion

TIG/AON represented to WEB in the 1999 Placement Materials that the VSC Block was expected to expand geographically (Trustmark Resp. at ¶ 46). At the time these representations were made, however, TIG was aware that Virginia Surety had sent a notice of cancellation of its agreement with TIG, terminating its agreement as of July 1, 1999 (Trustmark Resp. at Ex. 1121, Ekwall Decl. ¶ 17f & Ex. 12 attached thereto). The termination of the VSC Agreement was never communicated to Mr.

Ekwall by either TIG or AON. (Trustmark Resp. at Ex. 1121, Ekwall Decl. ¶ 17f). Had WEB been informed that the VSC Block was being terminated, WEB would not have bound Security to reinsure the TIG Portfolio or would have done so on substantially different terms, and WEB would not have bound Trustmark to serve as Security's retrocessionaire with respect to the TIG Portfolio or would have done so on substantially different terms. (Trustmark Resp. at Ex. 1121, Ekwall Decl. ¶ 17f).

TIG's response is to claim that the misstatement about expansion was a statement of future intent "that relates to future or contingent events" and is therefore not actionable as a matter of law. (TIG Brf. at 30). TIG misses the point. TIG's misstatement clearly implied that there was a future for the VSC segment – something it knew was not true given the notice of cancellation. "The test for whether a statement is one of opinion or fact is whether 'under the circumstances surrounding the statement, the representation was intended and understood as one of fact as distinguished from one of opinion.'" *Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2d Cir. 1987); *Omega Engineering, Inc. v. Eastman Kodak Co.*, 908 F. Supp. 1084, 1097-98 (D. Conn. 1995) In *Omega*, the Court held that the statements at issue were properly considered statements of ***fact***: "[T]he figures which expressed the alleged misrepresentation were furnished as estimates and approximations. But they were represented to be the result of expert engineering examination, and at least approximately accurate...." *Omega*, 908 F. Supp. at 1098; "The requirement that a representation be made as a statement of fact 'focuses on whether, under the circumstances surrounding the statement, the representation was intended as one of fact as distinguished from one of opinion.' " *Meyers v. Cornwell Quality Tools, Inc.*, 674 A.2d 444 (Conn. App. Ct. 1996). Here, the jury should consider the issue that TIG's statement about the future was coupled with the knowledge that it likely could not

carry out that future expansion simply *because VSC had cancelled*. *See New Horizon Financial Services, L.L.C. v. First Financial Equities, Inc.*, 175 F. Supp. 2d 348, 352-53 (D. Conn. 1997) (A promise to do something in the future is actionable when the promise is coupled with a present intention not to fulfill the promise); *Mitchell v. Mitchell*, 625 A.2d 828 (Conn. 1993).    Therefore, TIG/AON's misrepresentation regarding expansion served to conceal material information on the cancellation by VSC.

### b.    Muirfield Audit Coverup

The 1999 Placement Materials also stated the following about the VSC block:

> In addition to day to day Program Management, TIG conducts annual Underwriting, Claims, and Actuarial reviews of this business unit.  Major findings to date include a need to implement stronger managed care and injury management practices.

(Trustmark Resp. at ¶ 3 quoting, Ex. 79 thereto; TIG Ans. ¶ 18).

On May 5-8, 1998, more than five months before AON prepared the Placement Material and presented it to WEB, TIG personnel conducted an Actuarial, Claims and Underwriting Audit of Muirfield Underwriters, the AON-related MGA for the VSC book. (Trustmark Resp. at Ex. 1121, Ekwall Decl. At Ex. 8 attached thereto (the "Murifield Report"); TIG Ans. ¶ 20).    Muirfield Underwriters was the managing general underwriter for VSC, as discussed above one of the largest segments of the TIG Portfolio.  (Trustmark Resp. at Ex. 1121, Ekwall Decl. ¶ 17b & Ex. 8 attached thereto). Neither TIG nor AON provided WEB with a copy of the May 1998 Muirfield Report. (Trustmark Resp. at Ex. 1121, Ekwall Decl. ¶ 18).  With hindsight, that should be no surprise.

The Muirfield audit found significant and systemic problems with the VSC Block, including its pricing and reserving. (Trustmark Resp. at Ex. 1121, Ekwall Decl. ¶ 17b at Ex. 8 attached thereto)  TIG never disclosed these pricing and reserving

-25-

problems to WEB.  (Trustmark Resp. at Ex. 1121, Ekwall Decl. ¶ 17b).  Rather, TIG designed the Placement Materials specifically to mislead WEB as to this subject by representing that the one major finding of the Muirfield Audit was "a need to implement stronger managed care and injury management practices" (*id*).  This representation was false and TIG knew that it was false when made because other findings of the Muirfield Audit disclosed significant reserving and pricing problems with the VSC Block.

Even Jack Powell, a TIG Vice President who oversaw the Muirfield audit, admitted the following:

> Q:    Okay, sir.  Were the need to implement stronger managed care and injury management practices, were those the major findings of the audit that you conducted of Muirfield, sir?
>
> A:    No.

(J. Powell Dep. P. 178) (objection omitted); *See also* C. Smith Dep. P. 161).

Had WEB been advised of these problems, WEB would have declined to bind Security to reinsure the TIG Portfolio or would have done so on substantially different terms, and WEB would have declined to bind Trustmark as Security's retrocessionaire with respect to the TIG Portfolio or would have done so on substantially different terms (Trustmark Resp. at Ex. 1121, Ekwall Decl. ¶ 17b.)   Trustmark's expert, Richad Jessel, confirms the materiality of this information:

> Had WEB known the information contained in the Muirfield Audit of May 1998 (marked as Exhibit 123) that AON had in its possession but saw fit not to disclose to WEB with the rest of the placing information and had WEB been provided with the full data set that contained all the claims including those for Virginia Surety then WEB may well have chosen not to provide any quote at all or at least provided a quote that was more in line with those of the rest of the market."

(Trustmark Resp. at Ex. 950, Jessel Rpt. At 4). It is for the jury to weigh and consider these material misrepresentations and omissions in deciding whether Trustmark has proven a fraud case against TIG.

TIG contends that Ekwall's testimony that TIG "implicitly represented" that the VSC business was adequately reserved is insufficient to support Trustmark's claim (TIG Brf. At 32). TIG cites to *Mutuelle Generale Francaise Vie v. Life Assur. Co. of Pa.*, 688 F. Supp. 386, 395 (N.D. Ill. 1988) for the proposition that "implicit representations" are insufficient as a matter of law to support a fraud claim. *Mutuelle* is inapplicable to the claims presented here, as that court addressed on a motion to dismiss whether as a matter of pleading the plaintiff's allegations were sufficient to state a claim for fraud. There, the court held that such allegations related to plaintiff's breach of contract claim and could not, under the circumstances presented, be "shoehorn[ed]" into a tort claim. *Id.* Further, the *Mutuelle* court noted that under Illinois law, the failure to disclose or the "concealment of facts" constitutes fraud when done with the intention to deceive under circumstances creating an opportunity and duty to speak. Similarly, in Connecticut, "fraud by nondisclosure" is actionable where the party fails to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak." *See, e.g.*, *Wedig v. Brinster*, 469 A.2d 783, 788 (Conn. App. Ct. 1983); *Sullivan v. Mang*, 2002 WL 31000170, *3 (Conn. Super. Ct. 2002). As noted previously, the duty to disclose all relevant facts is a fundamental obligation of a ceding insurer. In providing reserving information to WEB, TIG had the duty to advise Trustmark if that reserving (a fundamental aspect of any risk) was not adequate. Thus, TIG's concealment of the true state of reserving is further evidence of their fraudulent conduct.

-27-

### c.    Misrepresenting The VSC Block As Desirable And Profitable

Ms. Bohuslav also orally misrepresented to Mr. Ekwall that the VSC Block was one of the most desirable and profitable segments of the TIG Portfolio (Trustmark Resp. at ¶ 71 (Ex. 1121, Ekwall Decl. ¶ 17c)). This representation was false and TIG knew it was false when made given the systemic pricing and reserving problems discovered by TIG when it audited Muirfield Underwriters, as discussed in detail above. Moreover, WEB was never informed by TIG or AON that the audit had revealed such problems (Trustmark Resp. at ¶ 69). Indeed, the Virginia Surety Block suffered from a variety of serious problems (Trustmark Resp. at ¶¶ 60-63, 66-69). As discussed above, Ms. Bohuslav withheld the Karen Rivara actuarial report (including loss development information) from Mr. Ekwall as well. Moreover, just shortly before TIG presented its 1999 Placement Materials to WEB, it had a quarterly report written by its actuary Tony Tio entitled "Virginia Surety Experience as of 9/30/98." (See Ex. 54, page TIG 110871). This report, addressed to Jack Powell, who was TIG's Vice President, indicated: that "Projected loss ratios have been steadily increasing," and was never revealed to WEB (id.). A jury should be permitted to consider this fraud claim as well.

### d.    Misrepresenting TIG's Ability To Report Losses

TIG represented in the Security/TIG reinsurance Agreement that it would report the claims and losses on a monthly basis: "The Company shall provide monthly bordereaux of losses within 30 days" (Trustmark Resp. at 72 & Ex. 1121, Ekwall Decl. ¶ 17e). In the reinsurance industry, a borderean is a term of art in the reinsurance industry; this court has already ruled that the issue is disputed here of its definition. (Trustmark Resp. at ¶ 28). TIG, however, made this representation knowing it had no ability to comply.

-28-

TIG's upper management had been advised by AON that it did not have the capability to perform these obligations  (Trustmark Resp. at 51 (Deposition of Gary Wood, at pp. 46, 112-114, 180-181)).  Mr. Wood, the TIG employee responsible for preparing the bordereaux, warned TIG's senior management that TIG did not have the capability to provide a "monthly bordereaux of losses within 30 days."  (Trustmark Resp. at ¶74) (Wood Dep. at  46, 112-114, 180-181.)[5]  Mr. Wood told this to TIG's senior management prior to their acceptance of the TIG/Security Contract (*Id.*).  TIG did not have an automatic system in place to identify claims that were required to be reported (Trustmark Resp. at 76 (Wood Dep. at 48-49)).  TIG could not comply with its reporting responsibilities (Trustmark Resp. at 53, 75  (Wood Dep. at pp. 48-49, 180-181)).  This warning was ignored by TIG's upper-management and TIG agreed to provide a monthly bordereau of losses to Security as part of the TIG/Security Agreement (Trustmark Resp. at 77].

Had WEB been informed that TIG would not be able to timely and accurately report losses, WEB would have never bound Security to reinsure the TIG Portfolio, nor would it have bound Trustmark to serve as Security's retrocessionaire with respect to the TIG Portfolio.  (Trustmark Resp., Ex. 1121, Ekwall Decl. 17e.)  Moreover, Trustmark's underwriting expert, Mr. Jessel, has opined the following on this point:

> The contract provided considerable comfort to a prudent underwriter in that it allowed for monthly reporting of claims.  This monthly reporting of

---

[5] TIG argues that Mr. Wood's testimony should be disregarded because Trustmark cites his deposition given in another case.  Gary Wood was named in Trustmark's Rule 26(a)(1) supplemental disclosures as a potential trial witness, served on February 28, 2003.  TIG had a meaningful opportunity to take his deposition prior to the close of discovery and chose not to do so.  As the very authority cited by TIG demonstrates, Mr. Wood's deposition, under oath, holds the same value as an affidavit for summary judgment purposes.  *See* 8A Charles A. Wright, *et.al.*, Federal Practice and Procedure § 2142 (1994) ("A deposition is at least as good as an affidavit and should be used whenever an affidavit would be permissible, even though the conditions of [Rule 32(a)] on the use of a deposition at trial are not satisfied").

claims would indicate good risk management in that it shows an efficient office that keeps on top of its claims and it indicates that there is an efficacious reserving policy in place. . . . As it turns out there was a problem with two of the vital elements mentioned above; the risk management turned out to be considerably different than that which WEB had been led to believe. . . . Had WEB also known that TIG had no way of fulfilling its stated intention to provide monthly claims data it might have considerably reduced the comfort level that WEB had assumed when that feature was promised.

(Trustmark Resp. at Ex. 950 (Jessel Report. at 4)).   A jury should be permitted to consider this fraud claim as well.

**B.      Robin Ekwall Reasonably Relied On TIG/AON's Misrepresentations.**

TIG spends much time, in several different parts of its memorandum, trying to convince the Court that Trustmark's underwriter, Robin Ekwall, could have somehow discovered all of TIG and AON's shenanigans if he had only asked the right questions, and that therefore TIG should have summary judgment (TIG Brf at . 8-9, 12, 15, 28-29, 32, 37).  This is nonsense.  TIG is essentially claiming that Mr. Ekwall should have asked AON questions such as "Say, you guys didn't do anything to play around with these numbers, did you?" or "Is there anything else you're not telling me?  Are you sure – cross your heart?"

TIG also argues that Mr. Ekwall should have known better than to rely on Ms. Bohuslav's statements. (TIG Mem. pp. 28).  This too, is nonsense.  Ms. Bohuslav was working for AON, one of the most widely recognized insurers in the country.  AON had a multi-level participation in this transaction – AON was TIG's broker, as well as owner of VSC and Muirfield, and Cambridge International, a third party administrator on much of the TIG portfolio at issue.  AON cannot play the empty head routine to escape on summary judgment.  The jury should hear the evidence.

Finally, Trustmark will offer at trial the opinion of Richard J. Jessel, a highly experienced reinsurance underwriter, on the issue of whether Mr. Ekwall acted as a

prudent underwriter with respect to the TIG workers' compensation portfolio. (Jessel Expert Report). He concluded he did. (Jessel Expert Report). Mr. Jessel has stated: "At the submission level, in this case, WEB was provided with a highly persuasive set of information by AON, including communications between WEB and AON. Given the nature of that information a prudent underwriting analysis could have concluded that this was an acceptable risk" (Trustmark Resp. at Ex. 950, Jessel Rpt., at 5).

At a minimum, this Court cannot resolve the issues raised in the various experts' reports, and must leave this responsibility to the jury. *See e.g.*, *Cortland Raquet Club v. Oy Saunatec, Ltd.*, 2003 WL 1108740, at *5 (S.D.N.Y. 2003).

When TIG discusses the 1999 Placement materials, it mischaracterizes the materials in an attempt to convince this court to grant summary judgment. Again, all TIG does is point to yet another factual issue in the case. TIG asserts that the 1999 Placement Materials also contained detailed premium and loss information, including listing of large losses referred to as "bordereaux." (TIG Brf. at 11). TIG appears to be arguing that it was sufficient and all they had to generate for WEB. Mr. Ekwall will testify that this is not only a misstatement of the term "bordereaux," but that, again, the 1999 Placement materials did not provide him sufficient information to perform his underwriting, which is why he needed (and relied upon) the claims data given to him by Ms. Bohuslav on November 24, 1998 by means of three e-mail attachments. (Exhibit 227; Trustmark Resp. Ex. 1120, Ekwall Supp. Decl). Trustmark has already discussed at length the incompleteness of this data and misrepresentations connected thereto. Whether Mr. Ekwall had sufficient information to underwrite from within the 1999 Placement Materials alone is yet another issue for the jury, at best. It cannot justify summary judgment.

**C.    TIG/AON's Misrepresentaions And Omissions Were Material.**

TIG argues that the misrepresentations made by TIG/AON were immaterial. (TIG Brf. at 25. This argument is no basis for a summary judgment.

First, Mr. Ekwall has testified that had TIG's placement materials contained the true facts, WEB "would have declined to bind Trustmark with respect to the TIG Portfolio or would have done so on substantially different terms." (Transmark Resp. at Ex. 1121, Ekwall Decl. ¶ 17(a)-(f). This is a textbook definition of materiality. *See Christiana*, 979 F.2d at 278 ("A fact is material so as to void *ab initio* an insurance contract if, had it been revealed, the insurer or reinsurer would either have not issued the policy or would have only at a higher premium."). Material facts in the context of reinsurance are those "likely to influence the decisions of underwriters," that is, facts which had they been revealed "would have either prevented a reinsurer from issuing a policy or prompted a reinsurer to issue it at a higher premium." *Union Indemnity*, 674 N.E.2d at 319.

Trustmark has offered the opinion of Richard J. Jessel, a highly experienced reinsurance underwriter, on the issue of materiality.    (Jessel Expert Report). Following a detailed analysis, Mr. Jessel has concluded that the late disclosures and non-disclosures by TIG/AON would have been extremely material to a prudent underwriter in evaluating whether to reinsure the risks presented by the TIG workers' compensation Portfolio (Trustmark Resp. at Ex. 950, Jessel Rpt. At 4.). Moreover, Mr. Jessel has also done a rating analysis. The ultimate test of materiality is what difference would the information have made. Mr. Jessel's results indicate a significant rating difference (*id*).

**D.    The Record Is Replete With Evidence That Tig/Aon's Fraud And Misconduct Damaged Trustmark**

Unable to deny that the ceded losses on the TIG Portfolio exceed premium paid by tens of millions of dollars, as to damages, TIG argues (as it has unsuccessfully throughout its motion) that Trustmark cannot sustain its burden of proof (TIG Brf. at 38-40). Specifically, TIG contends that Trustmark has "no evidence" that its damages have been proximately caused by TIG's fraud. (TIG Brf. p. 39). TIG's selective view, however, ignores not only the law, but also a record replete with evidence that TIG/AON's fraud and negligent misrepresentations caused Trustmark's damages.[6]

First, proximate cause is ordinarily a question of fact that should properly be left to the jury's determination. *Johnson v. Flammia*, 169 Conn. 491, 496, 363 A.2d 1048, 1052 (1975) (citation omitted). As such, it should not be decided on summary judgment.

The jury here should decide if Trustmark's evidence proves that TIG/AON's fraud caused Trustmark to sustain net ceded losses on the TIG Portfolio. Mr. Ekwall's testimony is clear (and in fact is *unrebutted*) that he would not have bound Security or Trustmark to the TIG business, or would have done so on substantially more favorable terms, had he known the truth that was known to TIG/AON (Trustmark Resp. at Ex. 1121, Ekwall Decl. ¶ 17a-f). Underwriting expert Mr. Jessel corroborates and confirms Mr. Ekwall's testimony, both by confirming the materiality of the information TIG/AON withheld, and testifying to the significant difference that the fraud made in Mr. Ekwall's underwriting (Trustmark Resp. Ex. 950, Jessel Rpt. at 3-6). The causal chain could not be clearer:

---

[6] TIG's attack on damages is limited to Trustmark's fraud claims. TIG does not argue that Trustmark has not sustained damages from TIG's negligent misrepresentations.

TIG/AON commit fraud and negligent misrepresentation    ⇒

Mr. Ekwall Enters Agreement    ⇒

<u>Trustmark sustains net ceded losses</u>

The bottom line is that Trustmark would not be left holding the bag on ceded losses if TIG/AON complied with the duty of utmost good faith and disclosed fully the information available to them.  Trustmark would have never entered the deal.

Finally, TIG's cited case law -- that Trustmark must prove that "but for" TIG/AON's fraud and negligent misrepresentations Mr. Ekwall never would have entered the transaction, and that Trustmark must also show that TIG/AON's fraud and negligent misrepresentations caused Trustmark's loss -- lends no support to TIG's position  (TIG Brf. at 39).  As already discussed, Trustmark has ample evidence, from the testimony of Messrs. Ekwall and Jessel demonstrating that TIG/AON's fraud and negligent misrepresentation caused Mr. Ekwall to enter the agreement, resulting in damages to Trustmark, which squarely fulfills the requirements for proximate cause and damages.  In fact, TIG's own case law defeats their point.  In *First Nationwide Bank v. Gelt Funding Corp.* 27 F.3d 763, 768 (2d Cir. 1994), the Second Circuit stated that "[t]he general rule of fraud damage is that the defrauded plaintiff may recover out-of-pocket losses caused by the fraud."  [citations omitted].  Here, TIG/AON's fraud induced Trustmark to reinsure the TIG Portfolio – tens of millions of dollars in net ceded losses have been the result.  TIG/AON hid the truth about material problems in the TIG Portfolio to procure and induce reinsurance – in their own words:

Dress it up and sell it

It is no surprise that enormous losses were the result.  TIG's motion should be denied. The jury should decide.

## CONCLUSION

For all reasons stated herein, the Court should deny TIG's Motion for Summary Judgment in its entirety.

Respectfully submitted,

Dated:  July 18, 2003

_William E. Meyer_

One of the attorneys for Trustmark Insurance Company

David M. Spector CT 21679
Everett J. Cygal CT 22765
William E. Meyer, Jr.
Schiff Hardin & Waite
6600 Sears Tower
Chicago, Illinois 60606-6473

Jeffrey Hellman
Zeisler & Zeisler
558 Clinton Avenue
P.O. Box 3186
Bridgeport, CT 06605

## CERTIFICATE OF SERVICE

I, Sharon Doherty, do certify that a true and correct copy of the foregoing Trustmark's Memorandum In Opposition to TIG's Motion For Summary Judgment was sent July 18, 2003 by electronic mail, and by overnight delivery addressed to:

Frank F. Coulom, Jr., Esq.
Marion Manzo
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103

Mark B. Holton, Esq.
David J. Grais, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193

David Grais
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY 10019-6092

David A. Slossberg, Esq.
Hurwitz & Sagarin
147 North Broad Street
Milford, CT 06460-0112

Harry P. Cohen, Esq.
Brian J. O'Sullivan, Esq.
Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, NY 10038

_____
Sharon Doherty