UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITY INSURANCE COMPANY OF HARTFORD,<br><br>    Plaintiff,<br><br>v.<br><br>TRUSTMARK INSURANCE COMPANY,<br><br>    Defendant.<br><br>TRUSTMARK INSURANCE COMPANY,<br><br>    Third Party Plaintiff,<br><br>v.<br><br>TIG INSURANCE COMPANY,<br><br>    Third Party Defendant. | Civil No. 301CV2198(PCD) |

**TRUSTMARK INSURANCE COMPANY'S
LOCAL RULE 56(a)2 STATEMENT**

Defendant, Trustmark Insurance Company ("Trustmark"), submits this Statement pursuant to Local Rule 56(a)2 of the Local Rules of Civil Procedure and in response to the Local Rule 56(a)1 Statement submitted by TIG Insurance Company ("TIG"):

  1.  Trustmark is an Illinois corporation with its principal place of business in Illinois. Ex. 1, ¶ 5.

**RESPONSE:** *Denied in part.* **Trustmark admits only that it is an insurance company organized under the laws of the State of Illinois and is part of an Illinois mutual holding company. (Ex. 1, ¶ 5.) Trustmark further admits that its principal place of business is in Illinois. (Ex. 1, ¶ 5.)**

  2.  At all relevant times, TIG was an insurance company that wrote numerous lines of business, including workers' compensation insurance on a direct and reinsurance basis in its Managed

2

> Compensation Division. *See* Ex. 79 at WEB00140-52. The executive responsible for the operation of TIG's Managed Compensation Division was Jay Chase. *See id.* at WEB00146.

**RESPONSE:** *Denied.* Trustmark admits only that TIG is an insurance company and that the above statement correctly reflects information set forth in Exhibit 79, the exhibit cited and referred by TIG. Trustmark denies that this information is accurate with respect to "all relevant times" as that phrase is undefined and vague, and notes that Exhibit 79 was a document prepared in October 1998. (*See* Ex. 79 at WEB00140-52.) Trustmark further denies that Jay Chase was the sole executive or individual at TIG responsible for TIG's Managed Compensation Division at all times relevant to the subject matter at issue in this litigation; Exhibit 79 states merely that "the Managed Compensation unit is under the direction of Jay Chase" and further speaks for itself. (Ex. 79 at WEB00146; *see also* Exs. 1122 (FX000501, 502, and 506).)

Further, the only significant reinsurance written by TIG in its Managed Compensation Division was a fronting arrangement with Virginia Surety that was cancelled effective July 1, 1999 pursuant to a notice issued to TIG on July 2, 1998. (Ex. 122; Ex. 160; Powell Dep. at 63:21 – 64:4; Kelley Dep. at 29:16-17, 31:13-32:3; McElhiney Dep. at 96:7-8.)

> 3.   The workers' compensation business written by TIG consisted of several separate and distinct business segments: TIG Primary, Virginia Surety, Alternative Programs, Innovus, ManagedComp Inc. ("MCI"), and Commercial Specialty. *See* Ex. 79 at WEB00146-152. Each of TIG's business segments had its own unique risk characteristics (*e.g.*, geographic scope, average account size, hazard group classifications) and was underwritten, priced and administered differently, including by different entities. *See id.*

**RESPONSE:** *Denied in part.* While TIG's workers' compensation business consisted of various business segments, Trustmark notes that TIG did not at all times treat them as "separate and distinct" segments. In its 1999 Placement Materials (Ex. 79), TIG stated that TIG's workers' compensation book was comprised of "three major segments": "Agency Business, Virginia Surety & Alternative Programs, and Coordinated Care," but then addressed various subparts collectively. (Ex. 79 at WEB00146.) Further, TIG and AON collected and provided information to WEB relating to certain of these major segments and their subparts, including performance results for various segments or subparts, in the same file or files. (*See* Exs. 218, 224, 240, 251, 252; Ex. 1120, Ekwall Supp. Decl. ¶¶ 4-7, 9.)

Certain aspects of TIG's workers compensation business were not disclosed to underwriters like WEB. For example, significant Virginia Surety data was omitted from the 1998 placement data and the 1999 renewal information. (*See, e.g.*, Ex. 243.) By way of further example, TIG had received a notice of cancellation dated June 30, 1998 terminating the Virginia Surety

3

business effective July 1, 1999, contrary to the representations made in the 1999 Placement Materials. (*See* Ex. 122; Ex. 160; Powell Dep. at 63:21-64:4.)

> 4. TIG entered into reinsurance agreements with other insurance companies pursuant to which those companies agreed to indemnify TIG for a portion of the losses arising from TIG's workers' compensation business. Historically, TIG generally retained the first $1 million of risk on each workers' compensation claim. See Chase Dep Tr. 78:6-17.

RESPONSE: Trustmark denies the first sentence of the above statement, which fails to contain any citation to the record in violation of Local Civil Rule 56(a). With respect to the second sentence, Trustmark denies it to the extent it does not accurately describe TIG's "historic" retention. Prior to the 1998 and 1999 underwriting years, TIG retained $1 million of the risk per each worker insured for most of the business segments at issue (including TIG Primary, Virginia Surety, Alternative Programs, Innovus, and Commercial Specialty). (Ex. 211.) TIG retained $500,000 of the risk per each worker insured for the MCI business segment. (Ex. 211.)

> 5. In late 1997, Mr. Chase came to learn that other workers' compensation insurance companies were lowering, or "buying down," their per claim retentions to levels that had not previously been readily available in the reinsurance market. Chase Dep. Tr 185:11-186:15, 279:12-280:15; *see also* Ryan Dep. Tr. 175:5-176:3. As a result, in early 1998, TIG asked AON Re, Inc. ("AON"), a reinsurance intermediary (or broker), to obtain information regarding the options available to TIG to lower, or "buy down," its retention on its workers' compensation book of business. Chase Dep. Tr. 180:3-20, 286:10-287:15; Bohuslav Dep. Tr. 14:5-15:5.

RESPONSE: *Denied.* Trustmark denies that the evidence and testimony cited by TIG supports the specific assertions contained in the above statement. None of the evidence submitted makes any reference to any other workers' compensation carriers "buying down" or lowering their retentions, nor that AON was working with TIG to explore alternatives. Indeed, in April 1998, Jay Chase advised AON that it had not informed nor provided TIG with any information regarding unspecified "current reinsurance alternatives" and stated that "many . . . competitors purchase vastly different types of reinsurance on favorable terms." (Ex. 117.)

With respect to the second sentence, Trustmark states that the evidence shows that TIG initiated and decided to "buy down" their retention levels and purchased such reinsurance for very specific reasons: in order to improve their business results and because the loss experience on their business segments was increasing. (*See* Ex. 50, TIG/T 015636-639; Ex. 122, TIG/T 015648; Ex. 51, TIG/T 015678-15682 ; Ex. 112, TIG 108013 (the "significant buy down of the retention" part of TIG's strategy to "get us through more difficult financial

times"); *see also* Ex. 590, TIG 115076; Ex. 592, TIG 115193; Ex. 593, TIG 115200; Ex. 598, TIG 115412.) In addition, TIG was aware that the Virginia Surety business was experiencing particular problems. *See* Ex. 123 (Muirfield Report); Ex. 1134 (TIG105817, T. Tio memo dated April 8, 1998).)

Further, Mr. Chase testified that TIG's decision to "buy down" its retention was made in 1998 after an analysis of the economic benefit to TIG, and was made without consideration as to what other worker's compensation insurance companies were doing with their reinsurance programs. (Chase Dep. at 177-181; Ex. 117.)

For example, Mr. Chase stated in an e-mail to Mary Hennessy dated April 1, 1998: "We further discussed that there are alternative strategies [Virginia Surety and TIG] can employ to get us through more difficult financial times (i.e. the current 115 combined ratio could be improved with significant buy down retention etc.) but that such a transaction would likely need to be on a long term arrangement with the reinsurers and we may not want to do that if plans are underway to materially improve the result." (Ex. 112 at TIG 108013.) Mr. Chase also stated in another e-mail to Mary Hennessy dated June 12, 1998: "Apparently, there was some abnormally frequent 'unpicked' losses that have plagued May's results, so Jon is more anxious than ever to be absolutely sure we get [the reinsurance with WEB] done in time to be reflected for the entire quarter." (Ex. 596, ¶ 2.)

Furthermore, in an e-mail to Mary Hennessey dated June 19, 1998, Mr. Chase stated: "I'm convinced that loss ratios are going up and that we will have purchased [reinsurance from WEB] at the right time." (Ex. 598.) In an e-mail dated July 7, 1999, Mr. Paul Churchill of TIG stated: "The treaty for reinsurance was lowered by Jay Chase from $1MM to $100,000 per file on April 1998 due to the loss experience going up." (Ex. 122 at TIG/T 015648, ¶ 4.) And Steve McElhiney in an e-mail dated July 16, 1999, of which a copy was sent to the President of TIG, Mr. Courtney Smith, stated: "The $50K x $50K buy-down [purchased from WEB] was added during the 1999 year due to a deterioration in the underwriting results of the [Virginia Surety] book." (Ex. 51 at TIG/T 015680; *see also* Ex. 121, AON10010, ¶ 1(May 17, 1999 AON letter to Courtney Smith where AON stated: [The $50K xs $50K buy-down] cover was purchased because TIG believes that the experience is deteriorating because of the Virginia Surety loss.))

Moreover, contrary to TIG's real (and undisclosed) motive, TIG and AON further advised WEB that TIG's reason for lowering its retention level was to provide financial stability in order to facilitate a sale of TIG. (*See* Ekwall Dep. at 35-36.) TIG's failure to disclose its reason for purchasing the new reinsurance at a significant lower retention was also contrary to TIG's own internal policy. The President of TIG's then-parent company (TIG Holdings), Mary Hennessey, agreed that reinsurance should not be used to address underpricing or inadequate underwriting, to transfer loss from a generally underpriced book into future accounting periods, or to economically disadvantage the reinsurance market. (Hennessey Dep. at 211-13; Ex. 606, PWC002134 (describing policy that "Reinsurance should not be viewed as a mechanism to address underpricing or

5

inadequate underwriting. It is not appropriate to buy reinsurance to [transfer loss or economically disadvantage the reinsurance market]"). Ms. Hennessey further agreed that when reinsurance was purchased in order to transfer losses or "smooth results" from an underpriced book, those reasons should have been disclosed to potential reinsurers. (Hennessey Dep. at 212).

>   6.   The individual broker at AON with principal responsibility for the TIG account was Sheila Bohuslav. *See* Bima Dep. Tr. 49:21-50:20. Ms. Bohuslav was a broker with no claims handling background or expertise. *See* Bohuslav Dep. Tr. 8:20-11:7.

RESPONSE: *Denied.* Trustmark admits that Ms. Bohuslav was a reinsurance broker at AON who was involved in the TIG workers' compensation business since 1994, but denies that Ms. Bohuslav was the only broker primarily responsible for the TIG account. Both Ms. Bohuslav and Mr. Robert Bima were primarily responsible for the TIG account and both were involved in the placement. (Bima Dep. at 50: 17-21, 18:18-22, 23:18-24:01, and 49-50; Bohuslav Dep. at 11-15; Exs. 209, 212, 214, 242.)

With respect to the second sentence of the above statement (that Ms. Bohuslav had "no claims handling background or expertise"), Trustmark denies that the testimony cited by TIG supports that specific assertion. Trustmark states that Ms. Bohuslav testified that she had significant experience in acting as a broker for reinsurance transactions. (Bohuslav Dep. at 8-10.) Trustmark further states that Ms. Bohuslav, a Vice President for AON, was an experienced employee who had been employed there for 12 years. (Bohuslav Dep. at 8-9.)

>   7.   AON prepared a package of underwriting information describing the nature and performance of TIG's workers' compensation business (the "1998 Underwriting Information"). *See* Ex. 70. In early May 1998, AON sent the 1998 Underwriting Information to certain specific companies, including WEB Management LLC ("WEB"), a managing general underwriter which acted on behalf of, *inter alia*, United States Life Insurance Company ("U.S. Life") and Trustmark. *See* Exs. 69, 70.

RESPONSE: *Denied.* Trustmark denies that AON was solely responsible for preparing the "1998 Underwriting Information" referenced above (Ex. 70). Rather, the placement materials provided by AON to WEB were a collaborative effort between AON and TIG. (Chase Dep. at 289:11-18.) AON compiled the information and underwriting materials included in Exhibit 70 after receiving the information from TIG; TIG in the first instance supplied the narrative and numerical underwriting numerical information to AON. (Bima Dep. at 14, 29-30, 33-34; Chase Dep. at 286-287, 289.) Further, the underwriting materials did not accurately describe the nature and performance of TIG's workers' compensation business because, among other things, the loss information for

6

the Virginia Surety segment was not provided to WEB. (Ekwall Dep. at 11-13, 232:11-25.)

With respect to the second sentence of the above statement, Trustmark admits only that AON sent the "1998 Underwriting Information" package (Ex. 70) to WEB in May 1998, and that AON knew WEB was acting at that time as the managing general underwriter for U.S. Life and Trustmark. (*See* Ekwall Dep. at 41:2-24:6, 152:17-153:13.) Further, the evidence cited by TIG does not show that anyone other than WEB received this placement package. (*See* Exs. 69, 70.)

> 8. The cover letter to WEB, dated May 5, 1998, requested that WEB "quote a new underlying Workers' Compensation program effective April 1, 1998," and indicated that "TIG is looking to buy down their current retentions. . . possibly to as low as $100,000." Ex. 69 at WUW021481.

**RESPONSE**: Trustmark admits that Exhibit 69 speaks for itself, and contains the language quoted by TIG. Trustmark states, however, that the letter quoted by TIG states in full that "TIG is looking to buy down their current retentions" on four specific business segments as outlined in that letter: "TIG Primary, Virginia Surety/Muirfield, Managed Comp., Inc., and Specialty Division Compensation." (Ex. 69 at WUW021481.)

> 9. The 1998 Underwriting Information included 120 pages of narrative descriptions of TIG's business segments, including information relating to the underwriting philosophy and methodologies associated with the segment and details regarding each business segment's unique risk characteristics, *see* Ex. 70 at WUW021242-44, and detailed statistical information regarding the loss history of TIG's workers' compensation and the reserves established for the business, historical and projected premium information as well as premium information broken down by state and business segment, and detailed individual loss information for incurred claims excess of $15,000. *See* Exs. 69, 70.

**RESPONSE**: *Denied.* Exhibit 70 speaks for itself and TIG's assertions in the above statement are argumentative and do not accurately reflect the contents of Exhibit 70. Trustmark admits only that the "1998 Underwriting Information" (Exhibit 70) contained 120 pages in total, which included three pages of narrative description relating to the underwriting of the four business segments at issue (*see* WUW021242-21244), as well as certain numerical information regarding premium, experience, and loss information for certain business segments. (Ex. 70.) The placement materials did not describe the nature and performance of the particular layers of TIG's workers' compensation business that WEB was being asked to quote. The information in Ex. 70 is presented as "ground up" loss ratios, with no development factors for the excess of loss layer. Accordingly, the 120 pages did not reveal the performance, condition or

7

prognosis of the layer WEB was being asked to underwrite. Furthermore, the loss information for the Virginia Surety segment layer was not provided to WEB (Ekwall Dep. at 11-13, 232:11-25), either in Ex. 70 or in the diskette of data that it referenced and disclosed.

In fact, Monty Washburn in a letter dated May 14, 1998 (9 days after the 1998 submission was sent to WEB) severely criticized AON for all of the deficiencies in the 1998 submission. (Ex. 166.) Mary Hennessey, in an e-mail to Jay Chase dated May 15, 1998, agreed with Mr. Chase that the 1998 placement package did not have up-to-date data and was "clearly disappointing." (Ex. 588.) (*See also* Ex. 209 at TIG106501 (AON letter to Jay Chase dated June 22, 1998 where AON advises TIG not to provide WEB with updated data loss figures for the Virginia Surety segment).) *See also* response to number 7 above.

> 10. The 1998 Underwriting Information contained information showing the historical performance of TIG's workers' compensation business, including incurred and projected ultimate loss ratios on an accident year basis going back as far as 1988. Ex. 70 at WUW021311-13. Those loss ratios reflected that the results of TIG's workers' compensation business had steadily deteriorated throughout the mid-1990s, with projected ultimate loss ratios ranging from 61% for the 1994 accident year to a range of 69.3% to 78.2% for the 1997 accident year. *Id.* at WUW021311; *see also* Ekwall Dep. Tr. 69:7-70:9. The incurred and projected loss ratios demonstrated not only that the results of the Virginia Surety business segment were also deteriorating, Ex. 70 at WUW021313, but that the loss ratios for the Virginia Surety business segment were significantly higher, and thus the business less profitable (or more unprofitable, as the case may be), than the balance of TIG's workers' compensation portfolio. *See id.* at WUW021311-13.

**RESPONSE**: *Denied.* Trustmark incorporates its response to Par. 9 above, and also denies this paragraph because TIG's characterization is argumentative and does not accurately reflect the contents of Exhibit 70. Further, the placement package contains historical information, in the form of gross loss ratios for the book and certain segments on a "ground up" basis. Indeed, Ex. 70 notes that the loss ratios in some cases were due not to the severity of claims, but instead due to frequency. (Ex. 70.) Losses due to frequency, rather than severity, of claims would not be relevant to an underwriter evaluating excess of loss layers. (Ex. 1120, Ekwall Supp. Decl., ¶ 4.) Moreover, TIG mischaracterizes the testimony of Mr. Ekwall, whose statements do support TIG's assertions above. Mr. Ekwall testified that the 1998 underwriting information showed that the loss ratios had "increased slightly." (Ekwall Dep. at 69:17-70:1.) He further testified that all of the premium had not been accounted for in the 1997 year, which would overstate the 1997 loss ratio as calculated in the placement package. (Ekwall Dep. at 69:17-70:1.)

8

11. Robin Ekwall was the individual at WEB who underwrote, priced, negotiated, and ultimately made the decision to bind U.S. Life to the 1998 Treaty. *See* Ekwall Dep. Tr. 33:10-19, 44:2-45:18, 63:21-64:6, 83:11-86:22, 156:22-163:24; *see also* Ex. 907, Interrogatory Response at 19. No one else at WEB had any meaningful involvement in the TIG account. *See* Wright Dep. Tr. 48:9-57:24; Bastan Dep. Tr. 104:7-19.

**RESPONSE:** **Trustmark admits that Robin Ekwall was the individual at WEB who was primarily responsible for the TIG account for the 1998 Treaty. Trustmark notes, however, that Stephen Wright and Chuck Bastan were involved to the extent they assisted Robin Ekwall with the TIG account, received and reviewed information from AON relating to the TIG account, or met with representatives of TIG and/or AON. (Wright Dep. at 48-49; Bastan Dep. at 101-104, 109-110, 113-114.)**

12. Trustmark alleges that, after receiving the 1998 Underwriting Information, Mr. Ekwall and his partner, Charles Bastan, called Ms. Bohuslav and were told by Ms Bohuslav that TIG was being put up for sale and wanted to lower its retention through the purchase of reinsurance in order to stabilize its balance sheet. Ekwall Dep. Tr. 36:2-4; *see also* Bastan Dep. Tr. 114:20-115:2; *see also* Ex. 907, Interrogatory Response at 15.

**RESPONSE:** *Admitted.*

13. In fact, TIG was not put up for sale until several months *after* the representation was allegedly made. *See* Hennessy Dep. Tr. 65:25-67:5. There was no public disclosure of TIG's potential sale until October 1998. *See id.*; *see also* Ex. 911.

**RESPONSE:** *Denied.* **Trustmark denies that the testimony cited by TIG supports the assertions made in the above statement, and denies that the cited testimony has any bearing on whether or not Ms. Bohuslav advised WEB in the summer of 1998 that TIG was going to be put up for sale. The evidence demonstrates that TIG contemplated the sale of at least a portion of their company during a June 18, 1998 Board Meeting. (Ex. 1123, GS000562.) Further, Mary Hennessey (TIG's President) reported to Jay Chase that she promised the Board, in that same meeting where a sale was discussed, that these buy-down reinsurance covers would be accomplished in the second quarter. (Ex. 597, TIG 115410). Ms. Bohuslav at AON was aware that TIG was contemplating a sale, and advised WEB of the same. (Ekwall Dep. at 35:21-36:11.)**

14. Mr. Ekwall reviewed and analyzed the 1998 Underwriting Information and, using a "burn cost" analysis, calculated the price he needed to charge TIG for the proposed reinsurance. Simply

stated, Mr. Ekwall estimated the anticipated ultimate losses to the layers he was quoting by summarizing the aggregate losses in the applicable layers (utilizing the historical loss detail provided by AON), applied loss development factors in order to estimate how those actual losses would develop to ultimate, and then added a "load" to account for applicable expenses and profit. *See* Ekwall Dep. Tr. 52:2-53:15, 65:6-68:13. The resulting figure was then expressed as a percentage of TIG's subject premium. *See* Ex. 69 at WUW021483.

RESPONSE: **Denied in part. Trustmark admits that Mr. Ekwall reviewed and analyzed the 1998 Underwriting Information in Ex. 70, but notes that he also reviewed data sent to him by AON, in a computer file labeled as TIG.EXE. Furthermore, Trustmark denies that Mr. Ekwall calculated a price, or decided to quote on this business, based solely on a "burn cost" analysis. Additional underwriting factors were utilized by or influenced Mr. Ekwall, including TIG's reasons for the new retention levels (*see* Hawksworth Dep. at 50:11-51:5), whether or not segments of the TIG business were in run-off (*see* Ekwall Dep. at 569:7-13), the results of current audits of segments of the TIG business (*see* Ekwall Dep. at 11:23-25, 198:24-199:7), TIG's ability to generate monthly bordereaux (*see* Ekwall Dep. at 267:15-268:4), the loss development of the business in terms of claim handling, and the reasons for the recent loss development experience (including claim practices) (*see* Ekwall Dep. at 122:22-123:3).**

15. On May 27, 1998, Mr. Ekwall issued an initial quote to provide "A&H carve-out" reinsurance to TIG: (a) for the MCI business segment for 100% of the layer $400,000 excess of $100,000 at the rate of 10.1% of subject premium; and (b) for all of TIG's other business segments for 100% of the layer $900,000 excess of $100,000 at the rate of 10.6% of subject premium. Ex. 71.

RESPONSE: *Admitted in part.* **Trustmark admits that Mr. Ekwall of WEB provided a written quotation to AON in May 1998, based on the information AON provided, for the terms referenced in the above statement, and that the quote was subject to five conditions outlined in the May 27, 1998 fax, but denies that the quoted rate of 10.6% applied to "all of TIG's other business segments." (Ex. 71.) Rather, as outlined on Exhibit 71, WEB's quote applied to specified business segments or blocks. (Ex. 71.)**

16. On June 2, 1998, AON provided WEB with "the latest Loss Development Triangles" for the TIG Primary business segment. Ex. 86. AON's cover facsimile stated that the triangles did not include the MCI or Virginia Surety business segments. *Id.* Loss development triangles graphically depict the development of losses over time and can be used by actuaries and underwriters to create loss development factors which, in turn, can be used by

10

> underwriters to price reinsurance business. *See* Ekwall Dep. Tr. 19:6-7.

**RESPONSE:** *Admitted in part*, and *denied* to the extent the testimony cited does not fully support the assertions contained in the above statement. Trustmark admits that by letter dated June 2, 1998 (which was faxed on June 1, 1998), AON provided WEB with what AON described as Loss Development Triangles for the TIG primary business, not including the Virginia Surety or MCI portions of that business. (Ex. 86.)

> 17. Mr. Ekwall testified that, after receiving the TIG Primary loss development triangles, he called Ms. Bohuslav and requested loss development factors, or the data necessary to prepare such factors, for the Virginia Surety business segment. Ekwall Dep. Tr. 24:11-16. Mr. Ekwall alleges that, in response, Ms. Bohuslav advised him that loss development factors and/or data which could be used to create loss development factors for the Virginia Surety business segment "were not available." *Id.* at 24:24-25:4. Mr. Ekwall testified that he did not insist that the Virginia Surety loss development information be obtained because he was assured by Ms. Bohuslav that the loss development triangles for the TIG Primary were "representative" of TIG's entire workers' compensation portfolio. *Id.* at 255:7-24; *see also* Ex. 907, Interrogatory Response at 15, ¶¶ (c), (d).

**RESPONSE:** *Admitted in part/Denied in part.* Trustmark admits that Mr. Ekwall requested loss development factors or triangles from Ms. Bohuslav for all segments of the TIG business, including the Virginia Surety business segment, and that Ms. Bohuslav told Mr. Ekwall that loss development information was not available for the Virginia Surety segment. (Ekwall Dep. at 24-25; 369:18-371:20.) Trustmark admits the second sentence of the above statement. With respect to the third sentence, Trustmark denies that Mr. Ekwall had any legal obligation to "insist" that AON produce information it had told him was unavailable. Trustmark notes that Ms. Bohuslav advised Mr. Ekwall that such information was not available, that the loss development information for the TIG primary business was representative of the entire TIG book of business, and that he had all of the individual loss data for the Virginia Surety business segment. (Ekwall Dep. at 24:10-25:16, 254-256.)

However, after the reinsurance was purchased, Mr. Ekwall later became aware that AON had not provided him all of the individual claims or loss data for the Virginia Surety business, even though they told him at the time of contracting that WEB did have all such data. (Ekwall Dep. at 18, 20, 26, 257; Ex. 1120, Ekwall Supp. Decl. at ¶¶ 6-7, 11.)

Trustmark further states that, despite AON's refusal to provide the loss development information to WEB, such information was in fact available. AON had actuarial information available for the Virginia Surety business segment,

11

despite telling Mr. Ekwall that it was not available. (Ex. 207, AR000106-120 (Rivera Memo); Ekwall Dep. at 11, 17-18.)

> 18. Mr. Ekwall also testified that, based on his review of the TIG Primary triangles received on June 2, 1998, he noticed that development of the TIG Primary business "was better than national average" and was told by Ms. Bohuslav that TIG's development was better than national average because of the "superior claims handling" by "TIG and [its] agents." Ekwall Dep. Tr. 122:21-123:3; *see also id.* at 125:22-126-3, 128:1-18, 195:23-196:6; Ex. 907, Interrogatory Response at 15, ¶ (e). Mr. Ekwall did not ask what Ms. Bohuslav meant by "superior," or why she believed, or how she knew, that TIG's claims handling was "superior." Ekwall Dep. Tr. 125:3-10.

<u>RESPONSE:</u>   *Admitted in part/Denied in part.* Trustmark admits the first sentence of the above statement, but notes that the date the loss triangle information was sent and received was June 1, 1998. (*See* Ex. 86, at p.2.) Trustmark admits the second sentence of the above statement, but denies that Mr. Ekwall had any duty or obligation to question Ms. Bohuslav's representations regarding the TIG account and the claims handling. TIG and AON were under a duty of utmost good faith to disclose all material facts concerning this placement. (*See* Ex. 958, Thomson Report at 6; Ex. 952, Gottheimer Report at 9.) Any facts that Ms. Bohuslav was aware of which made the misrepresentations she made to Mr. Ekwall untrue should have been disclosed to Mr. Ekwall, and the failure to do so was a breach of the duty of utmost good faith. Further, if Ms. Bohuslav did not possess the requisite knowledge with which to make those representations to Mr. Ekwall, she likewise breached that duty.

Trustmark further notes that AON had independent knowledge of the TIG workers' compensation business. AON owned Virginia Surety, owned Muirfield Underwriters (the company that underwrote the risks on the Virginia Surety segment), and acted as the broker for both sides in placing the Virginia Surety risk with TIG, and acted as TIG's broker and agent for the placement of the reinsurance with Trustmark and Security. (Chase Dep. at 22:13-25; McElhiney Dep. at 206:9-15.)

> 19. Mr. Ekwall has also alleged that, at some point during the negotiation of the 1998 Treaty, he was told by Ms. Bohuslav that TIG "had really cleaned up the book of business from the late '80s, early '90s. Got out of the states. . . where they couldn't be competitive, and that the more recent years were more reflective of what the experience would be going forward." Ekwall Dep. Tr. 432:7-433:5; *see also* Ex. 907, Interrogatory Response at 15,¶(f).

12

RESPONSE: *Admitted.*

    20.    On June 4, 1998, Mr. Ekwall issued a revised quote, reducing the rate for the $900,000 excess of $100,000 layer from 10.1% to 9.5% and reducing the rate for the $400,000 excess of $100,000 layer from 10.1% to 7.83%, with "[a]ll other terms and conditions apply[ing] from earlier quote/fax dated 5/27/98." Ex. 88.

RESPONSE: **Admitted, except that the quote issued on June 4, 1998 for the $900,000 excess of $100,000 layer was reduced from 10.6%, not 10.1% as asserted by TIG. (Exs. 71, 88.)**

    21.    By facsimile dated June 11, 1998, Ms. Bohuslav advised Mr. Ekwall that TIG "had a competitive full conditions quote from a direct writer," but indicated that WEB would possibly land the account if it reduced its quote on the business segments other than MCI from 9.5% to 9%. Ex. 72. Without doing any further qualitative or quantitative analysis (Ekwall Dep. Tr. 136:22-137:7), Mr. Ekwall agreed to reduce WEB's quote. Ex. 73.

RESPONSE: **Denied in part. With respect to the first sentence, in her June 11, 1998 fax (Ex. 72), Ms. Bohuslav advised WEB that TIG "had a competitive full conditions quote from a direct market", and that TIG "indicated that [AON] would possibly get an order at the following terms[.]" (Ex. 72.) Ms. Bohuslav then listed a rate of 9.0% for TIG Primary/VSI, a rate of 7.83% for MCI, terms of 80% Mininum & Deposit, and Bordereaux loss reporting and settlement, and advised that TIG was removing the Hawaii book from the quote. (Ex. 72.) With respect to the second sentence, Trustmark denies the second sentence because TIG mischaracterizes the testimony of Mr. Ekwall. Mr. Ekwall testified that he had already performed the qualitative and quantitative analysis, that his quote was in the range WEB needed to write the deal at a profit, and no further work was necessary at that time. (Ekwall Dep. at 135:4-137:7.)**

    22.    On June 25, 1998, Mr. Ekwall again agreed to decrease WEB's quote on the MCI segment in response to another competitive quote. See Ex. 6 at AON02010. In addition, AON agreed to reduce its brokerage (from 7.5% to 5% of ceded premium), resulting in a further decrease in WEB's quoted rate. Ex. 90.

RESPONSE: **Denied, and the evidence cited by TIG does not support the assertions contained in the above statement. Trustmark admits only that Mr. Ekwall at some point reduced his quote on the MCI business segment from**

13

7.83% to 7.45%, as stated in Exhibit 6, but the evidence cited does not explain when or why WEB reduced its quote on this segment. (*See* Ex. 6, AON02010.) Trustmark denies the second sentence, because the reduction in AON's brokerage (as reflected in Ex. 90) had no affect on WEB's net rate quoted to WEB, i.e. the reduction came out of AON's pocket, not WEB's. (Ex. 90.)

> 23. Ms. Bohuslav further advised Mr. Ekwall that TIG was prepared to bind WEB's quote "if we can make this a 3 year deal with no more than 10% annual increase each anniversary." Ex. 90. Mr. Ekwall agreed, and, by facsimile dated June 26, 1998 (Ex. 76), Ms. Bohuslav confirmed that "we have bound [WEB, on behalf of U.S. Life] 100%. . . effective April 1, 1998." *Id.*

**RESPONSE:** *Admitted in part/Denied in part.* Trustmark admits the first sentence of the above statement. Trustmark denies the second sentence. Although Mr. Ekwall did agree at some point to bind the coverage on those terms (as reflected on the facsimile dated June 29, 1998, not June 26), Ex. 76 is not the document which binds U.S. Life to the coverage. (Ekwall Dep. at 173:11-177:12.)

> 24. The Placement Slip for the 1998 Treaty was signed by WEB on behalf of U.S. Life on July 27, 1998 (Ex. 68) and the final contract wording was executed by WEB on November 12, 1998. Ex. 908.

**RESPONSE:** *Admitted.*

> 25. On September 17, 1998, TIG, through AON, sent WEB provisional notice of cancellation of the 1998 Treaty effective January 1, 1999. Ex. 860. This allowed TIG the option, but not the obligation, to terminate the 1998 Treaty and, thus, the opportunity to determine whether, as of January 1, 1999, more favorable terms were available in the reinsurance market. *See* Exs. 860, 872.

**RESPONSE:** *Admitted in part/Denied in part.* Trustmark admits the first sentence. Trustmark, however, denies the second sentence because it is a legal conclusion and is not supported by the evidence. There was no term in this Treaty that allowed a "provisional notice of cancellation." (Ex. 1124, US000862-891.) WEB therefore did not agree that the purported provisional notice allowed TIG to shop for more favorable terms while U.S. Life was still bound to the 1998 Treaty and advised TIG that the provisional notice was in fact a cancellation pursuant to the terms of the contract. (Ekwall Dep. at 188:16-23, 305:7-306:9; Ex. 263, ¶ 1.) TIG agreed with this interpretation, and rescinded the provisional notice for that very reason. (*See* Ex. 872; Ex. 263, ¶ 1.)

26. By cover letter dated November 11, 1998, AON sent to certain specific companies, including WEB, a "1999 underwriting memorandum. . . for TIG's Workers' compensation renewal effective January 1, 1999" (the "1999 Renewal Submission"). *See* Ex. 78 at WEB00525. The cover letter set forth certain information regarding TIG's business and indicated that AON "intend[ed] to present alternative quotes to TIG," including both a "full conditions coverage quote" and "a carve-out conditions quote," and invited WEB to "quote both ways" if it had the ability to do so. *Id.*

**RESPONSE:** *Admitted in part.* **Trustmark admits AON sent to WEB the "1999 underwriting memorandum" in November 1998, but the evidence cited by TIG does not demonstrate that any other company or individual received the cover letter (Ex. 78) or the 1999 placement materials (Ex. 79).**

27. The 1999 Renewal Submission contained a significant amount (in total, 257 pages) of narrative and statistical information concerning TIG's workers' compensation business, including an overview describing the business written in each TIG segment, its risk characteristics, the types of products being issued (*i.e.*, guaranteed cost, dividend or retrospective rated policies), the underwriting approaches and methodologies applied and the different entities that were underwriting the business and administering the claims. *See* Ex. 79 at WEB00146-52.

**RESPONSE:** *Denied.* **Exhibit 79 speaks for itself and TIG's assertions in the above statement are argumentative and do not accurately reflect the contents of Exhibit 79. Trustmark admits only that the "1999 Renewal Submission" (Exhibit 79) contained approximately 260 pages in total, which included twelve (12) pages of narrative relating to certain business segments (*see* WEB00140-152), as well as certain numerical information regarding various business segments and draft placement slips. (Ex. 79.)**

**These placement materials, like the 1998 information, did not describe the nature and performance of the layers of TIG's workers compensation business that WEB was being asked to quote. The information in Ex. 79 is presented as "ground up" loss ratios, with no development factors for the excess of loss layer. Accordingly, the 260 pages did not reveal the performance, condition or prognosis of the layer WEB was being asked to underwrite. Furthermore, the loss information for the Virginia Surety segment layer was not provided to WEB. (Ekwall Dep. at 11-13, 232:11-25.)**

28. The 1999 Renewal Submission also contained detailed premium and loss information, including listings of large losses (referred to as bordereaux) for the various business segments, *see* Ex. 79 at WEB00213-312, and projected loss ratios for the TIG Primary,

15