Virginia Surety and Innovus business segments. *See id.* at WEB00313-43. The projected loss ratios for the Virginia Surety business segment (as of June 30, 1998) were consistent with the projected loss ratios contained in the 1998 Underwriting Information, showing that the business written in that segment consistently deteriorated from 1994 through 1997, and that the deterioration had continued since the placement of the 1998 Treaty. *See id.* at WEB00217.

**RESPONSE:** *Admitted in part/Denied in part.* **Exhibit 79 speaks for itself and TIG's characterizations of the documents are argumentative and do not accurately reflect the contents of the document. Trustmark incorporates its response to statement No. 27 above, and admits that the 1999 renewal submission contained premium and loss information and project loss ratios on a ground up only basis. (Ex. 79.) Trustmark denies the second sentence. While the loss ratios increased slightly from 1994 through 1996 (Ex. 79 at WEB00217; *see also* Ekwall Dep. at 69:17-70:1), TIG represented in the 1999 Renewal Submission that the loss ratio for Accident year 1997 was in fact overstated because of additional premium to be paid on a retrospective basis by TIG's insureds. (Ex. 79 at WEB 00216.) Further, TIG separated the retrospectively-rated business from the guaranteed cost business in the renewal submission and represented there to be a less than 1% difference between the 1996 and 1997 loss ratios for the guaranteed cost business. (Ex. 79 at WEB00218.)**

**Furthermore, TIG is incorrect in characterizing the "listings of large losses" as "bordereaux." A bordereau is a term of at in the reinsurance industry, and by custom and practice. This Court has already ruled that this issue is a disputed issue in this action. (*See* Order dated August 27, 2002 at n.2 (ruling on cross-motions for summary judgment).)**

**Finally, Trustmark notes that the Virginia Surety information to which TIG refers in the 1999 renewal submission in fact represented only an approximate 1% of the total Virginia Surety claims. (*See* Hawksworth Dep. at 96:6-18.)**

29.     The 1999 Renewal Submission also contained numerous loss development triangles and loss development factors for the Virginia Surety, TIG Primary, MCI and Commercial Specialty business segments. *See* Ex. 79 at WEB00227-28, WEB00241-46, WEB00254-62, WEB00264-65 and WEB00284-302. In total, the Renewal Submission contained nineteen pages of claim statistics, loss rates, triangles and development factors displaying in detail the actual and projected development of the Virginia Surety business. *See* Ex. 79 at WEB00217-35.

**RESPONSE:** *Denied,* **because TIG's characterizations of Exhibit 79 do not accurately reflect its contents and misrepresent the information contained therein. The loss development information contained in Exhibit 79 was all**

presented on a ground up basis and was not on the basis of losses in excess of $50,000 and $100,000 needed to underwrite the treaty. (Ex. 79.) In view of the ground up nature of the information, AON therefore transmitted three computer files to Mr. Ekwall in November 1998, labeled "Eval98xs25k.zip", "Eval97xs25k.zip", and "Eval96xs25k.zip." (Ex. 227; *see also* Bohuslav Dep. at 103, 104, 106).

30.    The 1999 Renewal Submission also contained lists breaking down, on a state-by-state basis, the states in which the TIG business segments were writing business and the amount of business that was being written in each state. *See* Ex. 79 at WEB00160-64; Ex. 70 at WUW021275, WUW021296.

**RESPONSE:** *Admitted in part/Denied in part.* **Exhibit 79 as cited by TIG speaks for itself, and TIG's characterizations of the documents are argumentative and do not accurately reflect its contents. (Ex. 79 at WEB00160-64.)**

31.    Robin Ekwall was the individual at WEB who underwrote, priced, negotiated, and ultimately made the decision to bind Security Insurance Company of Hartford ("Security") to the 1999 Treaty. *See* Ekwall Dep. Tr. 313:11-15.

**RESPONSE:** *Admitted.*

32.    Shortly after November 11, 1998, AON sent WEB a CD-Rom containing individual claim data for each of the TIG workers compensation business segments that would be subject to the 1999 Treaty. *See* Ex. 224. Mr. Ekwall testified that when he tried to open the CD-Rom he found it to be "blank" and "useless" and that he called Ms. Bohuslav and "asked her to e-mail any data or put it on diskette." Ekwall Dep. Tr. 329:8-11. Subsequently, on November 24, 1998, Ms. Bohuslav sent an e-mail to Mr. Ekwall, with no note or text at all, attaching three data files containing individual losses excess of $25,000, evaluated as of three different points in 1996, 1997 and 1998. Ex. 227. Trustmark has alleged that TIG misrepresented that the "three data files e-mailed to WEB on November 24, 1998 contained losses for all segments of TIG's workers compensation business" when, in fact, the data files were missing loss information for the Virginia Surety business segment. Ex. 907, Interrogatory Response at 27, ¶ (f).

**RESPONSE:** *Admitted in part/Denied in part.* **With respect to the first sentence, Trustmark denies that the CD-rom contained the individual claim data for each of the TIG business segments; rather, the CD was in fact "blank" and "useless." (Ekwall Dep. at 329:8-11; *see also* Exhibit 235.) Trustmark admits the second sentence. Trustmark denies the third sentence, because Exhibit 227**

did not contain the individual Virginia Surety losses and AON knew that data was missing. (*See* Exs. 226-228, 241; Bohuslav Dep. at 103, 106-07.)  With respect to the fourth sentence, Trustmark's interrogatory response speaks for itself, but Trustmark admits that TIG and AON misrepresented that the data files provided to WEB on November 24, 1998 contained loss information for all of TIG's workers compensation business," when in reality certain loss information was missing. (*See* Exs. 234-241, 907 (Interrogatory Response at 27, ¶ (f)).)

> 33.    Mr. Ekwall testified at his deposition that he underwrote and priced the January 1, 1999 renewal based solely on the November 11, 1998 cover letter, the 1999 Renewal Submission and the claim data he received. Ekwall Dep. Tr. 313:2-16.

**RESPONSE:    *Denied*.    Trustmark denies this statement, because TIG mischaracterizes Mr. Ekwall's two days of deposition testimony.  Mr. Ekwall testified that he relied on other information provided by TIG as well, including, but not limited to, the 1998 underwriting information and data, the fax from Ms. Bohuslav to Mr. Ekwall dated November 17, 1998, the data files Ms. Bohuslav sent to Mr. Ekwall on November 24, 1998, and the verbal information provided by TIG, through AON, in numerous phone calls.  (Ekwall Dep. Tr. 323:24-324:6; Ex. 224; Ex. 227; Ex. 907 (Interrogatory Response at pp. 15-27; Ex. 1121, Ekwall Decl. (Jan. 22, 2003), ¶¶ 8-12, 16-17.)**

> 34.    Mr. Ekwall testified that he was able to recall only two topics discussed with Ms. Bohuslav in connection with the placement of the 1999 Treaty.  *See* Ekwall Dep. Tr. 325:14-24.  First, Mr. Ekwall recalled discussing with Ms. Bohuslav the fact that WEB would be able to provide a full conditions quote.  *See id.* at 325:25-326:9.  Second, Mr. Ekwall recalled discussions with Ms. Bohuslav in connection with WEB's subsequent quote to provide reinsurance to TIG for an additional layer of coverage ($50,000 excess of $50,000) for the Virginia Surety and Innovus business segments.  *See id.* at 326:10-327:2.

**RESPONSE:  *Denied*.  TIG omits several phrases from the cited testimony, and omits mention of other parts of that deposition.  Mr. Ekwall recalled and testified to several other topics discussed with Ms. Bohuslav in connection with the placement of the 1999 Treaty, such as: (1) the pricing of the full conditions cover (Ekwall Dep. at 325:14-326:9); (2) the confirmation of historical premium (Ex. 224; Ekwall Dep. at 321:5-322:20); (3) the applicability of recent experience on the programs (Ekwall Dep. at 431:20-432:22); (4) the utilization of managed care networks (Ekwall Dep. at 439:25-441:2); (5) the creditworthiness of Security Insurance Company (Ekwall Dep. at 442:5-443:2); and (6) the appropriate rate for the MCI segment (Ekwall Dep. at 446:2-447:15).  Those statements preceded, of course, Mr. Ekwall's repeated inquiries about the Virginia Surety data, and Ms. Bohuslav's ultimate admission that she had not provided it.**

18

35.    By fax dated December 6, 1998, WEB provided an initial quote on behalf of Security to provide "full conditions" reinsurance to TIG: (a) for 100% of the layer $900,000 excess $100,000 at the rate of 10.7% of subject premium; and (b) for 100% of the layer $400,000 excess $100,000 at the rate of 9.7% of the subject premium. Ex. 262.

**RESPONSE:    Trustmark admits that WEB provided an initial quote on behalf of Security on December 6, 1998 that included these terms, as outlined in Ex. 262, but Trustmark states that TIG's description of the quote is incomplete. (*See* Exhibit 262).**

36.    On December 7, 1998, TIG rescinded its provisional notice of cancellation on the 1998 Treaty, meaning that the 1998 Treaty would continue in full force and effect, thus rendering moot WEB's quote for the January 1, 1999 renewal. Ex. 872.

**RESPONSE: *Denied.* AON and WEB treated the provisional notice of cancellation as an actual notice of cancellation. (Ekwall Dep. at 306:5-308:25). Trustmark further denies this statement given that whether the quote was "moot" is a legal conclusion and TIG has failed to provide any supporting evidence that shows TIG, AON, or WEB treated the quote for the January 1, 1999 renewal as moot.**

37.    WEB nevertheless continued to negotiate the January 1, 1999 renewal. By fax dated December 14, 1998, WEB provided alternative, lower quotes on both a "full conditions" and "carve-out" basis. Ex. 876. As Mr. Ekwall explained, he exercised "a judgment call" to reduce his quote because "looking at the more recent years . . . the experience had been improving and I was comfortable. . . with lowering that rate based on the more recent years." Ekwall Dep. Tr. 431:8-12. Mr. Ekwall further asserts that his understanding of the improved results in the most recent years was based on an alleged discussion with Ms. Bohuslav during the placement of the 1998 Treaty that TIG "had cleaned up the book of business from the late '80s, early '90s [and] got out of the states. . . where they couldn't be competitive." *Id.* at 432:6-433:5.

**RESPONSE: *Admitted in part/Denied in part.* Trustmark denies the first sentence of the above statement, and incorporates by reference its response to Paragraph 36 above. Trustmark denies the second sentence because the quotes for the $900,000 excess $100,000 and $950,000 excess $50,000 layers were actually higher when looking at the fact that brokerage was reduced from 10% in the first quote to 5% in this quote. (Exhibit 876). Trustmark admits the third sentence. Trustmark denies the fourth sentence to the extent TIG misstates Mr. Ekwall's testimony; Mr. Ekwall testified that Ms. Bohuslav told him that TIG**

"had really cleaned up the book of business from the late '80s, early '90s[.]" (Ekwall Dep. at 432:6-433:5).

> 38. WEB reduced its quote twice more, again with no further quantitative or qualitative analysis. Exs. 909, 910. According to Ms. Bohuslav's contemporaneous fax to TIG, WEB advised her that it was WEB's "goal" to replace U.S. Life with Security as the reinsurer of the TIG business. Ex. 909. As a result, WEB ultimately quoted full conditions coverage for the layer $900,000 excess of $100,000 at the rate of 9.60%, and full conditions coverage for the MCI business segment at the rate of 6.8%. Ex. 269.

**RESPONSE:** *Denied.* **Trustmark denies the statement in the first sentence. The documents to which TIG cites are not generated by WEB and do not address the issue of whether WEB did further analysis prior to reducing its quote. Exhibits 909 and 910 only address the fact the WEB reduced its quote, and thus provide no support for TIG's statement. (Ex. 909; Ex. 910.) Trustmark denies the statement in the second sentence. The exhibit TIG cites as the basis for its statement that WEB advised Ms. Bohuslav that "it was WEB's 'goal' to replace U.S. Life with Security as the reinsurer of the TIG business" only discusses that Ms. Bohuslav and Ms. Bautista "think" that it is WEB's goal to use Security. (Exhibit 909). This statement is conjecture on the part of Ms. Bohuslav and Ms. Bautista and does not reflect any basis for the statement attributable to WEB. Trustmark also denies the last statement as Exhibit 269 is not a quote from WEB, and evidences 9.64% as the rate for the full conditions coverage for the layer $900,000 excess of $100,000 and 8.80% for the MCI business segment, not 9.60% and 6.8%, respectively, as TIG represents. (Exhibit 269).**

> 39. By facsimile dated December 21, 1998 (Ex. 877), Ms. Bohuslav outlined Mr. Ekwall's terms and Mr. Ekwall returned the facsimile with a note stating "All OK, RBE, 12/21/98." By facsimile dated December 31, 1998 (Ex. 269), Ms. Bohuslav confirmed the binding of WEB's quote.

**RESPONSE:** *Admitted.*

> 40. In her December 21, 1998 facsimile (Ex. 877), Ms. Bohuslav advised Mr. Ekwall that "TIG will likely buy down Virginia Surety, possibly even Commercial Specialty to $50,000." Ms. Bohuslav further advised in her December 31, 1998 facsimile (Ex. 269) that "TIG is interested in pursuing buying down the [Virginia Surety] and Innovus portions, [and] would consider a rate in the range of 7.327%." The same day, Mr. Ekwall responded (Ex. 270) that "at best we could be at 9.00% [rate, but] we would want the [$50,000

20

excess of $50,000] buy down on all business and not just [Virginia Surety] & Innovus."

**RESPONSE:** *Admitted in part/Denied in part.* **Trustmark admits the first sentence of this statement. Trustmark admits the second sentence. Trustmark denies the third statement as inaccurate; Mr. Ekwall responded that "at best we would be at 9.00%," not "could," as TIG represents. (Ex. 270).**

    41.    Mr. Ekwall testified that he was then told by Ms. Bohuslav that "Virginia Surety was one of the better or the best segments of [TIG's workers' compensation] business." Ekwall Dep. Tr. 189:2-5. Mr. Ekwall did not recall asking any questions regarding how the Virginia Surety business was being managed. *Id.* at 192:20-22. Instead, Mr. Ekwall interpreted that Ms. Bohuslav's alleged comment "meant for us as an excess of loss reinsurer that we could expect better results on the Virginia Surety book." *Id.* at 192:6-19.

**RESPONSE:** *Admitted in part/ Denied in part.* **Trustmark denies the first sentence of this statement. Mr Ekwall testified that he was told by Ms. Bohuslav *prior* to the binding of the 1999 Treaty that, "Virginia Surety was one of the better or the best segments of [TIG's workers' compensation] business." (Ekwall Dep. at 188:10-189:5). The second sentence is admitted with the exception that Trustmark denies the implication that Mr. Ekwall was under a duty to ask such questions, given the duty of utmost good faith. Rather, TIG had a duty to provide to Mr. Ekwall any information that would have been material to the placement of the 1999 Renewal. (Gottheimer Dep. at 181:5-21). Trustmark denies the third sentence in part; Mr. Ekwall testified that his understanding was based not only on Ms. Bohuslav's comment, but also on his review of the 1999 Placement material. (Ekwall Dep. at 192:11-194:14; Ex. 1125 (WEB 00230-35).)**

    42.    On January 19, 1999, Mr. Ekwall issued a quote on behalf of Security of 9% of subject premium for 100% of the $50,000 excess of $50,000 layer for the Virginia Surety and Innovus business segments. Ex. 271. By facsimile dated February 3, 1999 (Ex. 274), Ms. Bohuslav confirmed the binding of WEB's quote. *Id.*

**RESPONSE:** *Admitted in part/Denied in part.* **Trustmark admits the first sentence of this statement with the exception that it implies Mr. Ekwall's quote was written. The January 19, 1999 quote was verbally communicated to AON in the course of a telephone conversation. (Ex. 271). Trustmark denies the second sentence of this statement. Exhibit 274 asks WEB to bind the coverage ("Please bind ..."), but it does not confirm the binding of WEB's quote. (Ex. 274).**

43.   In March 1999, Security entered into a Retrocession Agreement with Trustmark (Ex. 469) pursuant to which Security retroceded to Trustmark 100% of the accident and health risk it assumed under the 1999 Treaty.  *See* Ex. 1, ¶ 32.  The Retrocession Agreement was not signed by WEB on Trustmark's behalf until April 19, 1999. Ex. 469 at TM/S01720.

**RESPONSE:** *Admitted in part/Denied in part.* **Trustmark admits this in part and denies it in part.  Trustmark admits that Trustmark and Security had a retrocession agreement that was formally documented in March of 1999, but denies that was the date the parties entered into that agreement. WEB informed AON prior to entering into the 1998 contract between TIG and USL that WEB was the agent for two life and health insurance companies (All American Life Insurance Company/USL, sometimes referred to as AAL/USL on the one hand and Trustmark on the other).  WEB also informed AON that the two companies that were part of its facility shared equally in the risk and that the AAL/USL and Trustmark paper was interchangeable.  With respect to the 1999 renewal, WEB and AON discussed the fact that WEB was in a business relationship with ARTIS, which, among other things, represented a property and casualty insurance company (Security).  In connection with the renewal, WEB and AON discussed the option of inserting Security as a fronting carrier between TIG and Trustmark/AAL/USL.  Ultimately, AON chose this option because it provided full conditions reinsurance coverage.  WEB informed AON that Security was acting only as a front and that the majority of the risks would be shared by the two life and health companies represented by WEB.  TIG and AON knew that Trustmark would be the ultimate risk bearer from the date that WEB bound Security to reinsure TIG. (Ex. 1120, Ekwall Supp. Decl., ¶ 17; Ekwall Dep. at 189:6-19; *see* Ex. 1126 (S01389-1391).)  Trustmark denies the second sentence, as the Agreement was signed as early as March 11, 1999. (Ex. 95, TM/S 00505-06).**

44.   In April 1999, Mr. Ekwall raised the question whether the data files that were e-mailed to him on November 24, 1998 contained Virginia Surety loss files.  By e-mail dated April 29, 1999, Ms. Bohuslav incorrectly advised Mr. Ekwall that those data files contained Virginia Surety loss information. *See* Ex. 240.  By fax dated June 9, 1999, Ms. Bohuslav voluntarily corrected herself and advised Mr. Ekwall that the data files that had been emailed to him on November 24, 1998 for the 1999 Treaty did not, in fact, include Virginia Surety loss detail. *See* Ex. 243.  By letter dated August 9, 1999, Ms. Bohuslav provided Mr. Ekwall with a CD-Rom containing loss information for all of the TIG business segments, including Virginia Surety. *See* Ex. 247.

**RESPONSE:** *Admitted in part/Denied in part.* **Trustmark acknowledges that after WEB bound the risk reflected in the 1999 renewal, WEB used an outside contractor to perform a routine claims audit.  In response to a question from the auditor, Mr. Ekwall sent an e-mail to Ms. Bohuslav asking her to confirm whether the computer files she had sent to him in November 1998 included the**

Virginia Surety results.  Ms. Bohuslav, in a response by e-mail, assured Mr. Ekwall on April 20, 1999 and April 29, 1999 that they did.  (Exs. 232, 240; Ex. 1120, Ekwall Supp. Decl., ¶ 10.)  Trustmark further states that discovery had revealed that Ms. Bohuslav had been advised in November 1998, before she sent the computer files to WEB, that those files did not include VSC data.  (Exs. 226, 227, 228; Bohuslav Dep. at 103, 106-07.)  In April 1999, Ms. Bohuslav disclosed to her superior, Robert Bima, that the inquiries from WEB about the VSC data had "heighten[ed] my anxiety."  (Ex. 237.)  Mr. Bima told her "to advise AON legal and get them involved from the start" if there was a problem.  (Ex. 238.)  On April 29, 1999, Ms. Bohuslav assured Mr. Ekwall that he had indeed received the VSC data.  (Ex. 240.)

On May 4, 1999, Ms. Bohuslav told Mr. Bima of AON that it appeared the VSC data had not been included in the materials sent to WEB.  (Ex. 241.)  Five weeks later, on June 9, 1999, she finally wrote to Mr. Ekwall that she had been "incorrect" in telling him that the VSC data had been included in the files she sent him in November 1998.  (Ex. 243.)

Trustmark admits the third sentence in so far as Ms. Bohuslav did correct herself by fax dated June 1999, but denies it to the extent that it states the correction was made voluntarily.   Despite repeated requests in June and July 1999 from Mr. Ekwall, it was not until August 9, 1999 that AON responded with VSC data. (Ex. 1120, Ekwall Supp. Decl., ¶ 11.)

On August 9, 1999, Ms. Bohuslav telephone Mr. Ekwall in Connecticut to advise him that she had been delayed in sending VSC data in response to his requests because she was getting him "updated figures" through the most recent quarter.  (*Id.*, ¶ 12.)   Accordingly, when he received the "updated" data, he understood and believed that the figures represented the 1999 figures for performance of the book, rather than the performance as of September 30, 1998. (*Id.*)  Unknown to him at the time, the figures Ms. Bohuslav sent him have turned out in retrospect to be the September 30, 1998 figures for the business, rather than figures updated through June 30, 1999. (*Id.*)

Trustmark denies the fourth sentence as Ms. Bohuslav's August 9, 1999 letter simply states that she has enclosed a "CDRom of Claims," without any explanation that it contained the missing loss information for Virginia Surety. (Ex. 247).

45.  Mr. Ekwall testified that:  (a) when Ms. Bohuslav advised him in June 1999 that the data files did not include Virginia Surety loss information, he asked for the missing information so that he could go back and revisit his pricing including the Virginia Surety losses and see what impact it had on his calculations (Ekwall Dep. Tr. 485:5-9); and (b) when he received the CD-Rom containing all of the loss information for all of TIG's business agreements *id.* at 488:23-489:16, he reviewed and analyzed the loss information on the CD-Rom with a view towards his pricing of the account, and

he concluded that "based on this updated claims information,
there wasn't a material change" in his pricing, and that he was
therefore comfortable with his original pricing. *Id.* at 490:5-24.

**RESPONSE:** *Admitted in part/Denied in part.* **Trustmark admits sentence (a).
Trustmark denies sentence (b) to the following extent. Because Ms. Bohuslav
had assured Mr. Ekwall that she was supplying him with "updated" figures in
August 1999, her statements actually concealed from him even further the true
condition of the VSC business. When he opened and examined the CD-rom file
Ms. Bohuslav sent him on August 9, 1999, he believed that he was looking at the
book's experience through June 30, 1999, when in fact the figures revealed
deterioration only through September 1998. Her statements that the data had
been updated therefore led Mr. Ekwall to the mistaken conclusion that the
missing Virginia Surety figures had not produced a material difference in the
performance figures I had anticipated in quoting this risk. (Ex. 1120, Ekwall
Supp. Decl., ¶ 13.)**

**Had Mr. Ekwall known that the figures Ms. Bohuslav sent to him on
August 9, 1999 were as of September 30, 1998, Mr. Ekwall would have
understood that the absence of the Virginia Surety data made a material
difference to the underwriting he had performed on this book of business. If he
had received the Virginia Surety data that should have been included in the
1998 and 1999 underwriting materials – and was not – then he would have priced
this reinsurance differently, if WEB had decided to quote it at all. (Ex. 1120,
Ekwall Supp. Decl., ¶ 14.)**

46.   Trustmark has alleged that the statement in the 1999 Renewal
      Submission that the "[Virginia Surety] Program is expected to
      expand geographically somewhat from its traditional Midwestern
      base" (Ex. 79 at WEB00148) is a misrepresentation. However, the
      evidence establishes that TIG expected Virginia Surety to expand
      in several states, including California, Florida and Pennsylvania.
      *See, e.g.,* Exs. 912, 913.

**RESPONSE:** *Admitted in part/Denied in part.* **With respect to the first sentence,
Trustmark admits that is has alleged that the referenced statement is a
misrepresentation. With respect to the second sentence above, Trustmark
denies that the evidence cited by TIG establishes that TIG expected Virginia
Surety to expand in several states. With respect to the expansion of the Virginia
Surety Program, TIG in fact knew as of July 1998 that the Virginia Surety
business had been cancelled, effective July 1, 1999 and failed to disclose this.
(Ex. 662; Ex. 1127, TIG 112095; Ex. 1128, TIG 111355). In addition, Lloyd
Hansen, Vice President-Director of Reinsurance for TIG (Hansen Dep. at 11:14-
15), acknowledged in an e-mail dated July 2, 1998, that all of TIG's reinsurers
should be made aware of the notice of cancellation. (Ex. 160.)**

**Moreover, Jay Chase, in an e-mail dated November 10, 1998, one day
before AON sent the 1999 Renewal submission to WEB, stated in capital letters**

24

"GIVEN CURRENT RESULTS OF THE VIRGINIA SURETY PROGRAM, WE MUST CONSIDER MAKING NOTICE OF OUR INTENT TO MATERIALLY CHANGE THE CEDING COMMISSION ON THE PROGRAM AND THEREBY OUR INTENT TO CANCEL UNDER CURRENT TERMS." (Ex. 609.) In fact, in financial forecasts dated November 13, 1998, TIG projected that the Virginia Surety segment would cancel as of July 1, 1999. (Ex. 1129, GS001257; see also Ex. 1130, GS000650.) Mr. Chase confirmed this fact in a memo dated April 2, 1999 when he stated: "During the TIG planning process, the reinsurance market remained extremely competitive and we therefore planned to lose [the Virginia Surety segment] at its natural anniversary." (Ex. 120 at TIG 111014.)

47.　Trustmark has alleged that the statement in the 1999 Renewal Submission that "TIG conducts annual Underwriting, Claims, and Actuarial reviews [of Virginia Surety]" (Ex. 79 at WEB00149) is a misrepresentation. However, between 1994, the inception of the reinsurance relationship between TIG and Virginia Surety, and the end of 1998, when the 1999 Renewal Submission was sent to WEB, TIG conducted regular - at least annually, and often more frequent - underwriting, claims and actuarial reviews of Virginia Surety. See, e.g., Ex. 474, 102, 188, 491, 105, 914, 915, 702, 123, 488, 916, 917, 137, 54.

RESPONSE: Admitted in part/Denied in part. Trustmark admits that is has alleged that the statement in the first sentence is a misrepresentation. With respect to the second sentence above, Trustmark denies that TIG has conducted regular underwriting, claims, and actuarial reviews on Virginia Surety. Mr. Chase testified that there were only two audits of Virginia Surety conducted between 1996 and 1998. (Chase Dep. at 188:9-189:9). Mr. Chase also testified that the May 11, 1998 audit was the first all-encompassing audit conducted of the Virginia Surety segment. (Chase Dep. at 118:2-9). The May 11, 1998 audit states that it was "the first joint audit between Claims, Underwriting and Actuarial..." of the Virginia Surety segment. (Ex. 484).

48.　Although Mr. Ekwall was advised in the 1999 Renewal Submission that TIG conducted annual claim and underwriting audits, he never asked for copies of the audit reports or asked any questions regarding the results of the audits. See Ekwall Dep. Tr. 584:5-13.

RESPONSE: Admitted in part/Denied in part. Trustmark admits that Mr. Ekwall never asked to see the audit reports for any audits conducted by TIG on the Virginia Surety Program, and denies that he had any obligation to do so. Rather, TIG had a duty to provide the materials to Mr. Ekwall if they would have been material to the placement of the 1999 Renewal. (Gottheimer Dep. at 181:5-21). Trustmark also denies that the testimony cited by TIG supports the assertion that Mr. Ekwall never asked any questions regarding the results of the audits, nor does it support the assertion that Mr. Ekwall never asked to see audit

25

reports for programs other than Virginia Surety.  In fact, as set forth below, in response to Paragraph 49, TIG/AON characterized the Muirfield findings in a way that reassured an underwriter that any other findings were not material to an assessment of the reinsurance risk; the contrary, of course, was true. (Ex. 1121, Ekwall Decl. (Jan. 22, 2003), ¶ 17(b); Ex. 950, Jessel Report, p.4.)

49.  Trustmark has alleged that the statement in the 1999 Renewal Submission that "[m]ajor findings to date include a need to implement stronger managed care and injury management practices" (Ex. 79 at WEB00149) is a misrepresentation.  However, the evidence establishes that TIG believed that Virginia Surety needed to implement stronger managed care and injury management practices, and that, during 1997 and 1998, TIG sought to improve Virginia Surety's managed care and injury management practices.  *See* Exs. 795, 106, 108, 114; Chase Dep. Tr. 111:12-19, 113:3-114:20.

RESPONSE: *Admitted in part/Denied in part.*  Trustmark admits that is has alleged that the statement in the first sentence is a misrepresentation.  TIG denies the second sentence above, because TIG misrepresented that the only material findings were the need to implement stronger managed care and injury management practices, and that, during 1997 and 1998, TIG sought to improve Virginia Surety's managed care and injury management practices.  Contrary to TIG's presentation of the facts, there were other major findings of the Muirfield Audit that TIG failed to disclose, such as a lack of proper reserving. (Ex. 123; Ex. 79, WEB 00375).  (Bima Dep. at 233:21-234:18; Hawksworth Dep. at 116:17-117:13; Gottheimer Dep. at 179:8-181:21; Thompson Dep. at 66:3-67:6).  As Mr. Bima noted, the representation that major findings "include" a need for managed care improvements did not mean that there were other major items or other findings.  (Bima Dep. at 234.)

50.  Trustmark has alleged that the 1999 Renewal Submission contained a representation that "TIG workers' compensation business was properly reserved."  However, the 1999 Renewal Submission does not contain a representation that "TIG workers' compensation business was properly reserved."

RESPONSE: *Admitted in part/Denied in part.*  Trustmark admits that is has alleged the first sentence is a misrepresentation.  Patrick C. McDonald, Vice President of TIG made such a representation in the 1999 Renewal Submission. (Ex. 79, at WEB021151.)  The renewal submission misrepresents that the TIG workers' compensation business was properly reserved, and such a representation is found in TIG's 1999 Renewal Submission: "There is no change planned or anticipated in the reserving standards or philosophy of TIG Insurance" as it relates to workers' compensation loss reserving. (Ex. 79 at WEB 00375; *cf.* Ex. 1131, PWC 05332-05341, at pp. 34-37 (reserving problems noted

in 1998 TIG Audit of the Ceded Reinsurance Department).)  **Furthermore, the November 1998 renewal submission represented that TIG followed template underwriting.  (Ex. 79.)  TIG made a far different, and far more candid representation, to its ultimate purchaser, Fairfax:  "[t]here are deviations from the Template MORE than not . . . ."  (Ex. 893, FX000515-517.)**

> 51.   In *Security Insurance Company of Hartford v. Trustmark Insurance Company,* Civ. No. 300CV1247(PCD), Gary Wood (a former TIG employee) was deposed.  TIG was not present or represented at the taking of the deposition.  During that deposition, Mr. Wood testified that "it would be hard to meet the stringent requirements" of the 1999 Treaty.  Wood Dep. Tr. 145:5-146:6.  In this proceeding, Steve McElhiney, vice president of TIG's Reinsurance Services Division, testified that he was told by Mr. Wood that it would be "difficult, but doable," to comply with the loss reporting provision in the 1999 Treaty.  McElhiney Dep. Tr. 146:15-147:7, 131:13-132:11.

**RESPONSE:**   *Admitted in part/Denied in part.*  **Trustmark admits that Gary Wood was deposed in the above-mentioned matter and that TIG was not present or represented at his deposition.  Trustmark admits that Mr. Wood testified that "it would be hard to meet the stringent requirements" of the 1999 Treaty. (Wood Dep. at 146:1-3).  Trustmark denies Mr. Wood told Mr. McElhiney that it would be "difficult, but doable," based on Mr. Wood's testimony that he told Mr. McElhiney that "the requirements in there [the 1999 treaty] were pretty stringent and we would not meet them."  (McElhiney Dep. at 146:24-147:2; Wood Dep. at 145:20-22.)**

> 52.   In an e-mail dated September 20, 1999, Mr. Wood explained that, while one system (the "TRACS" system) could not be used to generate the loss reports required by the 1999 Treaty, there were alternatives, involving a software query tool referred to as "PC Link," that were available and had been used to "provide this data in the past."  Ex 203.

**RESPONSE:** *Denied.*   **Trustmark admits only that Mr. Wood sent an e-mail on September 20, 1999 and denies the remainder of the statement.  Mr. Wood specifically excluded the availability of "PC Link" as an alternative to TRACS: "PCLINK was a software tool that TIG used to support . . . we lost our ability to use that tool." (Ex. 203).  Trustmark also denies TIG's characterization of this as "alternatives" as the e-mail only discusses PC Link, which, as noted above, is not an alternative.  (Id.)  Trustmark further denies this statement as the e-mail demonstrates that as of September 1999, TIG had not complied with the reporting requirements of either the 1998 or 1999 Treaties.  (Id.)**

53.   TIG uses today the same system that was in place in 1998 and 1999 to comply with the reporting requirements in the 1999 Treaty. Westover Dep. Tr. 41:10-42:12.

**RESPONSE:** *Denied.* **Trustmark denies this statement in so far as there is no "system" in place to comply with the reporting requirements. Gary Wood testified that TIG could not meet the reporting requirements of the treaties (Wood Dep. at 145:20-22), and Exhibit 203 shows that TIG had in fact not complied with the reporting requirements of either Treaty as of September 1999. (Ex. 203.)**

**Moreover, cessions and bordereaux are manual functions that are not created by any system, automatically, as TIG implies.    (PWC 05363-64) Trustmark further denies that the testimony cited by TIG supports the assertion that there was a system in place to comply with reporting requirements. Mr. Westover's testimony is that his staff uses "tools and data" to report the bordereau. (Westover Dep. at 42:11).    Mr. Westover was not employed by TIG until January 2001 (Westover Dep. Tr. 6:4-5) and did not have any first hand knowledge of what "tools and data" TIG had for reporting back in 1998 and 1999. (Westover Dep. at 41:4-7).    In addition, in May 2001, TIG was still working out the lengthy process by which to manually create the requisite bordereaux; Gary Stewart advised Gary Wood that he**

**"completed the queries for the WEB bordereaux. In order to provide the detail contractually required two Access queries had to be created from two different tables.    One query had to be exported into Excel and massaged and then imported back into Access. Then the two queries had to be run against each other and again exported into Excel for final preparation to be sent to AON Re."**

**(Ex. 1133, TIG 105911.)**

54.   In this litigation, Trustmark is seeking "an award of damages equal to the amount of all net losses Trustmark has paid or is required to pay to Security on TIG Business retroceded to Trustmark by Security." *See* Ex. 1 at 17; Ex. 918 (Trustmark's Rule 26(a)(1) Disclosure), ¶ (c).

**RESPONSE:** *Admitted.* **Trustmark admits it is seeking the above mentioned relief, but states that the above statement is incomplete and does not accurately reflect all that Trustmark is seeking in this litigation. Trustmark is also seeking: (1) "an order requiring TIG to indemnify Trustmark for all net losses Trustmark incurs on the TIG Business not otherwise recovered in damages"; (2) "Trustmark's attorneys' fees and costs associated with defending itself against Security"; (3) "punitive damages"; and (4) "such further relief as this Court deems just." (Ex. 1, p. 17).**

28

## MATERIAL ISSUES OF FACT TO BE TRIED

In addition to the disputed issues of fact outlined and demonstrated in Trustmark's Responses to TIG's statements 1-54 above incorporated herein, a genuine issue of material fact precluding the entry of summary judgment in favor of TIG exists with respect to the following:

55.    "The treaty for reinsurance was lowered by Jay Chase from $1 MM to $100,000. per file on April 1998 due to the loss experience going up." (Ex. 122, e-mail authored by P. Churchill, dated July 7, 1999 (TIG/T 015648).)

56.    "This cover was purchased because TIG believes that the experience is deteriorating because of the Virginia Surety loss." (Ex. 242, letter authored by Mr. Bima and addressed to TIG CEO Courtney Smith dated May 17, 1999 (AON10010).)

57.    "The $50k x $50 k buy-down was added during the 1999 year due to a deterioration in the underwriting results of the VSC book." (Exhibit 51, e-mail authored by TIG Vice President and Director of Reinsurance Services Steven McElhiney to TIG CEO C. `Smith dated May 25, 1998 (TIG/T –15678-82).)

58.    At the same time as Mr. Ekwall's inquiry, Ms. Bohuslav on June 3, 1998 received from AON actuary Karen Rivera the exact loss development information (including so-called "loss triangles") that Mr. Ekwall was requesting. (Ex. 207 (Rivera memo).)

59.    Ms. Rivera even wrote to Ms. Bohuslav that this was information that ought to be included in "presentation" to potential reinsurers:

> Sheila –
> I have printed off some information on Experience + Exposure Rating which I think may be interesting to include in presentation. First page is summary of rating.  Please call at your convenience to discuss.
> Karen.

(Ex. 207.)

60.    The loss experience on the TIG Portfolio was going up, particularly on the Virginia Surety Block of that portfolio, as evidenced by numerous sources. (*See* Group Ex. 1135 (VSC 000343-346; VSC 002271-2296; VSC 001362-1378; VSC 001312-1317; VSC 001300-1301; and VSC 001380-1387); Ex. 123 (Muirfield Report); Ex. 1134 (T. Tio memo, dated April 8, 1998).)

29

61.    Moreover, TIG clearly knew of significant problems with the loss development and claims handling of the VSC Block and other pieces of the TIG Portfolio. (Ex. 1121, Ekwall Decl. ¶ 17d (Ex. 6 attached thereto); Ex. 717; Ex. 123 (Muirfield Report); Ex. 1134 (Tio Memo); *see also* Responses to Par. 5-7, 46-48 above.

62.    TIG's knowledge of problems with the TIG Portfolio stretched to the highest levels, including its current parent company Fairfax Financial Holdings; Prem Watsa, CEO of .  Discovery in this case has revealed a memorandum authored by Prem Watsa, CEO of Fairfax wrote to TIG's CFO Roland Jackson on November 11, 1998 that, with respect to TIG's workers' compensation portfolio, TIG needed to "Dress it up and sell it." (*See* Ex. 893, FX 00515-17 at p. 17.)

63.    Additional documents dated in November of 1998 and produced by Fairfax indicate known trouble overall at TIG, as well as within the Virginia Surety, Innovus, and MCI segments of the TIG Portfolio: (Virginia Surety "looking at a level of trouble") (*see* Ex.899, FX 000029-34 (p. 33); (Innovus "currently trending for poor results; has not been successful to result. *Potential to reinsure 100%*.") (*see* Ex. 899, FX 000029-34 (p. 34)) (emphasis added); ("MCI has <u>not</u> been as successful in the U/W and pricing of the product.") (*see* Ex. 899 , FX 000029-34 (p. 34)); ("Nobody wants the Direct Side: potentially bad stuff there … deviations from the template MORE often than not.") (*see* Ex.893, FX 00515-17 (p. 15)).

64.    The 1999 Placement Materials also stated the following about the VSC block:

> In addition to day to day Program Management, TIG conducts annual Underwriting, Claims, and Actuarial reviews of this business unit.  Major findings to date include a need to implement stronger managed care and injury management practices.

(Ex. 79; TIG Ans. ¶ 18).

65.    Neither TIG nor AON ever disclosed or provided to WEB a copy of the May 1998 Muirfield Report. (Ex. 1121, Ekwall Decl. ¶ 18).

66.    The Muirfield audit found significant and systemic problems with the VSC Block.  The Muirfield audit disclosed pricing and reserving problems with the VSC block. (Ex. 1121, Ekwall Decl. ¶ 17b; Ex. 123 (Muirfield Report).)

67.    With respect to reserving, the TIG auditors found that the VSC Block was woefully under-reserved.  In particular, the Muirfield Audit states:

> RESERVING
> The establishment of adequate reserves is critical to the financial stability of the program.  Case reserves impact premiums and losses used in VRP and dividend adjustment plans.  At two years every claim should be reserved for ultimate claim exposure.  Some claims were not reserved for known permanency despite the medical reports reviewed in the file until one month before the

award was paid and the file closed. A reserve worksheet demonstrating reserve rationale should be in each file every time the reserve changes.

A significant number of files are below these standards, with most under-reserved. . . .

(Ex. 123; TIG Ans. ¶ 21).

68. The TIG auditors also discovered that Muirfield Underwriters' actuarial efforts with respect to the VSC Block were significantly inadequate. (Ex. 123 at ___.) Specifically, Muirfield was under-pricing this business, and two of the major problems identified by the TIG auditors was that Muirfield was systematically failing to include insurance charges as well as expense costs in their pricing. (Ex. 123.) With respect to the pricing problems associated with the VSC Block, the TIG auditors, stated, inter alia:

INSURANCE CHARGES

None of the files explicitly included a provision for the insurance charge needed to account for losses that exceed the maximum limitation of the VRP's or premium for dividends.

*       *       *

It appears loss picks are influenced by the current competitive marketplace. This aggravates the need for an insurance charge that specifically recognizes the size and hazards of each risk.

*       *       *

EXPENSE NEEDS

For the files reviewed, the average rating provision for ALAE, insurance charge and loss development was 32.9% (see summary). We estimate the expense load needed to satisfy the combined expense needs of Virginia Surety and TIG is 35.8% and this does not include any provision for insurance charge and loss development. Consequently, for the files reviewed, the average provision was 3% deficient even if we assumed there is no need for an insurance charge, a loss development provision beyond 36 months or a profit load.

AON actuaries indicated that the rates used to develop standard premium did not include any provision for TIG expenses. To promote a win - win partnership, a primary carrier needs to price adequately for its own needs and the needs of its reinsurance partners.

(Ex. 123, p. 16; TIG Ans. ¶ 21).

69.    TIG never disclosed these pricing and reserving problems to WEB.  (Ex. 1121, Ekwall Decl. ¶ 17b).

70.    Had WEB been advised of these problems, WEB would have declined to bind Security to reinsure the TIG Portfolio or would have done so on substantially different terms, and WEB would have declined to bind Trustmark as Security's retrocessionaire with respect to the TIG Portfolio or would have done so on substantially different terms.  (Ex. 1121, Ekwall Decl. ¶ 17b.)

71.    Ms. Bohuslav also orally misrepresented to Mr. Ekwall that the VSC Block was one of the most desirable and profitable segments of the TIG Portfolio.  (Ex. 1121, Ekwall Decl. ¶ 17c.)

72.    TIG represented in the Security/TIG reinsurance Agreement that it would report the claims and losses on a monthly basis: "The Company shall provide monthly bordereaux of losses within 30 days."  (Ex. 1121, Ekwall Decl. ¶ 7 (Ex. 3 attached thereto).)

73.    TIG's upper management had been advised by AON that it did not have the capability to perform these obligations.  (Ex. 1121, Ekwall Decl. ¶ 17e; Wood Dep. at 46, 112-114, 180-181.)

74.    Mr. Wood, the TIG employee responsible for preparing the bordereaux, warned TIG's senior management that TIG did not have the capability to provide a "monthly bordereaux of losses within 30 days."  (Wood Dep. at 46, 112-114, 180-181.)

75.    TIG did not have an automatic system in place to identify claims that were required to be reported.  (Wood Dep. at 48-49.)

76.    TIG could not comply with its reporting responsibilities.  (Wood Dep. at 48-49, 180-181.)

77.    This warning was ignored by TIG's upper-management and TIG agreed to provide a monthly bordereau of losses to Security as part of the TIG/Security Agreement.  (Ex. 1121, Ekwall Decl. ¶ 7 (Ex. 3 attached thereto).)

78.    Had WEB been informed that TIG would not be able to timely and accurately report losses, WEB would have never bound Security to reinsure the TIG Portfolio, nor would it have bound Trustmark to serve as Security's retrocessionaire with respect to the TIG Portfolio.  (Ex. 121, Ekwall Decl. ¶ 17e.)

Dated:  July 18, 2003                    TRUSTMARK INSURANCE COMPANY


_Will E. Mey_
Counsel for
Trustmark Insurance Company

David M. Spector CT 21679
Paula J. Morency CT 24740
William E. Meyer, Jr. CT 24362
Everett J. Cygal CT 22765
SCHIFF HARDIN & WAITE
6600 Sears Tower
Chicago, Illinois 60606-6473

Jeffrey Hellman CT 04102
Zeisler & Zeisler
558 Clinton Avenue, P.O. Box 3186
Bridgeport, Connecticut 06605

33