UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

| | |
|---|---|
| SECURITY INSURANCE COMPANY OF HARTFORD,<br><br>        Plaintiff,<br><br>    -against-<br><br>TRUSTMARK INSURANCE COMPANY,<br><br>        Defendant. | Civil No. 301CV2198 (PCD) |
| TRUSTMARK INSURANCE COMPANY,<br><br>        Third Party Plaintiff,<br><br>    -against-<br><br>TIG INSURANCE COMPANY,<br><br>        Third Party Defendant. | |

## THIRD-PARTY DEFENDANT TIG INSURANCE COMPANY'S RESPONSE TO TRUSTMARK INSURANCE COMPANY'S LOCAL RULE 56(a)2 STATEMENT

Third Party Defendant TIG Insurance Company ("TIG") submits this response pursuant to Local Rule 56(a) of the Local Rules for the District of Connecticut in response to the Local Rule 56(a)2 Statement submitted by Trustmark Insurance Company's ("Trustmark").

Most, if not all, of Trustmark's Local Rule 56(a)2 Statement of Material Issues of Fact to Be Tried consists of simple declarative assertions and carefully selected, and misleading, quotes from various documents. None of these assertions properly identify or constitute issues to be tried, nor do they raise any genuine issues of material fact precluding the entry of summary judgment in favor of TIG.

NYLIB2 243027.7

In any event, TIG responds to Trustmark's Statement as follows:

55. "The treaty for reinsurance was lowered by Jay Chase from $1 MM to $100,000. per file on April 1998 due to the loss experience going up." (Ex. 122, e-mail authored by P. Churchill, dated July 7, 1999 (TIG/T015648).)

**RESPONSE**: TIG admits that Trustmark accurately quoted from Exhibit 122, but denies that TIG lowered its retention due to the loss experience going up. Chase Dep. (02/12/03) Tr. 179:5-20, 180:21-81:17.

56. "This cover was purchased because TIG believes that the experience is deteriorating because of the Virginia Surety loss." (Ex. 242, letter authored by Mr. Bima and addressed to TIG CEO Courtney Smith dated May 17, 1999 (AON10010).)

**RESPONSE**: TIG admits that Trustmark accurately quoted from Mr. Bima's May 17, 1999 letter to Mr. Smith (but note that the document is Ex. 121, not Ex. 242), but denies that TIG purchased reinsurance because it believed the experience was deteriorating because of Virginia Surety losses. Chase Dep. (02/12/03) Tr. 179:5-20, 180:21-81:17.

57. The $50k x $50K buy-down was added during the 1999 year due to a deterioration in the underwriting results of the VSC book." (Exhibit 51, e-mail authored by TIG Vice President and Director of Reinsurance Services Steven McElhiney to TIG CEO C. Smith dated May 25, 1998 (TIG/T-15678-82).)

**RESPONSE**: TIG admits that Trustmark accurately quoted from Exhibit 51, but denies that the $50k x $50K buy-down was added during the 1999 year due to a deterioration in the underwriting results of the VSC book. *See* Chase Dep. (03/17/03) Tr. 242:5-10; Scholl Dep. Tr. 332:12-36:3; *see also* Chase Dep. (02/12/03) Tr. 179:5-20, 180:21-81:17.

58. At the same time as Mr. Ekwall's inquiry, Ms. Bohuslav on June 3, 1998 received from AON actuary Karen Rivera the exact loss development information (including so-called "loss triangles") that Mr. Ekwall was requesting. (Ex. 207 (Rivera memo).)

**RESPONSE:** TIG admits that, on June 3, 1998, Karen Rivara sent to Shelia Bohuslav Exhibit 207, which contains some loss development information, but denies that Mr. Ekwall inquired about or requested loss development information relating to the Virginia Surety business segment. Bohuslav Dep. Tr. 355:22-56:13. Moreover, even assuming that Mr. Ekwall made such a request or inquiry, the loss development information for Virginia Surety contained in Exhibit 207 was based upon a combination of TIG Primary loss triangles and industry loss development factors (Rivara Dep. Tr. 69:13-16, 72:9-73:13), both of which Mr. Ekwall testified were available to him (Ekwall Dep. Tr. 103:11-04:14).

> 59. Ms. Rivera even wrote to Ms. Bohuslav that this was information that ought to be included in "presentation" to potential reinsurers:
>
> Shelia –
>
> I have printed off some information on Experience + Exposure Rating which I think may be interesting to include in presentation. First page is summary of rating. Please call at your convenience to discuss.
>
> Karen.
>
> (Ex. 207.)

**RESPONSE:** TIG admits that Trustmark accurately quoted from Exhibit 207, but denies that the referenced "presentation" was to "potential reinsurers." In fact, Ms. Rivara testified that the "presentation" referenced in Exhibit 207 was <u>not</u> a "'presentation' to potential reinsurers," but rather a presentation to TIG (AON's client). Rivara Dep. Tr. 42:19-24.

> 60. The loss experience on the TIG Portfolio was going up, particularly on the Virginia Surety Block of that portfolio, as evidenced by numerous sources. (*See* Group Ex. 1135 (VSC 000343-346; VSC 002271-2296; VSC 001362-1378; VSC 001312-1317; VSC 001300-1301; and VSC 001380-1387; Ex. 123 (Muirfield Report); Ex. 1134 (T. Tio memo, dated April 8, 1998).)

**RESPONSE**: TIG admits that the loss experience on its workers compensation business, particularly on Virginia Surety business, was going up in the late 1990s, and notes that this information was fully disclosed to WEB in, *inter alia*, the 1998 Underwriting Information and the 1999 Renewal Submission.

> 61. Moreover, TIG clearly knew of significant problems with the loss development and claims handling of the VSC Block and other pieces of the TIG Portfolio. (Ex. 1121, Ekwall Decl. ¶ 17d (Ex. 6 attached thereto); Ex 717; Ex. 123 (Muirfield Report); Ex. 1134 (Tio Memo); *see also* Responses to Par. 5-7, 46-48 above.

**RESPONSE**: TIG denies that there were any "significant problems with the loss development and claims handling of the VSC Block and other pieces of the TIG Portfolio" that were not disclosed to WEB. *See* Ex. 70, Ex. 79.

> 62. TIG's knowledge of problems with the TIG Portfolio stretched to the highest levels, including its current parent company Fairfax Financial Holdings; Prem Watsa, CEO of. Discovery in this case has revealed a memorandum authored by Prem Watsa, CEO of Fairfax wrote to TIG's CFO Roland Jackson on November 11, 1998 that, with respect to TIG's workers' compensation portfolio, TIG needed to "Dress it up and sell it." (*See* Ex. 893, FX 00515-17 at p.17.)

**RESPONSE**: TIG denies that Exhibit 893 supports the proposition for which Trustmark cites it.

> 63. Additional documents dated in November of 1998 and produced by Fairfax indicate known trouble overall at TIG, as well as within the Virginia Surety, Innovus, and MCI segments of the TIG Portfolio: (Virginia Surety "looking at a level of trouble") (*see* Ex. 899, FX 000029-34 (p. 33); (Innovus "currently trending for poor results; has not been successful to result. *Potential to reinsure 100%.*") (*see* Ex. 899, FX 000029-34 (p.34)) (emphasis added); ("MCI has not been as successful in the U/W and pricing of the product.") (*see* Ex. 899, FX 000029-34 (p.34)); ("Nobody wants the Direct Side: potentially bad stuff there ... deviations from the template MORE often than not.") (*see* Ex. 893, FX 00515-17 (p. 15)).

**RESPONSE**: TIG denies that Exhibits 893 and 899 support the proposition for which Trustmark cites them.

 64. The 1999 Placement Materials also stated the following about the VSC block:

> In addition to day to day Program Management, TIG conducts annual Underwriting, Claims, and Actuarial reviews of this business unit. Major findings to date include a need to implement stronger managed care and injury management practices.

(Ex. 79; TIG Ans. ¶ 18).

**RESPONSE**: TIG admits that Trustmark accurately quoted from Exhibit 79.

 65. Neither TIG nor AON ever disclosed or provided to WEB a copy of the May 1998 Muirfield Report. (Ex. 1121, Ekwall Decl. ¶ 18).

**RESPONSE**: TIG denies that it never disclosed to WEB the May 1998 Muirfield Audit (*see* Ex. 79 at WEB 00149), but admits that Mr. Ekwall never asked for a copy of the audit report and thus was not provided with it.

 66. The Muirfield audit found significant and systemic problems with the VSC Block. The Muirfield audit disclosed pricing and reserving problems with the VSC block. (Ex. 1121, Ekwall Decl. ¶ 17b; Ex. 123 (Muirfield Report).)

**RESPONSE**: TIG denies that the Muirfield audit found any "significant and systemic problems with the VSC Block." *See* Ex. 123.

 67. With respect to reserving, the TIG auditors found that the VSC Block was woefully under-reserved. In particular, the Muirfield Audit states:

> RESERVING
> The establishment of adequate reserves is critical to the financial stability of the program. Case reserves impact premiums and losses used in VRP and dividend adjustment plans. At two years every claim should be reserved for ultimate claim exposure. Some claims were not reserved for known permanency despite the medical

> reports reviewed in the file until one month before the award was paid and the file closed. A reserve worksheet demonstrating reserve rationale should be in each file every time the reserve changes.
>
> A significant number of files are below these standards, with most under-reserved. . . . .

(Ex. 123; TIG Ans. ¶ 21).

**RESPONSE:** TIG admits that Trustmark accurately quoted from Exhibit 123, but denies that TIG's auditors found that the VSC Block was woefully under-reserved. *See* Ex. 123; *see also* Churchill Dep. Tr. at 173:21–74:1, 198:21–99:1.

68. The TIG auditors also discovered that Muirfield Underwriters' actuarial efforts with respect to the VSC Block were significantly inadequate. (Ex. 123 at __.) Specifically, Muirfield was under-pricing this business, and two of the major problems identified by the TIG auditors was that Muirfield was systematically failing to include insurance charges as well as expense costs in their pricing. (Ex. 123.) With respect to the pricing problems associated with the VSC Block, the TIG auditors, stated, inter alia:

> INSURANCE CHARGES
>
> None of the files explicitly included a provision for the insurance charge needed to account for losses that exceed the maximum limitation of the VRP's or premium for dividends.
>
> \* \* \*
>
> It appears loss picks are influenced by the current competitive marketplace. This aggravates the need for an insurance charge that specifically recognizes the size and hazards of each risk.
>
> \* \* \*
>
> EXPENSE NEEDS
>
> For the files reviewed, the average rating provision for ALAE, insurance charge and loss development was 32.9% (see summary). We estimate the expense load needed to satisfy the combined expense needs of Virginia Surety and TIG is 35.8% and this does not include any provision for

> insurance charge and loss development. Consequently, for the files reviewed, the average provision was 3% deficient even if we assumed there is no need for an insurance charge, a loss development provision beyond 36 months or a profit load.
>
> AON actuaries indicated that the rates used to develop standard premium did not include any provision for TIG expenses. To promote a win - win partnership, a primary carrier needs to price adequately for its own needs and the needs of its reinsurance partners.

(Ex. 123, p. 16; TIG Ans. ¶ 21).

**RESPONSE:** TIG admits that Trustmark accurately quoted from Exhibit 123, but denies that TIG's auditors found any of the alleged "significant inadequacies," "under-pricing" or "systemic failures" referenced by Trustmark. *See* Ex. 123.

> 69. TIG never disclosed these pricing and reserving problems to WEB. (Ex. 1121, Ekwall Decl. ¶ 17b).

**RESPONSE:** TIG denies that the Muirfield Audit Report reflects "pricing and reserving problems." *See also* TIG's Response to ¶¶ 65-68, above.

> 70. Had WEB been advised of these problems, WEB would have declined to bind Security to reinsure the TIG Portfolio or would have done so on substantially different terms, and WEB would have declined to bind Trustmark as Security's retrocessionaire with respect to the TIG Portfolio or would have done so on substantially different terms. (Ex. 1121, Ekwall Decl. ¶ 17b.)

**RESPONSE:** TIG denies that TIG's auditors found the alleged "problems" referenced by Trustmark and further denies that Mr. Ekwall would have declined to bind Security to reinsure the TIG Portfolio had he requested and received a copy of the Muirfield Audit report. *See* Ex. 92.

> 71. Ms. Bohuslav also orally misrepresented to Mr. Ekwall that the VSC Block was one of the most desirable and profitable segments of the TIG Portfolio. (Ex. 1121, Ekwall Decl.¶ 17c.)

**RESPONSE**: TIG denies that Ms. Bohuslav orally misrepresented to Mr. Ekwall that the VSC Block was one of the most desirable and profitable segments of the TIG Portfolio. *See* Bohuslav Dep. Tr. 370:21-25.

> 72. TIG represented in the Security/TIG reinsurance Agreement that it would report the claims and losses on a monthly basis: "The Company shall provide monthly bordereaux of losses within 30 days." (Ex. 1121, Ekwall Decl. ¶ 7 (Ex. 3 attached thereto).)

**RESPONSE**: TIG admits that Trustmark accurately quoted from the 1999 Placement Slip, but denies that the quoted language constitutes a representation.

> 73. TIG's upper management had been advised by AON that it did not have the capability to perform these obligations. (Ex. 1121, Ekwall Decl. ¶ 17e; Wood Dep. at 46, 112-114, 180-181.)

**RESPONSE**: TIG denies that AON advised its upper management that it did not have the capability to provide monthly bordereaux, and notes that the evidence to which Trustmark cites does not support this statement. *See also* TIG Response to ¶ 74, below.

> 74. Mr. Wood, the TIG employee responsible for preparing the bordereaux, warned TIG's senior management that TIG did not have the capability to provide a "monthly bordereaux of losses within 30 days." (Wood Dep. at 46, 112-114, 180-181.)

**RESPONSE**: TIG denies that Gary Wood warned TIG's senior management that TIG did not have the capability to provide a "monthly bordereaux of losses within 30 days." *See* Wood Dep. Tr. at 145:20–46:6; McElhiney Dep. Tr. at 131:13-32:11; *see also* Exs. 1154 & 1155.

> 75. TIG did not have an automatic system in place to identify claims that were required to be reported. (Wood Dep. at 48-49.)

**RESPONSE**: TIG admits that one of its computer systems for reporting losses was not modified for purposes of reporting claims under the 1999 Treaty, but denies that it did not have alternative methods and systems available to it to do so. *See* Wood Dep. Tr. 134:10-35:20; Westover (07/16/03) Dep. Tr. 34:7-35:2, 44:2-8.

> 76. TIG could not comply with its reporting responsibilities. (Wood Dep. at 48-49, 180-181.)

**RESPONSE**: TIG denies that it could not comply with its reporting responsibilities under the 1999 Treaty. *See* Wood Dep. Tr. 134:10-35:20; Westover (07/16/03) Dep. Tr. 34:7-35:2, 44:2-8; *see also* Exs. 1154 & 1155.

> 77. This warning was ignored by TIG's upper management and TIG agreed to provide a monthly bordereau of losses to Security as part of the TIG/Security Agreement. (Ex. 1121, Ekwall Decl. ¶ 7 (Ex. 3 attached thereto).)

**RESPONSE**: TIG denies that its upper management was ever warned that it could not comply with its reporting obligations under the 1999 Treaty. *See* Wood Dep. Tr. at 145:20-46:6; McElhiney Dep. Tr. at 131:13-32:11; *see also* Exs. 1154 & 1155.

> 78. Had WEB been informed that TIG would not be able to timely and accurately report losses, WEB would have never bound Security to reinsure the TIG Portfolio, nor would it have bound Trustmark to serve as Security's retrocessionaire with respect to the TIG Portfolio. (Ex. 121, Ekwall Decl. ¶ 17e.)

**RESPONSE**: TIG denies that it ever lacked the ability to comply with its loss reporting obligations under the 1999 Treaty.

Dated:    November 12, 2004

        HURWITZ, SAGARIN & SLOSSBERG, LLC

        By: /s/ David Slossberg
            David Slossberg CT 113116

        Daniel Sagarin CT 04289
        147 North Broad Street
        Milford, Connecticut 06460-0112
        Telephone: (203) 877-8000

        CADWALADER, WICKERSHAM & TAFT LLP
        Harry P. Cohen CT 20446
        Brian J. O'Sullivan CT 23790
        100 Maiden Lane
        New York, New York 10038
        (212) 504-6000

        Attorneys for Third Party Defendant
        TIG Insurance Company

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was sent by facsimile and federal express, this 12th day of November, 2004, to counsel of record for plaintiff Security Insurance Company of Hartford and defendant / third-party plaintiff Trustmark Insurance Company, addressed to:

Frank F. Coulom, Jr. CT 05230
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT  06103-3597

Attorneys for Plaintiff
Security Insurance Co. of Hartford

David J. Grais CT 23352
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY  10019

Attorneys for Plaintiff
Security Insurance Co. of Hartford

Jeffrey Hellman CT 04102
Zeisler & Zeisler, P.C.
558 Clinton Avenue
P.O. Box 3186
Bridgeport, CT  06605

Attorneys for Defendant and
Third Party Plaintiff
Trustmark Insurance Co.

Mark B. Holton CT 21727
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY  10166-0193

Attorneys for Plaintiff
Security Insurance Co. of Hartford

Everett J. Cygal CT 22765
Schiff Hardin & Waite
6600 Sears Tower
Chicago, IL  60606-6473

Attorneys for Defendant and
Third Party Plaintiff
Trustmark Insurance Co.

Brian J. O'Sullivan