FILED

2004 NOV 15 P 12: 07

U.S. DISTRICT COURT
NEW HAVEN, CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

SECURITY INSURANCE COMPANY OF HARTFORD,

Plaintiff,

-against-

TRUSTMARK INSURANCE COMPANY,

Defendant.

---

TRUSTMARK INSURANCE COMPANY,

Third Party Plaintiff,

-against-

TIG INSURANCE COMPANY,

Third Party
Defendant.

Civil No. 301CV2198 (PCD)

November 12, 2004

---

### THIRD-PARTY DEFENDANT TIG INSURANCE COMPANY'S
### REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
### FOR SUMMARY JUDGMENT DISMISSING THE THIRD-PARTY COMPLAINT

HURWITZ, SAGARIN & SLOSSBERG, LLC
147 North Broad Street
Milford, Connecticut 06460-0112
(203) 877-8000

CADWALADER, WICKERSHAM & TAFT LLP
100 Maiden Lane
New York, New York 10038
(212) 504-6000

Attorneys for Third Party Defendant
TIG Insurance Company

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT .............................................................................. 1

POINT I    ILLINOIS LAW GOVERNS THE RESOLUTION OF
           TRUSTMARK'S CLAIMS AGAINST TIG ............................................ 1

POINT II   THE ECONOMIC LOSS RULE BARS TRUSTMARK'S
           NEGLIGENT MISREPRESENTATION CLAIM .................................... 2

POINT III  TRUSTMARK'S FRAUDULENT NON-DISCLOSURE CLAIM
           FAILS AS A MATTER OF LAW SINCE TIG DID NOT OWE ANY
           DUTIES TO TRUSTMARK .................................................................. 4

POINT IV   TRUSTMARK HAS FAILED TO DEMONSTRATE THAT IT HAS
           SUFFERED ANY DAMAGES PROXIMATELY CAUSED BY TIG'S
           ALLEGED FRAUD ............................................................................. 6

POINT V    TRUSTMARK'S FRAUDULENT MISREPRESENTATION CLAIMS
           FAIL AS A MATTER OF LAW .............................................................. 8

CONCLUSION ...................................................................................................... 11

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES:**

*Anderson Elec., Inc. v. Ledbetter Erection Corp.,*
503 N.E.2d 246 (Ill. 1986).................................................................... 3

*Cooper v. Carl A. Nelson & Co.,*
211 F.3d 1008 (7th Cir. 2000) ............................................................. 5

*Delta Holdings, Inc. v. National Distillers & Chem. Corp.,*
945 F.2d 1226 (2d Cir. 1991), *cert. denied*, 503 U.S. 985 (1992)......... 7-8

*Economu v. Borg-Warner Corp.,*
652 F. Supp. 1242 (D. Conn.), *aff'd*, 829 F.2d 311 (2d Cir. 1987) ....... 1-2

*Fireman's Fund Ins. Co. v. SEC Donohue, Inc.,*
679 N.E.2d 1197 (Ill. 1997)................................................................. 3

*First Nationwide Bank v. Gelt Funding Corp.,*
27 F.3d 763 (2d Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995)............ 6-7

*GE Capital Corp. v. DirecTV, Inc.,*
94 F. Supp. 2d 190 (D. Conn. 1999)..................................................... 1

*International Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co.,*
No. 88 C 320, 1989 WL 99771 (N.D. Ill. Aug. 18, 1989)..................... 3

*LaMontagne v. E.I. Du Pont de Nemours & Co.,*
41 F.3d 846 (2d Cir. 1994)................................................................... 5

*Lang v. Consumers Ins. Serv., Inc.,*
583 N.E.2d 1147 (Ill. App. Ct. 1991) .................................................. 3

*Lazard Freres & Co. v. Protective Life Ins. Co.,*
108 F.3d 1531 (2d Cir.), *cert. denied*, 522 U.S. 864 (1997)................. 2

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,*
85 F. Supp. 2d 282 (S.D.N.Y. 2000), *aff'd*, 2 Fed. Appx. 109 (2d Cir. 2001) ........... 2, 5

*PXRE Reins. Co. v. Lumbermens Mut. Cas. Co.,*
330 F. Supp. 2d 981 (N.D. Ill. 2004)................................................... 3, 9-10

*PXRE Reins. Co. v. Lumbermens Mut. Cas. Co.,*
No. 03 C 5155, 2004 WL 2387637 (N.D. Ill. Oct. 21, 2004)................ 9

**PAGE(S)**

*Sun Mut. Ins. Co. v. Ocean Ins. Co.,*
    107 U.S. 485 (1883)..........................................................................................    4-5

*2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.,*
    555 N.E.2d 346 (Ill. 1990)...........................................................................    3

*Unigard Sec. Ins. Co. v. North River Ins. Co.,*
    4 F.3d 1049 (2d Cir. 1993)..........................................................................    5

iii

## PRELIMINARY STATEMENT[1]

As discussed in TIG's initial brief, each of Trustmark's three claims against TIG – negligent misrepresentation, fraudulent non-disclosure and fraudulent misrepresentation – fails as a matter of law and should be summarily dismissed. In its opposition, Trustmark ignores or fails to distinguish controlling authority and makes only a half-hearted, and ultimately unsuccessful, attempt to "lay bare its proof" with clear and convincing evidence of "specific facts" and "concrete particulars" with respect to each element of each fraud claim against TIG. TIG Mem. at 17, 22-23 (citations omitted). Perhaps recognizing that its claims are doomed, Trustmark instead impermissibly resorts to distortion, diversion and "factually unsubstantiated conclusory assertions." *Id.* at 17. The Court should not be distracted by Trustmark's ploy.

## POINT I

### ILLINOIS LAW GOVERNS THE RESOLUTION OF TRUSTMARK'S CLAIMS AGAINST TIG

Trustmark's contention that its claims against TIG are governed by Connecticut law is based on the erroneous premise that "the Connecticut Supreme Court abandoned categorical allegiance to the *lex loci delecti* test many years ago" and that courts in Connecticut currently "employ the 'most significant relationship analysis' as articulated in the *Restatement (Second) of Conflict of Laws.*" Trustmark Mem. at 4. To the contrary, as this Court has held on numerous occasions, the *lex loci* test governs choice of law determinations under Connecticut law unless it "'would produce arbitrary, irrational results.'" *GE Capital Corp. v. DirecTV, Inc.,* 94 F. Supp. 2d 190, 196 (D. Conn. 1999) (citation omitted); *Economu v. Borg-Warner Corp.,*

---

[1]    TIG adopts herein the same conventions and abbreviations used by it in its Memorandum of Law in Support of its Motion for Summary Judgment (the "TIG Mem."). References to "Trustmark Mem." and "Trustmark Resp." are to Trustmark's Memorandum in Opposition to TIG's Motion for Summary Judgment and its Local Rule 56(a)(2) Statement, respectively.

652 F. Supp. 1242, 1247 (D. Conn.), *aff'd*, 829 F.2d 311 (2d Cir. 1987).  Not surprisingly, Trustmark does not even attempt to argue that the application of Illinois law to its third party claims would produce an arbitrary or irrational result.  Nor could it since Trustmark is itself domiciled and has its principal place of business in Illinois.  Accordingly, Illinois law governs Trustmark's third party claims.[2]

## POINT II

### THE ECONOMIC LOSS RULE BARS TRUSTMARK'S NEGLIGENT MISREPRESENTATION CLAIM

Trustmark argues that its negligent misrepresentation claim is not barred by the economic loss rule because the law of Connecticut, not Illinois, governs its third party claims against TIG.  *See* Trustmark Mem. at 4.  As discussed above, Trustmark is wrong; Illinois law governs here and, thus, Trustmark's discussion of Connecticut law (*id.* at 7-9) is irrelevant and will be disregarded.

Trustmark's arguments that its negligent misrepresentation claim against TIG is not barred by Illinois' economic loss rule (*see id.* at 7 n.2) are unavailing.  First, Trustmark argues that the economic loss rule applies only where there is a contractual relationship between the parties.  To the contrary, the Illinois Supreme Court has not limited the application of the economic loss rule to instances where there is a contractual relationship between the parties, and has, indeed, applied the rule to bar recovery of economic losses in tort even when plaintiff has no

---

[2]  The fact that the Court has "already applied the law of Connecticut" to Security's claims against Trustmark (*see* Trustmark Mem. at 6 n.1) is irrelevant.  The Court did so because neither Trustmark nor Security argued for the application of any other law.  In any event, because Security is a Connecticut insurer and has sustained its economic injury in Connecticut, the *lex loci* test arguably requires the application of Connecticut law to Security's claims.  Obviously, there is no inconsistency between Connecticut law governing Security's claims against Trustmark, and Illinois law governing Trustmark's third party claims against TIG.  *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir.), *cert. denied*, 522 U.S. 864 (1997); *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 292-93 (S.D.N.Y. 2000), *aff'd*, 2 Fed. Appx. 109 (2d Cir. 2001).

NYLIB2 238777.3                                              -2-

contractual remedy against the defendant. *See 2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346, 350 (Ill. 1990); *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (Ill. 1986).

Second, Trustmark argues that the economic loss rule does not bar its negligent misrepresentation claim because TIG's agent, Aon, was in the business of supplying information for the guidance of others. Trustmark, however, offers no authority for its conclusory assertion that, as a matter of law, a reinsurance broker is in the business of supplying information for the guidance of others. And, in any event, under Illinois law, the dispositive issue is "whether *the defendant*," not its agent, "is in the business of supplying information for the guidance of others." *See Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1201 (Ill. 1997) (emphasis added). Obviously, a company, like TIG here, which is <u>not</u> in the business of supplying information for the guidance of others, does not magically become such a company simply because it operates through agents. Aon's involvement in the placement of the reinsurance is therefore irrelevant. *Lang v. Consumers Ins. Serv., Inc.*, 583 N.E.2d 1147, 1153-54 (Ill. App. Ct. 1991). Tellingly, Trustmark does not even address *International Surplus Lines Insurance Co. v. Fireman's Fund Insurance Co.*, No. 88 C 320, 1989 WL 99771, at *2 (N.D. Ill. Aug. 18, 1989), which is directly on point and where the court dismissed a negligent misrepresentation claim and held that an insurance company is not "in the business of supplying information." Similarly, another district court in the Northern District of Illinois recently dismissed a negligent misrepresentation claim brought by a reinsurer against its cedent on the ground that a ceding company "cannot be said to be in the business of supplying information." *PXRE Reins. Co. v. Lumbermens Mut. Cas. Co.*, No. 03 C 5155, 2004 WL 2387637, at *8 (N.D. Ill. Oct. 21, 2004).

**POINT III**

**TRUSTMARK'S FRAUDULENT NON-DISCLOSURE CLAIM FAILS AS A MATTER OF LAW SINCE TIG DID NOT OWE ANY DUTIES TO TRUSTMARK**

As a preliminary matter, Trustmark does not dispute that its fraudulent non-disclosure claim fails as a matter of Illinois law. *See* Trustmark Mem. at 9-12; TIG Mem. at 20-21. Since, as discussed in Point I above, Illinois law governs the resolution of Trustmark's third party claims against TIG, TIG is entitled to summary judgment dismissing Trustmark's fraudulent non-disclosure claims. Trustmark's discussion of Connecticut's reasonable foreseeability standard (Trustmark Mem. at 9-10) is therefore irrelevant and will be disregarded.

Trustmark's contention that TIG ignores the "duty of utmost good faith" and is seeking to impose a "caveat emptor" standard to reinsurance transactions is both wrong and beside the point. TIG does not dispute that it owed an utmost good faith duty to *its reinsurer*, Security (and whether TIG breached that duty will be the subject of an arbitration between TIG and Security). TIG does <u>not</u>, however, owe any duties to Security's retrocessionaire, Trustmark. Indeed, Trustmark's *ipse dixit* argument that TIG owed an utmost good faith duty *to Trustmark* is unsupported and belied, not just by the authorities on which Trustmark relies, but by Trustmark itself. In that regard, Trustmark correctly states that "[i]t is a fundamental precept of reinsurance industry custom and practice that a cedent is obligated to disclose *to its reinsurers* all material facts relating to the underlying risk." Trustmark Mem. at 10 (emphasis added).[3] Moreover, each of the cases cited by Trustmark holds only that a cedent has a duty of utmost good faith to its

---

[3] Throughout the Memorandum, Trustmark refers to "TIG's duty of good faith to its *retrocedents*." *See, e.g., id.* at 20 & 22 (emphasis added). These statements inaccurately describe the relationships before the Court, where TIG was the cedent, Security was TIG's reinsurer (and Trustmark's retrocedent) and Trustmark was Security's retrocessionaire.

own reinsurers. *See, e.g., Sun Mut. Ins. Co. v. Ocean Ins. Co.*, 107 U.S. 485, 510 (1883); *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049, 1066 (2d Cir. 1993).

Indeed, in *Odyssey Re*, a case involving WEB, Trustmark's agent, Judge Buchwald rejected the very same argument Trustmark raises here:

> Odyssey's argument that all parties to a reinsurance agreement owe one another an obligation "of utmost good faith" finds more support in case law. . . . However, this duty does not extend as far as plaintiff takes it. The case plaintiff cites, [*Sun Mutual*] . . . **does not address the duty owed between parties [*i.e.*, retrocessionaires] as far removed as Web and Odyssey, who had at least one and often two or three parties to the transaction between them.** . . . [*Sun Mutual*] . . . revolved around the duties implied into a contract between the parties *to that contract*, not between third and fourth parties.

85 F. Supp. 2d at 297 (italicized emphasis in original; bolded emphasis added; citations omitted). Tellingly, Trustmark does not cite a single case or any other authority holding that the duty of utmost good faith extends beyond a cedent's own reinsurers.

Finally, Trustmark cannot rely on "reinsurance custom and practice" to create a question of fact on this issue because the existence and nature of an alleged duty is a question of law to be determined by the Court. *See Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1015 (7th Cir. 2000); *LaMontagne v. E.I. Du Pont de Nemours & Co.*, 41 F.3d 846, 856 (2d Cir. 1994).[4] That being said, however, it is worth noting that even Trustmark's own experts concede that, as a matter of reinsurance custom and practice, TIG owed duties <u>only</u> to its own reinsurer, not to retrocessionaires such as Trustmark. *See, e.g.*, Ex. 958 at 8 ("It is the established industry custom and practice that a ceding company has an ongoing duty to take reasonable steps to assure that the information originally conveyed to all potentially interested *reinsurers* [*i.e.*, <u>not</u>

---

[4] For that reason, as well as others, TIG will at the appropriate time make an *in limine* motion to preclude Trustmark's experts from testifying on this and other issues.

-5-

retrocessionaires] was accurate and reliable") (emphasis added); Ex. 952 at 9 ("Basically, utmost good faith obligates the ceding company to disclose, voluntarily, information which might materially affect the scope of the risk(s) covered *by the reinsurer*") (emphasis added).[5]  In this regard, Mr. Gottheimer further explained at his deposition that "because the way the relationship runs, that Security's recourse would be against TIG and Trustmark's against Security." Gottheimer Dep. Tr. 267:18-268:7.  Obviously, if, as Trustmark's expert admits, Trustmark has no remedy against TIG, then, as a matter of law and simple logic, TIG had no duty to Trustmark.

**POINT IV**

**TRUSTMARK HAS FAILED TO DEMONSTRATE THAT
IT HAS SUFFERED ANY DAMAGES PROXIMATELY
CAUSED BY TIG'S ALLEGED FRAUD**

Trustmark does not dispute that in order to prevail on its third party claims it must prove <u>both</u> "transaction causation," *i.e.*, that *but for* TIG's alleged fraud, WEB would never have entered the transaction, <u>and</u> "loss causation," *i.e.*, that TIG's alleged fraud was the cause of its actual loss.  *See* Trustmark Mem. at 33-34; TIG Mem. at 39-40 (citing cases).  Trustmark has attempted to satisfy its burden on this issue solely through evidence of "but for" (or transaction) causation.  *See* Trustmark Mem. at 33-34.  Trustmark's attempt fails as a matter of law.

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995), is directly on point.  There, plaintiff ("FNB") sought to recover amounts it allegedly lost due to loan defaults because, according to FNB, it was "fraudulently induced . . . to make loans it otherwise would not have made." *Id.* at 765; *see also id.* at 769-72. The Second Circuit held that FNB could not recover all of its losses resulting from the loan

---

[5]    In its opposition brief, Trustmark blatantly distorts Mr. Gottheimer's comment, deleting the phrase "the reinsurer," *i.e.*, Security, and replacing it with "Security *and Trustmark.*" Trustmark Mem. at 13 (emphasis added).

defaults (even though FNB, like Trustmark here, alleged that it would never have entered into those transactions but for the fraud), and that its damages were limited to those amounts it could prove were proximately caused by the alleged fraud (as opposed to, for example, market conditions). The Second Circuit held that FNB's fraud claim was defective as a matter of law because its damages analysis did not "adequately account for the contribution of external market factors to the loss," such as "the complexity of the New York real estate market, and the fact that FNB's losses came in the wake of a downturn in the real estate market." *See id.* at 770-72.

Likewise, Trustmark has completely failed to account for any external market factors in its damages analysis, arguing instead (just like FNB) that it is entitled to its "net ceded losses" because it would never have entered into the 1999 Treaty and Retrocession Contract but for TIG's fraud. While Trustmark's assertion, if true, may be sufficient to demonstrate transaction causation, it is completely insufficient to sustain Trustmark's obligation to prove what portion (if any) of Trustmark's "net ceded losses" were proximately caused by TIG's alleged fraud (again, as opposed to market conditions). *See* TIG Mem. at 39-40 (citing cases).[6]

The fact that Trustmark may ultimately pay more losses under the Retrocession Contract than it anticipated is irrelevant to the loss causation issue (particularly where, as here, Trustmark is an insurance company and, thus, in the business of insuring against the unknown). As the Second Circuit noted in *Delta Holdings, Inc. v. National Distillers & Chemical Corp.*, 945 F.2d 1226 (2d Cir. 1991), *cert. denied*, 503 U.S. 985 (1992):

---

[6]    Trustmark's suggestion to the contrary notwithstanding (Trustmark Mem. at 33), Mr. Jessel's expert report is irrelevant to the loss causation issue. Mr. Jessel conceded that he made no effort to understand or replicate the manner in which Mr. Ekwall priced the 1999 Treaty, or the impact on Mr. Ekwall's pricing of the supposed "material" information that was allegedly misrepresented or not disclosed to WEB. *See* Jessel Dep. (11/05/04) Tr. 268:4-69:11, 274:8-24, 419:4-21:4. In any event, Mr. Jessel offers no opinion whatsoever regarding market forces and, indeed, specifically chose not to consult industry wide data sources in doing his analysis. *See* Jessel Dep. (07/02/03) Tr. 147:24-49:16; Jessel Dep. (11/05/04) Tr. 282:13-83:11.

> [I]n the reinsurance industry history may be an imperfect guide to the future, particularly with regard to casualty [*e.g.*, workers' compensation] risks. The incidence of claims may change, the costs of defense may increase, and inflation may lead to unexpectedly high losses per claim.

*Id.* at 1231. This was certainly true of the workers compensation insurance market during 1999 and 2000, which suffered considerably greater losses than in prior years. *See* Ex. 1150 at 14 (National Counsel on Compensation Insurance ("NCCI") statistics indicating that losses had increased by more than 18% between accident year 1997 and accident years 1999 and 2000); Ex. 1151 at 9 (indicating that 1999 was the worst year for California workers compensation between 1989 and 2003); *see also* Exs. 1152 (May 9, 2002 Business Wire article, "NCCI Reports on the State of the Workers Compensation Insurance Line") & 1153 (May 15, 2003 Business Wire article, "NCCI Releases Estimated 2002 Calendar Year Combined Ratio for Workers Compensation Insurance Market"). Under these circumstances, any award of damages in Trustmark's favor would be based upon nothing more than sheer speculation and conjecture.

## POINT V

## TRUSTMARK'S FRAUDULENT MISREPRESENTATION CLAIMS FAIL AS A MATTER OF LAW

In preparing its summary judgment motion, TIG scoured Mr. Ekwall's deposition and declaration, as well as Trustmark's pleadings and discovery responses, in order to identify a precise and comprehensive list of all of the specific misrepresentations underlying Trustmark's fraud claim. Trustmark does not take issue with the completeness of TIG's list, nor has it suggested that TIG has misstated or mischaracterized the allegations. However, rather than forthrightly addressing those specific allegations and the specific issues raised by TIG's summary judgment motion, Trustmark instead inundates the Court with rhetoric, irrelevant facts and unsupported assertions, and misstates, distorts or simply ignores critical and dispositive

evidence. In particular, Trustmark tries to mask the bankruptcy of its misrepresentation claims by bundling its arguments with general and irrelevant discussion of its non-disclosure claims.

TIG is confident that the Court will rigorously apply the appropriate standards and not be fooled or distracted by Trustmark's rhetoric. By focusing on the *specific* misrepresentations alleged by Trustmark, and on Trustmark's responses (or the absence of responses) to those *specific* allegations, it will become sufficiently clear to the Court that Trustmark has failed to meet its burden of demonstrating the existence of material facts as to its fraud claims and that TIG is, therefore, entitled to summary judgment on that claim.

Indeed, in a similar situation, Senior Judge Shadur of the Northern District of Illinois recently rejected another reinsurer's efforts to convert a fraudulent non-disclosure claim into a misrepresentation claim. In *PXRE*, the court held that the doctrine of utmost good faith did not apply to the reinsurance relationship at issue in that case, *PXRE Reinsurance Co. v. Lumbermens Mutual Casualty Co.*, 330 F. Supp. 2d 981 (N.D. Ill. 2004), and thus the reinsurer was unable to assert a fraudulent non-disclosure against the cedent. *PXRE*, 2004 WL 2387637, at **3-4, 8. As a result, the reinsurer sought to assert a misrepresentation claim based upon "such bland assurances as 'discipline, controlled underwriting' and 'profitability.'" *Id. at* \*6. The court rejected this claim, holding that, in the context of the entire transaction, "PXRE ha[d] not shown and cannot show justifiable reliance on Lumbermens' statements." *Id.* at \*8.

> It is an understatement to say that PXRE is a sophisticated party: Its very corporate name tells us that reinsurance – the subject matter of the Agreement – is its business. It is totally unpersuasive for it to assert it reasonably relied on such things as the bullet point statements that it now identifies in the Equus Re brochure, which includes such bland assurances as "discipline, controlled underwriting" and "profitability"....
>
> To be sure, Lumbermens had greater knowledge of the Protected Portfolio's component contracts [*i.e.*, the business subject to the reinsurance contract], but that does not – under the circumstances

here – mean that PXRE was justified in relying on any general representations as to those contracts made by Lumbermens. Transactions almost always begin with asymmetries of information, but that does not eliminate the need for the less-informed party to exercise ordinary prudence.

*Id.* at *6; *see also id.* at *4 ("the very nature of their transaction required each side to engage in valuations of risk that, though complex for nonprofessionals, were well within their area competence"). The court held that PXRE's purported reliance on the alleged misrepresentations was not justified in light of all of the information that had been provided or otherwise available to it. *See id.* at **4-5.[7]

As TIG demonstrated in its Initial Memorandum, WEB – which, like PXRE, was a sophisticated party whose business was reinsurance underwriting – could not have justifiably relied on the alleged statements underlying Trustmark's fraud claim because, *inter alia*, the statements were inherently implausible (*see, e.g.*, TIG Mem. at 26), too vague to be meaningful (*see, e.g., id.* at 28 & 37), inconsistent with other, more detailed, information that had been provided in the placing information (*see, e.g., id.* at 29-30 & 37), or immaterial as a matter of law (*see id.* at 26). Accordingly, just like Judge Shadur did in *PXRE*, the Court should dismiss Trustmark's misrepresentation claim.

---

[7]    The fact that PXRE conducted a more extensive due diligence than WEB is irrelevant since WEB could have, and should have, asked for all information it believed it needed to underwrite the risk. Indeed, Trustmark's own experts admitted that WEB had an obligation to conduct a thorough due diligence, including asking for additional information that it believed was necessary to underwrite the risk. *See* Gottheimer Dep. Tr. 35:4-12; Jessel Dep. (07/02/03) Tr. 59:7-60:4, 60:14-61:2. In this respect, the following comments by Judge Shadur are particularly relevant.

But no one held a gun to PXRE's corporate head – it was free to make the deal or pass it up as it chose. If it felt Lumbermens was giving it insufficient time to evaluate the package . . . all it had to do was to tell Lumbermens to go look for another buyer. It did not do so – it chose to examine the portion of the portfolio that it wished and to make the deal on that basis.

*PXRE*, 2004 WL 2387637, at *4.

## CONCLUSION

For all of the foregoing reasons, as well as those set forth in TIG's Initial Brief, TIG respectfully requests that the Court enter an Order granting Summary Judgment dismissing the Third Party Complaint in its entirety.

Dated:     November 12, 2004

HURWITZ, SAGARIN & SLOSSBERG, LLC

By: _Daniel Sagarin /bo_____
     Daniel J. Sagarin CT 04289
David Slossberg CT 113116
147 North Broad Street
Milford, Connecticut 06460-0112
Telephone:  (203) 877-8000

CADWALADER, WICKERSHAM & TAFT LLP
Harry P. Cohen CT 20446
Brian J. O'Sullivan CT 23790
100 Maiden Lane
New York, New York 10038
(212) 504-6000

Attorneys for Third Party Defendant
TIG Insurance Company

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was sent by facsimile and federal express, this 12th day of November, 2004, to counsel of record for plaintiff Security Insurance Company of Hartford and defendant / third-party plaintiff Trustmark Insurance Company, addressed to:

Frank F. Coulom, Jr. CT 05230
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT  06103-3597

Attorneys for Plaintiff
Security Insurance Co. of Hartford

David J. Grais CT 23352
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY  10019

Attorneys for Plaintiff
Security Insurance Co. of Hartford

Jeffrey Hellman CT 04102
Zeisler & Zeisler, P.C.
558 Clinton Avenue
P.O. Box 3186
Bridgeport, CT  06605

Attorneys for Defendant and
Third Party Plaintiff
Trustmark Insurance Co.

Mark B. Holton CT 21727
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY  10166-0193

Attorneys for Plaintiff
Security Insurance Co. of Hartford

Everett J. Cygal CT 22765
Schiff Hardin & Waite
6600 Sears Tower
Chicago, IL  60606-6473

Attorneys for Defendant and
Third Party Plaintiff
Trustmark Insurance Co.

_____
Brian J. O'Sullivan

NYLIB2 238777.3