UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
..................................................

SECURITY INSURANCE COMPANY OF HARTFORD,

                    Plaintiff

-against-                  No. 301CV2198(PDC)

TRUSTMARK INSURANCE COMPANY,

                    Defendant
..................................................

TRUSTMARK INSURANCE COMPANY,

                    Third-Party Plaintiff

-against-

TIG INSURANCE COMPANY,

                    Third-Part Defendant
..................................................

REPORT OF
MICHAEL L. TOOTHMAN
FCAS, MAAA, FCA, FCIA

### Introduction

1. I have been engaged by Respondents to provide my opinions on the matters set out in this report. My background and qualifications are set out in **Appendix A** hereto.

### Scope of Assignment

2. I have been asked to review the

### The Relevant Contracts

3. The four excess-of-loss layers were each swing-rated, meaning that the premium for each annual period under each contract would be adjusted annually based upon the losses incurred for each annual period. In particular, the premium for each layer was to be calculated as 100/70ths of Incurred Losses, subject to the Minimum and Maximum Premiums shown in the table below. Under each of these contracts, the final premium adjustment was to occur 96 months after the inception of each annual policy period.

TIG 159126

4. The total premium for the three burning cost contracts written by Centaur is therefore 4.25% of Subject Premium and the total swing covered is 12.25%. Therefore, if the rates adjust to the maximum, the loss ratio on the three Burning Cost contracts taken together would be 288% (12.25/4.25).

**Opinion I:** Based on Mr. Ekwall's own pricing analysis for the 1999 Treaty, he expected for the 1999 underwriting year to produce a significant loss for Trustmark gross of retrocession reinsurance, a significant profit for Trustmark net of retrocession reinsurance, and an extremely high loss ratio approaching 500% to Trustmark's retrocessional reinsurers.

5. The burn rates determined by Mr. Ekwall would produce a loss ratio of 179~~7~~2% gross of retrocession reinsurance. However, with the retrocessional program placed by Mr. Ekwall for Trustmark, he planned to achieve a net loss ratio of 3~~8~~6% after retrocession reinsurance, resulting in a significant underwriting profit for Trustmark. Mr. Ekwall planned to achieve this result by retroceding the majority of the underpriced business to Trustmark's retrocessionaires at extremely favorable retrocessional rates. As a result, the retrocessionaires would suffer an extremely high loss ratio of 480~~79~~% for the business they assumed from Trustmark. (**See Exhibit I**) (MY NOTES SAY WE NEED TO SPECIFY WHICH YEARS OF DATA EKWALL USED) — 1990 - 1996

6. The Treaty's actual results of the 1999 underwriting year were not inconsistent with Mr. Ekwall's planned results. In particular, Trustmark shows a net underwriting profit despite a large gross underwriting loss. As shown on **Exhibit I**, Trustmark's loss ratio gross of retrocession of 227% was reduced to 82% net of retrocession, leaving the retrocessionaires with an extremely poor loss ratio of 540%. (Need to revise Exhibit I to show new planned loss ratios and actual w/ and w/o retro performing—see new exhibit "TIG Buy Down-Plan to Actual: from Thirkill; add to paragraph)

**Opinion II:** Mr. Ekwall's pricing analysis contains several methodological and other flaws. Correcting these flaws would have increased his indicated burn rates.

7. The loss development triangles created by Mr. Ekwall for the $900,000 excess of $100,000 layer and the $50,000 excess of $50,000 contain two data errors. The data errors are in the 84-month point for years 1990 and 1992. These errors have impacted Mr. Ekwall's loss development factor calculations and thus have distorted his burn rate calculations, although the error is not considered material.

8. The earned premium data entered by Mr. Ekwall contain an error in the 1997 year. The erroneous amount of $312,412,018 was approximately 4% higher than the correct amount of $300,419,074, which was provided in the Placement Material. This transcribing error would understate Mr. Ekwall's calculated burn rate for 1997.

TIG 159127

9.  Mr. Ekwall incorrectly calculates the loss development factors for the development periods of 12 to 24 months, 24 to 36 months, 36 to 48 months, and 48 to 60 months. Mr. Ekwall used a 3-month diagonal as if it were a 12-month diagonal. This would result in understating the loss development factors Mr. Ekwall used in his burn rate calculations.

10. The loss development factors that Mr. Ekwall used in his 12/98 burn rate analysis do not appear to be reasonable. The factors are inconsistent with industry loss development pattern. The factors are also inconsistent with those underlying TIG's loss development data that Mr. Ekwall had access to. In addition, these factors are internally inconsistent. As an illustration, for the $900,000 excess of $100,000 layer, Mr. Ekwall used the same 1.62 factor for **both** 1993 and 1994 to develop their losses. One would expect the factor used to develop the 1993 losses to be smaller since the 1993 losses are more mature in its development stage. Mr. Ekwall did not provide any indication how these loss development factors were derived.

11. The loss development factors that Mr. Ekwall used in his 8/99 burn rate analysis are much different from the factors that he used in his 12/98 pricing analysis. While his factors for the $50,000 excess of $50,000 layer appear to be consistent with the underlying TIG loss development data, his factors for the $900,000 excess of $100,000 layer appear materially understated when compared with TIG's underlying loss development data. Mr. Ekwall's burn rate analysis would have been distorted downward resulting in inadequate pricing indication for this layer. (Exhibit III, Sheets 1 to 4)

12. Mr. Ekwall did not provide any support to justify the level of the discount factors that he used to discount the projected losses. The discount factors of 52.50% and 67.00% for the $900,000 excess of $100,000 layer and the $50,000 excess of $50,000 layer respectively appear unreasonably optimistic in light of the prevailing interest rate and TIG's loss payout patterns that he had access to when he performed his pricing analysis. On the basis of the TIG loss payout patterns for the $900,000 excess of $100,000 layer and the $50,000 excess of $50,000 layer, Mr. Ekwall had to assume interest rates of approximately **11%** and **12%** per annum in order to support his discount rates of 52.50% and 67.00% for the $900,000 excess of $100,000 layer and the $50,000 excess of $50,000 layer respectively. The assumed 11% and 12% annual interest rates cannot be supported when the long-term risk-free rate was **below 6%** when Mr. Ekwall performed his 8/99 pricing analysis. (Exhibits III, Sheets 1 to 4, Exhibit IV, Sheets 1 to 4)

13. Mr. Ekwall did not support the trend factors used in his analysis. The trend factors appear unreasonably low if he intended them to be loss trend. It appears that Mr. Ekwall used a trend factor of 2% per annum to trend his projected losses to the period underlying the TIG Treaty. However, the trend factors ~~Mr. Ekwall~~ should increase geometrically rather than arithmetically as they appear in Mr. Ekwall's pricing analysis.

14. These errors in Mr. Ekwall's pricing analyses are consistent with an underwriter who was not concerned with the gross profitability of the business.

**Opinion III:** The ~~August 1999~~ loss development factors used by Mr. Ekwall in his 8/99 pricing analysis were based upon TIG's loss development data, but the ~~December 1998~~ loss development factors he used in his 12/98 pricing analysis were apparently not based on TIG data.

15. ~~PLACEHOLDER~~ As evidenced from his own handwriting, the loss development factors used by Mr. Ekwall in this 8/99 analysis were derived from TIG's loss development factors. These factors are ~~significantly~~ lower than the loss development factors that he used in his 12/98 pricing analysis. The 12/98 factors are inconsistent with those underlying TIG's loss development data that Mr. Ekwall had access to when he performed the 12/98 pricing analysis. (Exhibit II, Sheets 1 and 2) *same exhibits as Q11 7 - yes*

*expand*

**Opinion IV:** Information from both the 1998 and 1999 Placement Materials would cause any knowledgeable underwriter to find implausible an unsupported assertion that TIG's four business segments would have similar loss development patterns, particularly for an excess layer.

16. Differences include mix by state, by hazard group, by average premium size and by industry group. Also different claims staffs and no common claims philosophy.

17. EXPAND ON THOUGHTS IN 16

**Opinion V:** When correctly analyzed, the "missing data" discussed by Mr. Jessel in his report actually has a minimal impact on the necessary rate, consistent with Mr. Ekwall's testimony.

18. Jessel was unable to explain how he derived his estimates of the effect of the missing data (See page 6 of his report.)

19. On the basis of Mr. Jessel's testimony, I reconstructed his analysis to replicate his burn rate indications for the $50,000 excess of $50,000 layer, the $400,000 excess of $100,000 layer, and the $500,000 excess of $500,000 layer. I replicated his indicated burn rates of 13.81%, 12.29%, and 1.16% respectively for the $50,000 excess of $50,000 layer, the $400,000 excess of $100,000 layer, and the $500,000 excess of $500,000 layer. In the process of replicating his analysis, some errors were detected. First, the 13.81% rate for the $50,000 excess of $50,000 layer was incorrectly shown as 13.89% in his table. Mr. Jessel also made a calculation error in the $500,000 excess of $500,000 layer for years 1989-1998. His erroneous burn rate of 1.08% is corrected in my replication analysis.

20. Mr. Jessel did not provide any documentation in his analysis of the impact of the "missing data" in his analysis. Since I successfully replicated Mr. Jessel's analysis with

TIG 159129

the "missing data", I was able to add in the "missing data", i.e., the MCI and VSI data according to Mr. Jessel's testimony, in order to estimate the impact of the "missing data" to the burn rate indications. The burn rates with the "missing data" added are 14.59%, 13.31%, and 1.19% respectively for the $50,000 excess of $50,000 layer, the $400,000 excess of $100,000 layer, and the $500,000 excess of $500,000 layer. Therefore, the impact of the "missing data" is 0.78%, 1.03%, and 0.04% respectively for the $50,000 excess of $50,000 layer, the $400,000 excess of $100,000 layer, and the $500,000 excess of $500,000 layer. This result is quite different from Mr. Jessel's claimed effect of missing data of 5.92%, 4.89%, and 0.58% respectively. (Exhibit VI)

21. Cite the relevant portions of Ekwall's testimony.

**Opinion VI:** Virginia Surety's loss and allocated loss adjustment expense ("ALAE") reserves for accident years 1994–1997 were reasonably stated at the time of the Placement Materials.

22. Using data as of 12/31/02, I projected Virginia Surety's ultimate losses and ALAE for accident years 1994-1997. My projected ultimate losses and ALAE for the four-year period of $165.1 million is approximately $1.1 million, or 0.7% **lower** than the ultimate losses and ALAE of $166.2 million shown in the Placement Materials, which was based on data as of 6/30/98. This updated analysis indicates that Virginia Surety's ultimate losses and ALAE and the corresponding loss and ALAE reserves were reasonably stated at the time of the Placement Materials. (Exhibit VII, Sheets 1 to 13)

*[handwritten: TIG DATA FILES ✓]*

**Opinion VII:** The CD-Rom titled Aon T002391 ——— *[handwritten: TIG DATA FILES]* (the "CD") provided to Mr. Ekwall by Ms. Bohuslav on or about August 9, 1999, clearly contains loss data valued as of 6/30/98 or 9/30/98 rather than 6/30/99. The correct evaluation dates are readily apparent from a quick review of the data on the CD.

*[handwritten margin: Somehow T002391]*

23. ~~PLACEHOLDER~~ The CD Ms. Bahuslav sent to Mr. Ekwall contains data for both Managed Comp Inc. ("MCI") and Virginia Surety ("VSI"). The MCI data is clearly shown as being as of 9/30/98 since the data was labeled as "Microsoft Access-[MCI Data 093098 Table]". The VSI data does not indicate exactly what date it is at, but a cursory examination of the data shows that the last date of loss shown is in June, 1998. *[handwritten: expand - why?]*

*[handwritten margin: show me]*

**Opinion VIII:** The Virginia Surety loss information on the CD and the ~~large loss~~ data for Virginia Surety found in the 1999 Placement Material are not identical, but the two data sources are consistent.

24. ~~PLACEHOLDER~~ The VSI data on the CD and the VSI data found in the 1999 Placement Material are both for Virginia Surety. The Data on the CD is valued as of 6/30/89 and the data contained in the Placement Material is as of 9/30/89 as it is clearly labeled as such. (See WEB 00313-318, 332-342, 350-353). One could easily compare the two data

*[handwritten: ¶ 8]*

sources and could quickly conclude that the VSI data on the CD is consistent with the VSI data contained in the Placement Material and that they are just valued three months apart. However, Mr. Ekwall obviously did not attempt to reconcile the two data sources but instead assumed the data on the CD was as of 9/30/69) Mr. Ekwall's own handwriting confirmed this. (See TRH026677)

~~25. PLACEHOLDER~~

**Opinion IX: The reduction of TIG's net retention from $1,000,000 to $100,000 per claim would reduce TIG's aggregate loss exposure by approximately 26%.**

~~26.~~25. This assessment is based on my analysis of the excess loss statistics published by the National Council on Compensation Insurance ("NCCI"). NCCI is a national workers compensation statistical and rating association that promulgates advisory loss rates for its member insurance companies. NCCI publishes excess loss and loss expense factors ("ELFs") and excess loss and loss expense pure premium factors ("ELPPFs") by state where it has jurisdictions.

~~27.~~26. I have obtained from NCCI the ELPPFs and ELFs that were in effect in December of 1997 for the states in which NCCI made rate filings. That information is attached as **Appendix B**. Data was provided for 37 states. ELPPFs were available for thirty states, and ELFs were available for nine states. (For two states, Indiana and Rhode Island, both ELPPFs ad ELFs were published.) For one state, Missouri, ELPPFs are shown for a loss limit of $10,000. In all other states, the ELPPFs or ELFs begin at a loss limit of $25,000.

~~28.~~27. The ELFs and ELPPFs can be used to measure the distribution of loss by size of loss. I analyzed the ELFs and ELPPFs for Hazard Groups II and III, which I understand represent the majority of TIG's workers compensation exposures. My analysis reveals that on average the reduction of loss retention from $1 million to $100,000 per claim would reduce TIG's aggregate loss exposure by approximately 26% for Hazard Group II and III combined using a 50-50 split between Hazard Groups II and III based on TIG's premium distribution for the two Hazard Groups. (Exhibit VII)

Signed: _____

Date: _____

TIG 159131