UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
..................................................
SECURITY INSURANCE COMPANY OF HARTFORD,

                        Plaintiff

-against-                     No. 301CV2198(PCD)

TRUSTMARK INSURANCE COMPANY,

                        Defendant
..................................................
TRUSTMARK INSURANCE COMPANY,

                        Third-Party Plaintiff

-against-

TIG INSURANCE COMPANY,

                        Third-Party Defendant
..................................................

**REPORT OF
MICHAEL L. TOOTHMAN
FCAS, MAAA, FCA, FCIA**

### Introduction

1. I have been engaged by attorneys for TIG Insurance Company ("TIG") to provide my opinions on the matters set out in this report. My background and qualifications are set out in **Appendix A** hereto.

### Documents Relied Upon

2. The documents upon which I relied in forming my opinions are listed in the attached **Appendix B**.

### Background

3. The workers' compensation business written by TIG consisted of four business segments: 1) TIG Agency, also referred to as TIG Primary ("TIG Agency"), 2) Virginia Surety ("VSI") and Alternative Programs, 3) Coordinated Care, which consisted of Managed Comp Inc. ("MCI") and Innovus, and 4) Commercial Specialty ("CSP"). Each of these

information. Information was also provided to WEB in electronic form, though the specific information thus provided is in dispute and cannot be indisputably determined since the CD-Rom has not been produced by Trustmark or WEB.

12. On December 6, 1998, Mr. Ekwall provided quotes for full conditions coverage on behalf of Security Insurance Company of Hartford ("Security"), which by then had also appointed WEB as its MGU. Again, there were subsequently a series of reductions in WEB's quote until coverage was ultimately bound on December 31, 1998. The coverage was bound by WEB on behalf of Security as full conditions coverage for (a) 100% of the $400,000 excess of $100,000 layer at a rate of 6.8% for the MCI business segment and (b) 100% of the $900,000 excess of $100,000 layer at a rate of 9.64% for the other business segments, all effective January 1, 1999. Thereafter, Mr. Ekwall agreed to reduce the rate for the $900,000 excess of $100,000 layer to 9.60%.

13. Subsequently, Mr. Ekwall also quoted and bound coverage on behalf of Security for 100% of the $50,000 excess of $50,000 layer for the VSI and Innovus business segments, at a rate of 9% of subject premium.

14. In March of 1999, Security entered into a Retrocession Agreement with Trustmark by which Security retroceded 100% of the accident and health risk it had assumed under the 1999 treaty.

15. During the Spring and Summer of 1999, there was discussion and correspondence between Mr. Ekwall and Ms. Bohuslav regarding the loss data that had been sent to Mr. Ekwall. The parties dispute the specific loss information which Mr. Ekwall had received from Aon prior to his pricing of this account in December of 1998. However, there is no dispute that in August of 1999 Ms. Bohuslav provided Mr. Ekwall with a CD-Rom which included loss information for VSI. Mr. Ekwall then reviewed and analyzed that information and determined that he was comfortable with his original pricing.

**Opinion I:** **The loss development factors used by Mr. Ekwall in his December 1998 pricing analysis were inconsistent with the TIG Agency loss development data provided to him by Aon in June of 1998. In contrast, the loss development factors used by Mr. Ekwall in his August 1999 pricing analysis were clearly derived from the TIG Agency loss development data. Furthermore, the loss development factors used by Mr. Ekwall in August of 1999 were properly applicable only to losses evaluated as of September 30, 1998.**

16. The loss development factors used by Mr. Ekwall in his December 1998 pricing analysis were inconsistent with the TIG Agency loss development data provided to him by Aon in June of 1998. (See **AON 10515 – 10521**) I have not been able to deduce how these factors might have been derived. Development triangles for the $900,000 excess of $100,000 layer and the $50,000 excess of $50,000 layer are shown on **Exhibit I, Sheets 1**

(WUW020927) CSP claims are "administered by IRISC for the Sherwood business and Crawford, and IRISC for K&K business." (WUW020928)

31. The descriptive information and the numerous supporting data and exhibits contained in both the 1998 Underwriting Information and the 1999 Renewal Submission, when examined by an experienced underwriter, would lead him to conclude that TIG's major business segments are quite distinct and different in most business characteristics. This would reasonably lead him to conclude that these business segments would generate claims that would be quite different in nature and size and that the loss development patterns of these claims would not be similar.

**Opinion IV:** **Virginia Surety's loss and allocated loss adjustment expense ("ALAE") reserves for accident years 1994–1997 as stated at the time of the 1999 Renewal Submission were sufficient to cover the ultimate loss exposure from those years.**

32. Using data evaluated as of December 31, 2002, I projected Virginia Surety's ultimate losses and ALAE for accident years 1994-1997. My projected ultimate losses and ALAE for the four-year period of $165.1 million are approximately $1.1 million, or 0.7% **lower** than the ultimate losses and ALAE of $166.2 million shown in the 1999 Renewal Submission, which was based on data as of June 30, 1998. This updated analysis indicates that Virginia Surety's ultimate losses and ALAE and the corresponding loss and ALAE reserves were reasonably stated in the aggregate at the time of the 1999 Renewal Submission. **(Exhibit IV, Sheets 1 to 11)**

**Opinion V:** **The CD-Rom titled TIG DATA FILES (the "CD") (AON T002391) provided to Mr. Ekwall by Ms. Bohuslav on or about August 9, 1999, clearly contains loss data valued as of June 30, 1998 or September 30, 1998 rather than June 30, 1999.**

33. The CD Ms. Bohuslav sent to Mr. Ekwall contains data for both MCI and VSI. The MCI data is clearly shown as being as of September 30, 1998, since the data was labeled as "Microsoft Access-[MCI Data 093098:Table]". The VSI data does not carry a comparable reference, but a cursory examination of the data shows that the last date of loss shown is in June of 1998. The data is therefore clearly not valued as of June, 1999.

**Opinion VI:** **The Virginia Surety loss information on the CD and the data for Virginia Surety found in the 1999 Renewal Submission are not identical, but the two data sources are consistent.**

34. The VSI data on the CD and the VSI data found in the 1999 Renewal Submission are both for Virginia Surety. The Data on the CD is valued as of June 30, 1998, and the data contained in the 1999 Renewal Submission is as of September 30, 1998 as it is clearly labeled as such. (See **WEB 00313-318, 332-342, 350-353**). A reasonable and competent underwriter could easily compare the two data sources and could quickly conclude that the VSI data on the CD is consistent with the VSI data contained in the 1999 Renewal Submission and that they are just valued three months apart. However, Mr. Ekwall obviously did not attempt to reconcile the two data sources but instead assumed the data on the CD was as of September 30, 1998. Mr. Ekwall's own handwriting confirmed this. (See **TRE026677**) It is my understanding that Mr. Ekwall has now testified that he believed that the data on the CD was valued as of June 30, 1999. Not only would this belief have been disproved by a cursory examination of the data, as discussed in paragraph 39 above, but this assertion is also inconsistent with Mr. Ekwall's analysis as contained in **Exhibit 869** and discussed more fully in paragraph 18 above.

**Opinion VII:** **The number of TIG workers compensation claims with amounts larger than $100,000 per claim represents less than 1% of the total number of claims.**

35. On the basis of TIG's workers compensation claim data by size of claim as of June 30, 2003, I calculated the distribution of the population of number of claims by size range. The ranges that I used are $0 to $50,000, $50,000 to $100,000, $100,000 to $1,000,000, and Excess of $1,000,000. The calculation was performed based on data for accident years 1994-1997 combined and for accident years 1998-2000 combined. **Exhibit V** displays the results of my calculations for the two periods. The great majority of the claims were within the $0-$50,000 band. Only **0.75%** and **1.06%** of all claims were within the $100,000 to $1,000,000 band for the 1994-1997 period and the 1998-2000 period respectively. Only about **0.02%** of all claims were within the Excess of $1,000,000 band. For the combined period of 1994-2000, less than **1.0%** of all claims were in excess of $100,000 per claim.

**Opinion VIII:** **The reduction of TIG's net retention from $1,000,000 to $100,000 per claim would reduce TIG's aggregate loss exposure by approximately 26%. Said another way, TIG would still retain approximately 74% of its original exposure even after reducing its per claim retention to $100,000.**

36. The allocation of workers' compensation premiums among various loss layers would normally be expected to vary, sometimes significantly, due to several factors. Two of the most important variables are the distribution of exposures by geographical location (i.e., by state) and the distribution of exposures by Hazard Group. Hazard Groups represent the grouping of the multitude of workers' compensation classifications in accordance with the relative expected severities of each classification, where Hazard Group I consists of the least hazardous risks and Hazard Group IV consists of the most hazardous risks. A higher Hazard Group does not mean that the classification is necessarily less profitable –