# EXHIBIT A

**Report**
*to*


**Schiff Hardin & Waite**


*on*


**Security Insurance Company of Hartford**
*Plaintiff*


*v.*


**Trustmark Insurance Company, et al.**
*Defendant and Third Party Plaintiff*


**United States District Court**
**District of Connecticut**
**Civil No. 301CV2198 (PCD)**


*by*


**George M. Gottheimer, Jr., Ph.D., CPCU, CLU, ARe**
June 10, 2003

Kernan Associates, Inc.

TIG 161399

**TIG 161400**

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................3

BACKGROUND.....................................................................................................5

REINSURANCE CUSTOMS AND PRACTICES.......................................................8

UTMOST GOOD FAITH........................................................................................9

OPINIONS............................................................................................................10

EXHIBIT A: CURRICULUM VITAE .......................................................................

EXHIBIT B: LIST OF CASES................................................................................

EXHIBIT C: DOCUMENTS REVIEWED ................................................................

Kernan Associates, Inc.

TIG 161401

## INTRODUCTION

I have been retained in this matter to render opinions as to:

1. Whether the presentation of information and data with respect to the TIG Insurance Company ("TIG") workers' compensation portfolio, which TIG and its agent made to Security Insurance Company of Hartford ("Security") and Trustmark Insurance Company ("Trustmark"), conformed with the obligations imposed by the customs and practices of the insurance and reinsurance industry;

2. Whether TIG and its agent were under an affirmative and ongoing duty, pursuant to the obligations imposed by the customs and practices of the insurance and reinsurance industry, to disclose accurate and complete information and data concerning the TIG workers' compensation portfolio to all potentially interested reinsurance markets;

3. Whether TIG and its agent had an affirmative duty, pursuant to the obligations imposed by the insurance and reinsurance industry, to correct any significant and material inaccuracies or omissions in the reinsurance placement information and data as respects the TIG workers' compensation portfolio;

4. Whether the customs and practices of the insurance and reinsurance industry imposed an obligation on WEB Management LLC ("WEB") to verify independently the accuracy of the representations made by TIG and its agent in connection with the placement of the TIG workers' compensation portfolio;

5. Whether the misrepresentations, late disclosures and nondisclosures by TIG's agent Aon Re Worldwide ("Aon") would have been material to a reasonable underwriter in evaluating whether to reinsure the risks presented by the TIG workers' compensation portfolio;

6. Whether Security, as a ceding company seeking retrocessional reinsurance protection, bears the risk, pursuant to the obligations imposed by the customs and practices of the insurance and reinsurance industry, if the information and

3

Kernan Associates, Inc.

TIG 161402

data it conveys to prospective retrocessionaires such as Trustmark are not accurate and reliable; and

7. Whether, pursuant to the obligations imposed by the customs and practices of the insurance and reinsurance industry, Security had a duty to act promptly to rescind its reinsurance agreement with TIG, upon receiving information from its retrocessionaire, Trustmark, identifying grounds for doing so.

I have previously been qualified as an insurance and reinsurance expert in both federal and state courts, as well as by arbitration panels. I have served as an arbitrator in over 50 arbitrations regarding insurance and reinsurance disputes. My Curriculum Vitae, which includes a listing of publications that I have authored during the past ten years, is contained in Exhibit A, attached hereto. The cases in which I have testified or given deposition testimony during the past four years, are listed in Exhibit B, attached to this report.

In arriving at my opinions, I have relied on the materials that I have reviewed which are listed in Exhibit C, attached to this report, my more than forty years of experience in the insurance and reinsurance business, and my thirty years of teaching experience: I held the rank of Associate Professor at St. John's University, Tobin College of Business, School of Risk Management, Insurance, and Actuarial Science (formerly The College of Insurance), where I taught two courses in reinsurance. I have given Reinsurance seminars on an international basis, and at Seton Hall University where I am Senior Consultant.

My review is continuing and I reserve the right to amend, supplement or modify the opinions expressed herein.

My compensation for this study, and providing testimony if necessary, is $275.00 per hour.

4

**Kernan Associates, Inc.**

TIG 161403

## BACKGROUND

In 1997, WEB entered into an underwriting administration management agreement with Trustmark, under which WEB was authorized to act as a Managing General Underwriter ("MGU") for Trustmark as provided in the agreement.

In 1998, WEB entered into a separate underwriting administration management agreement with Security, under which WEB was authorized to act as MGU for Security as provided in the agreement.

Until 1998, TIG retained a large amount of the risk associated with claims under its worker's compensation insurance portfolio. Prior to April 1998, TIG purchased excess of loss reinsurance above a retention of $1,000,000 each and every loss occurrence.

Excess of loss reinsurance is purchased to protect the reinsured against large losses, either as the result of a single claim, or as the result of multiple claims caused by the same occurrence.[1] Since workers' compensation policy limits are prescribed by the statutes of the various states, the maximum dollar loss is virtually unlimited; therefore, workers' compensation insurers traditionally purchase a number of excess of loss contracts. Excess of loss reinsurance is purchased in "layers", which divides the amount of protection sought into pieces.[2]

In early 1998, TIG decided that it wanted to reduce the retention level under its workers' compensation portfolio. TIG was a member of the TIG Holdings Group, which was held by TIG Holdings Inc., a widely held, publicly traded holding company, formed in 1993 in connection with an initial public offering.[3]

TIG instructed its agent, Aon, to find reinsurance on its workers' compensation portfolio, with a retention of $100,000, thereby reducing its loss exposure by 90%. By July 1998, Aon had placed a three year excess of loss reinsurance agreement with United States Life Insurance Company ("USL") with a retention of $100,000 each loss occurrence.

---

[1] George M. Gottheimer, Jr., *RE-CONCEPTS: Principles of Reinsurance*, 14 Edition, 2000, Berkeley Heights, NJ, The Kernan Press, pp. 4-3 – 4-4.
[2] *Ibid.*, p. 4-4.
[3] Best's Insurance Reports, 1998, Oldwick, NJ, The A.M. Best Company, pp. 4384-4388.

Kernan Associates, Inc.

TIG 161404

Almost immediately after finalizing the three year agreement with USL, TIG decided it wanted to renegotiate and change its reinsurance program. Accordingly, TIG provided USL with what is called a "provisional" notice of cancellation, and instructed its agent Aon to prepare new placement material relating to its workers' compensation portfolio.

Aon prepared a "Renewal Submission" for a revised Workers' Compensation Reinsurance Program, to become effective January 1, 1999.[4] This Renewal Submission contained general, underwriting, premium, loss, managed care initiatives, and claims information, as well as a proposed placement slip. The submission is called "Placement Material" and customarily contains the information the prospective reinsurer will rely upon in deciding whether or not to enter into a reinsurance relationship, and if so, on what basis.

The Placement Material purported to provide the prospective reinsurer with the historical loss experience of the TIG workers' compensation portfolio, its loss reserves, a written description of each segment of business included in the portfolio, as well as its underwriting practices and policies with respect to each segment, and its expectations for the future, including the results of any audits concluded with respect to those segments.

The Placement Material described three segments that comprised the workers' compensation portfolio:

1.      <u>TIG Agency Business</u>
    This business unit consisted of the Direct Segment, where TIG employers underwrote and priced the business.

2.      <u>Virginia Surety and Alternative Programs</u>
    This business was underwritten by Muirfield Underwriters, Ltd., an Aon entity, using Virginia Surety Company ("VSC") paper (policies), an Aon entity, which the Placement Material represented to be 100% reinsured by TIG since 1984.

---

[4] Defendant's Exhibit 79.

6

**Kernan Associates, Inc.**

TIG 161405

It was represented that the business was expected to be expanded geographically from its traditional Midwestern base. Claims were administered by Martin Boyer Company, another Aon entity.

3.   Coordinated Care

This business segment consisted of Managed Comp Inc. and Innovus. Managed Comp Inc.'s target business was "single location, four walled accounts, generating in excess of $50,000 of premium". The production source was typically medium sized regional brokers. The Innovus program was a coordinated care program consisting of a TIG worker's compensation product and a Blue Shield of California group health product. In addition to the three segments, described above, a small percentage of workers' compensation exposure was generated by the Commercial Specialty Division (K & K Construction).

With respect to the VSC business, in addition to the geographic expansion, the Placement Material provided other representations:

> "In addition to day-to-day Program Management, TIG conducts Annual Underwriting, Claims, and Actuarial reviews of this business unit. Major findings to date include a need to implement stronger managed care and injury management practices."

This purportedly was the result of TIG personnel conducting an Actuarial, Claims and Underwriting Audit of Muirfield Underwriting, Inc., the Managing General Agent ("MGA") for VSC, on May 5-8, 1998 more than five months before Aon completed the Placement Material and provided it to WEB.

Steven McElhiney, Vice President and Director of Reinsurance Services for TIG, who was responsible for TIG's ceded reinsurance, testified that he would review all Placement Material prior its dissemination by Aon, and if there were substantive changes, he would "sign off" before its release.[5]

---

[5] Steven McElhiney deposition, February 21, 2003, pp. 15-21.

7

Kernan Associates, Inc.

TIG 161406

Based upon the information and representations contained in the Placement Material, and representations made by TIG's Agent Aon, WEB accepted reinsurance on behalf of Security, and entered into an excess of loss reinsurance agreement with TIG, whereby Security agreed to reinsure certain workers' compensation risks that TIG insured and/or reinsured. The agreement was for losses occurring between January 1, 1999 and December 31, 2000.

Contemporaneously with WEB's binding on Security's behalf for the TIG workers' compensation business, it bound Trustmark to a retrocession agreement with Security, whereby Trustmark reinsured 100% of the risk for which Security reinsured TIG.

TIG represented to WEB that the reason for reducing its retention, and purchasing the new lower layer of reinsurance protection, was to stabilize its business in preparation for a sale of TIG's business. In March 1999, the retention on the VSC and Innovus business was reduced to $50,000, effective January 1, 1999.

## REINSURANCE CUSTOMS AND PRACTICES

Reinsurance is a form of insurance, being the insurance of one insurer (called the "reinsured" or "cedent") by another insurer (called the "reinsurer" or "assuming company") by means of which the reinsured is indemnified for loss under insurance policies issued by the reinsured to the public.[6]

Retrocession is used to describe a transaction whereby a reinsurer is reinsured by another reinsurer for all or part of the reinsurance it has previously affected with a reinsured. As such, retrocessions are reinsurance for reinsurers. The ceding reinsurer is called the "retrocedent" and the assuming reinsurer is called the "retrocessionaire". All of the principles applying to reinsurance are applicable to retrocession.[7]

---

[6] Gottheimer, *op. cit.*, p. 1-3.
[7] Robert W. Strain, ed., *Reinsurance, Revised Edition,* 1997 Athens, TX Strain Publishing & Seminars, Inc. pp. 19-20.

8

Kernan Associates, Inc.

TIG 161407

## UTMOST GOOD FAITH

The reinsurance agreement is often said to be a contract of utmost good faith. The duty of utmost good faith pervades the reinsurance relationship. Utmost good faith is also referred to as "an unwritten requirement of contractual continuity." As such, it is a basic prerequisite essential to the operation of the reinsurance business. Basically, utmost good faith obligates the ceding company to disclose, voluntarily, information which might materially affect the scope of the risk(s) covered by the reinsurer. A failure to make such full disclosure may allow the reinsurer to void the contract. The duty begins when the parties open negotiations, and continues throughout the term of the contract.[8]  The obligation to conduct oneself in utmost good faith, however, is not just one of the ceding companies. The reinsurer also must conduct itself in utmost good faith in its dealing with the reinsured.[9]

---

[8] Vincent J. Vitkowsky, "The Evolving Meaning of the Duty of Utmost Good Faith", *Mealey's Litigation Report – Reinsurance*, July 27, 1994.
[9] Gottheimer, *op. cit.*, p. 1-6.

9

Kernan Associates, Inc.

**TIG 161408**

<u>OPINIONS</u>

In my opinion, TIG failed to comply with their duty of most good faith in their dealings with Security and Trustmark in the following respects:

1. The information provided to Security and Trustmark was incomplete and inaccurate, giving a false picture of the business which Security and Trustmark were being asked to reinsure. Accordingly, TIG failed to conform to the obligations imposed by the customs and practices of the reinsurance industry. Had Security and Trustmark been provided with accurate and complete information, they would not have entered into the reinsurance relationship with TIG.[10]

   a. The reasons TIG gave for seeking reinsurance were false. It was not to stabilize their balance sheet in preparation for sale, but rather, to minimize the impact of the deterioration in TIG's workers' compensation loss experience.

   b. The VSC business, which was represented as being some of the better and more profitable business, was, by and large, the worst business and most unprofitable book of business in the entire portfolio. In fact, Jay Chase, TIG's senior underwriting officer, has since stated that it was his opinion that VSC's results were not as good as Aon and VSC represented they were.[11]

   c. The loss development on this book of business, which was represented as better than industry average, was actually worse than industry average. Had Security and Trustmark been furnished with accurate information, they would have easily determined that the loss development on TIG's workers' compensation business was considerably worse than industry average.

---

[10] Michael Hawksworth deposition, January 20, 2003, pp. 12-15.
Robin Ekwall deposition, May 2, 2003, pp. 568-583.
[11] Jay Chase deposition, February 12, 2003

Kernan Associates, Inc.

TIG 161409

d. TIG was unable to furnish a report of losses on a monthly bordereaux basis as required under the terms of the reinsurance agreement. Their system would have had to have been modified in order to report losses excess of $50,000. TIG's standard procedure was to report losses to their reinsurers when a loss reserve was established in an amount equal to one half of the retention. TIG's automated claims reporting system (TRACS) was programmed to report losses at a $500,000 level (one-half of their previous retention of $1,000,000). Nonetheless, TIG committed that it could provide monthly bordereaux for losses in excess of $50,000. This was a misrepresentation, and the failure to supply such reports violated TIG's obligations under the contract.

TIG decided not to change the TRACS system because it "cost too much," – a decision made in 1998, and never communicated to TIG's reinsurers.[12]

Despite the concerns expressed by TIG's consultants, Price WaterhouseCoopers Financial Solutions ("PWFS"), that TIG could not comply with the reporting requirements under its workers' compensation reinsurance agreements, TIG refused to lower the threshold under their automated claims reporting system.[13]

e. When Aon first provided loss data to WEB, in November 1998, they represented that the CD-ROM contained all of the loss information. When Robin Ekwall ("Ekwall"), WEB's underwriter, inquired whether the loss data included VSC, he was assured that it did. In fact, this proved to be false. It was not until June 9, 1999, that Aon finally admitted that the data did not include VSC losses (Defendant's Exhibit 243). It was not until August 9, 1999, seven months after the inception of the contract and nine months after the original submission of loss data, that Aon finally provided data for all categories of losses (Defendant's Exhibit 247). However, Aon represented in August 1999 that the CD-ROM furnished to WEB

---

[12] Garry Wood deposition, September 27, 2001. pp. 29-40.
[13] *ibid*., pp. 55-60.

**Kernan Associates, Inc.**

TIG 161410

contained loss data as of June 30, 1999, when in fact the data was as of September 30, 1998.

f.   It was represented that TIG focused on states where they could get the best prices and that VSC was looking to expand geographically.  This representation was not accurate.

g.   The Placement Material described the major findings from the recent audit of VSC as simply a need to implement managed care.  This was false.  The Muirfield Audit actually revealed several weaknesses and problems, which were withheld from WEB.  Had this been communicated to WEB, it would have resulted in at least a complete investigation, if not a declination of the proposal.  The "true" findings revealed:

  (i)    Claims were not reserved for known permanency.
  (ii)   A "significant number" of claim files were below standard, with most under reserved.
  (iii)  Indemnity payments to claimants were not being made on a timely basis, in accordance with regulatory requirements.
  (iv)   File documentation was in need of improvement.
  (v)    Standards needed to be implemented for establishing case reserves following claims notification.[14]

2.   TIG and its agent had an affirmative and ongoing duty, pursuant to the obligations imposed by the customs and practices of the insurance and reinsurance industry, to disclose accurate and complete information and data concerning the TIG workers' compensation portfolio to all potentially interested reinsurance markets.  It appears that, based on my review, all potential reinsurers were not provided with the same information, and that caused a different evaluation of the information submitted by Aon by the potential reinsurers.  TIG provided Swiss Re, a direct writing reinsurer, with the Milliman & Robertson Report of May 1, 1998.  Yet this report was withheld from WEB.

---

[14] Muirfield Underwriters Actuarial, Claims & Underwriting Audit, May 5-8, 1998, TIG/TO14436 - TIG/TO14461.

12

Kernan Associates, Inc.

TIG 161411

TIG had a duty to provide all potential reinsurers with the same information. TIG breached their duty of utmost good faith by not providing WEB with the same information given to Swiss Re and others. Had this information been disclosed, WEB would have had the opportunity to conduct a further analysis and evaluation of TIG's workers' compensation program, or declined the proposal outright.

3. TIG and its agent had an affirmative duty, pursuant to the obligations imposed by the customs and practices of the insurance and reinsurance industry, to correct any significant and material inaccuracies or omissions in the reinsurance placement information as respects the TIG workers' compensation portfolio. TIG failed to correct significant and material inaccuracies, namely:

   a. TIG was looking for this reinsurance as a way to prepare TIG to be sold, and stabilize their balance sheet in preparation for the sale.
   b. The VSC business was some of the better and more profitable business in the portfolio.
   c. The loss development on this book of business was better than the industry average.
   d. TIG would report losses on a bordereaux fashion and that they could provide the bordereaux on a monthly basis.
   e. The loss data provided included VSC.
   f. TIG focused on states where they could get the best policies.
   g. The VSC program was looking to expand geographically.
   h. The major findings from recent audits of VSC were simply a need to implement managed care.[15]

All of these reasons proved to be false. TIG was not reducing their retention to provide financial stability to a prospective buyer, but rather because of the poor performance of TIG's workers' compensation portfolio, of which VSC represented 25% of the entire program (WEB 00149). The reduction in TIG's retention from the original $100,000 to $50,000 in 1999 was because TIG believed the experience on the workers' compensation portfolio was deteriorating due to

---

[15] Hawksworth, *Op. Cit.*, pp. 12-15. Robin Ekwall deposition, February 6, 2003, pp. 35-36.

**Kernan Associates, Inc.**

**TIG 161412**

VSC's loss ratio (Defendant's Exhibit 121, letter May 17, 1999, from David M. Kelly, Vice Chairman, and Robert L. Bima, Senior Vice President of Aon to Courtney Smith, President and CEO of TIG).

Neither Security nor Trustmark could have been aware of this information other than by TIG disclosing it to them. TIG was a company in a deteriorating position, and this was the real reason for their reducing their retention of the workers' compensation portfolio. The reasons given to WEB were complete misrepresentations.

4.  The customs and practices of the reinsurance industry did not impose upon WEB an obligation to independently verify the accuracy of the representations made by TIG and its agent in connection with the placement of TIG's workers' compensation portfolio. The broker-market reinsurers do not, as a custom and practice, independently verify the accuracy of representations. Rather, they rely on the representations made in the Placement Material, under the well-established customs and practices of the industry. Pursuant to those customs and practices, TIG and its agent should have been well aware that WEB would not conduct an independent verification of the accuracy of the Placement Material (see Opinion 2).

5.  The misrepresentations, late disclosures, and nondisclosures by TIG's agent Aon would have been material to a reasonable underwriter in evaluating whether to reinsure the risks presented by the TIG workers' compensation portfolio.

6.  Security, as a ceding company, seeking retrocessional reinsurance protection, bears the risk, pursuant to the obligations imposed by the customs and practices of the reinsurance industry, if the information and data it conveys to prospective retrocessionaires, such as Trustmark, are not accurate and reliable.

Kernan Associates, Inc.

TIG 161413

7.  Pursuant to the obligations imposed by the customs and practices of the
    insurance industry, Security had a duty to act promptly to rescind its
    reinsurance agreement with TIG upon receiving information from Trustmark
    identifying the grounds for doing so. In November 2001, Counsel for
    Trustmark advised Counsel for Security that it was Trustmark's belief that
    Security should rescind its reinsurance agreement with TIG. Security was
    advised of the various misconceptions, inaccuracies and information hidden
    from Security by TIG.

    The letter requested Security to evaluate this information and discuss this
    with Trustmark before taking action on their demand letter of October 26,
    2001.

    Security's response was a demand for return of all premiums paid to
    Trustmark before taking further action. This left Trustmark with no other
    option than to rescind *ab initio* the reinsurance with Security. Therefore,
    Security must bear the responsibility for its failure to do so.

    Security's failure to act promptly to rescind its agreement with TIG would
    appear to constitute the latest example of a pattern of conduct whereby
    Security breached the duties it owed to Trustmark.    Under the well-
    established customs and practices of the insurance and reinsurance industry,
    as well as my understanding of the agreement between the parties, a
    "fronting" company, such as Security, which bears little or no risk of loss, is
    obligated to allow the risk-bearing retrocessionaire, such as Trustmark, to
    make substantive decisions regarding the administration of the book of
    business and to cooperate in effectuating those decisions. Security, by its
    actions, after execution of the retrocessional agreement, appears to have
    breached the customary duties it owed to Trustmark in the following regards:

    a.  Security and TIG negotiated an agreement to terminate the reinsurance
        agreement by:

15

**Kernan Associates, Inc.**

**TIG 161414**

(i) Security agreeing to forego the 10% automatic rate increase provided for in the agreement;

(ii) Security agreeing to terminate the agreement on a "run-off" basis; and

(iii) Security waiving its right of cancellation for any future breaches by TIG of its loss reporting obligations.

Security failed to inform Trustmark of termination on a "run-off" basis and secure their agreement to such an approach in advance. (Trustmark's understanding apparently was that the TIG/Security agreement was terminated on a "cut-off" basis).

A "run-off" termination stipulates that the reinsurer remains liable for losses under reinsured policies in force at the date of termination, as a result of occurrences taking place after the date of termination until their normal expiry (sometimes limited to a period not exceeding twelve months). Trustmark never agreed to terminate the agreements on a run-off basis. In accordance with the well-established customs and practices if the industry, Security had no authority to commit Trustmark to a run-off without its consent.

b. Security accepted a change in the monthly bordereaux loss reporting to quarterly reporting without seeking Trustmark's approval. Since Trustmark was the risk-bearer, Security was obligated to obtain their concurrence.

16

Kernan Associates, Inc.

TIG 161415

Respectfully submitted,

George M. Gottheimer, Jr., Ph.D., CPCU, CLU, ARe
June 10, 2003

17

Kernan Associates, Inc.

TIG 161416

EXHIBIT B: LIST OF CASES

Kernan Associates, Inc.

TIG 161417

GEORGE M. GOTTHEIMER, Jr., Ph.D., CPCU, CLU, ARe

**Experience - Expert Witness - Arbitration - Litigation**

1. Arbitration between NAC Reinsurance Corporation and North American Insurance Company of California (1) (2)

2. Andrew Edwards & Company, Inc. v. Roland A. Stollsteimer and Towers, Perrin, Forster & Crosby, Inc., United States District Court, Eastern District of New York (1) (2)

3. Biddle Sawyer Corp. v. Fireman's Fund, et al., Superior Court of NJ, Law Division, Monmouth County (1)

4. Stonewall Insurance Co. v. Argonaut Insurance Co., United States District Court for the Northern District of Illinois, Eastern Division (2)

5. MIC Re v. Cigna Reinsurance, et al., Superior Court of the State of California for the County of Orange, Case No.: 784172 (1)

6. Arbitration between Bankers Trust Company, et al., and National Union Fire Insurance Company (1) (2)

7. Centennial Management Services, Inc. et al., v. AXA Re Vie, et al., United States District Court for the District of Kansas, Case No: 97-2509 JWL (1)

8. Luz Salmon/Martha Ramey/Randy Payne v. Kemper, LMC, United States District Court, District of New Mexico, Action No.: CIV 98843 MV/DJS (1)

9. Arbitration between Truck Insurance Exchange and Certain Underwriters at Lloyds, London and Certain London Markets Insurance Companies (2)

10. Minnesota School Boards Association Trust v. Employers Insurance of Wausau, United States District Court, District of Minnesota, Third Division, CV-96-1029 (MJD) (1) (2)

11. Jose Vieira v. Maher Terminals, Inc., v. American Maritime Services of New York, Inc., et al. United States District Court, Eastern District of New York, 95 CIV-1789 (2)

12. Tony Gomes Construction Co. Inc. v. Colonial Surety Company, Superior Court of New Jersey, Essex County, Civil Part, Docket No. L- 2550-89 (1)

13. Arbitration between New Hampshire Insurance Company and CNA Insurance Company (2)

Kernan Associates, Inc.

TIG 161418

14. Sherry Meyers v. Go-Pro Contracting, Inc. & North Sea Insurance Company, Supreme Court of the State of New York, County of Nassau, Index No. 96-000748 (2)

15. Nationwide Mutual Insurance Company v. First State Insurance Company et al., United States District Court, District of Massachusetts, CV. No. 00-10047-GAO (1)

16. Arbitration between Appalachian Insurance Company and Gerling Global Reinsurance Company (1) (2)

17. Arbitration between Riunione Adriatica de Sicurta, SpA and United National Insurance Company, et al (1)

18. Damon G. Douglas Company v. The PMA Insurance Group, et al., Superior Court of New Jersey Law Division, Union County Docket No. L-4012-99 (1)

19. ACandS, Inc. v. Aon Risk Services, Inc. of Maryland, et al., United States District Court for the Eastern District of Pennsylvania, Civil Action No. 01-CV-3277 (1)

20. RISCORP, Inc. v. American Reinsurance Company, United States District Court Middle District of Florida Tampa Division, Case No.: 8:01-cv-1101-T-26MSS (1)

21. Arbitration between Acordia, Inc. and American International Specialty Lines Insurance Company (AISLIC) (2)

22. Lawrence Insurance Group, Inc. v. KPMG Peat Marwick, LLP., Supreme Court of the State of New York, County of Schenectady, Case No. 96-1973 (1)

23. Arbitration between Everest Reinsurance Company and ACE American Insurance Company, et al. (1)

24. Arbitration between Fire and Casualty Insurance Company of Connecticut and Trustmark Insurance Company (1)

25. First Commercial Mutual Company v. John P. Woods, Inc., et al., United States District Court, Southern District of Florida (Miami Division) Case. No. 01-5084-CIV-HIGHSMITH (1)


(1) Deposed
(2) Trial or Arbitration Testimony

May 31, 2003

2

**Kernan Associates, Inc.**

**TIG 161419**

*Curriculum Vitae*

**Paul C. Thomson III**
12 Crescent Beach Drive
Huntington, NY USA 11743
Business: 631•673•1243
Fax: 631•547•8419
e-mail: reassess@optonline.net
website: www.reassessinc.com

**EXPERIENCE**
**July 1994 to**
**Present:**

**REASSESS, INC., a New York corporation**

**President**

- Arbitrations (Party appointed arbitrator or umpire in 40° proceedings)
- Loss portfolio evaluations and reassessments
- Testimonial expert in insurance and reinsurance arbitrations and litigations
- Consulting expert in insurance and reinsurance matters
- Insurance and reinsurance portfolio assessments
- Workers compensation (including WC Carve-out) and Marine Employers' Liability claims audits
- Specialty claims audits including Computer Warranty, Homeowner Warranty, Malicious Products Tampering, Political Risk, D&O Liability and all other Professional Liability lines
- Commutation evaluations and negotiations
- Insurance and Reinsurance inspection of records projects
- Dispute resolutions, facilitations and mediations
- Due diligence work

**1990 to 1994:**

**SOREMA N. A. REINSURANCE COMPANY, New York, NY**

**(SOREMA N. A. acquired Copenhagen Re of America in 1989 and Le Mans Re USA in 1993)**

**Vice President and Director of Claims**

- Management of SOREMA N.A. technical property insurance, assumed casualty and property treaty, facultative and special risk reinsurance losses
- Management of Copenhagen Re USA's and Le Man Re USA's domestic property and casualty assumed treaty business runoff loss portfolio
- Director on Board, Fulcrum Insurance Company (a wholly owned subsidiary of SOREMA N. A., underwriting E & S casualty and property insurance)
- Budget and administration of claims department
- Client company claims audits
- Commutation evaluations and negotiations
- Due diligence reviews and arbitrations

**1982 to 1990:**

**US INTERNATIONAL REINSURANCE COMPANY, New York, NY**
**(Formerly Home Reinsurance Company)**

**Vice President 1989-1990   Corporate Secretary 1986-1989**

**Assistant Manager 1984-1986       Senior Analyst 1982-1984**

**TIG 161420**

2

- Claims department management, including budget, administration and technical matters
- Responsible for all professional indemnity, directors & officers liability and special risk losses
- Commutation evaluations and negotiations
- Client company claims audits
- Accounted for excess of loss retrocessional loss recoveries

**1978 to 1982:**    **ROYAL INSURANCE COMPANY OF AMERICA**, New York, NY

Home Office Liability Claims Supervisor 1980–1982
Home Office Liability Claims Examiner 1978–1980

- Management of litigation involving the companies (including "bad faith" and declaratory judgment actions seeking extra-contractual/ excess of policy limits damages)
- Supervised national accounts products liability and professional indemnity claims for client companies
- Managed the runoff of Royal's aviation portfolio
- Responsible for branch office claim reserves exceeding field office authority levels and trial/ settlement authority
- Creation and maintenance of ISO coverage library

**1977 to 1978:**    **RELIANCE INSURANCE COMPANY**, Radnor, PA

Casualty Lines Claims Adjuster: Workers Comp & Liability

**OTHER INDUSTRY**
**INFORMATION:**

- Member of ARIAS • US Certified Arbitrator and Umpire - http://www.arias-us.org/
- Member American Arbitration Association
- Approved Arbitrator - International Association of Insurance Receivers -http//www.IAIR.org
- Listed in Reinsurance Association of America's Arbitrators Directory - http://www.reinsurancearbitrators.com/arbdir/index.html
- Approved for expert witness and audit work by the Liquidation Bureaus of California, Florida and New York

**EDUCATION:**    **Franklin and Marshall College, Lancaster, PA**

- Bachelor of Arts, History Major (Major GPA 3.46)
- Dean's List- four of eight semesters
- Varsity football and lacrosse

**Touro College School of Law, Huntington, NY**

- Completed 68 credits toward Juris Doctorate degree (84 credits required)
- Dean's List

TIG 161421