# EXHIBIT B

SECURITY INSURANCE COMPANY
OF HARTFORD,

        Plaintiff,

    v.

TRUSTMARK INSURANCE COMPANY,

        Defendant,

    v.

TIG INSURANCE COMPANY

        Third-Party Defendant.

Civil Action No.
301CV2198(PCD)

Expert Witness Report of Mary Ellen Burns, Esq.
November 15, 2004

**Experience**

My experience is reflected on my curriculum vitae, which is attached hereto as Exhibit A. The articles I have authored are included in Exhibit A.

With respect to fronting, I am very familiar with fronting relationships in insurance and reinsurance. I have dealt with fronting arrangements throughout the course of my practice. I have dealt with the regulatory aspects of fronting and have negotiated a number of fronting arrangements. I am familiar with them from the perspective of a primary company fronting for another primary and with fronting in the reinsurance context. In several of my arbitrations, fronting has been an issue.

**Opinion**

I have been asked to opine on the following questions. In rendering my opinions, I have relied on my experience as a General Counsel of a respected reinsurance company, and as an arbitrator who has been appointed approximately 100 times to resolve insurance and reinsurance disputes. The documents I reviewed to reach my opinions are listed in the attached Exhibit B.

1.     **Under reinsurance custom and practice, was Security a guarantor to Trustmark of the accuracy and completeness of the information provided to their mutual agent, WEB Management LLC, by or on behalf of TIG Insurance Company?**

**Answer: No.**

Under the customs and practices of reinsurance, in a complicated transaction with many parties involved, i.e. insurance companies, brokers, and managing general agents, which person or people are responsible for the accuracy of placement

information depends on the facts and circumstances surrounding the transaction, or more accurately, the series of transactions.

In this particular case, Trustmark and United States Life had reinsured TIG as of April 1, 1998, a year prior to Security's involvement. So, presumably, Trustmark and US Life had already reviewed whatever information they needed at that time. In addition, they reaped the benefit of actual historical experience with the risks reinsured. Moreover, when the treaty was renewed in 1999, with Security now in between TIG and Trustmark as a front, "it was really just a rewrite of the old treaty...", according to Michael Hawksworth, on page 35, line 18 and again on pages 68 and 70 of his January 10, 2003 deposition. Mr. Hawksworth goes on to say on page 35 at line 21, that "...in this instance, really what was happening is they were putting in Security as a property and casualty fronting company and not really changing the fundamentals of the deal, the pricing structure and so on." Under these circumstances, Trustmark cannot now say that Security was a guarantor to it of the integrity of the data, that Trustmark already had reviewed and evaluated.

In addition, in the instant situation, Security did not even pass the information along to Trustmark. Rather it went from TIG's agent to Trustmark's agent. That Trustmark's agent, WEB, had also signed an agreement with Security does not change the flow of the information. It also does not change the responsibility for the information if it proves to be faulty.

This is the custom and practice in my experience. Imposing absolute responsibility in these circumstances would bring the stream of reinsurance commerce to a halt, since each new player would have to thoroughly investigate the facts for itself

3

all the way back in the chain to the original insurer, knowing that it would be held absolutely responsible for all prior errors, without regard to the predecessors or antecedents.

Finally, the concept of absolute responsibility that Trustmark postulates does not exist in any circumstances in reinsurance. In any action for rescission based on misrepresentation, the responsibility for information which turns out to be incorrect is determined by the facts and circumstances. These include the materiality of the information, the relative sophistication of the parties, whether or not the information was relied upon and the reasonableness of the reliance, and the knowledge of the party transmitting the information, i.e., did that party know that the information was false or incomplete. Here, there is no evidence that Security had any such knowledge, as Mr. Hawksworth admitted in his deposition on page 233.

**2.    Under reinsurance custom and practice, what obligations did Security have, as a fronting carrier, when it received the letter dated November 2, 2001 from Trustmark asking Security to rescind its reinsurance agreement with TIG, and did Security acquit those obligations?**

**Answer:  Security did acquit its obligations.**

When Security received the November 2, 2001 letter, it had an obligation to consider both the allegations and the motivations and credibility of the sender. With respect to Trustmark's credibility, its assertions warranted some skepticism because they came in response to Security's demand that Trustmark pay its claims. Regardless, Security had the responsibility to TIG to investigate Trustmark's allegations before rescinding its agreement with TIG. If Security had acted solely on Trustmark's direction

without conducting its own investigation, it may have been found liable for bad faith with respect to TIG.

I understand that there is some issue with respect to the length of time it took Peter Lovell to hire the outside consultant, Kevin Ryan, to investigate the allegations. As a former chief legal officer of a company, I know it takes time to decide how to deal with allegations of the magnitude of those raised in the November 2, 2001 letter. Mr. Lovell, who was new to the company, needed to familiarize himself with the contracts, the issues and the ramifications of his company's actions. It takes time to decide what to do. This is rational and reasonable conduct. Moreover, that neither TIG nor Trustmark was willing to cooperate in Security's investigation obviously prolonged the process.

Further, Trustmark gave Security no opportunity to conduct an investigation. Contrary to the reasonable behavior of Security, Trustmark acted unreasonably in rescinding its contract with Security a mere three weeks after it first made its allegations against TIG. Such conduct by Trustmark put Security in an untenable position.

Reinsurance relationships are governed by standards of good faith and fair dealing. There is no higher standard, and it applies to all such relationships. There is no higher or different standard if one or more of the parties is fronting for another. Fronting is a factor in determining how the standard applies or operates in particular circumstances, but it does not change the general rules. Mr. Thomson's assertion that Security had a duty to rescind its contract with TIG at Trustmark's behest on page 277 and page 283 of his July 8, 2003 deposition because Security was fronting for Trustmark, is quite simply wrong. On pages 285 and 286, Mr. Thompson seems to

acknowledge that such a demand was actually contrary to reinsurance custom and practice but for the nature of the relationship. The nature of the relationship, which I assume means fronting, does not eliminate the obligations of good faith and fair dealing inherent in a reinsurance relationship.

The nature of the allegations in the November 2, 2001 letter reinforce the fact that Security acted reasonably in seeking to investigate those allegations rather than simply acceding to Trustmark's request to rescind. Any allegations of improper dealing must be investigated, but the allegations made in the letter were of the type hardest to investigate and prove.

For example, in the fourth paragraph of the letter, which carries over to page 2, Trustmark says that it "believes that the projected performance of the VSC block was critical not only to the rating of the reinsurance agreement but to the underwriter's decision to bind these risks on behalf of Security." Projections are, by their very nature, educated guesses. It is difficult if not impossible to obtain rescission based on projections that do not turn out as they are supposed to. The paragraph goes on to say that the projected performance of VSC was critical to the underwriter's decision to bind the risks. Given that the VSC block was only a part of the book and that the VSC block was reinsurance as opposed to TIG's direct book, it is again hard to prove that this one component was that important. Moreover, one would have to prove that the performance of VSC did in fact impact the retrocessionaires. Frequently in workers' compensation the problems stay in the lower levels.

The fourth paragraph also asserts that there were both misrepresentations and omissions. Asserting omissions is very difficult. It essentially boils down to showing

that the provider of the information knew that the recipient would want the information and deliberately withheld it. A very plausible defense is that the provider of the information gave the recipient everything he thought was important and invited inquiry.

The fifth paragraph starts to enumerate the misrepresentations and omissions. Trustmark says that TIG said that it expected VSC to "expand geographically" and then cites a notice of cancellation from VSC to TIG as evidence that the representation of the expansion was false. First, expectations are like projections. They are wishes, hopes and visions but they are not facts. It is difficult to obtain rescission based on one party's "expectations". Second, even if VSC did plan on terminating its reinsurance, that does not mean that VSC did not continue to expand geographically. It certainly does not mean that VSC is going to stop writing business altogether, Mr. Hawksworth's understanding to the contrary notwithstanding (pp. 109-110 of his deposition). It simply means that it was replacing its reinsurance. TIG might not even know why. Third, the cancellation may only have been a provisional notice which is routinely sent out and almost never disclosed. Fourth, even if TIG knew that VSC was not going to renew its reinsurance with TIG, TIG may have reasonably assumed that its direct book was of far greater importance to WEB and Trustmark. These are all issues that Security should have investigated (as I understand that it has) before acting on Trustmark's request to rescind.

Trustmark identifies the second alleged misrepresentation in the sixth paragraph. There it is claimed that TIG withheld information about pricing and reserving problems. After proving that this is true, Trustmark would then have to prove that the problems alluded to impacted the retrocessionaires' layers, i.e. the layers that Security and

7

Trustmark were on. Then Trustmark would have to explain whether it asked for the report that allegedly detailed the pricing and reserving problems. Again, in the course of due diligence, not all documents are produced, as it would make the examination process unwieldy to do so. However, if a company does not ask for a document that it knows exists, it is difficult for the company to later argue that it was critical that the document be produced.

The question as to the deterioration of the VSC book again raises the issues of whether the allegation is true, and if it is true, the impact, if any, this would have on the layers that Trustmark is on, and if there was a material impact, whether this is something Trustmark could have known with the slightest amount of inquiry.

On the last page of the letter Trustmark asserts that TIG's missing loss data is another reason for rescinding the contract. When judging materiality, one factor is what was known, for how long and what was done to rectify the problem in the time between discovery of the problem and the claim for rescission. If facts were known for a period of time, no complaints were made and no corrective measures were taken, and then the contract was renewed, it is extremely difficult to prove that the problems were material so as to justify rescission. I understand that even though the initial reinsurance agreement was effective April 1, 1998, the first loss bordereaux were not produced until the summer of 1999, and that Trustmark took no interest in the issue until August 1999, 16 months after the commencement of the first reinsurance agreement between the parties, and some months after the contract had been renewed.

Security opted to investigate Trustmark's allegations and asked Trustmark to put the premium in a trust account, to show its good faith. This was reasonable for several

reasons. First, Security would have needed the money to rescind if it chose to do so. Second, it would lend credibility to Trustmark's assertions. It would give Security assurance that Trustmark was not just trying to avoid making the claims payments that it owed Security. Such a request is reasonable, under any circumstances. In the instant situation, Security certainly had reason to be concerned since Trustmark had already stopped paying claims. Finally, Security did not make the deposit a condition of its own investigation, which Security conducted even after Trustmark refused to comply with Security's request and rescinded its retrocession agreement with Security.

**3.    Did Trustmark breach its duty of good faith to Security by rescinding the retrocession agreement on November 26, 2001?**

**Answer: Yes**

Security's decision to investigate Trustmark's allegations before deciding whether to rescind against TIG was completely reasonable and comported with Security's duties to Trustmark and TIG. It also was reasonable for Security to ask Trustmark to put into a trust account the premium that would have to be returned to TIG if Security decided to rescind. As a result, it was a clear breach of Trustmark's duty of utmost good faith to Security for Trustmark to rescind their retrocession agreement by letter dated November 26, 2001. Trustmark simply had no defensible basis to rescind at that time.

**4.    Is there a pattern of misconduct by Security which justifies Trustmark's rescission?**

**Answer: No**

Messrs. Gottheimer and Thomson assert that there is a pattern of misconduct by Security which justifies Trustmark's rescission of the contract, aside from Security's

refusal to immediately rescind the contract with TIG. None of the conduct asserted would justify rescission, in my opinion.

The items cited pertain primarily to the negotiation of the revisions to the contract between TIG and Security and Security's purported interference with Trustmark's audit of TIG. As for the revisions, under the circumstances, those revisions were reasonable. Security agreed to forego the 10% automatic rate increase provided for in the agreement. Security also agreed to terminate the contract on a run off-basis and Security agreed for certain segments of the business to accept loss bordereaux on a quarterly basis rather than on a monthly basis. Security also waived its right of cancellation for any future breaches by TIG for its loss reporting obligations.

The need for the revisions came about because both TIG and Security and Security and Trustmark had two year contracts. Trustmark told Security it wanted to terminate its contract after one year, which it did not have the right to do under the retrocession agreement. Faced with this situation, Security did the only thing it could do. It negotiated an early termination with TIG. It had to agree to several modifications to obtain this termination, but this is normal business practice. It is called a compromise.

The compromises involved foregoing a rate increase, agreeing to a run off of liabilities and modifying the claim reporting (bordereaux) requirements. Forgoing a rate increase for the run-off period in the second year is reasonable when the party forgoing the increase is the party saying that it does not want to be on the contract for the second year. This is true even though Security and TIG agreed to a termination on a run-off basis. Because Security was asking for a change in the terms, it had to be

prepared to give something up.  Since Security was acting at Trustmark's behest,

Trustmark should have been prepared to give something up as well.

Regarding the run-off feature of the termination, that is also a reasonable

compromise, particularly since it is far more common in the property and casualty

industry to terminate contracts on a run-off basis than on a cut-off basis.  Because the

contract would end a full year earlier than TIG had initially expected, it is reasonable for

TIG to want a more gradual termination in exchange for its agreeing to an earlier

termination.

Finally, on the issue of the late reporting of the losses, that is really not even a

compromise.  Security agreed to what the custom and practice is.  The custom and

practice is that if there is loss information a company wants and it feels it is not getting,

the company that wants the information negotiates for it, pleads for it, and audits the

recalcitrant company.  What they do not do is walk away.  Not only is it bad business

practice but it recognizes the reality that it is very difficult to rescind a contract based on

late reporting.  It is difficult to even avoid paying a claim for that reason.  Additionally, in

this situation, the loss information had apparently never been provided in a timely

manner and notwithstanding, Trustmark continued to do business, and renewed its

contract.  I understand that the issue did not even come up until Security raised it.  It is

Security who was acting in a reasonable manner in trying to get the loss information.

Insisting on TIG's compliance with the original terms of the contract when TIG had not

produced loss data over a considerable period would have been futile and unproductive.

Therefore the compromise Security struck was reasonable.  Additionally, given

Trustmark's pre-Security involvement with TIG, its tacit complicity with the late reporting, and its insistence on an early termination, they are really not in a position to complain.

In addition, I understand that Security sharply disputes Trustmark's contention that it was not kept informed of Security's negotiations with TIG and that Security insists that it kept Trustmark apprised. Even assuming that Trustmark is correct, however, there is no doubt that Trustmark knew about the changes in the contract by May 16, 2000 when Stephanie Raymond sent the revised contractual terms to Mr. Hawksworth. Those changes alone would not justify rescission even then since there were less radical remedies available, such as insisting on the original terms, or canceling the treaty going forward, which Trustmark did. Trustmark elected a remedy. It cannot wait 18 months and elect another one.

Trustmark also asserts that Security interfered with its audit of TIG. Even if this is true, disputes over the nature and extent of an audit or even one party's recalcitrance with respect thereto does not support a claim for rescission. I have never, in all my years of experience, seen a rescission granted for such conduct. For rescission to be justified by post-execution conduct, the conduct has to proven to go to the essence of the contract. Even an outright refusal to allow an audit would not satisfy that requirement. Disputes over the nature, extent, and timing of audits arise frequently. Some companies even have to commence an arbitration to enforce their audit rights, and a company may sometimes be penalized with an award of damages if it is proven that its actions with respect to the audit exacerbated the costs of the company seeking the audit. But, I have never seen such disputes result in a rescission.

Trustmark seems to be trying to pile up enough incidents to make up one cause of action to justify rescission. It simply does not work that way. Even if the incidents complained of here, modifying the contract, revising the claims reporting requirement, and delaying the audit were all true, it is not enough to justify recession. None of these things go to the essence of the contract. A company cannot stockpile its grievances over time and then later use them to try to justify rescission. Such conduct is not good faith or fair dealing.

5.    **Comments on Trustmark's Response to Security's Second Set of Interrogatories**

On November 4, 2004, I received by fax from counsel a copy of Trustmark's response to Security's Second Set of Interrogatories. The response, which states Trustmark's grounds for rescission, does not alter any of my conclusions as set forth above. I discuss each ground expressed in the response below.

Trustmark's first ground depends on its imagined existence of an "agreement" between Security and Trustmark whereby Security supposedly agreed to absent itself completely from any involvement in the administration of the TIG business and to accept without independent consideration any and all instructions from Trustmark regarding the business, including an instruction to terminate or rescind Security's reinsurance agreement with TIG, for whatever reason.

There is no evidence of such an agreement between Security and Trustmark, and it would have been contrary to common sense, good business practices and perhaps even would have jeopardized its insurance licenses had Security entered into such an agreement. When any insurance company issues its paper, a host of

13

responsibilities attach regardless of the percentage of insurance risk it actually retains. Thus, a reinsurer owes the duty of utmost good faith to its reinsureds, and has significant reputational interests at stake because its paper has been issued. In addition, it faces the very real possibility of having to make payment without being reimbursed if its retrocessionaire becomes insolvent or is otherwise unwilling or unable to acquit its retrocessional obligations. And finally, it would be no defense to a regulator for a licensed insurer to say that that it was not responsible because it had "no role in the administration of the ... business." Thus, the complete abdication of involvement and responsibility that Trustmark claims was agreed to here would be extremely imprudent on the part of a fronting carrier.

Moreover, even if such an agreement existed, the claimed "breaches" of that agreement that Trustmark says Security committed do not justify rescission of the retrocession agreement between Trustmark and Security. The first such claimed breach is Security's alleged failure to cooperate with Trustmark to terminate the reinsurance agreement with TIG based on inadequate loss reporting. I have already addressed this issue above. I understand that Trustmark's factual contentions on this issue are sharply disputed by Security. But even if they were true, inadequacies in loss reporting virtually never justify termination or rescission of a reinsurance contract.

The second claimed breach is the alleged "novation" that Trustmark says Security entered into with TIG without Trustmark's knowledge or consent. Again, I already have largely addressed this issue above. One new contention Trustmark makes in its interrogatory response is that Security should not have agreed to waive the "right" to terminate the TIG agreement in the future based on problems with loss

reporting. This new assertion in no way alters the conclusion that this alleged breach does not justify rescission. Also, as failures of loss reporting rarely, if ever, justify rescission or termination, Security's agreement to an express contractual term to that effect was reasonable. This is particularly true given the situation in which Security found itself, caught between its reinsured and retrocessionaire.

The third claimed breach is Security's alleged insertion of itself between TIG and Trustmark in administering the business after June 2000. Trustmark claims that Security should not have done this because Trustmark had assumed virtually 100% of the risk and Security was acting as a front. To the extent Security became more actively involved in administering the business after June 2000, it was perfectly justified in doing so because: (1) WEB, Security's and Trustmark's former agent, no longer was involved at all in administering the business, and it was appropriate and necessary for someone to fill that vacuum;[1] (2) on June 1, 2000, Trustmark made clear that it no longer considered itself bound to reinsure Security for the run-off portion of the TIG business, meaning that Security faced the potential for substantial reinsurance liability to TIG; and (3) Trustmark's repudiation of its obligations for the run-off portion of the retrocession agreement had led to litigation between Trustmark and Security, and it was appropriate for Security to take a more active role in administering the business at issue in the litigation to protect its interests.

---

[1] There is no evidence that Trustmark or Transamerica (Trustmark's replacement for WEB) ever expressed the desire that Transamerica fill the vacuum to permit "direct access" to TIG or that Transamerica or Trustmark ever complained about Artis' assumption after June 2000 of a more active role in administering the business.

As for the only specific instance of alleged interference that Trustmark mentions in its response, Security's supposed effort to prevent an audit of the TIG business by Trustmark, I have addressed that issue above. In addition, as a result of Security's efforts, the audit ultimately was performed. Finally, although the claimed audit interference occurred prior to November 2001, Trustmark's letter of November 26, 2001 seeking to rescind the retrocession agreement with Security made no mention of this issue as a ground for rescission.

Trustmark's fourth claimed breach is Security's alleged "improper use of its sister corporation, FCIC, in order to exert leverage over Trustmark in connection with the TIG Novation." I understand that Security and FCIC sharply dispute Trustmark's assertions as found in the interrogatory response. But even if those assertions are true, Trustmark nowhere explains how FCIC's conduct in connection with the Unicare business was ever used as "leverage" against Trustmark in connection with the so-called TIG novation. Moreover, I understand that in the arbitration between itself and FCIC, Trustmark made the same allegations to support its attempted rescission of the Unicare retrocession agreement. The panel of arbitrators unanimously rejected Trustmark's effort to rescind on these or any other grounds.

Trustmark's fifth claimed breach of the agreement is Security's alleged failure to immediately and without independent consideration accede to Trustmark's demand that Security rescind the reinsurance agreement with TIG. I already have addressed this contention as well. One additional point to note here is that Trustmark's position relies heavily on its assertion that Security, as a mere fronting company, should have deferred without question to the wishes of Trustmark, the entity that had assumed virtually 100%

of the reinsurance risk.  By this time, however, Trustmark had long since repudiated its obligation to reinsure Security for the run-off period of the TIG agreement.  Although Security contests Trustmark's position on that issue, as a result of Trustmark's purported termination, by November 2001, Security faced the prospect of substantial actual reinsurance exposure to TIG.

The second ground upon which Trustmark relies to rescind its agreement with Security is basically an elaborated regurgitation of the November 2, 2001 letter.  Nothing contained in the interrogatory response changes any of my conclusions about the propriety of Security's response to that letter.  Moreover, to the extent that Trustmark's response contains new allegations not found in the November 2, 2001 letter, the appropriate action is for Security to evaluate those allegations, as I understand it has done and continues to do, rather than simply accede to Trustmark's demand that Security rescind the agreement with TIG.

Respectfully submitted,

*Mary Ellen Burns*

Mary Ellen Burns

November 15, 2004

**MARY ELLEN BURNS**
7 Cogswell Lane
Stamford, Connecticut 06902
(203) 327-4998
(203) 323-9511 facsimile
burnsm@optonline.net

## PROFESSIONAL EXPERIENCE:

**ARBITRATOR, MEDIATOR, AND ATTORNEY**, Stamford, CT.                          1997 to present
Serve as an arbitrator, umpire and expert witness in a variety of insurance, reinsurance and securities
disputes. Qualified as a mediator and perform limited transactional work.  I have been appointed to over 125
arbitration panels since January of 1997, as both an umpire and an arbitrator, approximately 95 of which
dealt with insurance and reinsurance disputes. The balance addressed security and employment issues.

**NATIONAL REINSURANCE CORPORATION**, Stamford, CT

**General Counsel,** Senior Vice President                          1993- 1996
**General Counsel,** Vice President                          1990 - 1993
**Assistant General Counsel**                          1987 - 1990

Directed legal activities supporting business operations. Responsible for resolving questions and disputes
involving facultative certificates, treaties, retrocessional contracts, alternative risk products, direct excess,
fronting and other primary products. Interpreted reinsurance and primary contract language.  Oversaw all
arbitrations and litigation in which National Re was involved, either as a party or as a witness.  Coordinated
recoveries and, commutations with current and former clients including ones in liquidation.  Issues I dealt with
included allocation of losses to various treaties, the allocation of legal fees between policies, the obligations
of MGA's and agents under their contracts, coverages intended, and settlements to be paid under treaties,
the adjustment of automobile warranty claims, suretyship issues, including construction, financial guarantee
and workers comp. In fulfilling these duties I worked closely with the claims and audit departments as well as
underwriting.

**KROLL & TRACT**, New York, NY

**Partner**                          1986 - 1987
**Associate**                          1981 - 1986

Concentrated in insurance and reinsurance with emphasis on regulatory issues, corporate law and litigation.
Managed legal aspects of corporate transactions including acquisitions, divestitures, company formations,
and liquidations.  Served as an incorporating or interim director for several insurance companies. Liaised with
regulators, industry representatives and legislators, devised and administered compliance, licensing and
eligibility procedures and rates and forms filings; wrote a monthly insurance report; and prepared position
papers.  I represented many primary insurers, including surety companies, both domestic and alien, in a wide
variety of coverage issues. Drafted and negotiated contracts, including stock and asset, employment, agency
and management contracts  as well as insurance and surety contracts, participated in panels and seminars.
Attended pretrial conferences; argued motions and appeals; appeared at administrative and judicial hearings;
drafted pleadings, motions and briefs; and evaluated  claims.

**BRADY & TARPEY**, New York, NY                          1980 - 1981

**Associate**

**MARY ELLEN BURNS**                                    **Page two**

Researched and investigated all areas of insurance law and policies. Responsible for maintaining multi-state eligibility for alien insurers, liaised with regulators, examined and interpreted various tax treaties and contracts, and represented clients in various aspects of insurance litigation, including negligence, and malpractice

**AHEARN, DIMANTI & CARLSON**, New York, NY                    1978 - 1980

**Associate**

Managed real estate closings and foreclosures. Dealt with U.C.C. Workers compensation, ERISA, banking, and commercial law and federal guideline compliance.

## EDUCATION:

J.D., St. John's University School of Law, 1978.
B.A., History/Political Science, College of New Rochelle, Kappa Gamma Phi, 1974.

## MEMBERSHIP/BAR ADMISSIONS:

Admitted, New York and Connecticut State Bars
Admitted, U.S. District Court - Eastern and Southern Districts
Connecticut State Bar Association 1988-1996
Reinsurance Association of America, Law Committee 1989 - 1996.Chair 1995-96
ARIAS-US (AIDA Reinsurance & Insurance Arbitration Society) member 1997-present
NAII (National Association of Independent Insurers) Law Committee 1989-1996

## CERTIFICATIONS/LISTINGS

**Register of Mediators** for the United States Bankruptcy Court of the Southern District of NY
Member, **NASD Regulation**, Inc. Board of Arbitrators. Arbitrator Number A17036
Certified arbitrator American Reinsurance and Insurance Arbitration Society **-ARIAS US.**
Included on list of eligible arbitrators by the **New York Stock Exchange**
Member, **American Arbitration Association**, National Panel of Neutrals and Roster of Umpires.

## ARTICLES

"Taxation Issues Affecting Captives, Insurers & Reinsurers." Published in Reinsurance Digest 1990.

"Responsibilities and Liabilities of the Securities Lawyer: An Insiders Prospective." included in <u>Avoiding Legal Malpractice</u>, New York Practice Skills Handbook Series, published by PLI.1998.

**DOCUMENTS REVIEWED**

1.  10/26/01 Letter from Mark Holton to David Spector

2.  11/2/01 Letter from David Spector to David Grais

3.  11/15/01 Letter from David Grais to David Spector

4.  11/26/01 Letter from David Spector to David Grais

5.  5/16/00 letter from Stephanie Raymond to Michael Hawksworth

6.  6/1/00 letter from Ray Lester to Stephanie Raymond

7.  2/27/03 Deposition of Peter Lovell, with exhibits

8.  4/1/03 Deposition of Kevin Ryan, with exhibits

9.  3/11/03 Deposition of Stephanie Raymond, with exhibits

10.  4/21/03 Deposition of Edward O'Brien, with exhibits

11.  1/20/03 Deposition of Michael Hawksworth, with exhibits

12.  3/7/03 Deposition of Camilita Walker, with exhibits

13.  7/3/03 Deposition of George Gottheimer, with exhibits

14.  7/2/03 Deposition of Richard Jessel, as corrected, with exhibits

15.  7/8/03 Deposition of Paul Thomson, with exhibits

16.  6/10/03 Expert Witness Report of Richard Jessel

17.  6/10/03 Expert Witness Report of Paul Thomson

18.  6/10/03 Expert Witness Report of George Gottheimer

19.  11/9/01 Security's Motion for Summary Judgment in Case No. 3:00 CV 1247 (PCD)

20.  11/9/01 Security's Memorandum of Law in Support of its Motion for Summary Judgment in Case No. 3:00 CV 1247 (PCD)

21.  11/9/01 Security's Local Rule 9(c)(1) Statement in Case No. 3:00 CV 1247 (PCD)

22.  11/9/01 Declaration of Kathryn Nealon in Connection with Security's Memorandum of Law in Support of its Motion for Summary Judgment in Case No. 3:00 CV 1247 (PCD)

23.   11/9/01 Trustmark's Motion for Summary Judgment in Case No. 3:00 CV 1247 (PCD)

24.   11/9/01 Trustmark's Memorandum of Law in Support of its Motion for Summary Judgment in Case No. 3:00 CV 1247 (PCD)

25.   11/9/01 Trustmark's Local Rule 9(c)(1) Statement in Case No. 3:00 CV 1247 (PCD)

26.   12/3/01 Security's Memorandum of Law in Opposition to Trustmark's Motion for Summary Judgment in Case No. 3:00 CV 1247 (PCD)

27.   12/3/01 Declaration of Kathryn Nealon in Connection with Security's Memorandum of Law in Opposition to Trustmark's Motion for Summary Judgment in Case No. 3:00 CV 1247 (PCD)

28.   12/3/01 Security's Local Rule 9(c)(2) Statement in Case No. 3:00 CV 1247 (PCD)

29.   12/3/01 Trustmark's Memorandum of Law in Opposition to Security's Motion for Summary Judgment in Case No. 3:00 CV 1247 (PCD)

30.   12/3/01 Trustmark's Local Rule 9(c)(2) Statement in Case No. 3:00 CV 1247 (PCD)

31.   12/10/01 Security's Amended Local Rule 9(c)(2) Statement in Case No. 3:00 CV 1247 (PCD)

32.   12/17/01 Security's Reply Memorandum of Law in Support of Its Motion for Summary Judgment in Case No. 3:00 CV 1247 (PCD)

33.   12/17/01 Security's Reply to Trustmark's Local Rule 9(c)(2) Statement in Case No. 3:00 CV 1247 (PCD)

34.   12/17/01 Trustmark's Reply Memorandum of Law in Support of Its Motion for Summary Judgment in Case No. 3:00 CV 1247 (PCD)

35.   11/26/02 Security's Motion for Partial Summary Judgment Against Trustmark in Case No. 3:01 CV 2198 (PCD)

36.   11/26/02 Security's Memorandum of Law in Support of Partial Summary Judgment Against Trustmark in Case No. 3:01 CV 2198 (PCD)

37.   11/26/02 Security's Local Rule 9(c)(1) Statement in Case No. 3:01 CV 2198 (PCD)

38.   11/26/02 Kathryn Nealon's Declaration in Support of Partial Summary Judgment Against Trustmark in Case No. 3:01 CV 2198 (PCD)

39.   1/22/03 Trustmark's Cross-Motion for Summary Judgment in Case No. 3:01 CV 2198 (PCD)

40.  1/22/03 Trustmark's Combined Memorandum: (a) In Opposition to Security's Motion for Partial Summary Judgment, and (b) In Support of its Cross-Motion for Summary Judgment in Case No. 3:01 CV 2198 (PCD)

41.  1/22/03 Trustmark's Combined Local Rule 9(c)(1) and 9(c)(2) Statement in Opposition to Security's Motion for Summary Judgment and in Support of Trustmark's Cross-Motion for Summary Judgment in Case No. 3:01 CV 2198 (PCD)

42.  2/12/03 Security's Local Rule 9(c)(2) Statement in Response to Trustmark's Cross-Motion for Summary Judgment and Security's Reply to Trustmark's Local Rule (9)(c) Statement in Opposition to Security's Motion for Summary Judgment in Case No. 3:01 CV 2198 (PCD)

43.  2/12/03 Mark Holton's Declaration for Partial Summary Judgment and in Opposition to Trustmark's Cross-Motion for Summary Judgment in Case No. 3:01 CV 2198 (PCD)

44.  2/12/03 Memorandum in Further Support of Security's Motion for Partial Summary Judgment and in Opposition to Trustmark's Cross-Motion for Summary Judgment in Case No. 3:01 CV 2198 (PCD)

45.  2/26/03 Trustmark's Reply Memorandum in Support of its Cross-Motion for Summary Judgment in Case No. 3:01 CV 2198 (PCD)

46.  2/14/02 Security's Second Amended Complaint in Case No. 3:01 CV 2198 (PCD)

47.  9/17/02 Trustmark's Answer and Affirmative Defenses to Security's Second Amended Complaint in Case No. 3:01 CV 2198 (PCD)

48.  Endorsement # 1 to Worker's Compensation Underlying First, Second and Third Excess of Loss Reinsurance Agreement between TIG and Security

49.  10/17/00 Subpoena to TIG from Trustmark for Documents in Case No. 3:00 CV 1247 (PCD)

50.  TM/R059786-59925

51.  TM/R059377-59701

52.  TM/R065370-65515

53.  6/29/01 Deposition of Brian Ralphs, with exhibits

54.  3/6/03 Deposition of Brian Ralphs, with exhibits

55.  3/12/03 Deposition of Mark Murphy, with exhibits

56.  Trustmark's Response to Security's Second Set of Interrogatories in Case No. 3:01 CV 2198 (PCD)

3

57.    Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary
Judgment on Security's Third Claim for Relief in Case No. 3:01 CV 2198 (PCD)