# EXHIBIT A

**SCHIFF HARDIN & WAITE**
A Partnership Including Professional Corporations

6600 Sears Tower, Chicago, Illinois 60606-6473
Telephone (312) 258-5500   Facsimile (312) 258-5700

Chicago
Washington
New York
Merrillville
Dublin

DAVID M. SPECTOR
(312) 258-5552
(312) 258-5700 (fax)
dspector@schiffhardin.com

Privileged and Confidential
Subject to the Common Interest Privilege

November 2, 2001

<u>VIA Telecopy</u>

David J. Grais, Esq.
Gibson Dunn & Crutcher
200 Park Avenue, Floor 48
New York, New York 10166

Re:   *The Payment of Claims Relating to the 1999 Underwriting Year of the TIG Insurance Company ("TIG") Block of Business*

Dear David:

In our recent telephone conversation, you asked me to provide you with details in support of Trustmark's belief that Security Insurance Company of Hartford ("Security") should rescind it excess of loss reinsurance agreement with TIG (the "Reinsurance Agreement"). The following is a summary of the facts that support Trustmark's position, which are being supplied to Security pursuant to the common interest privilege. As I am sure you can appreciate, the information contained in this letter is highly sensitive. Trustmark does not want this information disclosed to AON or TIG by Security without Trustmark's prior consent.

Security provides excess of loss reinsurance cover for the 1999 underwriting year to TIG on TIG's direct and assumed book of worker's compensation business. AON Re Worldwide ("AON") was TIG's intermediary for the placement of this business. Security's underwriter was WEB Management, LLC ("WEB"). WEB, on Security's behalf, secured retrocessional protection from Trustmark for a portion of the risks assumed by Security.

The Reinsurance Agreement divides the risks assumed by Security into five segments to reflect their origin and TIG's retention. (S01389-91) One of the largest of the five segments is the Virginia Surety Company ("VSC") block, which was produced for VSC by Muirfield Underwriters, Ltd. ("Muirfield"). TIG assumes 100% of the worker's compensation risks underwritten by Muirfield on VSC paper pursuant to a Quota Share Agreement (the "TIG/VSC Agreement"). (TIG/T 000080-104) The VSC block represents approximately 25% of the estimated subject premium and has an attachment point of $50,000. Given its size and low attachment point, the VSC block is one of the most important segments assumed by Security. Indeed, Trustmark

TM/R000543
**Highly Confidential**

SCHIFF HARDIN & WAITE

David J. Grais, Esq.
November 2, 2001
Page 2

believes that the projected performance of the VSC block was critical not only to the rating of the Reinsurance Agreement, but to the underwriter's decision to bind these risks on behalf of Security in the first instance.

Trustmark believes that TIG failed to disclose certain facts and misrepresented others to Security's underwriter regarding the VSC block. Given the significance of the VSC block and the omitted and misrepresented facts, Trustmark believes that rescission of the Reinsurance Agreement is warranted. Among others, TIG made four material omissions/misrepresentations with respect to the VSC block.

First, TIG's placement material stated, among other things, that TIG expected the Virginia Surety block to "expand geographically." (TIG/T 000283-96) Discovery has shown this to be false. On July 1, 1998, a notice of cancellation of the TIG/VSC Agreement was apparently sent terminating the agreement as of July 1, 1999. While Trustmark is still in the process of trying to find the termination letter, its existence is confirmed in a July 2, 1998 TIG e-mail. (TIG/T 000024) The termination of the TIG/VSC Agreement was never communicated to Security's underwriter. Certainly, even the consideration by TIG or VSC of such an action would have raised a red flag with Security's underwriter. Security's underwriter, however, did not have the opportunity to consider this issue because of TIG's misrepresentations and omissions.

Second, TIG did not inform Security's underwriter that a TIG May, 1998 audit of Muirfield established that the VSC block was plagued with significant pricing and reserving problems. (TIG/T 014436-61) To the contrary, TIG's placement material painted a very different picture of this audit. Specifically, the placement material stated that the audit's "major findings" were "a need to implement stronger managed care and injury management practices." (TIG/T 000291) No mention was made of TIG's significant criticisms of Muirfield's pricing and reserving practices. Trustmark believes that this information would have been material to Security's underwriter. Again, Security's underwriter was not given all the necessary information by TIG to adequately analyze this block of business.

Third, internal TIG e-mails show that TIG knew before April, 1998, that the results of the VSC block were deteriorating. For example, one TIG e-mail stated that TIG's retention was lowered in 1998 "from $1MM to a $100,000 . . . due to the loss experience going up." (TIG/T 015648) Similar statements were made by TIG with respect to the 1999 underwriting year. Regarding the 1999 underwriting year, TIG's president and CEO was informed that: "The $50k x $50k buy-down was added during the 1999 year due to a deterioration in the underwriting results of the VSC book." (TIG/T 015678-82) This deterioration was hidden from Security's underwriter.

TM/R000544
Highly Confidential

## SCHIFF HARDIN & WAITE

David J. Grais, Esq.
November 2, 2001
Page 3

---

        Finally, Mr. Gary Wood testified that Security knew before the Reinsurance Agreement was placed with Security that TIG could not comply with the Reinsurance Agreement's loss reporting requirements. Specifically, Mr. Wood stated that TIG lacked a system that would have enabled it to, among other things, provide an accurate and complete monthly bordereaux of losses for the VSC block. TIG's representation that it could provide certain loss reporting when it knew it did not have that capability justifies rescission. Furthermore, Trustmark believes that the complete lack of a reporting system is a breach of the duty of utmost good faith, which also warrants rescission. Trustmark is uncertain whether Security can assert these loss reporting claims. Accordingly, Trustmark would like an opportunity to discuss this issue in greater detail with Security.

        In sum, Trustmark believes that the information produced by TIG and AON demonstrates, at a minimum, that TIG: (1) knew it had significant problems with the VSC block; (2) knew that it would take a year for TIG to extricate itself from the TIG/VSC Agreement; and (3) attempted to solve its problems by passing these known losses on to Security. This was accomplished by the misrepresentations and omissions described above. Indeed, obtaining this cover was so important to TIG that TIG agreed to a contractual provision that it knew it could not keep. Trustmark believes that these facts present a strong case for the rescission of the Reinsurance Agreement. Furthermore, Trustmark is in the process of reviewing information relating to the Innovus and ManagedComp segments that shows nearly identical problems. (TIG/T 015758-827) Given all this, Security should refrain from paying losses or taking any other actions that could be construed as an affirmation of the Reinsurance Agreement.

        We trust that Security will evaluate the information contained in this letter and discuss the same before Security takes any actions in connection with its October 26, 2001 demand letter. I look forward to discussing these issues with you in the immediate future.

                                    Sincerely,

                                    David M. Spector

cc:  Raymond J. Lester, Esq.
      Ronald S. Safer, Esq.
      Everett J. Cygal, Esq.

CHI_DOCS2\ 540367.3

TM/R000545
Highly Confidential