United States District Court
District of Connecticut
..................................................     No 301CV2198(PCD)

**Security Insurance Company of Hartford**
Plaintfiff

       Against

**Trustmark Insurance Company**
Defendant
.........................................................................

**Trustmark Insurance Company**
Third Party plaintiff

       Against

**TIG Insurance Company**

Third Party Defendant
................................................................

**Report of
Stephen A Hartigan
M.C.I.arb M.A.E.**



1

**Introduction**

1.  I have been engaged by the Schiff Hardin LLP, lawyers acting in this dispute on behalf of Trustmark Insurance Company, to give my opinion on various matters set out in this report. I am being remunerated for my work at my normal fee rate for expert witness services of £245 per hour.

**Personal details and Qualifications**

2.  I am the Chief Executive Officer of Interglobal Ltd, a managing general underwriter based in England which writes medical insurance policies on behalf of Lloyds's of London and two major European companies (De Goudse of Holland and Munich Re of Germany). A copy of my curriculum vitae is attached in Appendix A. My career in insurance and reinsurance spans over thirty years during which I have held positions as a reinsurance underwriter, a reinsurance broker, a purchaser of reinsurance and senior management positions in insurance companies and an underwriting agency. I have also acted as a consultant on insurance a reinsurance matters, and as an arbitrator and expert witness in insurance and reinsurance disputes.

**Documentation reviewed**

3.  The documentation which I have reviewed in order to form my opinions is set out in the attached appendix B.

**General background to the Insurance and Reinsurance market as it is applicable to this dispute.**

4.  It is quite normal for insurance companies to insure themselves for part (and sometimes all) of the risks they underwrite and this is process is known as reinsurance. Reinsurance is normally purchased to smooth out an insurance company's results over time by reinsuring them against exceptionally high

losses (such as an accumulation of losses arising from a hurricane or a particularly large claim arising from serious injury to one or more individuals involving substantial payments for damages , treatment and long term care).

5.  However reinsurance is also purchased for other valid reasons including allowing an insurance company to write more business than its financial resources might allow (as determined by regulation) and passing part of that business into the reinsurance market. This is sometimes known as "surplus relief".

6.  An Insurance company might also purchase reinsurance to take advantage of competitive terms available in the reinsurance market which in turn might enable the insurance company to enhance its results at any particular time. This happens when an insurer writes business at a certain projected margin (which might be a profit or a loss) and reinsures that business in such a way and at such terms that the net recovery they make from reinsurers improves their margin. This form of reinsurance has come to be known as "arbitrage" and is commented upon by Mr Harry Tipper in para 27 of his expert report.

7.  The types of business which are reinsured and the motives for purchasing reinsurance are very diverse. For example most insurance companies, in their normal course of business, would be able to pay the loss of a single trailer home out of their own resources but they might seek to reinsure against a potential accumulation of losses to several trailer homes in the event of a hurricane. Similarly most insurance companies would feel comfortable with paying out losses arising from accidents to employees at work but might wish to protect themselves against an unexpected or exceptional increase in frequency or magnitude of such losses within a specified period of time.

3

8.  When considering risks offered to them reinsurers will differentiate between "short tail" and "long tail" business. Whilst these are not finite terms, "short tail" is used to define business where the period between the date of loss and its final settlement is normally no longer than 12 months. This would apply to classes of business where there is little room for dispute or delay in determining the quantum payable for the loss. For example, a factory which suffers a fire loss will sustain material damage and a loss of revenue which are easily calculable. An estimate for the repairs will be carried out and the loss of revenue calculated so that the factory can be put back into business as soon as possible. In most circumstances the cost of repairs for the material damage and the loss of revenue will form the basis of the insurance claim.

9.  "Long tail" is used to define business where the period between date of loss and its final settlement may take longer than 12 months and in some cases considerably longer. This would apply to classes of business where it is not always easy to determine the quantum of loss because it relies on variable criteria. For example the driver of a motor vehicle may sustain serious injuries for which he may sue a third party. It may take some time before the claim is notified to the third party's insurers because of the claimant's condition or because of ongoing consultations with his lawyers and /or medical advisors (insurers and reinsurers describe these claims as Incurred but not reported or IBNR). Costs relating to the treatment, long term care, rehabilitation, loss of earnings legal costs and pain and suffering can all form part of his claim against the third party which in turn becomes an insurance claim. These costs are often difficult to determine in the early stages of the claim and may increase with time. The difference between the current estimate and what the

4

claim might eventually end up being settled for is often described by reinsurers as Incurred but not enough reported or IBNER). The term IBNR is often used to include both IBNR and IBNER claims.

10. A prudent reinsurance underwriter, when considering reinsurance of long tail business, will take into account that reported historical results will have an element of IBNR and an element of IBNER. The extent to which IBNR and IBNER need to be taken into account is strongly influenced by the pro-activity and competence of the Reinsured in handling claims, fixing accurate reserves at an early stage and processing the advice of claims and any movement in claims provisions in a timely manner.

11. Reinsurance of Workers compensation business on an excess of loss basis, (where reinsurers are not concerned in each and every claim but only those which exceed the retention) is viewed as "long tail" business.

12. Reinsurance companies, (those who insure insurance companies) also purchase reinsurance for themselves from other insurance companies for the very same reasons that insurance companies purchase reinsurance. This process is known as retrocession. Insurance companies take into account the effect and constraints of their reinsurance protections when underwriting their original insurance risks and a prudent reinsurance underwriter will take into account the effect and constraints of his own retrocessional protections when accepting reinsurance risks.

13. The reinsurance market is very large and truly international with insurers and reinsurers purchasing reinsurance and retrocession from companies all over the world. The major reinsurance markets are located in the United States,

London, (including Lloyd's of London) continental Europe and, nowadays, Bermuda.

14. Reinsurance may be conducted on a facultative basis, which involves the submission by the reinsured and the consideration by the reinsurer of individual risks, and treaty reinsurance under which the reinsurer agrees to cover all risks underwritten by the reinsured within certain parameters over an agreed period of time.

15. Broadly there are two types of treaty reinsurance: Proportional reinsurance (alternatively known as pro rata reinsurance of which quota share, surplus and facultative obligatory treaties are types of contract) and non proportional reinsurance (alternatively known as excess of loss reinsurance of which excess layer, working layer, catastrophe layer and stop loss are types of contract).

16. The essential differences between proportional and non proportional reinsurance are described in paragraphs 17-19 of Mr Harry Tipper's expert report.

17. Proportional reinsurance involves a proportionate distribution of risk between the reinsured and the reinsurer. For example if the reinsurer accepts 10% of the risk he will receive 10% of the premium (less any deductions he agrees to pay the reinsured) and he will pay 10% of any claims which that risk sustains.

18. Non Proportional or Excess of Loss reinsurance involves a non proportionate distribution of risk. Under this form of reinsurance the reinsured themselves will pay all losses up to a certain pre- agreed amount (called the reinsured's retention or alternatively the treaty deductible) and reinsurers will pay that part of the loss which exceeds the retention up to an agreed upper limit. Generally

6

speaking the mathematical principal of distribution of loss determines that larger losses happen less frequently than smaller losses. It follows therefore that the higher the Reinsured's retention the more losses they will pay for themselves and the reinsurance premium they are required to pay will be lower. The lower the retention the greater is the transfer of risk to the Reinsurer.

19. The reinsurance market involves many players. It includes:

- insurance companies and syndicates at Lloyd's who accept reinsurance business as well as insurance business.

- specialist reinsurance companies (for example General Re, Munich Re and Swiss Re ) who may deal directly with insurance companies or who may underwrite business through the intermediary of reinsurance brokers.

- underwriting agencies (such as WEB who are involved in this dispute) who underwrite reinsurance on behalf of insurance or reinsurance companies within agreed guidelines.

- reinsurance brokers , who may deal only in reinsurance or who may be specialist divisions within broking companies that deal in both insurance and reinsurance risk (as in the case of Aon Re. who are involved in this dispute)

**Utmost Good Faith**

20. Insurance contracts and reinsurance contracts are contracts of Utmost Good Faith which involves a mutual duty which each party owes towards the other. The following extracts from "Reinsurance" (The College of Insurance 1980

edition) by Robert Strain explain some of the principals of Utmost Good faith as it applies to contracts of reinsurance:

"A basic duty of the party purchasing reinsurance (the reinsured) is to disclose to the reinsurer all known information touching on the risk of loss"

"Disclosure for a treaty becomes a broader duty, in respect to terms of the proposed treaty, its interplay with other reinsurances and the nature of primary policies to be produced and its probable use in the future, as well as all pertinent information about past loss experience to which the treaty as a whole is likely to be subject"

"In reinsurance a person's word is good, assumed to be given in good faith, and it will be relied upon. In giving it, the person is necessarily assumed to be authorized to do so and to be sufficiently knowledgeable and skilled to preclude its groundless disavowal later. Were this not so the cost of transacting reinsurance would be significantly increased and it is doubtful it would survive as we know it today"

"On the other hand good faith is not a shelter against the bad judgement or carelessness of either party"

(Chapter 1 by Henry T Kramer "The Nature of Reinsurance pp.9-11)

21. The principal of utmost good faith applies equally to proportional and non proportional reinsurance contracts.

22. In my experience as a reinsurance underwriter, reinsurance broker and purchaser of reinsurance the principal of the utmost good faith requires the reinsured and / or the reinsurance broker acting as his agent to disclose to the reinsurer all relevant and material information relating to the business to be reinsured. My understanding is that the principal of utmost good faith means

that relevant and material information should not be withheld, undisclosed or
misrepresented by the reinsured or by the reinsurance broker acting as his
agent.

23.  Often the reinsured will be the only party that is aware of the information
which is relevant to the business to be reinsured and the onus is therefore on
the reinsured to provide it. The reinsurer is reasonably entitled to expect that
the information which is provided to him in connection with a proposal to
reinsure is accurate and complete.

**The circumstances of this dispute.**

24.  Although this dispute covers the reinsurance contracts entered into between
TIG and Security and Security and Trustmark (for whom WEB, in their
capacity as managing general underwriter were authorised to underwrite) for
the period commencing 12 months at the 1st January 1999 it is necessary , in
my opinion, to refer also to the preceding period of reinsurance(1st April 1998
until 31st December 1998) between TIG and US Life for (whom WEB were
authorised to underwrite  at that time in their capacity as managing general
underwriter).

25.  It is clear, from the evidence which I have examined that Robin Ekwall, who
underwrote this business at WEB for the period commencing 1st April 1998 on
behalf of US Life (whom I understand shared part of their business
underwritten through Web with Trustmark under a form of partnership
arrangement) also underwrote this business for the period commencing 1st
January 1999 on behalf of Security who then reinsured 100% of the disputed
contract to Trustmark.  Robin Ekwall, and indeed any prudent underwriter
would therefore have considered the 1st January 1999 contract as a renewal

9

(notwithstanding that the principal underwriter for whom he was accepting the business had changed) and it would be impossible for him not to have been influenced at the renewal (the negotiations for which commenced in November 1998) by the representations made to him at the time he was first offered to quote terms for the business some 6 months earlier in May 1998.

26. Early in 1998 TIG sought to obtain terms for an excess of loss reinsurance with a retention of $100,000, to protect the Workers Compensation business they wrote through a number a number of distribution sources (which they described as "segments"). Prior to this TIG had purchased reinsurance for this business with a retention of $1,000,000 except for the business described as the Managed Comp Inc (MCI) segment for which they had a retention of $500,000

27. TIG approached at least one reinsurer (Swiss Re) on a direct basis and asked the reinsurance broker Aon Re Inc to obtain quotes from various other reinsurers for protection in excess of $100,000 with a limit of cover of $400,000 for the MCI segement and $900,000 for all other segments.

28. Aon approached various reinsurers for a quotation for the cover required by TIG. This included an approach to the managing general underwriter WEB to whom Aon provided a package of information which described the underlying business and gave certain details about its historical performance.

29. Based on the information received, Aon's responses to questions which he raised and further additional information provided by Aon , Robin Ekwall of WEB calculated a reinsurance premium which, after some negotiation and "fine tuning" was reduced to a level where it was acceptable to TIG as confirmed by their agent , Aon.

30. The premium quoted by Robin Ekwall of WEB for the period commencing 1st April 1998 was to apply for a 36 month period with a provision for WEB to increase the premium by up to 10% at each anniversary. However the agreement also included provision for TIG to cancel the contract at 1st January 1999. In September 1998 TIG decided to give notice of cancellation under the contract to enable them to renegotiate the terms effective 1st January 1999.

31. In November 1998 Aon provided WEB with detailed information relating to TIG's workers compensation business to enable WEB to quote renewal terms for the excess of loss reinsurance they had provided from 1st April 1998.

32. TIG were anxious to have terms quoted on the basis of "full conditions" which included not only the benefits under part B of a workers compensation policy (the Accident and Health benefits) but also Part A which is Employers Liability coverage.

33. The coverage under section A could not be written by US Life in 1998 nor Trustmark from 1st January 1999 because both US Life and Trustmark are Life insurance companies and do not possess the necessary licences to write this class of cover. Security Insurance of Hartford did possess the necessary licences and for the period effective 1st January 1999 had entered into an arrangement with WEB whereby they appointed WEB as a managing general underwriter to accept business within certain pre-agreed guidelines. WEB therefore offered full condition terms (part A and part B) on behalf of Security for the expiring excess of loss reinsurance contracts ($400,000 excess of $100,000 for the MCI segment and $900,000 excess of $100,000 for all other segments) which were accepted by TIG. WEB also provided an alternative quote for the for the Workers Compensation carve out only.

34. WEB also subsequently offered reinsurance terms on behalf of Security, which were accepted by TIG, for a new excess of loss layer of $50,000 excess of $50,000 for the Virginia Surety Insurance and Innovus segments of their Workers compensation business.

35. Security entered into a 100% reinsurance with Trustmark effective from 1st January 1999 for all of the excess of loss reinsurances they had granted for part B of TIG'S workers compensation business.

36. The dispute under consideration arises from allegations by Trustmark that representations made by TIG and/or their agent, Aon, at the time the risk was first underwritten by WEB on behalf of US life and then subsequently renewed by WEB on behalf of Security were either incomplete or in certain cases misleading and inaccurate.

**The initial broking of the risk and Trustmark's allegations.**

37. On 5th May 1998 Aon, the reinsurance broker acting on behalf of TIG, wrote to WEB, a managing general underwriter authorised to accept business within certain guidelines by US Life, with a request for a quotation for an excess of loss protection on a portfolio of workers compensation basis which would be considered by a reinsurer to be long tail business.

38. In order to quote for this reinsurance a prudent underwriter would rely on the representations made to him by the broker and where necessary seek clarification or additional information. The prudent underwriter does not start from the position that certain material information may not have been provided to him, nor that the information which has been provided is misrepresentative.

39. Based on the principal of utmost good faith the prudent underwriter is entitled to believe that full and accurate disclosure has been made of all material facts which might deter him from writing the risk or induce him to underwrite the risk at the terms he is prepared to offer

40. I understand from the documents that I have reviewed that Trustmark allege that TIG and /or Aon, acting as agent for TIG made a number of misrepresentations to Robin Ekwall of Web upon which he relied or incorrectly omitted to provide material information upon which he would have relied.

41. Trustmark allege that Sheilah Bohuslav advised Mr Ekwall that TIG was purchasing this new reinsurance in anticipation of an impending sale of TIG. However, Trustmark allege that the true motive behind purchasing this reinsurance was to provide some relief on the poor results being experienced.

42. Shielah Bohuslav denies that she made this representation. I am not in a position to comment on the veracity or otherwise of this denial but there is much evidence to support the view that the reinsurance in question was sought to provide some relief on the poor and deteriorating results which TIG were experiencing in their Workers compensation business . For example:

- Jay Chase September 1997 Flash report (exhibit 107)
  "The effect of price trends resulting from the market competition is down with commensurate pressure on loss and expense ratios...............Pricing pressures in the Mid West have deteriorated significantly"

- Memo from Steve Kelley of Muirfield underwriters dated 6th February 1999 (Exhibit 453)

13

"They (TIG) are aware of the softness of the market and the pricing and production pressures that are felt within the underwriting process"

- E mail from Jay Chase to Mary Hennessy dated 19th June 1998 (Exhibit 598) in which he states:

"In the final analysis, if we do see a price increase from Aon, which I don't expect, purchasing real risk transfer will turn out to be a good move in any event. I'm convinced that loss ratios are going up and that we will have purchased at the right time"

- Memo from Steve Kelley of Muirfield underwriters dated February 28th 2001 (Exhibit 435):

" I have attached several exhibits that articulate the pricing changes we felt obligated to make *in 1998 and early 1999* (my italics) and which resulted in the elevated loss ratios experienced in these policy years."

- Draft Aon Internal memo from Sam Licitra to Larry Sorenson (Exhibit 436):

"Muirfield undertook, under direction of TIG, an incentive plan for dramatic growth that began in 1998 , with an additional mandate to expand geographically to be a nationwide market for Workers Compensation. All of this occurred in a softening P and C market. The large influx of new business , which has a tendency to run higher loss ratios, put pressure on the book"

- Swiss Re internal e mail of 5th April 1998 from Richard Wallace in which he states:

"To further improve is net underwriting results, Chase wants to buy

14

down his per occurrence retention. Under three of the four

programmes that retention is $1,000,000, whereas under the fourth it is

$500,000. He suggested a $100,000 retention, but is willing to

consider alternatives even lower, including a quota share treaty.

Chase believes he can further improve his net results through

reinsurance simply because the reinsurers can do the excess layers at a

cheaper price than he could charge internally. This is because, in his

opinion, reinsurers can discount their pricing to a larger extent than he

can for any investment income, given the conservative investment

portfolio TIG has." (Exhibit 583)

43. In my opinion if the reason given for purchasing this reinsurance was as

Trustmark allege, this would have contributed to an overall impression that

TIG were seeking to reduce volatility in their underwriting performance and

wished to trade reinsurance cost for such volatility in anticipation of a sale.

44. On the other hand if the real reason was to alleviate a deteriorating

underwriting performance then this should have been disclosed to the

underwriter who would have had the opportunity to either decline the risk or

offer terms which would have been more appropriate to such circumstances.

45. Trustmark allege that Sheilah Bohuslav represented to Robin Ekwall that the

the reason why the development of TIG's primary Workers Compensation

book was better than the national average was because of "superior claims

handling". Sheila Bohuslav certainly made a similar representation to

Reliastar, one of the other reinsurers whom Aon had approached to quote for

this business. (See her e-mail of 28th may 1998 to Paul Kersten of Reliastar,

Exhibit 252):

"TIG attributes their development to good claims handling and evaluation".

46. In my opinion any experienced reinsurance broker or underwriter will understand the meaning of "superior claims handling" particularly in the context of "long tail business". It implies early notification of claims, proactive claims handling, regular review of medical evidence and circumstances likely to affect the eventual quantum of a claim and accurate determination of adequate case reserves to reflect the likely outcome of the claim.

47. The underwriting presentation for the 1.1.99 period continued the emphasis on superior claims handling by providing a copy of TIG'Ss loss reserving policy for Workers Compensation business. The policy opens with the statement:

" It is the policy of TIG Insurance Co. that case based reserves shall *at all times represent the best estimate of the ultimate claims cost.* " (My italics).

It goes on to say:

"Authority to determine claim reserves will be subject to specific authority levels as determined by TIG claims and agreed in writing in reserve authorizations or claim Contracts, Any reserve recommended shall include the agreement of the claim handler , claim supervisor or claim management employee with sufficient reserve authority for approval."

48. In my opinion any prudent underwriter reading this claims reserving policy, and in particular the above two extracts from the policy, would be entitled to believe that any and all case reserves presented to him would have been calculated in accordance with these principles.

49. The 1.1.99 underwriting presentation also included commentary on post loss management, loss cost management programmes and managed care philosophy, all of which would have contributed to the impression that TIG ran a superior claims handling regime.

50. If a reinsurance broker represents to an underwriter that a reinsured runs a regime of superior claims handling, in my opinion the prudent underwriter can accept this on face value. Furthermore, if the loss development figures which the underwriter is being asked to consider at the time appear to be better than the national average (which is also confirmed by Mr. Toothman's comparison of the TIG loss development factors with those published by the Reinsurance Association of America ) then the prudent underwriter would have little reason to doubt the representation.

51. If the representations relating to superior claims handling are false or misleading this potentially conceals the fact that the claims information being considered by the underwriter has an element of under reserving which in turn distorts the underwriter's estimated outcome of loss settlements for prior years.

52. From the evidence I have reviewed there are numerous references to concerns within TIG about the adequacy of the claims reserves and the claims reserving procedures for certain segments of the business.

53. For example:

- In his memo of 6th February 1998 Steve Kelly of Muirfield underwriters , the MGA for the Virginia Surety segment of the business, states that : "They (TIG) have concluded the loss –cost component needs attention and

they feel they need our claims handled on a "Level 4" basis or they cannot continue the program at the current cede level if they continue at all".

- In his Februrary 1998 flash report (exhibit 111) Jay Chase of TIG refers to: "TIG pushing Martin Boyer to implement stronger Managed Care tools faster"

- In his March 1998 flash report (exhibit 577) Jay Chase states: "Loss ratio for the division is worse than plan by approximately 1.5 points before emulator cover adjustment. Deficiency being driven almost entirely by the VSC programme. We planned for a more aggressive managed care implementation and to date this has not materialised."

- In his 8th April 1998 e mail to Jay Chase Patrick McDonald reported : "Reporting through Aon on the martin Boyer large losses has been tardy and not effective. The reporting of $100k losses has been behind for some time (to which Aon agrees but pleads backlogs, new employees, workloads) and some of the most recent responses were nothing more than retyped versions of last years report. On some simpler issues such as open subrogation, these repeat reports are obvious and would seem to indicate no progress or new information since last year.
   We have had 4 death claims since last August, the first one was on 8/19 and not reported to TIG until 11/5...................
   Overall, we don't get the feeling that there is a sense of urgency or importance with some or all of the TIG business..........." (Exhibit 114)

- Exhibit 893 shows that on 11th November 1998, the very same day that Sheilah Bohuslav sent out the underwriting information for the 1.1999 renewal (which included the claims reserving philosophy) there was a

telephone conversation between Mr. Roland Jackson, the CFO of TIG and Mr Prem Watsa of Fairfax who were in negotiations to purchase the company, in which Mr Jackson referred to a "reserve hit of $60 to 100 million."

54. Trustmark allege that Aon or TIG represented that the loss development factors for TIG's own book of primary Workers Compensation business were representative of the Virginia Surety book. I have read the report conducted by TIG on Muirfield underwriters (the managing general underwriter authorised to accept workers compensation business on behalf of Virginia Surety Insurance company) which was one of the segments making up the TIG workers compensation portfolio for which reinsurance was sought).

55. Only selective and favourable extracts from this report were communicated to WEB for the 1st January 1999 submission in which Aon advised "TIG conducts annual underwriting claims and actuarial reviews. Of this business unit major findings to date include a need to implement stronger managed care and injury management practices". However the full report, which like any audit report has reviewed a representative sample of files and the overall procedures applied, contains comments and observations which contradict any suggestion that a regime of superior claims handling existed in this segment of the business.

56. The negative comments in the Muirfield audit, which were not communicated to WEB include:

Under the Executive Summary: "On going loss control service (Martin Boyer) is not driven by loss – cost reduction"

"Case file ultimate reserves should be set within two years of an accident"

19

Under Claims Reserving: "some claims were not reserved for known permanency despite the medical reports reviewed in the file until one month before the aware was paid and the file closed.   A reserve worksheet demonstrating reserve rationale should be in each file every time the reserve changes.

A significant number of files are below these standards with most under-reserved"

In my opinion these observations, arising from an audit carried out in early May 1998 are material and the onus is on the reinsured to disclose them.  Had they been brought to the attention of a prudent underwriter then such underwriter might have been deterred from quoting for the business or would at the very least have made further investigation into the accuracy of the claims reserves he was reviewing and made greater provision for IBNR and IBNER in any loss development factors he used to estimate the eventual outcome of losses for any particular accident year.

57. Trustmark allege that TIG represented that they could report losses by monthly bordereaux but knew in so representing that they did not have the capability to report on this basis.

58. I have noted that both the 1998 slip and the 1999 slip include provision which states that "The Company shall provide monthly bordereaux of losses". Although it is not written explicitly I believe that market custom and practice would entitle any prudent reinsurer and any prudent  reinsured to understand this to mean that they would receive a monthly notification of paid and reserved losses  impacting or likely to impact the reinsurance contract which

they are underwriting and providing details by which the loss and details of the loss might be identified.

59. Reinsurers need this information to monitor the progress and performance of the reinsurance contract and to provide information to their own retrocessionaires where relevant. In my opinion the format in which the information is provided (whether claims from the ground, claims in excess of 50% of the retention or claims in excess of the retention) is almost secondary to the importance a prudent underwriter would put on the willingness and ability for the reinsured to provide this information on a regular basis which is an indication that the reinsured has his claims processing well under control.

60. However the testimony of Mr Gary Wood strongly suggests that this was not the case. On page 16 of his deposition of September 21st 2001 Mr Wood in response to a question form counsel as to how significant the claims backlog was in December 1998 responds "I would say between 250 and 300 claims" (confirming also that these were individual claims that had been received by TIG that would need to be ultimately reported ). By April 1999 this backlog had grown, according to Mr. Wood's estimate, to between 300 and 400.

61. In my opinion if a prudent underwriter knew that TIG was unable to provide the information it had contracted to provide, the underwriter would wish to ascertain the reasons why. This in turn would disclose the true situation of TIG'S claims handling.

62. Furthermore, a prudent reinsurance underwriter would be concerned to discover that his reinsured had entered into a contractual obligation knowing full well, according to Gary Wood's testimony, that he was unable to comply with it. Even if a reinsured enters into such a contractual obligation in good

faith and then discovers that he is unable to fulfil that obligation he should be prepared to take measures , including spending money on systems development, to ensure that the situation could be remedied. However, according to the testimony of Gary Wood, TIG did not see any cost benefit in making the changes to their systems which would have enabled this obligation to be fulfilled.

63. Aon's letter to WEB of 5th May 1998 which contained the original submission for the disputed reinsurance contract for the period effective 1st April 1998 contained a diskette entitle Claims which "includes losses excess of $15,000" The letter went on to say that "This data is primarily for the TIG primary book but it does contain Virginia Surety since 1994. Very little, if any Managed Comp Inc will be included due to this being a new programme for TIG. It is not disputed that subsequent investigation has established that this diskette did not include claims in respect of the Virginia Surety segment.

64. For the 1999 renewal the diskette containing claims information was unable to be opened by Mr Ekwall and the information was therefore sent by e mail in three separate files entitled EVAL 1998, EVAL 1997 and EVAL 1996 but these files did not contain loss data for Virginia Surety Insurance and MCI.

65. In my view it is self evident that if a prudent underwriter of an excess of loss contract covering workers compensation business is told, incorrectly, that the loss information with which he has been provided includes historical losses for a significant segment of the business (for which he has been provided historical premium details) the underwriter is entitled to take that representation on face value.

66. The underwriter will make his calculations on the basis that the historical losses include the information for that segment and this will inevitably result in the underwriter reaching a fundamentally incorrect conclusion.

67. In my opinion if Robin Ekwall had been given the claims information for the Virginia Surety segment in the submission for the period commencing 1st April 1998 and the subsequent submission for the period commencing 1st January 1999 his calculations at the time would inevitably have produced a higher historical burning cost (the relationship, expressed as a percentage, which claims in excess of the retention bear to the subject premium income of the business which is reinsured) leading him to either quote a higher premium, make further investigation or decline the account according to his appetite for contracts with high loss frequency.

**The underwriting process carried out by Mr. Ekwall.**

68. In an ideal world reinsurers would not enter into reinsurance contracts with reinsureds without carrying out a full due diligence on the Reinsured. This would involve an investigation and audit of each area of each segment of their business and in the case of TIG and its various segments of Workers Compensation business. This would have been a gargantuan task.

69. The world of reinsurance, like many other areas of commerce, does not work like this and significant underwriting decisions are taken on the basis of the principal of Utmost Good Faith which I have described above. Lloyd's of London, where millions of dollars of reinsurance risk are placed everyday is an example of how the market works in practice. Reinsurance brokers will bring complicated reinsurance proposals to Lloyds underwriters who will review the information presented to them, seek clarification and further

information if necessary but very often quote a price within 24 hours and sometimes on the spot. As Henry Kramer puts it in his Chapter on the Nature of Reinsurance in "Reinsurance" published by the college of insurance and which I have already quoted above:

"In reinsurance a person's word is good, assumed to be given in good faith, and it will be relied upon. In giving it, the person is necessarily assumed to be authorized to do so and to be sufficiently knowledgeable and skilled to preclude its groundless disavowal later. *Were this not so the cost of transacting reinsurance would be significantly increased and it is doubtful it would survive as we know it today.*" (my italics).

70. It is therefore important to bear in mind that the prudent reinsurance underwriter will rely on, and is entitled to rely on the principal of utmost good faith when considering a reinsurance proposal.

71. In my experience a prudent underwriter will take the following approach, when considering a new proposal to provide reinsurance protection, at a lower retention than the reinsured has brought protection in prior years, for a portfolio of Workers Compensation business:

72. In these circumstances the prudent underwriter will wish to understand why the Reinsured now wants to protect his account at a lower retention than prior years. In the case of TIG a reduction in retention from $1,000,000 (or $500,000 for the MCI segment) would entail a significant transfer of risk and collectible losses which hitherto TIG had been prepared to fund from their own resources. It begs the question Why?

73. The answer to the question is disputed between WEB and Aon acting as agent for TIG. Robin Ekwall says that Sheila Bohuslav of Aon told him that TIG

24

77. The prudent reinsurance underwriter will consider the information which is provided to him to determine whether or not his proposed reinsured writes an account which fits in with his underwriting criteria (and in the case of a managing general underwriter with the underwriting criteria of the risk carrying company). The prudent underwriter will also consider the information which is provided to him against the capacity and constraints of his own retrocessions if these are going to be exposed to the risk he is considering.

78. When the reinsurance contract in question was first submitted to WEB in May of 1998 the information which was available for Mr Ekwall to consider was contained in the letter from Aon dated 5th May, the attached underwriting information document and two diskettes , one which contained premium data (although there is some question according to Mr Ekwall's testimony as to whether this information was provided in disktette or printed document format) and a diskette containing historical claims information which was said to include the historical claims information of the Virginia Surety Insurance company segment but which was subsequently discovered not to do so.

79. The written representations in the underwriting information documents attached to Aon's letter of 5th May 1998 and the renewal submission letter dated 11th November 19998 included numerous positive statements about the way TIG conducted its workers compensation business on which the prudent underwriter would be entitled to rely. In my view these documents conveyed the overall impression of a well run portfolio consisting largely of low-medium hazard business. This was supported by statistics which suggested

that the ground up Virginia Surety account performed worse than the TIG

Primary account. Mr Kevin Ryan in pages 258 -261 gives his explanation of

why this was the case. In his opinion it had nothing to do with the Virginia

Security business have a higher frequency or, more importantly to the excess

of loss underwriter more severe losses than the TIG business but it was a

function of lower premium rates resulting from unmerited premium rebates.

The information also showed that the TIG primary account had better than

average loss development experience (which was allegedly explained in

further exchanges between Robin Ekwall and Sheilah Bohuslav as being due

to TIG's superior claims handling, which as I have already stated, the prudent

underwriter could expect to apply to all of the workers compensation business

underwritten by TIG.)

80. Against this background the prudent underwriter would need to analyse the
performance of the account at the proposed level of reinsurance. In this case
Robin Ekwall needed to calculate the historical performance of the portfolio
for claims in excess of $100,000 up to a further $900,000 of cover (and up to a
further $400,000 for the MCI segment.

81. I wish to stress that in my opinion, underwriting, and in particular the
underwriting of excess of loss reinsurance contracts protecting "long tail"
business is as much an art as it is a science.

82. Whilst it is normally not a complicated mathematical exercise to calculate the
historical burning cost performance of any portfolio at any point in time, by
calculating the relevant losses which exceed the retention and expressing these
as a percentage of the subject premium many subjective decisions need to be

27

made by the underwriter to reach a view on the likely outcome of prior years where many of the claims will still be open (not settled).

83. Furthermore additional subjective decisions will need to be taken as to the value of investment income, the future settlement pattern of losses, potential future claims inflation the profit margin required and the influence, if any , of the Reinsurer's own retrocession arrangements.

84. It is hardly surprising therefore that the various experts asked to report in this matter have described different approaches to calculating the expected ultimate burning costs for the reinsurance contracts in question and have expressed differing opinions as to what the premium rate should have been.

85. Karen Rivera of Aon's actuarial department had produced her own initial calculations, dated June 3rd 1998, which suggested that the ultimate outcome for the layers in questions would be equivalent to a rate of 10.86% (see memorandum from Bob Bima to David Kelly dated 29th June 1998). Karen Rivera's calculations were subsequently revised upwards on June 24th 1998.

86. The various underwriters who did quote for this business have a range of prices, from the Swiss Re price, which appears to be the closest to that quoted by WEB to prices quoted by LDG of 15.94% for the VSI segments and 14.22% for the MCI segment and a composite quote from Westport of 15% (see memorandum from Bob Bima to David Kelly dated 29th June 1998)

87. The prudent underwriter will take the statistical information available to him and apply a number of procedures to determine the likely outcome of prior years and the year under consideration which will enable him to calculate an adequate reinsurance premium. According to my experience in the rating of excess of loss contracts covering long tail business these procedures include:

88. Calculating the historical Crude Burning Cost. (the aggregate of paid and outstanding losses for each prior underwriting period in excess of the retention up to the reinsurance treaty limit at a particular point in time expressed as a percentage of the subject premium income for the relevant underwriting period).

89. Mr Ekwall did this by manipulating the claims data in the claims diskette submitted to him in May 1998 and the updated claims data included in the three EVAL files submitted to him in November for the 1st January 1999 renewal. He took all of the claims in excess of $100,000 for what he believed to be all segments of the business   and aggregated them by underwriting period (in this case by accident year /year of occurrence).

90. The next procedure would be to apply factors (referred to as Loss development factors) to the aggregate losses making up the burning cost for each period to project the losses to their anticipated ultimate settlement position. This procedure effectively adds the IBNR and IBNER for any year to the incurred claims (paid plus outstanding claims) which are available at that point in time.

91. Generally speaking the older the year the more mature will be the claims development, the lower the IBNR and therefore the lower the factor needed to be applied to project claims to their anticipated ultimate settlement amount.

92. Varying approaches are used by underwriters to apply and calculate IBNR/Loss development factors. These include two actuarial methods known as the Bornheutter Ferguson method and Chain Ladder progression with which I am familiar but not to any detailed extent, as well as the use of market produced loss development factors, (such as those published by the RAA) or

29

alternatively loss development factors developed by the underwriter from empirical data.

93. Analysing any particular company's loss development will generally enable an underwriter to determine what their particular loss development factors might be although changes in claim management procedures and claims reserving philosophies can distort the picture. This procedure , as I have already stated, attempts to add the IBNR and IBNER to the incurred claims for previous underwriting years to predict the ultimate claims development figure. It is one of the most subjective procedures in the underwriting process for excess of loss reinsurance contracts covering long tail business and is subject to distortion by many variable factors such as unexpected loss developments, future changes in legislation with retrospective effect and changes in claims management and reserving philosophy.

94. Mr Ekwall applied loss development factors to the claims numbers he had compiled to produce his crude historical burning cost. In his 1998 analysis the factors which he used were factors compiled by WEB from empirical data and were higher than the factors based on the information provided to him by Aon in June 1998 and generally more conservative that than the industry data (see page 212-214 of deposition of Michael Toothman of 15th December 2004).

95. It is true of any large portfolio of business that if you segment it, different segments may produce different loss development factors but a prudent underwriter may legitimately take a composite view of loss development factors across the whole account just as he may take a view over the whole account to quote a composite rate.

96. In my experience some underwriters will apply an inflation factor which is designed to take into account future claims inflation. In most classes of long tail business, and particularly business which involves injury and resulting in loss of earnings and medical treatment for individuals claims inflation is made up of the increase in medical care and the increase in wages. This overall number has historically increased at a faster rate than inflation measured by consumer price or wage indices. Other underwriters might include the inflation factor in their loss development factors.

97. Mr Ekwall did not apply an inflation factor when he priced the contract which commenced on 1st April 1998 but he did when he priced the renewal contract effective 1st January 1999. His explanation for this can be found on pages 357 and 358 of his deposition of May 2nd 2003 where he states that "I just recall that for the 4/1/98 we had so much fat in the numbers that it wasn't really necessary" and his answer to the question why he applied an inflation factor for the 1/1/99 renewal " because we were bringing in the full conditions paper and that was going to cost us something.

98. Applying loss development factors and loss inflation factors to the losses calculated to produce the crude burning cost produces the expected ultimate developed losses and the next procedure is to apply a discount factor to these.

99. The principal behind this discount factor is that because the business is "long tail" the ultimate developed losses do not represent payments by the reinsurer until some time in the future. In fact the payment of the ultimate developed losses is spread out over time in the future. In the meantime the Reinsurer has the balance of the reinsurance premium less any paid losses and is allowed to establish reserves for the ultimate losses. Those reserves have the advantage

31

of being tax deductible. The normal calculation is to apply the discount factor to the ultimate developed losses to determine their net present value. As Mr. Cohen puts it in his interrogation of Mr Ekwall (See page 113-114 of Robin Ekwall's deposition of 6th February 2003) "it is the present value which tells you what premium you need – it gives you relevant information for what premium you need to charge for the risk knowing how your are going to earn the investment income on the premium."

100.      The amount of the discount factor is another subjective factor depending on such things as the Reinsurer's investment strategy and the tax regime in which it operates. I am not an expert on discount factors nor investment factors and in my personal underwrwiting experience the investment factors included in underwriting have always been determined by the company's investment department or its in-house actuaries.

101.      From my review of the evidence submitted to me it is clear that Mr. Ekwall did apply discount factors to his developed ultimate claims figures to produce what he describes as "Discounted Claims"

102.      Having calculated losses which make up the crude burning cost, loaded those losses for IBNR and IBNER (by applying loss development factors) and loading those losses for future claims claims inflation, then discounting the claims for the investment factor the underwriter can produce a developed burning cost (sometimes called the burn rate) by expressing the final figure as a percentage of the subject premium income.

103.      The final stage is to load the developed burning cost to cover the reinsurers expenses, profit margin and, if appropriate, cost of retrocession.

This results in the premium or rate which the reinsurance underwriter will quote.

104.    From the evidence I have reviewed I note that Mr Ekwall applied a 15% loading to his burn rate for the contract incepting 1/4/98 which is not broken down and a 28.5% load for the contract incepting 1/1/99 which is broken down as 10% brokerage (payable to Aon), 10% profit, 5% fronting fee to Orion, 1% for Blanche and 2.5% to WEB.

105.    From all the evidence I have reviewed relating to the approach which Mr Ekwall took in underwriting this business for both the 1/4/98 and the 1/4/99 periods I have concluded, contrary to the opinions expressed by Mr. Ryan, Mr. Tipper and Mr. Toothman in their expert reports, that he has taken the approach of a prudent underwriter in applying methodological and tried and tested procedures which include considerable scope for a prudent underwriter to make subjective decisions and apply commercial considerations according to his appetite for risk.

**The role of Aon the Reinsurance Broker acting as TIG's agent.**

106.    The principle of utmost good faith applies equally to reinsurance brokers acting on behalf of a reinsured as it does to the reinsured themselves. The reinsurance broker has a duty to disclose all material information provided to them by the reinsured or of which they have knowledge and they have a duty to represent that information accurately.

107.    The reinsurance broker also has a duty to correct any misinformation which they discover during the broking of the risk or subsequent to the risk being placed and to provide any material information which was incorrectly omitted from the broker's presentation to the reinsurer.

33

108.    Aon were therefore under an obligation to inform WEB as soon as they discovered that, contrary to the representation made in their letter of the 5th May 1998, the enclosed claims diskette did not in fact included claims information relating to Virginia Surety They were also under an obligation to adise WEB that the files entitled EVAL1998, EVAL1997 and EVAL 1996 in connection with the 1.1.99 renewal did not contain claims information relating to the Virginia Surety and MCI segments as they ought to have done.

109.    In my experience where a significant piece of material information is incorrectly omitted from a presentation to an underwriter the reinsured and or the reinsured's broker will advise the reinsurer as soon as the omission is realised and the will draw the reinsurer's intention to the nature and extent of the omission, its potential impact on the terms the reinsurer has quoted and concede that the reinsurer has the opportunity to review his quotation and to requote based on the new and correct information now available.

110.    From the evidence I have reviewed it appears to me that Aon did not act in good faith towards WEB once they realised the Virginia Surety claims data (and subsequently the MCI claims data) had been omitted from the underwriting presentation to WEB. I believe that this is clearly shown in the following exchange of correspondence.

111.    Mr Ekwall first flagged up a concern that the VSI Virginia Surety data might not have been included in the EVAL 98, EVAL97 and EVAL96 files in his e mail to Sheila Bohuslav dated 20th April 1999 (Exhibit 231) "We believed that these files contained all the divisions but we are now concerned that this data may not have reflected VSI losses", Ms. Bohuslav responded on the same day to say that "you received separate file for TIG and

34

VSI both ground up" (Exhibit 232) to which Mr. Ekwall responded , also on the same day "The files I referenced in my e mail were the files your offices e mailed me for losses excess of $25,000. As these were the only files I received I want to be sure they contained all losses including VSI" (Exhibit 233).

112.    The following day Ms Bohuslav responded to Mr Ekwall that she had somebody in Chicago looking at the file because it was too big for her to open and added "In my correspondence , I reference the CD Rom that was sent prior to this file....." (Exhibit 234) To which Mr. Ekwall responded (same day) "As you will recall, we were unable to use the CD Rom thus the need for e mailing the excess $25k files" Exhibit 235.

113.    Robin Ekwall sent a chaser two days later for this information . "How are you coming on the review of the loss information excess $25k . I am still concerned that the loss info provided was not complete with at least respect to VSI."

114.    Sheilah Bohuslav then , on 26th April 1999, e mailed Robert Bima and Jeffrey Day within Aon to report " earlier this week I received a mail questioning the data file we sent to them at renewal. The tone was "this is the file used to price this risk, and now we need you to confirm that the Virginia Surety Segment was included. I have one e mail on my data base from Chicago referencing VSI within the data file, but I have contact (sic) Chicago to review the file and reconfirm, This will be complete tomorrow. Today I received a follow up on this from WEB which has heighted my anxiety......" (Exhibit 237). Mr Bima replied on the same day saying "Obviously I assume Chicago will confirm the V.S. info. If , however, there

35

is any problem with Web now or in the future that is not resolved quickly and satisfactorily we will immediately advise AON legal and get them involved from the start". (Exhibit 238)

115.     On 27th April 1999 Stephen J Maguire of Aon e mailed Sheila Bohuslav (in response to an e mail she had sent him on 21st April) to the effect that that "Re: help TIG xs 25k" that the files did contain data for VSI. (Exhibit 239). Sheila Bohuslva then e mailed Robin Exwall on 19th April to say

" this is to confirm that the TIG file contained the VSI claim data. This is coded as Division 2"

However this misapprenhension is corrected in a May 4th memo from Robert Bima to Jeff Day and cc'd to Sheila Bohuslav in which Mr Bima says :

"last Wednesday , I got some pressure from WEB to confirm that VSI data was in this file, which I did.

Today, it appears that this is not the case...............

While I suspect that WEB is correct about this file not having the data, I am not sure they are correct regarding this being the only file they have"

116.     On 9th June 1999 Sheilah Bohuslav sent an internal e mail to Stephen Maguire saying that she was preparing a response to WEB. "in reviewing the attached spreadsheet sent to me the day before the CD Rom went to WEB I realised that you had split this into 4 worksheets, TIG, VSI 1 VSI 2 and MCI. That lead me to realise , that the CD Rom probably contained these same sperate files we sent to WEB . The cut above 25k that they sent us, only applied to the TIG segment.

Later correspondence regarding the difficulty of combining simply the two VSI files made it crystalize for me."

117.    On June 9th Sheilah wrote to Robin Ekwall (Exhibit 245) and said she was incorrect in saying that the TIG file excess of $25,000 (the EVAL files) contained all of the relevant data.. Knowing (and having been reminded by Ekwall as recently as 21st April) that Mr Ekwall had not been able to open the original CD Rom she goes on to explain that

"on the CD Rom provided there were four files, two files for VSI, one for MCI (which duplicated some of the 1998 MCI claims in the TIG file , and the TIG file). In my opinion it must have been clear to Ms Bohuslav and her colleagues in Aon at this stage that the Virginia Surety claims and the MCI data had not been provided to WEB, at least for the 1999 renewal. It was certainly clear to Mr. Ekwall who asked for it and sent a second request on 1[st] July. (Exhibits 244 and 245).

118.    The missing VSI and MCI data for the 1999 renewal was finally sent to Mr. Ekwall in August of 1999 as updated claims information including VSI and MCI. However as far as I can ascertain from the data I have reviewed WEB were never told explicity, either by Aon or by TIG that the VSI data was missing from the presentation sent back in May 1998 when a quotation was first requested for the period commencing 1st April 1998.

119.    Aon owned Virginia Surety, which underwrote and then reinsured 100% to TIG one of the segments of business for which TIG were seeking reinsurance. Aon owned Muirfield Underwriters who were the managing general agency underwriting this segment on behalf of Virginia Surety. Aon also owned Martin Boyer who handled the claims on the Virginia Surety book

of business.  Aon senior management were therefore aware of various frictions between Aon and TIG in the period immediately leading up to the first submission to WEB in may 1998. (See the internal Aon memo from Ken LeStrange to Tracey Carragher dated February 19th 1998 which begins "As we discussed, the relationship with TIG is , at best , uneven and at worst, a continual annoyance and waste of time." And ends "We are too big, too responsible , and too professional to be doing business with this company" (Exhibit 454)

120.    Aon management were also aware of various problems with the Aon subsidiary Martin Boyer who were handling Workers Compensation  claims for Virginia Surety business underwritten by Muirfield underwriters . (See again the TIG internal e mail from Patrick McDonald to Chase in which he advises "criticisms were made about the timeliness and adequacy of reporting on large (over  $100k) losses. Aon agreed that the reports were late ........." (Exhibit 114).

121.    Aon, being the owner of Virginia Surety and also of Muirfield underwriting , the managing general agency which wrote workers compensation business on behalf of Virginia Surety,  were also aware that there were difficulties between TIG and Virginia Surety  which had led to Virginia Surety issuing a provisional notice of cancellation of the arrangement between them and TIG effective 1st July 1999

122.    Against this background of  known tensions between TIG and Aon and dissatisfaction within TIG at the performance of  Martin Boyer I am very surprised that Aon Re, in broking the risk  to potential underwriters, represented that TIG ran a superior claims handling regime.

123.    Against the background of tensions between Aon and TIG and Aon's

knowledge that Virginia Surety had tendered provisional notice of cancellation

on 30 June 1998, of their arrangements with TIG effective 1st July 1999 I am

surprised that Aon failed or chose not to disclose this material fact to potential

underwriters when the renewal of the reinsurance for the period commencing

1.1.99 was broked since bearing in mind the proportion with the Virginia

Surety business represented of the overall business to be reinsured a prudent

underwriter would wish to know if there was a likelihood that the Virginia

Surety segment was not going to be renewed. Certainly if the likelihood that

the Virginia Surety business would be renewed was less than 50/50 as

reported by Jim Davis in an internal TIG e mail dated 22nd January 1999

(Exhibit 605) then this would have been material information for a prudent

reinsurance underwriter.

124.    A prudent reinsurance underwriter is generally concerned with long

term relationships and continuing business which presents the opportunity to

recoup any losses which might be sustained on a particular account over a

period of time. If a prudent reinsurance underwriter is told that he is only

being given the opportunity to reinsure a segment of business for a limited

period of time he will take into account that there is not potential of "payback"

for that particular segment if it produces losses and he might decline to

reinsure that segment and would certainly adjust his price accordingly if he

decided to reinsure it.

125.    In my opinion the notice of cancellation under the Virginia Surety/TIG

agreement insofar as it was tendered in circumstances which had identified a

lot of issues that needed to be resolved between TIG and Virgina Surety.

39

Furthermore  at the time the TIG reinsurance in dispute was first broked in may 1998 the Virginia Surety segment represented a significant proportion of the whole account to be reinsured (Estimated earned premium of $78,900,000 out of a total of $350,700,000 or 22.5% of the subject business.

### Specific areas of disagreement with points raised by other experts.

126.     I have read the reports of several other experts whose opinions have been sought in connection with this dispute and I agree with much of what they have to say.  However there are some particular  points with which I do not agree and I have detailed them in the following paragraphs.  I would stress that these are particular points which I wish to highlight and do not constitute a comprehensive list of all of the points with which I do not agree. Neither does the limitation of my comments to these specific points suggest that I agree with all of the other conclusions contained in the other expert's reports.

127.     **Report of Mr Harry Tipper**

paragraph 21.  I do not agree that "a reasonably prudent reinsurance underwriter pricing an excess of loss reinsurance programme ..........is little concerned with the premium that the insurance company is charging his policyholders." In my opinion part of the art of a successful reinsurance underwriter is to select cedants who do a good job themselves and charge sufficient premium for the risks they underwrite. "It might well happen" , as Mr Tipper suggests,  that the reinsurer's excess of loss cover is profitable even when the underlying business is not" but such a situation represents a double whammy for the insurer, ( loss on the underlying business and a net cost of reinsurance) which cannot be viable in the long term.

128.     paragraph 30. For the reasons I have given above and based on my understanding of the duty of disclosure within the principal of Utmost Good Faith I do not agree that "the reinsurance underwriter should have followed up with a series of questions to draw out information concerning the potential sale of TIG"

129.     paragraph 38. For the reasons I have given above and based on my understanding of the duty of disclosure within the principal of Utmost Good Faith I do not agree that "If a reasonably prudent reinsurance underwriter was told that loss development information and / or development factors for the VSC segment were not available, he or she then should have requested that TIG get such information". On the contrary I believe the prudent reinsurance underwriter is entitled to take this statement on face value.

130.     paragraph 39. For the reasons I have given above and based on my understanding of the duty of disclosure within the principal of Utmost Good Faith I do not agree that "a reasonably prudent reinsurance underwriter should not have accepted Aon's statement that the loss development for TIG's primary portfolio was representative of the VSC business segment."

131.     paragraph 43. For the reasons I have given in paragaraphs    above and based on my understanding of the duty of disclosure within the principal of Utmost Good Faith I do not agree that "a reasonably prudent reinsurance underwriter should have considered any statement to the effect that TIG's claims handling was superior as too vague to be meaningful".

132.     paragraph 58a I do not agree that the onus was on Mr Ekwall to request a copy of the TIG audit report on Muirfield. If the report contained material information which might have deterred or induced Mr Ekwall to write the

41

reinsurance contract or to have led him to offer different terms it was the duty of TIG to disclose such information.

133.    paragraph 61 . I think it is disingenuous to say that the thirty files reviewed was "a small sample, the results of which may not be, and likely are not representative of this entire portfolio". An audit by its very nature takes a random sample of subject matter and the auditors make their comments based on their review of that sample and the overall procedures and practices which they review.

134.    paragraph 75. I disagree for the reasons I have outlined in the preceding paragraphs that "the information that Trustmark alleges that TIG ought to have disclosed (for example the Muirfield audit report discussed above) is immaterial to a reasonably {prudent} reinsurance underwriter writing an excess of loss reinsurance programme.

135.    paragraph 78 For the reasons I have given above and based on my understanding of the duty of disclosure within the principal of Utmost Good Faith I do not agree that "a reasonably prudent reinsurance underwriter should not have relied simply upon statements of the reinsurance broker, particularly when empirical evidence contradicted those statements (for example, the desirability of the VSC segment) . I have seen no evidence to suggest that the VSC segment was any more or any less desirable to the excess of loss reinsurer. Indeed in the absence of any advice of excess of loss claims arising from VSC it is difficult to see how this conclusion could be reached.

136.    paragraph 79 . I disagree that a reasonably prudent reinsurance underwriter would have underwritten each business segment separately. In my experience whether to rate particular segments separately or to apply a

composite rate over all the segments is a matter of personal choice and discretion of the underwriter. Any differences as to the level of hazard, loss intensity or loss frequency within a particular segment ought to reflected in the levels of original premium charged for the risks within that segment.

137.    **Report of Mr Michael Toothman**

Opinion 1. whilst it might be correct that "the development factors used by Mr Ekwall in his December 1998 pricing analysis were inconsistent with the TIG Agency loss development data provided to him Aon in June of 1998" it would be fair to point out the development factors which Mr. Ekwall used were more conservative and would have contributed to a higher reinsurance premium rate.

138.    paragraph 22. I do not agree that "the most logical source of industry data would be the loss development data published by the Reinsurance Association of America. As I have stated above this is an area where a prudent reinsurance underwriter is entitled to use his discretion and draw upon any one of a number of sources to make a calculation of the expected ultimate outcome of losses relevant to any particular underwriting period.

139.    Opinion X  I do not agree that "when correctly analysesd , the allegedly "missing data" discussed by Mr. Jessel in his report actually has a minimal impact on the necessary rate, consistent with Mr Ekwall's testimony. This was not the conclusion of the arbitration panel which determined in their final award in the  dispute between US Life and TIG under the contract effective 1/4/98 that the Virginia Surety segment of the reinsurance contract should be rescinded and that VSC claims which had amounted to $4,720,836 at the time of the final award (5[th] May 2004 ) should be repaid.

43

140.    **Report of Mr Kevin Ryan**

page 7. For the reasons I have detailed above I disagree that "Audits taken by a quota share participant, for example, would require a more detailed review of the claims handling processes, file maintenance and general workings of the whole of the insurance process. On the other hand an audit of an excess agreement participant would require a review of only those processes that would have an impact on serious claims." The fact is that a company that does not manage the whole process properly is unlikely to determine at an early stage which claims are likely to become serious claims.

141.    page 16. I disagree with the comment that "the two areas pointed to as significant problems, reserving and pricing , were immaterial to the excess of loss reinsurer. As I have described above the starting point for calculating an excess of loss reinsurance rate is the calculation of the crude burning cost, (the relationship of incurred claims above the excess point to the subject premium). If the subject premium is suppressed because of inadequate pricing , and the incurred claims are suppressed because of inadequate reserving the reinsurer can be misled into producing an inadequate calculation of premium to cover the reinsured risk.

142.    page 17. I do not fully agree with the statement "The loss obligations for the excess reinsurer do not decrease or increase because the case reserve is less than what it will ultimately settle for". Where case reserves are consistently inadequate it usually indicates a lack of pro-activity in claims handling, claims management and claims reserving which means that claims end up being settled for more than they might have been. There is a popular

44

maxim amongst claims personnel involved in long tail business which says "a good claim is a settled claim"

143.    page 23. for the reasons I have outlined in the preceding paragraph I disagree with the comment "What material problem was presented by a delay in reporting of losses, It did not change the magnitude of the ultimate loss, nor did it shift any obligations".

144.    page 30 . I am very surprised at the statement " I have never heard of any underwriter asking a potential cedant "why are you buying reinsurance?" In my experience this is a question which is often asked. In my opinion it is a question which ought to be asked, particularly when a reinsured is seeking reinsurance at a lower retention than that which he has purchased reinsurance in prior years.

45

15/01 2023 09:19 FAX                                                      002

The opinions which I have expressed in this report are my own independent opinions based on my experience of the reinsurance market and from reading the evidence which has been submitted to me.

Signed in London this ....14th.... day of ...January... 2005

**Appendix A**
Curriculum Vitae

# Stephen Hartigan MCIArb M.A.E.

Maskee. Tudor Close, Great Bookham, Surrey KT 23 3 DP

01372 454993, Mobile : 077896 30903  e-mail: stephenhartigan@aol.com

**Career History**

| | |
|---|---|
| **Present** | **Chief Executive Officer, Interglobal Limited.** Running a major Insurance Underwriting Operation specialising in Medical Insurance programmes for Expatriates. Underwritten by Lloyds and International companies. |
| **2003-2004** | **JTW Reinsurance Services Ltd** London-based reinsurance consultancy **Director** acting as an Arbitrator, Mediator and Expert Witness in Insurance and Reinsurance disputes. Overseeing major inspection and consultancy projects. |
| **1992 – 2002** | **Groupama Insurance Company** (previously Gan Minster Insurance Company) **Managing Director** with specific responsibility for UK Commercial Insurance and claims. London Market Underwriting, Reinsurance purchasing, Dispute resolution and Miscellaneous Risks Account. Presided over merger with Lombard Insurance Company and significant input into preparation of Sale Information Memorandum in conjunction with Lazards and Linklaters. |
| **1990 – 1992** | **Trinity Insurance Company Ltd.** **Managing Director** Established Reinsurance division and took over UK Commercial operations. Identified irregularities in shareholder structure and terminated underwriting activities. Worked with administrators on successful Scheme of Arrangement. |
| **1986 – 1990** | **Hogg Robinson and Gardner Mountain** (now Aon group) **Acting Managing Director** of Non Marine reinsurance division. Chairman of Divisional Executive committee. |
| **1977 – 1986** | **J.D . Rowland Insurance Brokers** (re-named Nasco Insurance brokers) **Director** responsible for all reinsurance placements for the group Insurance Companies located in Lebanon, Saudi Arabia and the United Arab Emirates, as well as development of London Market Reinsurance business. |
| **1971 – 1977** | **Mercantile and General Reinsurance Company PLC** **Assistant Underwriter**, International Treaty account (Middle East Division) |

47

**Professional Qualifications & Accreditations**
Member of the Chartered Institute of Arbitrators ("MCIArb")
Member of the Academy of Experts (registered no. 2521)
Accredited CEDR mediator
Member of ABI Reinsurance Committee 1995-2002
Member of Pool Re Technical Committee 1996-2002
Panel Member of A.R.I.A.S. UK
Member of British Insurance Law Association (BILA)
Admitted to Worshipful Company of Insurers in October 2001.
Freeman of the City of London
Additional languages: French and Spanish

**Speaking engagements and attendance at conferences**
Lloyds Training Institute, Chartered Insurance Institute, Swiss Re, Federation of
Afro Asian Insurers and Reinsurers (F.A.I.R.) Monte Carlo Rendez Vous, Baden
Baden Reinsurance Meeting
Eurolegal conference on Reinsurance Underwriting (July 2003). Member of Training
Faculty for Arias Mediation course in conjunction with University of Nottingham
Law School (2004)

48

## Stephen Hartigan MCIArb

### Examples of assignments

| | |
|---|---|
| 2004 | Expert witness on PA spiral dispute |
| 2004 | Expert witness on credit insurance dispute involving football clubs |
| 2004 | Expert witness on dispute relating to authorisation to carry on business in the UK |
| 2004 | Expert witness on Underwriting agency dispute |
| 2004 | Expert witness on Insurance Premium Tax dispute with Customs and Excise |
| 2004 | Expert witness on dispute between US Reinsurer and London Market Cedant on PA reinsurance |
| 2004 | Expert witness on dispute between US Cedant and London Market reinsurers on professional indemnity reinsurance commutation. |
| 2003 | Expert witness on dispute between Motor manufacturer and Residual Value Insurers |
| 2003 | Expert witness on Sports Personal Accident dispute |
| 2003 | Expert witness in dispute on reinsurance of a major travel account. |
| 2003 | Expert witness on P.A. reinsurance dispute |
| 2003 | Expert witness on Workers Compensation reinsurance dispute |
| 2003 | Inspection and advice on reinsurance of major London Market Marine reinsurance programme |
| 2003 | Advice on Film Finance Dispute |
| 2003 | Appointed as Arbitrator on a London Market Facultative placement of World Trade Centre (Award given) |
| 2003 | Arbitrator on Reinsurance Dispute relating to Bloodstock Reinsurance treaties (Award given) |
| 2002 | Reinsurance Consultant to Road Accident Fund of South Africa |
| 2002 | Novation of over 1000 Reinsurance contracts ranging from 1982 – 2002 |
| 2001 | Commercial Settlement of disputed Personal Accident Retrocession Programme |
| 2001 | Litigation of Medical Expense Reinsurance treaty. |
| 2000 – 2002 | Litigation on Property Binder |
| 2000 | Commutation of disputed Motor Excess of Loss protections (£5m) |
| 1998 | Negotiated establishment of Broadgate Underwriting syndicate at Lloyds |
| 1995 – 2001 | Expert Witness on Trade Credit issue |
| 1994-1996 | Collaborated with City of London Fraud Office on £26m fraud by city based insurance brokers leading to successful conviction. |
| 1992- 2002 | Annual purchase of £100m reinsurance programme. |
| | Expert Witness on Mortgage Indemnity/Residual Value dispute. |
| | Expert Witness on role and duties of a reinsurance broker |

49

Exhibit B

## Documents Reviewed by Stephen Hartigan

Deposition transcript of Gary Wood w/exhibits 1-30 ( Security 1 - 00-1247)

Deposition transcript of Paul Thomson

Deposition transcript of George Gottheimer, Jr.

Deposition transcripts of Robin Ekwall (February 6, 2003 and May 2, 2003)

Deposition transcript of Sheila Bohuslav (Arbitration between TIG and US Life - 2/4/2004)

Deposition transcripts of Sheila Bohuslav (March 3, 2003 and March 4, 2003)

Deposition transcript of Harry Tipper

Deposition transcript of Michael Toothman

Deposition transcript of Richard Jessel (7/2/2003 (w/errata sheet) & 11/5/2004)

Deposition transcript of Stephen Kelly

Deposition Exhibits 1-2

Deposition Exhibits 5-6

Deposition Exhibit 15

Deposition Exhibits 36-38

Deposition Exhibit 47

Deposition Exhibits 50-51

Deposition Exhibits 54-55

Deposition Exhibits 68-74

Deposition Exhibits 76-79

Deposition Exhibits 81-117

Deposition Exhibits 119-123

Deposition Exhibit 123

Deposition Exhibit 130

Deposition Exhibit 134

Deposition Exhibits 136-137

Deposition Exhibits 139-141

Deposition Exhibit 158

Deposition Exhibit 160

Deposition Exhibit 164

Deposition Exhibit 169

Deposition Exhibit 177

Deposition Exhibit 181

Deposition Exhibit 183

Deposition Exhibit 188

Deposition Exhibits 189-190

Deposition Exhibits 194-196

Deposition Exhibit 203

Exhibit B

Deposition Exhibits 205-214
Deposition Exhibits 216-283
Deposition Exhibit 284
Deposition Exhibits 417-418
Deposition Exhibit 429
Deposition Exhibits 435-464
Deposition Exhibit 469
Deposition Exhibit 474
Deposition Exhibit 481
Deposition Exhibit 484
Deposition Exhibit 488
Deposition Exhibit 491
Deposition Exhibit 551
Deposition Exhibit 564
Deposition Exhibits 569-593
Deposition Exhibit 594
Deposition Exhibit 595
Deposition Exhibits 595-629
Deposition Exhibit 666
Deposition Exhibit 668
Deposition Exhibits 702-703
Deposition Exhibits 785-787
Deposition Exhibit 790
Deposition Exhibit 795
Deposition Exhibit 801
Deposition Exhibit 824
Deposition Exhibits 838-839
Deposition Exhibit 842
Deposition Exhibit 850
Deposition Exhibits 857-887
Deposition Exhibits 892-906
Deposition Exhibits 950-951
Deposition Exhibits 952-958
Deposition Exhibit 961
Deposition Exhibits 1100-1107
Deposition Exhibit 1111
Deposition Exhibits 1140-1149
Deposition Exhibits 1155-1167

Exhibit B

Lovell Deposition Exhibit 4
Expert Report of George Gottheimer, Jr.
Expert Report of Harry Tipper
Expert Report of Kevin Ryan
Expert Report of Mary Ellen Burns
Expert Report of Michael Toothman
Expert Report of Paul C. Thomson
Expert Report of Richard Jessel
Final Award from the Arbitration between TIG and US Life
Interim Final Award from the Arbitration between TIG and US Life
TIG v USL Life Arbitration Hearing transcript  (4/13/2004)
TIG v USL Life Arbitration Hearing transcript  (4/14/2004)
TIG v USL Life Arbitration Hearing transcript  (4/15/2004)
TIG v. AON Re complaint - USDC TX, 304CV1307-H
TIG.txt, TIG.exe.xls, VCS.txt, TIG Data Files, Eval96XS25k.xls, Eval976XS25k.xls and
Eval98XS25k.xls;
Trustmark Insurance Company's Second Supplemental Response to Third-Party Defendant TIG
Insurance Company's First Set of Interrogatories;