## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES LIFE INSURANCE COMPANY OF
THE CITY OF NEW YORK AND AMERICAN
GENERAL LIFE INSURANCE COMPANY (AS
SUCCESSOR IN INTEREST TO ALL AMERICAN
INSURANCE COMPANY)

          Plaintiffs,

    -against-

TRUSTMARK INSURANCE COMPANY,

          Defendant.

Civil No. 3:03cv2114(PCD)

AUGUST 27, 2004

### FIRST AMENDED COMPLAINT

Plaintiffs United States Life Insurance Company of the City of New York ("US Life") and American General Life Insurance Company (as successor in interest to All American Life Insurance Company) ("All American"), by their attorneys, Simpson, Thacher & Bartlett LLP and Bingham McCutchen LLP, as and for their First Amended Complaint, allege as follows:

### NATURE OF THE ACTION

1.    This action arises out of various reinsurance contracts issued by a managing general agent on behalf of a joint venture reinsurance facility in which US Life and All American on the one hand, and Defendant Trustmark Insurance Company ("Trustmark") on the other hand, were equal partners in 1997 and 1998. US Life and All American bring this action to: (a) determine the rights, duties and liabilities of Trustmark with respect to obligations under the various reinsurance agreements entered into pursuant to the joint venture reinsurance facility; (b) seek reimbursement from Trustmark for Trustmark's one-half share of payments made by US

CTDOCS/1601216.1



Life and All American under the various reinsurance agreements and for Trustmark's one-half share of the liability incurred by US Life in compliance with statutory requirements under California Insurance Law in respect of one such reinsurance contract; and (c) determine the rights, duties and obligations of US Life and All American with respect to obligations under reinsurance agreements entered into by Trustmark after US Life and All American terminated their participation in the joint venture reinsurance facility.

## PARTIES

2.     Plaintiff US Life is a New York corporation with its principal place of business in Neptune, New Jersey, and is licensed to do business in Connecticut.

3.     Plaintiff All American is a Texas corporation with its principal place of business in Houston, Texas, and is licensed to do business in Connecticut.

4.     Defendant Trustmark is an Illinois corporation with its principal place of business in Lake Forest, Illinois, and is licensed to do business in Connecticut.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the matter in controversy exceeds $75,000, exclusive of interest and costs.

6.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to US Life and All American's claims occurred in this district.



## FACTUAL BACKGROUND

### The WEB Facility

7.    Through reinsurance, an insurer (known as the "ceding company" or "cedent") cedes to another insurer (known as the "reinsurer") all or part of the liabilities that the insurer assumed under the policies that the insurer issued.

8.    The reinsurer may agree to reinsure a cedent with respect to a specific policy of insurance issued by the cedent to a particular policyholder ("facultative reinsurance"), or with respect to a particular line or lines of insurance business written by the cedent ("treaty reinsurance").

9.    Reinsurers may, in turn, cede portions of the risk they assume to other reinsurers, called "retrocessionaires."

10.    In 1997 and 1998, US Life and its affiliate All American participated together with Trustmark in a personal accident and health reinsurance facility administered by WEB Management LLC ("WEB"), a managing general agent.  Pursuant to Managing General Underwriting agreements with US Life/All American and Trustmark, WEB was granted limited authority to underwrite reinsurance on behalf of US Life, All American and Trustmark.

11.    The facility (the "WEB Facility") was a reinsurance pool effective January 1, 1997. The participants in the pool – created as a joint venture to underwrite personal accident and workers' compensation carve-out business – were Trustmark (50%) and either US Life (50%) or All American (50%), depending on the circumstances.

12.    As a general matter, WEB would bind assumed risks on either Trustmark, US Life or All American paper, depending on the particular circumstances presented.  If the risk was bound on US Life or All American paper, US Life or All American would cede a percentage of the risk to the applicable retrocessional programs and then cede 50% of the portion retained by



the WEB Facility to Trustmark pursuant to an intra-facility pooling arrangement ("Pooling Arrangement"). If the risk was bound on Trustmark paper, then Trustmark would cede 100% of the risk to All American, which in turn would cede a percentage of the risk to the applicable retrocessional programs and then cede 50% of the portion retained by the WEB Facility back to Trustmark pursuant to the Pooling Arrangement.

13.    Trustmark, US Life, All American, WEB and others discussed, and Trustmark acknowledged, the Pooling Arrangement numerous times after the 1997 creation of the Facility. Namely:

a.    On January 2, 1997, Jim Grant of Collins Associates, who had brokered US Life/All American's and Trustmark's participation in the WEB Facility, sent US Life a letter stating: "Also, this will confirm that in addition to the retained risk being split equally between All America [sic] and Trustmark, the fronting fee will be shared equally between the two companies."

b.    On January 27, 1997, Jim Grant sent US Life a letter stating: "Here is the new plan, which has 2 options. We would identify All American as the ceding company to all retro markets, including the domestic ones. This would not change the elements of WEB's program or the risk you and Trustmark would retain. Simply, the Trustmark facility would cede 100% of the risk to All American who in return would cede the Excess and the Surplus reinsurance to the retrocessionaires. All American would cede 50% of its retained risk back to Trustmark."

c.    On December 17, 1997, Robert Stahnke of Trustmark sent to Rebecca Lowe of US Life, a draft Interests and Liabilities Agreement that he intended to send to

Trustmark's Law Department and Reinsurance Committee for approval. The draft

Interests and Liabilities Agreement states:

Article I – Classes of Business Reinsured

A.   [Trustmark] obligates itself to cede to [All American] and [All American] obligates itself to accept a 100% of quota share of assumed reinsurance treaties placed by WEB on behalf of [Trustmark].

B.   [All American] obligates itself to cede to [Trustmark] and [Trustmark] obligates itself to accept from [All American] a 50% quota share of the net liability (assumed less retrocession) of the following:

1.   Business ceded to [All American] under Article 1, Section A of this Agreement. This cession to [Trustmark] is not to be assumed by [All American] under Article 1, Section A of this Agreement; and

2.   Reinsurance assumed business placed by WEB on behalf of [All American].

C.   The liability of the Reinsurer with respect to each cession hereunder shall commence obligatorily and simultaneously with that of the Reinsured, subject to the effective date, terms conditions and limitations hereinafter set forth.

d.   The language quoted above also appeared in further drafts of the Interests and

Liabilities Agreement exchanged between Trustmark and US Life on February 5,

1998 and June 10, 1999.

e.   On April 6, 1999, Leonard Koloms, then Senior Vice President and Chief Actuary

of Trustmark, sent a letter to Larry Gorski of the State of Illinois Department of

Insurance, stating:

The way the WEB arrangement is set-up is that WEB may write reinsurance contracts on behalf of either Trustmark or [All American]. Any business written on a Trustmark contract is 100% retroceded by Trustmark to All American. Therefore, the net result is that business written by WEB ultimately ends up 100% on All American. Then, All American has automatic and facultative retrocession contracts to cede away a portion of the risk. Any retained risk is 50% coinsured by Trustmark.



f.  In a March 20, 2000 letter to the arbitration panel in a fee arbitration between

WEB and US Life, David Spector, Trustmark's outside counsel, wrote:

> This letter is submitted on behalf of Trustmark Insurance Company, which
> is a fifty-percent participant, along with US Life and All American, in the
> WEB Management Pool. . . .

* * * *

> [I]n early 1997 All American, a subsidiary of US Life, and Trustmark
> entered into an equal partnership to write accident and health reinsurance
> utilizing WEB as the managing general underwriter. This partnership is
> evidenced by three documents. The first document . . . is an interest and
> liabilities agreement between All American and Trustmark. . . . While US
> Life did not execute . . . the interests and liabilities agreement, it was the
> issuing company on various important books of business pursuant to both
> agreements . . . .

> The interests and liabilities agreement between the two parties acts to
> equalize the participations of US Life and Trustmark under the WEB pool.
> Under the terms of that agreement, no matter who acts as issuing company,
> Trustmark and US Life maintain equal net retentions after reinsurance.

g.  On April 12, 2000, the California Department of Insurance asked Raymond Lester,

Associate General Counsel at Trustmark, to clarify the Pooling Arrangement:

> Please provide us details on how much the participation of Trustmark
> Mutual was on the Superior National's workers' compensation business
> assumed from US Life of New York. You have mentioned that certain
> percentage of the assumed business was retroceded by Trustmark to
> another company, while the remaining balance was split between
> Trustmark and another company.

h.  In a draft response dated April 13, 2000, Raymond Lester wrote:

> Trustmark and All American Life have an arrangement whereby the two
> companies share on a 50/50 basis the financial results of all workers'
> compensation carve out business placed through the WEB facility after
> retrocessions. . . .

* * * *

> A 25% share of the Quota Share Treaty was retroceded to Overseas
> Partners Ltd., a Bermuda domiciled company. WEB Management was
> under instructions to cede an additional 50% of the risk (75% in total) prior



to binding US Life to the contract. However, through its own negligence, WEB failed to do so. . . . Consequently, the remaining 75% of the risk is shared on a 50/50 basis between US Life and Trustmark (37 ½ % each).

i.   In an April 24, 2000 draft letter to the arbitration panel in the fee arbitration

between WEB and US Life, David Spector again asked that Trustmark be

permitted to attend the arbitration hearings:

> The first and foremost reason to allow Trustmark to attend is that Trustmark has a direct interest in various aspects of this arbitration – as 50% of the reinsurance pool on certain of the business bound and underwritten by WEB. . . .
>
> \* \* \* \*
>
> Trustmark's direct interest in this proceeding cannot be disputed. WEB has identical UMA agreements with All American/US Life and WEB. US Life and Trustmark share 50/50 the reinsurance risks bound and underwritten by WEB.

j.   On April 18, 2003, J. Brinke Marcuccilli of Trustmark sent a fax to Jack

Messimore of the Illinois Department of Insurance, and wrote:

> This fax includes the following documents to substantiate the contractual relationship between [All American] and Trustmark with regard to WEB business:
>
> - Interest and Liabilities Agreement ("INL Agreement", or alternatively, the "unsigned reinsurance contract") . . .
>
> - Opening statement of American General's Counsel in connection with a hearing related to the Superior National matter. In the first full paragraph on the second page, the transcript refers to Trustmark being "US Life's partner in the WEB facility", consistent with other provisions of the INL Agreement.

k.   On May 23, 2003, J. Anthony Clark, Director of the Illinois Department of

Insurance, responded to Trustmark's April 18, 2003 fax and stated:

> The Illinois Department of Insurance is aware that the reinsurance treaty between [All American] and Trustmark Insurance Company was not executed as required by 50 IL Adm Code 1103.40. However, Trustmark Insurance Company should continue to account for the transaction as if the



agreement had been approved by the Department of Insurance. The accounting for the reserve credit should not be altered from the current method used.

14.    In addition, based upon the Pooling Arrangement, the Illinois Department of

Insurance (where Trustmark is domiciled) has allowed Trustmark to take reserve credit on its

books for retrocessional protection from US Life and All American pursuant to the Pooling

Arrangement.

The Superior National Treaty

15.    One of the risks bound by the WEB Facility was a May 1, 1998 workers'

compensation quota share reinsurance treaty under which US Life reinsured Superior National

Insurance Company, Superior Pacific Casualty Company, California Compensation Insurance

Company, Commercial Compensation Insurance Company, Combined Benefits Company,

Business Insurance Company, now known as Centre Insurance Company, and ZC Insurance

Company, now known as Converium Insurance (North America) Inc. (the "Superior National

Treaty").

16.    The Superior National Treaty as issued provides 100% quota share protection for

all direct workers' compensation policies generating premium in excess of $25,000 up to a limit

of $500,000 per occurrence. The portion retained by the WEB Facility, after retrocessional

protection, is 75%. Pursuant to the Pooling Arrangement, US Life and Trustmark have an equal

share of the retained portion, or 37.5% share each.

17.    On November 29, 1999, US Life commenced an arbitration against the cedents on

the Superior National Treaty, seeking rescission of the Superior National Treaty on the grounds of

material misrepresentations and omissions during the placement negotiations (the "Superior

National Arbitration").

18.    The Superior National Arbitration has not yet been completed.

CTDOCS/1601216.1                                    8



19.    Certain of the cedents under the Superior National Treaty are domiciled in California and write direct workers' compensation policies to California insureds that are reinsured under the Superior National Treaty.

20.    Pursuant to California Insurance Code §§ 11691 and 11694, every insurer and reinsurer transacting workers' compensation insurance or workers' compensation reinsurance business with California insureds must make a deposit with the Insurance Commissioner of California (the "Commissioner"). Such deposits are held to secure payment of claims under existing policies and reinsurance contracts. The deposits are known as "Special Schedule P Deposits."

21.    In accordance with its Special Schedule P Deposit requirement, US Life placed on deposit on June 30, 1999, a total of approximately $124 million in a Special Schedule P Deposit in connection with the Superior National Treaty.

22.    On September 10, 2003, the Commissioner advised US Life that he had drawn down $111 million from the existing Schedule P Deposit and demanded that US Life deposit additional Special Schedule P Deposit funds of approximately $706 million in relation to the Superior National Treaty.

23.    US Life disputed its obligation to post $706 million as an additional Special Schedule P Deposit.

24.    On September 11, 2003, US Life filed a motion in the Superior Court of California, Los Angeles County, seeking a temporary restraining order enjoining the Commissioner from drawing down any Schedule P Deposit funds or requiring US Life to post additional deposits pending the final outcome of the Superior National Arbitration.

 

25.    The Superior Court issued a temporary injunction barring the Commissioner from making further draw downs pending a hearing on the merits but expressly stated that the injunction "shall not effect [sic] the obligation of US Life or All American to make deposits pursuant to the statutory and regulatory scheme, and shall not effect [sic] the accrual of penalties under applicable statutes and regulations."

26.    On October 24, 2003, US Life and the Commissioner agreed by stipulation to resolve partially their dispute over payment of the additional Special Schedule P Deposit (the "Stipulation").

27.    Because the dispute with the Commissioner was a claim arising under the Superior National Treaty, to which US Life was individually legally bound, US Life had full authority to settle this dispute without Trustmark's permission or approval.

28.    Under the Stipulation, which was "so ordered" by the California Superior Court on October 27, 2003, US Life was required to deposit an additional $332 million in Special Schedule P Deposit funds.

29.    US Life made the deposit in the form of security on November 10, 2003. US Life has no control over these deposited funds in that US Life cannot utilize them to pay any of its other liabilities, such as the various settlements and awards mentioned below.

<u>The 1998 TIG Treaty</u>

30.    Another of the risks bound by the WEB Facility was an April 1, 1998 workers' compensation excess of loss reinsurance treaty (program number U98001), under which US Life reinsured TIG Insurance Company ("TIG") (the "1998 TIG Treaty").

31.    On or before December 31, 2001, US Life paid claims in the amount of $2,790,827 under the 1998 TIG Treaty (the "TIG Claim Payment").



32.    On October 1, 2002, TIG commenced an arbitration against US Life seeking an award of additional amounts allegedly due to TIG by US Life and a declaration that the 1998 TIG Treaty was valid and enforceable.

33.    On May 17, 2004, following a hearing on the merits, the TIG Arbitration Panel ruled that a portion of the 1998 TIG Treaty was rescinded but the remainder is valid and enforceable (the "TIG Award"). Under the TIG Award, US Life was required to pay TIG $15,985,422 within 15 days of the date of the Award.

34.    On May 18, 2004, US Life paid TIG $15,985,422 in accordance with the TIG Award.

35.    On or before July 21, 2004, US Life submitted a bill to Trustmark for $1,395,413.50, representing Trustmark's 50% share of the liability for the TIG Claim Payment under the Pooling Arrangement.

36.    On June 17, 2004, US Life submitted a bill to Trustmark for $7,992,711, representing Trustmark's 50% share of the liability for the TIG Award under the Pooling Arrangement.

37.    Trustmark has failed to pay any portion of the amount of $9,388,124.50, which is due and owing to US Life in connection with the 1998 TIG Treaty.

<u>The Pac Rim Treaty</u>

38.    Another of the risks bound by the WEB Facility was a February 1, 1998 workers' compensation quota share reinsurance treaty (program number A98036) (the "Pac Rim Treaty") under which All American reinsured Superior National Insurance Company and Superior Pacific Casualty Company (collectively, the "SNICIL cedents"), and ZC Insurance Company, now known as Converium Insurance (North America) Inc. ("Converium").



39.    On or before April 5, 2002, All American paid claims in the amount of $24,631,159 under the Pac Rim Treaty (the "Pac Rim Claim Payment").

40.    On August 7, 2002, All American demanded that Trustmark pay its 50% share of the liability for the Pac Rim Claim Payment under the Pooling Arrangement.

41.    Following drawdown of a Letter of Credit posted by a retrocessionare of the Pac Rim Treaty, the amount currently due from Trustmark in respect of the Pac Rim Claim Payment is $166,740.50.

42.    Trustmark has failed to pay any portion of the amount of $166,740.50 that is currently due and owing to All American in connection with the Pac Rim Claim Payment.

43.    On December 24, 2002, the SNICIL cedents and Converium commenced an arbitration against All American seeking an award of amounts allegedly due under the Pac Rim Treaty and a declaration that the Treaty was valid and enforceable.

44.    On May 21, 2004, All American entered into a Confidential Settlement and Commutation Agreement with Converium (the "Converium/Pac Rim Settlement") whereby All American agreed to pay Converium a confidential sum, which has been disclosed to Trustmark, in full and final satisfaction of All American's obligations to Converium under the Pac Rim Treaty.

45.    On May 26, 2004, All American paid Converium the full amount of the confidential sum agreed to under the Converium/Pac Rim Settlement.

46.    On June 17, 2004, All American submitted a bill to Trustmark for Trustmark's 50% share of the liability for the Converium/Pac Rim Settlement, under the Pooling Arrangement.



47.    Trustmark has failed to pay any portion of the amounts that are due and owing to All American in connection with the Converium/Pac Rim Settlement.

48.    On June 3, 2004, All American entered into a Confidential Settlement and Commutation Agreement with the California Insurance Comissioner, in his capacity as Liquidator of the SNICIL cedents (the "SNICIL/Pac Rim Settlement").

49.    Under the SNICIL/Pac Rim Settlement All American agreed to pay the SNICIL Liquidator a confidential sum, which has been disclosed to Trustmark, in full and final settlement of All American's obligations to the SNICIL cedents under the Pac Rim Treaty.

50.    On August 24, 2004, All American paid the SNICIL Liquidator the full amount of the confidential sum agreed to under the SNICIL/Pac Rim Settlement.

51.    On August 26, 2004, All American submitted a bill to Trustmark for Trustmark's 50% share of the liability for the SNICIL/Pac Rim Settlement, under the Pooling Arrangement.

52.    On information and belief, Trustmark disputes and denies that it has any obligation to pay its 50% share of the liability for the SNICIL/Pac Rim Settlement.

The New Cap Re Treaty

53.    Another of the risks bound by WEB was a January 1, 1998 excess of loss treaty (program number A98047), under which All American reinsured New Cap Re Bermuda (the "New Cap Re Treaty").

54.    On February 13, 2004, All American paid New Cap Re $1,600,000 in exchange for a full and final commutation of the New Cap Re Treaty (the "New Cap Re Commutation").

55.    On July 21, 2004, All American submitted a bill to Trustmark for $800,000, representing Trustmark's 50% share of the liability for the New Cap Re Commutation, under the Pooling Arrangement.



56.    Trustmark has failed to pay any portion of the amount of $800,000 which is due and owing to All American in connection with the New Cap Re Commutation.

### The GAN Treaties

57.    Another of the risks bound by WEB was a group of sixteen excess of loss treaties (program number R97001), under which All American reinsured the GAN Insurance Company (the "GAN Treaties").

58.    On August 22, 2003, All American entered into a confidential Commutation Agreement with the GAN Insurance Company ("GAN") whereby All American agreed to pay GAN a confidential sum, which has been disclosed to Trustmark, in full and final satisfaction of All American's obligations to GAN under the GAN Treaties (the "GAN Commutation").

59.    On September 4, 2003, All American paid GAN the full amount of the confidential sum agreed to under the GAN Commutation.

60.    On July 21, 2004, All American submitted a bill to Trustmark for Trustmark's 50% share of the liability for the GAN Commutation under the Pooling Arrangement.

61.    Trustmark has failed to pay any portion of the amounts that are due and owing to All American in connection with the GAN Commutation.

### The TPAC (Busbridge) Treaty

62.    Another of the risks bound by WEB on All American paper was a January 1, 1998 stop loss reinsurance treaty (broker reference #RBF 987175) reinsuring Lloyd's Syndicate No. 959 (Busbridge) ("Busbridge") for its participation in a Travel and Personal Accident Consortium ("TPAC") Treaty (the "TPAC Treaty").

63.    On May 30, 2003, All American entered into a confidential Settlement Agreement with Busbridge whereby All American agreed to pay Busbridge a confidential sum, which has




been disclosed to Trustmark, in full and final satisfaction of All American's obligations to

Busbridge under the TPAC Treaty (the "Busbridge (TPAC) Commutation").

64.    On June 10, 2003, All American paid Busbridge the full amount of the confidential

sum agreed to under the Busbridge (TPAC) Commutation.

65.    On July 21, 2004, All American submitted a bill to Trustmark for Trustmark's

50% share of the liability for the Busbridge (TPAC) Commutation under the Pooling

Arrangement.

66.    Trustmark has failed to pay any portion of the amounts which are due and owing

to All American in connection with the Busbridge (TPAC) Commutation.

<u>Disputed Claim Payments</u>

67.    From January 1, 1997 to December 31, 1998, WEB bound numerous other

reinsurance treaties on All American paper through the WEB Facility.

68.    All American has paid claims on various of these treaties as follows:

| Program | Amount Paid |
|---|---|
| a.  CM Owen (program #A98005) | $2,787.00 |
| b.  Hiscox (program #A98012) | $31,500.00 |
| c.  IGI Palmer (program #A98019) | $11,214.00 |
| d.  Cassidy (program #A98021) | $329,202.00 |
| e.  Villers (program #A98026) | $84,647.00 |
| f.  Busbridge (program #R97003/R98004) | $3,928,103.00 |
| g.  Battle (program #R97004/R98005) | $3,912,764.00 |
| h.  AIOI (program #R98007) | $52,487.00 |
| i.  Rivington (program #R98008) | $80,683.00 |



    j.  QBE (program #R98009)        $75,832.00

    k.  Etheridge (program #R98010)    $348,077.00

69.    All American has submitted bills to Trustmark for its 50% share of the incurred liability on these treaties as follows:

| Program | Amount Billed to Trustmark |
|---|---|
| a.  CM Owen (program #A98005) | $1,393.50 |
| b.  Hiscox (program #A98012) | $15,750.00 |
| c.  IGI Palmer (program #A98019) | $5,607.00 |
| d.  Cassidy (program #A98021) | $164,601.00 |
| e.  Villers (program #98026) | $42,323.50 |
| f.  Busbridge (program #R97003/R98004) | $1,964,051.00 |
| g.  Battle (program #R97004/R98005) | $1,956,382.00 |
| h.  AIOI (program #R98007) | $26,243.50 |
| i.  Rivington (program #R98008) | $40,341.50 |
| j.  QBE (program #R98009) | $37,916.00 |
| k.  Etheridge (program #R98010) | $174,038.50 |

70.    Trustmark has failed to pay any portion of the amounts due and owing to All American in connection with the above referenced programs.

### The Dispute Over the Accrual of Trustmark's Liabilities

71.    Under the Pooling Arrangement, each party had full authority to settle or otherwise resolve claims made under treaties bound on its own paper (the "Issuing Party"), with the



obligation of the joint venture partner to share in the resulting liability arising after such a claim was settled or otherwise resolved in good faith by the Issuing Party.

72.    Such shared liability commenced obligatorily and simultaneously with the Issuing Party's payment or settlement of the claim.

73.    Upon information and belief, Trustmark disputes that its liability under the Pooling Arrangement attaches obligatorily and simultaneously with US Life's or All American's payment or settlement of claims made under treaties bound on US Life or All American's paper.

74.    Upon information and belief, Trustmark contends that its liability for such payments or settlements by US Life and All American does not commence until after US Life or All American has obtained a recovery from the retrocessionaires of the WEB Facility.

<u>1999 Disputed Deals</u>

75.    By letter dated September 11, 1998, US Life/All American revoked WEB's authority to act as Managing General Underwriter for US Life/All American and terminated their participation in the WEB Facility effective January 1, 1999.

76.    On information and belief, WEB continued to bind risks on Trustmark paper after January 1, 1999, with the authority and approval of Trustmark.

77.    By its conduct and admissions, Trustmark acknowledged that US Life and All American were no longer liable for risks bound by WEB on Trustmark paper after December 31, 1998.

78.    Trustmark now alleges that US Life and/or All American are liable for 50% of the risk on certain treaties bound on Trustmark paper after December 31, 1998 (the "1999 Disputed Deals").

79.    The 1999 Disputed Deals consist of the following treaties or groupings of treaties:



a. <u>CNA Re</u> (program number T98025) – an excess of loss treaty signed by WEB on January 25, 1999, with an effective date of January 1, 1998.

b. <u>Westchester Fire & Marine</u> (program number T98027) – an excess of loss treaty signed by WEB on or about February 2, 1999 with an effective date of December 1, 1998.

c. <u>Frontier Insurance Company</u> (program number T98028) – an excess of loss worker's compensation treaty signed by WEB on January 22, 1999, with an effective date of December 1, 1998.

d. <u>Security Insurance of Hartford – ORS</u> (program number T98031) – a quota share treaty signed by WEB on May 4, 1999, with an effective date of October 1, 1998.

e. <u>Clarendon National Insurance Company</u> (program number T98032) – a quota share treaty signed by WEB on January 15, 1999, with an effective date of December 1, 1998.

f. <u>Chiyoda Fire & Marine</u> (program number T99009) – an excess of loss treaty signed by WEB on March 9, 1999, with an effective date of January 1, 1999.

g. <u>CIGNA Re Europe – The Aviary Account</u> (program number T99008) – an excess of loss treaty signed by WEB on March 23 and 29, 1999, with an effective date of January 1, 1999.

h. <u>CIGNA Re Europe – The Main Program</u> (program number T99041) – an excess of loss treaty signed by WEB on March 23, 1999, with an effective date of January 1, 1999.

i. <u>I.M. Crane, Lloyd's Syndicate #53</u> (program number T99033) – an excess of loss treaty signed by WEB on March 9, 1999, with an effective date of January 1, 1999.



    j.   <u>Reliastar</u> (program number T99011) – an excess of loss treaty signed by WEB on

March 9, 1999, with an effective date of January 1, 1999.

    k.   <u>The 1999 TIG Treaty</u> (program number T99001) – an excess of loss treaty signed

by WEB on or about March 4, 1999, with an effective date of January 1, 1999.

    l.   <u>RJ Blunt Consortium</u> (program number T99016) – an excess of loss treaty signed

by WEB on March 8, 1999, with an effective date of January 1, 1999.

    80.    Trustmark has, in addition, reserved its rights to contend that All American is

obligated to pay a 50% share on contracts other than the 1999 Disputed Deals that were also

bound in 1999 on Trustmark paper ("Other 1999 Contracts").

**FIRST CAUSE OF ACTION**
**<u>(Declaratory Relief)</u>**

    81.    US Life repeats and realleges the allegations contained in paragraphs 1 through 80

hereof as if set forth in full.

    82.    Upon information and belief, Trustmark denies that its participating share of the

risk under the Superior National Treaty is 37.5%.

    83.    Therefore, an actual controversy exists between and among US Life and

Trustmark concerning their rights and obligations under the Superior National Treaty.

    84.    US Life has no adequate remedy at law to resolve the controversy that exists

between US Life and Trustmark.

**SECOND CAUSE OF ACTION**
**<u>(Declaratory Relief)</u>**

    85.    US Life and All American repeat and reallege the allegations contained in

paragraphs 1 through 84 hereof as if set forth in full.

86.     Upon information and belief, Trustmark denies that its liability under the Pooling Arrangement attaches obligatorily and simultaneously with US Life's or All American's payment or settlement of claims for risks bound on their respective paper.

87.     Therefore, an actual controversy exists between and among US Life/All American and Trustmark concerning their rights and obligations under the Pooling Arrangement.

88.     US Life and All American have no adequate remedy at law to resolve the controversy that exists between US Life/All American and Trustmark.

### THIRD CAUSE OF ACTION
### (Declaratory Relief)

89.     US Life and All American repeat and reallege the allegations contained in paragraphs 1 through 88 hereof as if set forth in full.

90.     Upon information and belief, Trustmark alleges that US Life and/or All American are liable for 50% of the risk on the 1999 Disputed Deals.

91.     Upon information and belief, Trustmark has reserved its rights to contend that All American is obligated to pay a 50% share on the Other 1999 Contracts.

92.     US Life and All American deny that they are liable for any portion of the risks bound by WEB on Trustmark paper after December 31, 1998.

93.     Therefore, an actual controversy exists between and among US Life/All American and Trustmark concerning their rights and obligations under the Pooling Arrangement.

94.     US Life and All American have no adequate remedy at law to resolve the controversy that exists between US Life/All American and Trustmark.

### FOURTH CAUSE OF ACTION
### (US Life's Claim for Breach of Contract)

95.     US Life repeats and realleges the allegations contained in paragraphs 1 through 94 hereof as if set forth in full.

CTDOCS/1601216.1                          20



96.    Pursuant to the Pooling Arrangement, Trustmark is obligated to pay 37.5% of the liabilities incurred by US Life under the Superior National Treaty, including liability incurred by US Life under California's Special Schedule P Deposit obligations.

97.    US Life has demanded that Trustmark pay US Life $124.5 million, representing Trustmark's 37.5% share of the additional Special Schedule P Deposit made by US Life on November 10, 2003.

98.    US Life has complied with all of the terms and conditions of the Pooling Arrangement.

99.    Trustmark has wrongfully refused to pay its 37.5% share of the additional $332 million Special Schedule P Deposit made by US Life.

100.    Trustmark has materially breached the Pooling Arrangement by not paying the amount owed thereunder with respect to the Superior National Treaty, despite the absence of any legitimate grounds for such nonpayment.

101.    As a direct and proximate result of Trustmark's unreasonable refusal to reimburse US Life for Trustmark's share of the additional Special Schedule P Deposit, US Life has suffered damages in the amount of $124.5 million, together with interest from the date payment was due from Trustmark under the Pooling Arrangement.

### FIFTH CAUSE OF ACTION
### (US Life's Claim for Breach of Contract)

102.    US Life repeats and realleges the allegations contained in paragraphs 1 through 101 hereof as if set forth in full.

103.    US Life has complied with all of the terms and conditions of the Pooling Arrangement.

CTDOCS/1601216.1                              21



104.    Trustmark has wrongfully refused to pay any portion of the amount of $9,388,124.50, which is due and owing to US Life in connection with the TIG Claim Payment and the TIG Award.

105.    Trustmark has materially breached the Pooling Arrangement by not paying the amounts owed with respect to the TIG Claim Payment and the TIG Award, despite the absence of any legitimate grounds for such nonpayment.

106.    As a direct and proximate result of Trustmark's unreasonable refusal to reimburse US Life for Trustmark's share of the TIG Claim Payment and the TIG Award, US Life has been damaged in the sum of $9,388,124.50, together with interest from the date payment was due from Trustmark under the Pooling Arrangement.

### SIXTH CAUSE OF ACTION
#### (All American's Claim for Breach of Contract)

107.    All American repeats and realleges the allegations contained in paragraphs 1 through 106 hereof as if set forth in full.

108.    All American has complied with all of the terms and conditions of the Pooling Arrangement.

109.    Trustmark has wrongfully refused to pay the amounts currently owed to All American under the Pooling Arrangement as set forth below:

|     |                                |               |
| --- | ------------------------------ | ------------- |
| a.  | New Cap Re (program #A98047)   | $800,000.00   |
| b.  | CM Owen (program #A98005)      | $1,393.50     |
| c.  | Hiscox (program #A98012)       | $15,750.00    |
| d.  | IGI Palmer (program #A98019)   | $5,607.00     |
| e.  | Cassidy (program #A98021)      | $164,601.00   |

CTDOCS/1001216.1                          22



| | | |
|---|---|---|
| f. | Villers (program #98026) | $42,323.50 |
| g. | Busbridge (program #R97003/R98004) | $1,964,051.00 |
| h. | Battle (program #R97004/R98005) | $1,956,382.00 |
| i. | AIOI (program #R98007) | $26,243.50 |
| j. | Rivington (program #R98008) | $40,341.50 |
| k. | QBE (program #R98009) | $37,916.00 |
| l. | Etheridge (program #R98010) | $174,038.50 |

110.    In addition, Trustmark has wrongfully refused to pay the $166,740.50 currently owed to All American as a result of the Pac Rim Claim Payment, as well as the amounts owed as a result of the Converium/Pac Rim Settlement, the SNICIL/Pac Rim Settlement, the GAN Commutation, and the Busbridge (TPAC) Commutation.

111.    Trustmark has materially breached the Pooling Arrangement by not paying the amounts currently owed thereunder, despite the absence of any legitimate grounds for such nonpayment.

112.    As a direct and proximate result of Trustmark's unreasonable failure to pay the amounts owed to All American under the Pooling Arrangement, All American has been damaged in the sum of $5,395,388 together with Trustmark's share of the confidential sums paid under the Converium/Pac Rim Settlement, the SNICIL/Pac Rim Settlement, the GAN Commutation, and the Busbridge (TPAC) Commutation, and together with interest from the date payment was due from Trustmark under the Pooling Arrangement.



**WHEREFORE**, US Life and All American are entitled to judgment against Trustmark as follows:

A.     On the First Cause of Action, a judgment declaring that Trustmark is responsible for 37.5% of the risk on the Superior National Treaty and is liable to pay US Life $124.5 million, representing Trustmark's share of the additional Special Schedule P Deposit made by US Life on November 10, 2003;

B.     On the Second Cause of Action, a judgment declaring that Trustmark's liability under the Pooling Arrangement attaches simultaneously with US Life's or All American's payment or settlement of claims made under treaties bound on their respective paper, and that US Life/All American are not required to collect from retrocessionaires before billing Trustmark for its 50% share of liability under the Pooling Arrangement;

C.     On the Third Cause of Action, a judgment declaring that US Life and All American are not liable for any portion of the risks bound by WEB on Trustmark paper after December 31, 1998;

E.     On the Fourth Cause of Action, a judgment requiring Trustmark to pay US Life compensatory damages of $124.5 million, together with interest thereon;

F.     On the Fifth Cause of Action, a judgment requiring Trustmark to pay to US Life compensatory damages in the amount of $9,388,124.50, together with interest thereon, less any amounts recovered from retrocessionaires prior to the date of judgment;

G.     On the Sixth Cause of Action, a judgment requiring Trustmark to pay All American compensatory damages of $5,395,388 together with Trustmark's share of the confidential sums paid under the Converium/Pac Rim Settlement, the SNICIL/Pac Rim Settlement, the GAN Commutation, and the Busbridge (TPAC) Commutation, and together with



interest thereon, less any amounts recovered from retrocessionaires prior to the date of judgment; and

      H.    For such other, further and different relief as this Court shall deem just and proper together with the costs and disbursements of this action.

## JURY DEMAND

      US Life and All American hereby demand a trial by jury of all issues so triable.

Dated:    August 27, 2004

          Respectfully submitted,

          Bingham McCutchen LLP

      By: _____

          Stuart D. Rosen (ct 05472)
          One State Street
          Hartford, Connecticut 06103
          Telephone: (860) 240-2700
          Facsimile: (860) 240-2818
          E-mail: stuart.rosen@bingham.com

          and

          Simpson Thacher & Bartlett LLP
          Andrew S. Amer
          Mary Beth Forshaw
          Patricia A. Taylor (ct 16831)
          425 Lexington Avenue
          New York, N.Y. 10017-3954
          Telephone: (212) 455-2000
          Facsimile: (212) 455-2502
          E-mail: aamer@stblaw.com
                  mforshaw@stblaw.com
                  ptfox@stblaw.com

          ATTORNEYS FOR PLAINTIFFS
          UNITED STATES LIFE INSURANCE COMPANY
           OF THE CITY OF NEW YORK AND AMERICAN
          GENERAL LIFE INSURANCE COMPANY (AS SUCCESSOR IN
          INTEREST TO ALL AMERICAN LIFE INSURANCE COMPANY)

 

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing has been mailed this 27th day of August, 2004 via

first-class, postage pre-paid, mail to the following counsel of record:

Anthony M. Fitzgerald, Esq.
Carmody & Torrance LLP
195 Church St. - 18th Fl.
P.O. Box 1990
New Haven, CT  06509

Andrew S. Amer, Esq.
Simpson Tacher & Bartlett
425 Lexington Ave.
New York, NY  10017

Joel T. Pelz, Esq.
Robert L. Byman, Esq.
Jenner & Block, LLP
One IBM Plaza
Chicago, IL  60611

_____
Stuart D. Rosen