```
 1
 2   UNITED STATES DISTRICT COURT
 3   DISTRICT OF CONNECTICUT
 4   ------------------------------------------X
     SECURITY INSURANCE COMPANY OF HARTFORD,
 5
                                   Plaintiff,
 6
              vs.
 7
     TRUSTMARK INSURANCE COMPANY,
 8
                                   Defendant.
 9
     Case No. 301 CV 2198 (PCD)
10   ------------------------------------------X
     TRUSTMARK INSURANCE COMPANY,
11
                         Third-Party Plaintiff,
12
              vs.
13
     TIG INSURANCE COMPANY,
14
                         Third-Party Defendant.
15   ------------------------------------------X
16
17          CONTINUED VIDEOTAPED DEPOSITION OF
18             ROBIN EKWALL - Volume III
19               Stamford, Connecticut
20             Friday, February 11, 2005
21
22
23
     Reported by:
24   JOYCE G. ABELES
     JOB NO. 170145
25
```

Page 618

```
 1                Ekwall
 2   pursuant to your personal services
 3   agreement?
 4       A.   I'm sorry, since when?
 5       Q.   Since your last deposition in
 6   this case, which was May 2nd, 2003?
 7       A.   Oh, I don't -- I don't recall.
 8   It's been a lot.
 9       Q.   More than 10 times?
10       A.   I would believe so.
11       Q.   More than 20?
12       A.   It could be.
13       Q.   Do you submit bills to Trustmark
14   and/or U.S. Life in connection with the
15   services you provide pursuant to the
16   personal services agreement?
17       A.   Yes.
18       Q.   Of the services that you've
19   provided to Trustmark or U.S. Life pursuant
20   to the personal services agreement in the,
21   since the date of your last deposition, what
22   were the nature of those services?
23       A.   Consulting.
24       Q.   Can you be more specific?
25       A.   They'd have questions, I would
```

Page 619

```
 1                Ekwall
 2   answer them.
 3       Q.   Were they face-to-face meetings?
 4       A.   Face-to-face, or they could be
 5   over the phone.
 6       Q.   Or by letter or email or other
 7   written communication?
 8       A.   Not very often, I don't, I don't
 9   believe that.
10       Q.   Did those services include any
11   testimony at depositions or hearings or
12   trials?
13       A.   Yes.
14       Q.   On how many occasions?
15       A.   I'd be guessing at the time frame
16   here. I just don't remember.
17       Q.   With respect to how many matters
18   have you provided testimony for Trustmark or
19   U.S. Life pursuant to the personal services
20   agreement since May of '03?
21       A.   What do you mean by testimony?
22       Q.   Deposition, hearing, trial or
23   submitting written testimony in the form of
24   an affidavit or a witness statement.
25       A.   Probably less than 10.
```

Page 620

```
 1                Ekwall
 2       Q.   You testified in the Superior
 3   National arbitration?
 4       A.   Yes.
 5       Q.   And the TIG/U.S. Life
 6   arbitration?
 7       A.   Yes.
 8       Q.   What other matters did you
 9   testify in?
10            MR. CYGAL:  Since '03?
11            MR. COHEN:  Since '03.
12       A.   I've given some witness statements
13   in some other matters. I don't, I don't
14   recall depositions. I just don't recall.
15       Q.   What matters were they?
16       A.   They were some matters with
17   business out of London.
18       Q.   Who were the parties?
19       A.   Well, it was U.S. Life and
20   Trustmark.
21       Q.   This was a dispute between U.S.
22   Life and Trustmark?
23       A.   No.
24       Q.   There were some disputes
25   involving U.S. Life and some disputes
```

Page 621

```
 1                Ekwall
 2   involving Trustmark?
 3       A.   Yes.
 4       Q.   Okay. Who were the parties that
 5   U.S. Life and Trustmark had their disputes
 6   with?
 7       A.   Well, they would include some
 8   Lloyd's syndicates. I don't remember
 9   specifically which ones. I think CIGNA Re
10   is one. That's about all I can remember.
11       Q.   What were the issues in those
12   cases?
13       A.   The issues involved ceded
14   business to Trustmark and/or U.S. Life.
15       Q.   So it was business that you
16   underwrote on behalf of U.S. Life and/or
17   Trustmark while at WEB
18            (Discussion off the record.)
19       A.   Yeah, that I or Chuck Bastan or
20   Steve Wright underwrote, yes.
21       Q.   And in each of those disputes,
22   either U.S. Life or Trustmark were seeking
23   rescission of the agreement, or otherwise
24   alleging that it had been breached?
25       A.   Correct.
```

Page 622

1 Ekwall
2     MR. CYGAL: Objection, compound.
3   Q.  Were they all rescission claims?
4   A.  I believe so.
5   Q.  So in each of those disputes,
6 U.S. Life and/or Trustmark claimed that
7 either you, Mr. Bastan or Mr. Wright had
8 been defrauded into entering into those
9 contracts, is that correct?
10  A.  Yes.
11  Q.  Were those claims based on
12 misrepresentations and nondisclosures?
13  A.  I believe so.
14  Q.  What information specifically
15 were you, Mr. Bastan or Mr. Wright alleging
16 had been misrepresented or not disclosed to
17 you?
18  A.  I don't recall all the specifics;
19 class of business, types of business that
20 were to be written, things of that nature.
21  Q.  Tell me everything you can
22 recall.
23  A.  That's what I can recall at the
24 moment. That really was the type of
25 business and classes of business.

Page 623

1 Ekwall
2   Q.  And what type of business were
3 you alleging you understood you were
4 receiving and what types of business were
5 actually ceded that you were not expecting?
6   A.  Oh, it included, well, we were
7 looking at underwriting accident and health
8 business, and some of it in -- ended up
9 being liability business and that wasn't
10 something we were anticipating.
11  Q.  Who were the brokers on those
12 contracts?
13  A.  Who were the brokers? I believe
14 it included Rattner-MacKenzie. I can't
15 recall the name of the other one.
16  Q.  To your knowledge, have any of
17 those matters been concluded?
18  A.  Yes.
19  Q.  All of them?
20  A.  No.
21  Q.  Which ones, which one or ones
22 were concluded?
23  A.  Well, several of the Lloyd's
24 syndicates were concluded. And one of the
25 company -- I can't remember which one it was

Page 624

1 Ekwall
2 that was concluded, so probably three or
3 four of them -- three or four of them have
4 been concluded.
5   Q.  Were they concluded by
6 decision -- I'm sorry.
7       Were these all in arbitration?
8   A.  Yes.
9   Q.  Were they concluded by decision
10 of an arbitration panel or by settlement?
11  A.  Settlement.
12  Q.  All of them?
13  A.  Yes.
14  Q.  My next question I'm not limiting
15 it to since May of 2003. Have you ever been
16 involved in -- strike that.
17      Have you ever provided services
18 to Trustmark and/or U.S. Life in connection
19 with a dispute between Trustmark or U.S.
20 Life and its retrocessionaires?
21  A.  I'm sorry, ask the question
22 again?
23      MR. COHEN: Can you read it back,
24 please?
25      (Whereupon, the requested portion

Page 625

1 Ekwall
2 of the record was read back by the
3 reporter.)
4   A.  No.
5   Q.  Are you aware of there ever
6 having been any disputes between Trustmark
7 and/or U.S. Life and the participants in the
8 international treaty or international
9 facility?
10  A.  I'm aware of some issues, but I'm
11 not aware of where they are, what's
12 happened.
13  Q.  Are you aware that one or more of
14 the participants in the international
15 facility rescinded or purported to rescind
16 the contract with Trustmark or U.S. Life?
17  A.  I recall a long time ago that
18 there was some issues raised, but I'm not --
19 I'm not aware of rescission.
20  Q.  And is it correct that you have
21 not been asked to provide services pursuant
22 to your personal services agreement with
23 respect to those issues?
24  A.  No, just to the extent of the
25 issues that may be between U.S. Life and

Page 698

```
 1        Ekwall
 2   strike that.
 3        When you underwrote the renewal,
 4   I think you testified that you received a CD
 5   from AON and it was blank or useless, I
 6   forgot exactly what you said, and you
 7   chucked it in the garbage.
 8        And then Ms. Bohuslav
 9   subsequently sent you an email with data and
10   that was the data you used to price the
11   renewal, correct?
12        MR. CYGAL:  Objections the form.
13   Mischaracterizes the testimony.
14   A.   Yeah, the CD was blank and I got
15   back to her and told her that, and asked her
16   to either send an email with the data or
17   another file.
18   Q.   And she sent by email?
19   A.   I believe that's correct, yes.
20   Q.   And when she sent you that data
21   by email, what format was it in?
22   A.   Excel.
23   Q.   You sure?
24   A.   Yes.
25   Q.   Positive?
```

Page 699

```
 1        Ekwall
 2   A.   Yes.
 3   Q.   One of the accounts that WEB
 4   underwrote on behalf of Trustmark or U.S.
 5   Life was, involved GAN Insurance Company,
 6   correct?
 7   A.   Yes.
 8   Q.   And GAN was the ceding company to
 9   one of the WEB facility members?
10   A.   Yes.
11   Q.   Was there a dispute involving
12   that contract?
13   A.   Yes.
14   Q.   Was that one of the contracts
15   which you or Mr. Bastan or Mr. Wright
16   alleged that they were misled or defrauded
17   into entering into the contract?
18   A.   Yes, it was misrepresented.
19   Q.   And that was a dispute that was
20   subject to an arbitration in London?
21   A.   Yes.
22   Q.   And did you testify in that
23   matter?
24   A.   No.
25   Q.   Did you provide any services
```

Page 700

```
 1        Ekwall
 2   under the personal services agreement
 3   relating to that matter?
 4   A.   Yes.
 5   Q.   And what was the -- what were the
 6   nature of those services?
 7   A.   Conversations with U.S. Life, All
 8   American.
 9   Q.   Can you be more specific?
10   A.   I really don't remember all the,
11   all that was provided.
12   Q.   Well, what can you remember?
13   Tell me everything you can.
14   A.   All I can remember is some
15   conversations.
16   Q.   You can't be any more specific
17   than that?
18   A.   No.
19   Q.   What was the nature of the
20   information that you say was misrepresented
21   by GAN?
22   A.   My recollection is that they were
23   writing retro business and didn't disclose
24   that.
25   Q.   Did your, did the contract with
```

Page 701

```
 1        Ekwall
 2   GAN have an exclusion for assumed
 3   reinsurance?
 4   A.   I don't recall.
 5   Q.   Anything else that you say was
 6   misrepresented by GAN?
 7   A.   Not that I can recall, that was
 8   the main thing, as I remember.
 9   Q.   Are you familiar with the concept
10   of utmost good faith?
11   A.   Yes.
12   Q.   What does that mean to you?
13   A.   It means full disclosure.
14   Q.   So was it your understanding that
15   utmost good faith imposes obligations only
16   on the ceding company?
17        MR. CYGAL:  Objection, asks for a
18   legal conclusion.
19   A.   It provides an obligation on the
20   ceding company and the broker to be
21   providing all the information.
22   Q.   Does it impose any obligations on
23   the reinsurer?
24   A.   I suppose it does, but the burden
25   is on the reinsurer and the broker to
```

24 (Pages 698 to 701)